No. 25-1007

# In the United States Court of Appeals for the First Circuit

FRANK THOMPSON,

*Plaintiff-Appellant*,

v.

CARL WILSON, in his official capacity as Acting Commissioner, Maine Department of Marine Resources,

*Defendant-Appellee*,

**PLAINTIFF-APPELLANT'S INITIAL BRIEF**

On Appeal from the United States District Court for the District of Maine (No. 1:24-cv-00001-JAW)

Edward M. Wenger
Caleb Acker
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Appellant Frank Thompson is a natural person and represents no corporations.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................... I

TABLE OF CONTENTS ........................................................................... II

TABLE OF AUTHORITIES ................................................................... IV

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 5

STATEMENT OF THE ISSUE ................................................................. 6

STATEMENT OF FACTS &  THE COURSE OF PROCEEDINGS ...................... 7

SUMMARY OF THE ARGUMENT ...................................................... 11

STANDARD OF REVIEW ..................................................................... 14

ARGUMENT ............................................................................................ 14

THE MDMR RULE'S BLACK BOX TRACKING VIOLATES THE FOURTH AMENDMENT AS AN ILLEGAL AND UNREASONABLE ADMINISTRATIVE SEARCH. .............................................................................................. 14

    I.    The MDMR Rule's writ-of-assistance search is unreasonable regardless. ................................................................................. 16

    II.    The black box tracking fails under *Patel*'s requirements for searches within a closely regulated industry ............................. 25

        A.    *Patel* refined *Burger* by holding it to its own language: "necessary" means "necessary." .................................... 26

        B.    The black box tracking is not necessary to pursue conservation and sustainability ...................................... 29

        C.    Even under a more relaxed pre-*Patel* standard, the search fails .................................................................................. 33

        D.    The black box tracking requirement is not like a specific warrant. ............................................................................ 33

    III.    The black box tracking is an unlawful search of an industry not closely regulated. ................................................................. 35

        A.    Modern lobstering is not a closely regulated industry under *Patel*'s standards. ................................................. 35

        B.    Under *Patel*'s non-closely regulated standard, the administrative search is unlawful. ................................. 39

C.     The Court should exercise its discretion to hear this dispositive, meritorious argument on a constitutionally important issue almost certain to recur in future litigation. ........................................................................................40

CONCLUSION ....................................................................................43

CERTIFICATE OF COMPLIANCE......................................................45

CERTIFICATE OF SERVICE ..............................................................46

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*Bruce v. Beary,*
  498 F.3d 1232 (11th Cir. 2007) ........................................................................... 16

*New York v. Burger,*
  482 U.S. 691 (1987) .......................................................................25, 27, 28, 36

*Carpenter v. United States,*
  585 U.S. 296 (2018) ...........................................................................1, 20, 21, 42

*Carroll v. United States,*
  267 U.S. 132 (1925) ............................................................................................ 17

*City of L.A. v. Patel,*
  576 U.S. 409 (2015) ...... 3, 4, 10, 11, 14, 15, 24, 25, 27, 30, 33, 34, 35, 36, 37, 40

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................................................ 17

*Donovan v. Dewey,*
  452 U.S. 594 (1980) ............................................................................................ 36

*Emps. Ins. Co. of Wausau v. OneBeacon Am. Ins. Co.,*
  744 F.3d 25 (1st Cir. 2014) ................................................................................. 43

*Fernandez v. California,*
  571 U.S. 292 (2014) ............................................................................................ 16

*Johnson v. Smith,*
  104 F.4th 153 (10th Cir. 2024) ..................................................................... 13, 38

*Kaufman v. Comm'r,*
  784 F.3d 56 (1st Cir. 2015) ................................................................................. 41

*Lang v. Wal-Mart Stores E., L.P.,*
  813 F.3d 447 (1st Cir. 2016) ............................................................................... 43

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
  2 F.4th 330 (4th Cir. 2021) ..................................................................... 21, 22, 23

*Maryland v. King,*
  569 U.S. 435 (2013) ................................................................................. 14, 16, 23

*Mathis v. United States*,
  579 U.S. 500 (2016) ........................................................................29

*Mexican Gulf Fishing Co. v. U.S. DOC*,
  60 F.4th 956 (5th Cir. 2023) .....................................13, 15, 32, 36, 38

*Owner-Operator Indep. Drivers Ass'n v. U.S. DOT*,
  840 F.3d 879 (7th Cir. 2016) ............................................................39

*Reyes-Colón v. United States*,
  974 F.3d 56 (1st Cir. 2020) ..............................................................40

*Riley v. California*,
  573 U.S. 373 (2014) ......................................................................1, 18

*Rivera-Corraliza v. Puig-Morales*,
  794 F.3d 208 (1st Cir. 2015) ...............................4, 13, 26, 28, 37

*SAS Int'l, Ltd. v. Gen. Star Indem. Co.*,
  36 F.4th 23 (1st Cir. 2022) ...............................................................14

*Stanford v. Texas*,
  379 U.S. 476 (1965) ....................................................................17, 18

*Taylor v. City of Saginaw*,
  11 F.4th 483 (6th Cir. 2021) .............................................................33

*United States v. Almonte-Báez*,
  857 F.3d 27 (1st Cir. 2017) ..............................................................14

*United States v. Bulacan*,
  156 F.3d 963 (9th Cir. 1998) ...........................................................14

*United States v. Jones*,
  565 U.S. 400 (2012) ....................................................................21, 22

*United States v. La. Guardia*,
  902 F.2d 1010 (1st Cir. 1990) ..........................................................41

*United States v. Slade*,
  980 F.2d 27 (1st Cir. 1992) ..............................................................43

*Verdun v. City of San Diego*,
  51 F.4th 1033 (9th Cir. 2022) ..........................................................17

*Vernonia Sch. Dist. 47J v. Acton,*
  515 U.S. 646 (1995) ...................................................................................17

*Zadeh v. Robinson,*
  928 F.3d 457 (5th Cir. 2019) ...............................................................36

**Statutes**

28 U.S.C. § 1291 ................................................................................5, 9

28 U.S.C. § 1331 ..................................................................................5

**Other**

U.S. Const. amend. IV ...................................................................14, 15

Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures,*
  25 U. MEM. L. REV. 483 (1995) .........................................................19

NELSON D. LASSON, THE HISTORY AND DEVELOPMENT OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION (Leonard W. Levy, De Capo Press reprt. ed. 1970)...................................................................18

## INTRODUCTION

The proceedings below ended with a rare thing: The district court called for this appeal. While ruling against Mr. Thompson, who challenged the Maine Department of Marine Resources Commissioner's[1] rule requiring all federally permitted lobster boats to have an electronic tracking device on board at all times, the court recognized that "this case raises significant Fourth Amendment issues, and the court encourages the lobstermen to appeal this decision to the Court of Appeals for the First Circuit for an authoritative ruling." ADD-4. So torn was the court that it repeated its admonition: "The Court believes this is an issue that should be presented to the First Circuit on review." ADD-92.

This case began in spirit, though, a quarter millennium ago, when Customs officials serving the Crown in the Colonies would—empowered by "writs of assistance"—board private vessels (and invade private residences) without warrants and without suspicion of any crime. The purpose was to enforce Parliament's trade policies. That "reviled" behavior allowing "British officers to rummage" through homes and vessels "in an unrestrained search" triggered both the Revolution and the Fourth Amendment itself. *See Riley v. California*, 573 U.S. 373, 403 (2014).

---

[1] Carl Wilson has been named Acting Commissioner as of February 26, 2025, replacing Patrick Keliher. Patrick Keliher was the Commissioner during the course of the facts and proceedings described in this brief.

1

That behavior did not end with the Revolution, instead continuing into this era where "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter v. United States*, 585 U.S. 296, 305 (2018). In the words (again) of the district court: the challenged "MDMR Rule contemplates a constant search of each licensed lobster boat in the entire lobstering fleet." ADD-87. The Commissioner's conceded search does the following:

- Installs a tracking device directly into private citizen vessels;

- Records via the device the location (longitude and latitude within one-hundred meters) of private citizen vessels, every *minute* at sea and every six hours on land;

- Tracks citizen location in federal *and* nonfederal waters;

- Tracks all private citizen vessel activity, including unregulated activities, recreation, other fishing, and even search and rescue operations;

- Collects unknown amounts of data with no clear indication of how it will be used;

- Has the capacity to collect other data, like audio information; and

- Cannot be powered down for any period of time.

ADD-19-20. This behavior is—due to its high-tech nature—even worse than the unrestrained searches of Customs officials in the Colonies. The government, without a warrant and without suspicion, is searching the private vessels of citizens,

2

everywhere, all at once, and all the time. The similarities between British Custom official searches and the Commissioner's modern search jump out: (1) A government official (2) concerned with private vessels (3) enters and searches every part of any private vessel (4) without a warrant and (5) without individualized suspicion (6) to pursue the government's policy goals. In other words, the Commissioner is acting less like someone who backs the lobster industry and more like a lobsterback.

This district court's rare endorsement of an appeal likely stems from those problems in the nature of the Commissioner's search technology. Specifically, the district court's expressed concerns focused on the Supreme Court's *Burger* test, which allows for "warrantless inspections in closely regulated industries" when they satisfy three criteria: "(1) 'There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.'" *City of L.A. v. Patel*, 576 U.S. 409, 426 (2015) (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)) (cleaned up). The district court found this Court's application of the *Burger* test to create, in essence, a rational-basis, rubber-stamp review for administrative searches. ADD-80. Attempting to do its job and apply this Court's

3

precedents, the court found no Fourth Amendment violation, though begrudgingly so. *See* ADD-92 (defending its ruling against Mr. Thompson as "[c]onsistent with this Supreme Court and First Circuit jurisprudence" but quickly following that with a precatory "[t]he Court believes this is an issue that should be presented to the First Circuit on review"). There the court erred, because Mr. Thompson's argument "ha[s] more traction given the [Supreme] Court's *Patel* decision." *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 219 n.16 (1st Cir. 2015). This Court has so far kept its powder dry on *Patel*'s effect on *Burger*'s test, though it acknowledged the question. *See id*. at 217 n.12 (reserving for future determination "whether *Patel*—the Supreme Court's most recent decision dealing with *Burger*—changed the *Burger* test in any way."). *Patel* did change that test, making "necessary" mean "necessary." Now, an administrative search is necessary if its absence would "fatally undermine the scheme's efficacy." *Patel*, 576 U.S. at 427. And here, the Commissioner does not *need* the black box tracking system to pursue his legitimate ends of conservation and sustainability; he merely *wants* it because it will make life easier for him. But that is not enough to satisfy the *Patel* requirements for an administrative search.

In any case, it is undisputed that no precompliance review procedure is available under the MDMR Rule. Moreover, since Maine lobstering is not a closely regulated industry under *Patel*, the Rule is facially unconstitutional. *Patel*, 576 U.S. at 420–21.

4

## STATEMENT OF JURISDICTION

The district court had federal question subject-matter jurisdiction under 28 U.S.C. § 1331 for Mr. Thompson's Fourth and Fourteenth Amendment claim. The district court dismissed Mr. Thompson's claims on November 21, 2024. *See* ECF No. 33; ADD-100. On December 19, 2024, Mr. Thompson filed a timely notice of appeal. *See* ECF No. 35; APP-10. Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the Commissioner's black box tracking system violates the Fourth Amendment to the United States Constitution as incorporated by the Fourteenth Amendment.

## STATEMENT OF FACTS &
## THE COURSE OF PROCEEDINGS

The facts here are undisputed and well summarized by the district court. Plaintiffs below, Frank Thompson, Joel Strout, Jason Lord, Chris Smith, and Jack Cunningham, are lobstermen. Defendant Commissioner Keliher shares oversight of Atlantic coast lobster fisheries with the federal government and may regulate waters within three nautical miles of shore. Further waters are "federal waters." Also at play is the Atlantic States Marine Fisheries Commission ("ASMFC"), a multi-state regulatory entity through which Maine coordinates its conservation efforts.

In March 2022, the ASMFC published Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan. The Addendum required Maine to issue rules mandating federally permitted lobstermen to install an electronic tracking device on their vessels that will transmit spatial data via GPS. Addendum XXIX required compliance by December 15, 2023. The device needed to be installed directly on the vessel and never deactivated, with the purpose of continual location-data transmission. The tracker has a once-per-minute ping rate; in other words, it collects the longitude and latitude of the vessel, within one hundred meters, every minute. The Addendum's overall goal was to "improve special information data concerning the location of where the majority of fishing effort occurs by collecting spatial data more frequently and with more accurate precision." ADD-14.

The Commissioner and MDMR are responsible for enforcing ASMFC's guidance, including Addendum XXIX. Accordingly, MDMR published a Final Rule, "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders" (the "MDMR Rule"). While adopting the Addendum, the MDMR Rule also expressly made it illegal for any federally permitted lobsterman to fish without the tracking device, remove it, or otherwise tamper with it. The Rule also specified that the continuous tracking of lobstermen would extend to when they were not in federal waters and engaged in other, dissimilarly and unregulated activity, such as fishing for other fish, recreation, or any other use—even emergency search and rescues operations.

Under the Addendum and Rule, the Commissioner unveiled the Particle TrackerOne Device ("black box" or "device" or "tracker"). The black box is directly installed on vessels and collects the position of each vessel once per minute while moving, and once every six hours when the vessel is moored or docked. It does so in federal and nonfederal waters, and for any activity of the vessel, lobstering-related or not. It may never be turned off (unless repairs are needed). Further, the black box is Bluetooth-compatible and can collect audio information. Fishermen are not told what data will be collected or how it will be used. ADD-19-20.

The Plaintiffs (including Mr. Thompson) sued the Commissioner and asked the district court to declare that the MDMR Rule violated the Fourth Amendment,

was void for vagueness, violated due process, violated the Maine Constitution, and violated the Maine Administrative Procedures Act. They also asked the district court to enjoin the Commissioner from enforcing the Rule. ECF No. 1; APP-12-41. The Commissioner moved to dismiss, on which the court held a hearing. ECF Nos. 23, 32.

On November 21, 2024, the district court entered an order that dismissed the Maine APA claim for lack of subject-matter jurisdiction, dismissed the Equal Protection Clause constitutional claims for failure to state a claim,[2] and dismissed "the Fourth Amendment claim pursuant to Supreme Court and First Circuit caselaw on administrative searches." ADD-4. In so doing, the court opined that "this case raises significant Fourth Amendment issues, and the court encourages the lobstermen to appeal this decision to the Court of Appeals for the First Circuit for an authoritative ruling." *Id*.

Still, the court ruled against Mr. Thompson on the Fourth Amendment: "Consistent with [] Supreme Court and First Circuit jurisprudence, the Court accordingly concludes that Plaintiffs" failed to state a Fourth Amendment claim. ADD-92. It continued: "The Court believes this is an issue that should be presented to the First Circuit on review." *Id*. In so holding, the court first noted that

---

[2] Mr. Thompson presses only the Fourth Amendment claim on appeal and so will not further discuss the district court's handling of the other claims.

Commissioner Keliher conceded that the tracking requirements in the Rule constituted a search. Since no warrants issue, the court analyzed the Commissioner's theory that the black-box requirement constitutes an administrative search in a closely regulated industry. The court recited the three-prong *Burger* test as delivered in *Patel*: "(1) 'There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 702–03) (cleaned up).

Applying those three, the court upheld the search. First, everyone agreed that MDMR has an interest in sustaining and conserving the lobster fishery. Second, the court held that the Rule was "necessary" to further that interest. Last, the court concluded that the Rule was sufficiently limited to function as a warrant.

Having found the Rule facially valid, the district court nonetheless noted the Plaintiffs' "legitimate privacy concerns about the degree of governmental intrusion from the MDMR Rule." ADD-86. This "degree of state intrusion would be inimical to the restraint on government guaranteed by the Fourth Amendment but for the *Burger* exception for administrative searches of a closely regulated industry." ADD-87. The court, however, felt itself bound by that precedent, as explicated by this

Court. Ultimately, for the district court, "[w]hat trips the MDMR Rule from unconstitutional to constitutional is that the MDMR has represented that the collection of data from lobster boats cannot be effective without collecting both personal and lobstering data." ADD-89.

Frank Thompson, alone among the original Plaintiffs, filed a timely notice of appeal to this Court. ECF No. 35; APP-10. He brings solely the Fourth Amendment issue.

## SUMMARY OF THE ARGUMENT

It is undisputed that the black box tracking is a warrantless and suspicion-less search. It is further undisputed that the Rule features no precompliance review procedures. Therefore, the Rule is unconstitutional unless it is *both* reasonable *and* fits entirely within the "narrow exception" for administrative searches within a "closely regulated industry." *Patel*, 576 U.S. at 424.

Regardless of all the Fourth Amendment permutations this case features, the MDMR is unconstitutional because it is unreasonable. Its use of overbroad and intrusive tracking technology is not justified by the alleged policy and law enforcement concerns. The sweeping scope is manifest. The directly installed device:

- Records via the device the location (longitude and latitude within one hundred meters) of private citizen vessels, every *minute* at sea and every six hours on land;

- Tracks citizen location in federal *and* nonfederal waters;

- Tracks all private citizen vessel activity, including unregulated activities, recreation, other fishing, and even search and rescue operations;

- Collects unknown amounts of data with no clear indication of how it will be used;

- Has the capacity to collect other data, like audio information; and

- Cannot be powered down for any period of time.

ADD-19-20. The search of vessels is nothing less than a high-tech version of the very types of searches that birthed the American Revolution along with the Fourth Amendment. Because the search is itself unreasonable, the inquiry need not proceed further.

If, however, the Court does as the court below did and applies the test for administrative inspections within closely regulated industries, Mr. Thompson should still win. First, the MDMR rule is unnecessary for the Commissioner to pursue conservation and sustainability interests. *Patel* made clear that the test is not, as this Court had previously implied, "akin to rational basis review." ADD-80 (citing

*Rivera-Corraliza*, 794 F.3d at 216–17). Rather, the question is whether conservation and sustainability would be fatally undermined but for the search technology.

No one—party or court—thinks that, and indeed, no other state has successfully pushed any search technology like the Commissioner has. The Commissioner wants, but does not need, the black box to do his job and advance his legitimate policy pursuits. Furthermore, the search's sweeping reach, constancy, and near-unlimited scope is nothing like legal, particularized warrants, but rather much more like general ones. Accordingly, the MDMR Rule flunks *Burger*'s test for administrative searches, both under *Patel*'s more rigorous read of *Burger* and under this Court's more relaxed pre-*Patel* one.

Still, Mr. Thompson asserts on appeal that Maine lobstering is not a closely regulated industry. Under *Patel*'s clarified framework, the dispositive question should be "whether the industry would pose a threat to the public welfare if left unregulated." *See Mexican Gulf Fishing Co. v. United States DOC*, 60 F.4th 956, 969 (5th Cir. 2023); *accord Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024). Maine lobstering does not. It is neither intrinsically dangerous nor inherently criminally adjacent. Nor does it sit comfortably alongside the Supreme Court's four industries deemed closely regulated. For those reasons (and because it is undisputed that no precompliance review is available), the Rule is unconstitutional.

13

## STANDARD OF REVIEW

The Court reviews de novo a dismissal for failure to state a claim under Rule 12(b)(6). *SAS Int'l, Ltd. v. Gen. Star Indem. Co*., 36 F.4th 23, 26 (1st Cir. 2022).

## ARGUMENT

### THE MDMR RULE'S BLACK BOX TRACKING VIOLATES THE FOURTH AMENDMENT AS AN ILLEGAL AND UNREASONABLE ADMINISTRATIVE SEARCH.

This Court's "analysis begins with bedrock: the Fourth Amendment protects individuals 'against unreasonable searches and seizures.' U.S. Const. amend. IV. Under this standard, warrantless searches of private premises are presumptively unreasonable." *United States v. Almonte-Báez*, 857 F.3d 27, 31 (1st Cir. 2017). Limited exceptions apply, such as administrative searches, but those must be narrow, lest they swallow the rule. *See Patel*, 576 U.S. at 424–25.

Even when "a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for *it must be reasonable in its scope and manner of execution*." *Maryland v. King*, 569 U.S. 435, 448 (2013) (emphasis added); *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998) ("While administrative searches are an exception to the Fourth Amendment's warrant requirement, they are not an exception to the Fourth Amendment's standard of reasonableness."). And even when an administrative search is reasonable, it must feature a precompliance review procedure. *Patel*, 576 U.S. at 420–21. If not, the search is flatly, facially unconstitutional. *Id*. at 421.

14

Even more exceptional still is the closely regulated industry exception to the precompliance review requirement to the administrative search exception to the Fourth Amendment's warrant requirement. Under this exception, a reasonable administrative search within a "closely regulated industry" is lawful. *Id.* at 424. But this has "always been a narrow exception." *Id*.

This case *is* exceptional, but in the sense that the black box is an exceptionally intrusive and overbroad search, and thereby a violation of the Fourth Amendment. The Commissioner's Rule violates the Fourth Amendment to the U.S. Constitution, incorporated against Maine, if the black box tracking requirement (1) is a search that (2) is unreasonable and unlawful. Commissioner Keliher concedes that the electronic tracking requirement in the MDMR Rule constitutes a Fourth Amendment search. ADD-35 (citing ECF No. 23 at 12 n.16 (Keliher Mot. to Dismiss)). So, this appeal turns solely on whether the conceded search is reasonable and therefore constitutional.

It is not. Mr. Thompson and other lobstermen "have a legitimate expectation of privacy to the whole of their movements while at sea." *See Mexican Gulf Fishing Co.*, 60 F.4th at 970. The black box "regulation violates that expectation." *Id*.

First off, regardless of exceptions, the search is per se unreasonable under Supreme Court precedent and the Amendment's history. And second, reviewing the

black box tracking under the Supreme Court's administrative-search test (as clarified in *Patel*) shows it to be unlawful. Either way, it must be stricken.

## I.    The MDMR Rule's writ-of-assistance search is unreasonable regardless.

Warrant or no warrant, exception or no exception, reasonableness remains the "ultimate touchstone of the Fourth Amendment." *Fernandez v. California*, 571 U.S. 292, 298 (2014). Therefore, even were the administrative-search exception to apply, this Court must still, no matter what, "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *King*, 569 U.S. at 448. "This application of traditional standards of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy." *Id*. (quotation marks and citation omitted and cleaned up).

"[E]ven when permitted, the Constitution requires that administrative inspections be 'appropriately limited.'" *Bruce v. Beary*, 498 F.3d 1232, 1240 (11th Cir. 2007) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). The authorizing regulation—here, the MDMR Rule, must "carefully limit" the "time, place, and scope" of the search. *Id*. (quoting *Burger*, 482 U.S. at 718) (Brennan, J., dissenting on other grounds). On its face, the Rule does no such thing.

Reasonableness, not just whether something constitutes a search, is subject to the meaning of reasonableness at the time of adoption, because the Fourth

16

Amendment "is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted." *Carroll v. United States*, 267 U.S. 132, 149 (1925); *see also District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008) ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). First off, "the individualized-suspicion requirement was a core feature of 'reasonableness' at the time of the Founding[,]" *Verdun v. City of San Diego*, 51 F.4th 1033, 1058 (9th Cir. 2022) (Bumatay, J., dissenting), "has a legal pedigree as old as the Fourth Amendment itself, and . . . may not be easily cast aside in the name of policy concerns[,]" *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 678 (1995) (O'Connor, J., dissenting). In the absence of individual suspicion, as here, the burden should be squarely on the government's shoulders to provide a historical analogue to justify the scope of the administrative search.

History, however, would be no ally to the Commissioner. A cursory look at the most basic, undisputed history of the Fourth Amendment quickly calls up a viable contender for a close analogy: writs of assistance for British Customs officials, much hated by the Founding generation.

History—and searching for historical analogues—can sometimes be a fickle mistress. But not here. "[T]he Fourth Amendment was most immediately the product of contemporary revulsion against a regime of writs of assistance[,]" *Stanford v.*

17

*Texas*, 379 U.S. 476, 482 (1965), and "was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search[,]" *Riley*, 573 U.S. at 403. The "unbridled authority of a general warrant[,]" *Stanford*, 379 U.S. at 481, stands in contravention to the Fourth Amendment's scope requirements for reasonableness.

Writs of assistance accompanied Parliament's attempts to enact certain English-industry-protectionist (i.e., not criminal law) policies against the Colonies. Accordingly, Parliament extended its Customs laws to the Colonies, including giving Customs officers the "same powers and authorities" and "like assistance" that the same officials had in England. NELSON D. LASSON, THE HISTORY AND DEVELOPMENT OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION 53 (Leonard W. Levy, De Capo Press reprt. ed. 1970). The writs functioned in part to enforce England's Navigation Acts against the Colonies (and were later reaffirmed in the Townshend Acts), which are counted among the list of Parliamentary Acts that prompted the Revolution.

One of the primary evils of the writs was the massive general scope of the search authority given them. "The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford*, 379 U.S. at 481. "The writs were issued

18

without any suspicion of illegal activity and permitted those holding a writ to go anywhere they chose. Each writ charged all officers of the crown with assisting those executing it and empowered messengers *to enter into any vessel*, house, warehouse, or cellar, search in any trunk or chest and breach any bulk whatsoever." Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. Mem. L. Rev. 483, 497 (1995) (quotation marks and citation omitted) (emphasis added).

The upshot of the writs is that Customs officials could at any time search any vessel without a warrant and without individualized suspicion. And again, although the Customs officials were in part looking for criminal activity (e.g., smuggling), the true purpose of the writs was to pursue England's overarching administrative goals of limiting the Colonies' commerce.

The black box tracking is no less odious than the writs of assistance issued to Customs officials to have unbridled search authority over ships. Just as those writs granted officials unlimited, warrantless, suspicion-less access to vessels as part of the Customs officer's administrative work, so too here, the tracker gives the Commissioner unlimited access to the location—every minute of every day asea— of Mr. Thompson's vessel. The black box:

- Is placed on every single vessel of a federally permitted lobsterman;

- Records via the device the location (longitude and latitude within one hundred meters) of private citizen vessels, every *minute* at sea and every six hours on land;

- Tracks private citizen location in federal *and* nonfederal waters;

- Tracks all private citizen vessel activity, including unregulated activities, recreation, other fishing, and even search and rescue operations;

- Collects unknown amounts of data with no clear indication of how it will be used (the Commissioner revealed at oral argument that the data would be available for others within federal and state government);

- Has the capacity to collect other data, like audio information; and

- Cannot be powered down for any period of time.

If anything, the high-tech nature of the Commissioner's search renders it even more offensive to the Fourth Amendment. The British Customs officials could conduct warrantless, suspicion-less searches of vessels only once they came into port. But since those days, "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter*, 585 U.S. at 305. Here, the Commissioner's use of technology would make even the most Hobbesian Tory Customs official blush.

The *Carpenter* Court recognized "a person's expectation of privacy in [their] physical location and movements." *Id*. at 306. It similarly recognized that "[t]he

20

'basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Id.* at 303 (quoting *Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967)). *Carpenter* took the Founding principles cited above in *Riley* (odium against British officers' rummaging around in an "unrestrained search") and brought them to bear on "a new phenomenon: the ability to chronicle a person's past movements through the record" of pinging signals. *Id.* at 309.

In that case, the "retrospective quality" of the government's technology allowed it to "travel back in time to retrace a person's whereabouts." *Id.* at 312. The extremely broad tracking logged all locations such that the "newfound tracking capacity runs against everyone." *Id.* "*Carpenter* solidified the line between short-term tracking of public movements—akin to what law enforcement could do '[p]rior to the digital age'—and prolonged tracking that can reveal intimate details through habits and patterns. The latter form of surveillance invades the reasonable expectation of privacy that individuals have in the whole of their movements and therefore *requires a warrant*." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (emphasis added) (quoting *Carpenter*, 585 U.S. at 310).

Similarly, in *United States v. Jones*, 565 U.S. 400 (2012), a majority of the Justices recognized that location-tracking technology (there, a GPS-tracking device

21

remotely monitoring *all* a vehicle's movements over twenty-eight days) crossed the line from merely augmenting to impermissibly enhancing. Five Justices agreed that "longer term GPS monitoring . . . impinges on expectations of privacy." *Id*. at 430 (Alito, J., concurring); *accord id*. at 415 (Sotomayor, J., concurring). The same five further agreed that "society's expectation" was that law enforcement would not "secretly monitor and catalogue every single movement of an individual's [vehicle] for a very long period." *See id*. at 430 (Alito, J., concurring); *accord id*. at 415 (Sotomayor, J., concurring) (agreeing).

The Commissioner was right to concede that the MDMR Rule creates a search via the black box—its constant invasion of individual movement flatly sits within *Carpenter* and *Jones*. But the application of those cases does not stop there. First, as the Fourth Circuit suggests, such a search "requires a warrant." *Leaders of a Beautiful Struggle*, 2 F.4th at 341. Second, the fact that, as the Supreme Court made clear, constant searches like the black box go to the core of the Fourth Amendment, and that history should put a judicial finger on the scale in favor of the constitutional right in Mr. Thompson's case.

Mr. Thompson has not disputed and does not dispute the legitimate government interests, claimed by the Commissioner, of *conservation* and *sustainability* of the lobster industry, an interest shared by the industry itself. *See* ECF No. 23 at 15 ("DMR undoubtedly has a substantial interest in . . . ensuring [the

lobster industry's] long-term viability as an economic and cultural pillar of Maine society."). He *does* dispute that the claimed interest of "*regulating* the lobster fishery" is legitimate, *see id.* (emphasis added), considering it is tautological. In other words, he does not believe regulation for its own sake is a legitimate government interest.

Where the regulation fails is at the balancing. *See King*, 569 U.S. at 448. The tracking is simply not a reasonable counterpart to the conservation/sustainability interests. That alone ends this case.

The district court understood this to a large—but incomplete—extent, noting that "the MDMR Rule contemplates a constant search of each licensed lobster boat in the entire lobstering fleet." ADD-87. To wit: "The lobstermen have legitimate privacy concerns about the degree of governmental intrusion from the MDMR Rule." ADD-86. The court recognized that lobstermen "have their own lives" outside of federal lobster fishing, include using their "vessels to perform personal errands, to visit family and friends, and even in some cases to live on." ADD-86-87.

In the ordinary case, the government, whether state or federal, would not have the right to track a citizen's location and to force a citizen to wear an electronic monitoring device or to attach one to a company car. The degree of state intrusion would be inimical to the restraint on government guaranteed by the Fourth

Amendment but for the *Burger* exception for administrative searches of a closely regulated industry.

ADD-86-87. The district court's description of the privacy concerns is self-evidently correct. The tracking is overbroad and sweeping, tracking not just boats but the individuals who use them—and their lives.

But the district court failed to follow its own logic to the natural conclusion. The fact that the search is so bad as to be "inimical to the restraint on government guaranteed by the Fourth Amendment" means that the search is unconstitutional *regardless* of the *Burger* exception. Unreasonable searches are unreasonable searches. The *Burger* exception is *not* an exception to the Fourth Amendment's reasonableness requirement. Indeed, the Rule's search is so broad that it violates expectations of privacy even outside the lobster industry, since it tracks personal data and collects information of unregulated areas. Although the Commissioner has waved this away as (in essence) collateral damage, it is instead dispositive.

If the Commissioner, with no warrant, no suspicion, and no precompliance review, may constantly search the property of Mr. Thompson *every single minute* of *every single day* in *every part of the Atlantic Ocean*, then it's fair to say that the administrative search exception has "swallow[ed] the rule." *Patel*, 576 U.S. at 425. The Commissioner is acting less like a lobster-sustainer, his claimed interest, and

more like a lobsterback. The unlimited, constant search of Mr. Thompson's vessel is unreasonable and unlawful, which means it is unconstitutional.

## II. The black box tracking fails under *Patel*'s requirements for searches within a closely regulated industry.

Assuming for the sake of this Section that lobstering is closely regulated (*but see infra* Section C), the black-box requirement flunks the *Burger* test. This remains true whether or not the *Burger* test has been narrowed by *Patel*.

Without precompliance review, the administrative-search doctrine is ruled by the *Burger* test, and "warrantless inspections in closely regulated industries must still satisfy three criteria: (1) 'There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 702–03) (cleaned up).

For many years, that second criterion was saddled with an inherent contradiction: the Supreme Court had said such a search must be "necessary" but treated the test as a rational-basis one. *See Burger*, 482 U.S. at 709 (The "regulation of the vehicle-dismantling industry *reasonably serves* the State's substantial interest in eradicating automobile theft.") (emphasis added). For example, in applying the *Burger* test, this Court in the past has treated it as more-or-less toothless, holding

that the test for the second criterion is simply whether the administrative searches "advance" the substantial government interest. *Rivera-Corraliza*, 794 F.3d at 216–17. The district court thus concluded that this Court and the *Burger* Court "applied a standard akin to rational basis review to analyze this second prong." ADD-80.

This extremely relaxed standard clearly gave the district court significant heartburn. It described its holding against Mr. Thompson as "[c]onsistent with this Supreme Court and First Circuit jurisprudence." ADD-92. But the district court quickly followed that with a precatory request: "The Court believes this is an issue that should be presented to the First Circuit on review." *Id.*

The decision below did not go so far as to second guess its own reasoning or the holding of this or the Supreme Court. Still, it found this issue substantial and unclear enough to merit not one but *two published* suggestions to the Plaintiffs to bring this appeal to this Court. Even so, *Patel* has already clarified the issue.

### A. *Patel* refined *Burger* by holding it to its own language: "necessary" means "necessary."

Where the district court went awry was by not fully recognizing the impact of *Patel*. The decision below rightly recognized that this Court, following the waffling language in *Burger*, has basically applied a rational-basis test, whereby an administrative search satisfies the second *Burger* criterion if it reasonably advances a sufficiently important government interest.

*Patel*, however, clarified that the second criterion turns on *necessity*. It did so in three ways. *First*, it gives the *Burger* test with the necessity language: "'the warrantless inspections must be *necessary* to further the regulatory scheme.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 702–03) (emphasis added). *Second*, *Patel* does *not* quote the conflicting *Burger* language of "reasonably serves the State's substantial interest." 482 U.S. at 709. *Third*, and most dispositively, *Patel*'s actual application of the second prong confirms the implication of the Court's use of "necessity" by acting much more like strict scrutiny or least-restrictive-means test than a rational-basis one.

Specifically, in *Patel*, the Court dealt with whether, assuming *Burger* applied, Los Angeles's law—which required hotel operators to record extensive personal information about their guests and provide that information to any LAPD officer— was "necessary" to pursue the city's interest in ensuring hotels maintained accurate and complete registries. *Id*. at 412–13, 426. "No" was the clear answer; precompliance review would not "*fatally* undermine the scheme's efficacy by giving operators a chance to falsify their records." *Id*. at 427 (emphasis added). That argument was fatuous in part because it "could be made regarding any recordkeeping requirement." *Id*. In other words, the Court made clear: for a requirement to be *necessary*, its absence must be *fatal* to the government's interest.

Justice Scalia, in dissent, noted this change, complaining that an administrative search's tailoring to a government interest should "need only be reasonable." *Id.* at 438 (Scalia, J., dissenting). The *Patel* majority's approach, in his view, "import[ed] a least-restrictive-means test into *Burger*'s Fourth Amendment framework." *Id.* Justice Scalia expressed his frustration that the majority had put the "burden" on the government to show "that there are no less restrictive means of achieving the [the government's] purpose." *Id.*

This Court has not yet fully analyzed *Patel*'s effect on the *Burger* test. Indeed, in the only case by this Court to cite *Patel*, it arose narrowly in the qualified-immunity context such that *Patel* did "not apply in [that] case (because of the qualified-immunity overlay)." *Rivera-Corraliza*, 794 F.3d at 223. There, the Court noted that "the law governing administrative searches continues to develop and that the bench and bar must be on the lookout for situations where *Patel* does hold sway." *Id.* Accordingly, that panel explicitly reserved for future determination "whether *Patel*—the Supreme Court's most recent decision dealing with *Burger*—changed the *Burger* test in any way." *Id.* at 217 n.12; *accord id.* at 219 n.16 ("Plaintiffs' argument may have more traction given the Court's *Patel* decision"). In other words, the *River-Corraliza* Court seemed interested in—but left open—whether Justice Scalia was correct that the *Patel* Court had changed the *Burger* test.

28

This appeal squarely asks this Court that question. Mr. Thompson's position is that *Patel did* change the *Burger* test. Perhaps not so far as Justice Scalia suggests, but far enough that the Supreme Court has now made clear that rational basis is not the correct standard for the second criterion, as the district court thought. Rather, "necessary" means "necessary." *See Mathis v. United States*, 579 U.S. 500, 514 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same"). As *Patel* laid out, the question is whether the government's interest would be *completely defeated* by the lack of the challenged regulation.

## B. The black box tracking is not necessary to pursue conservation and sustainability.

The decision below applied the quasi-rational-basis test implied by *Burger*. It concluded that "the electronic tracker requirement articulated in the MDMR Rule and the Addendum on which it is based are 'necessary' to advance the long-term health and stability of the Maine lobster fishery." ADD-80. But this in turn broke down into two sub-premises: (1) that electronic tracker data collection is necessary to conserve the lobster fishery; and (2) "the MDMR's data collection system cannot be designed without the overaccumulation of both relevant and irrelevant data." ADD-89; ADD-90.

In other words, the district court incorrectly attenuated the search from the government interest. The question is *not*, as the district court here framed, whether

the absence of the black box search would be fatal to the data collection goals of the Commissioner. The question is whether the absence of the black box tracking would "fatally undermine" the Commissioner's conservation and sustainability efforts. *See Patel*, 576 U.S. at 427. Correctly framed as such, the answer is no, the absence of the overbroad and intrusive search would not entirely defeat the Commissioner's conservation goals.

Striking down the black-box tracking requirement would not fatally undermine conservation and sustainability interests. The electronic vessel tracking is not necessary to conservation. In fact, in the Commissioner's *own words*: "The application of electronic vessel tracking to this fishery *could significantly improve the information available* to fishery managers and stock assessment scientists." ADD-74; ADD-119 (emphasis added). This is a classic "want vs. need" scenario. Of course, the tracking could *improve* conservation efforts. Maintaining the fishery will always be easier with more information. And of course, the Commissioner *wants* to have constant tracking of all lobster boat locations in order to "improve" his fishery data. But he doesn't *need* it to do his job of conservation and sustainability.

This is why the district court erred by concluding that "[w]hat trips the MDMR Rule from unconstitutional to constitutional is that the MDMR has represented that the collection of data from lobster boats cannot be effective without collecting both personal and lobstering data." ADD-89. The court was wrong that

black-box tracking is the only way to collect data from lobster boats. Instead, the district court's flawed premise was that the MDMR black box tracking was the *only* effective way to gather data, and that black box's overbroad data collection was the only effective way to collect the lobstering data. Its syllogism looks like this:

    i.    **Premise I**: Improved data collection "could improve" the Commissioner's sustainability and conservation efforts;

    ii.    **Premise II**: The black box search is effective at improving the collection lobstering data;

    iii.    **Premise III**: The black box search only works by overbroad data collecting methods;

    iv.    **Conclusion**: Therefore, the black box search is necessary for conservation efforts.

That Conclusion does not follow from those three premises. The logical fallacy is rooted in Premise I: The question is not whether the black box *can improve* the sustainability efforts; of course it can. The question is also not the factual one of whether the black box only functions by overbroad data collection (Premise III); Mr. Thompson does not dispute the Commissioner's submission that the black box can only function by collecting personal data.

The correct question is whether the Commissioner's sustainability and conservation efforts would be fatally undermined by the absence of the black box.

The district court's syllogism works only if Premise I were as follows: "Improved data collection through the black box is *necessary* to further the Commissioner's efforts." Then the Conclusion would follow. But the Commissioner—and the district court—never found that the black box's improved data collection was *necessary* for conservation and sustainability efforts. Nor could they have.

The biggest giveaway is that *no one else* seems to be doing this in such an invasive way. The only other litigated attempt got smacked down in *Mexican Gulf Fishing Co.*, 60 F.4th 956. The reason is obvious: there are *far* less intrusive ways to improve the fishery data. For example, as Plaintiffs noted below, the Commissioner could have limited tracking to vessels fishing for lobsters in federal waters (ostensibly the whole point of the Rule in the first place) or employing lesser "ping rates," as is done in other contexts (like the scallop fishery). ECF No. 24 at 8. Similarly, the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") "does not require lobster boats to have a vessel tracker[,] nor does it mention or contemplate 24-hour location and movement surveillance of any vessel, whether by GPS or otherwise," no matter whether the vessel is fishing in federal waters under a federal permit or being used for any other, unregulated purpose. ADD-9.

If governments can find—and have—alternate avenues to pursue conservation and sustainability apart from the black box, then the black box is

unnecessary for the Commissioner. *Cf. Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021) ("[M]unicipalities have found ways to enforce parking regulations without implicating the Fourth Amendment. Thus, tire chalking is not necessary to meet the ordinary needs of law enforcement, let alone the extraordinary.") (internal citations omitted). For that reason, it flunks the *Burger* test (as clarified by *Patel*). The Court should thus reverse.

### C. Even under a more relaxed pre-*Patel* standard, the search fails.

If the question were whether the administrative search is a *reasonable* method of pursuing the government's interest, the tracking fails the *Burger* test anyway, for all the reasons stated in Part I.A. of this brief.

### D. The black box tracking requirement is not like a *specific* warrant.

The third criterion is whether the regulation is like a *legal*, *particularized* warrant—i.e., whether it is sufficiently tailored in scope and time to function akin to an actual specific warrant as contemplated in the Fourth Amendment. *Patel*, 576 U.S. at 426. As noted above, the black box tracking is much more like a *general* warrant, in the sense that it gives the Commissioner unlimited, plenary authority to constantly search the private property of Mr. Thompson. It is too unbridled.

This is not like an administrative search of commercial premises, where scheduled, limited inspections are imposed on commercial entities. Such searches are akin to specific warrants by having a limited scope. To the contrary, this is a

*constant*, *unlimited* search. This is no routine, or even surprise, inspection of a restaurant by a governmental health inspector. This is more as if the government placed an elf-on-the-shelf in the kitchen of a restaurant that recorded—and reported—everything done on the commercial premises. That is not like a specific warrant. That is a general warrant.

Similarly, in *Patel*, the LAPD officers had unlimited access to, at any time, all of the hotel's intrusively personal information about its guests. *Id*. at 426. That rendered the requirement "constitutionally deficient under the 'certainty and regularity' prong of the closely regulated industries test because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances." *Id*. The Court noted that, though it had previously "upheld inspection schemes of closely regulated industries that called for searches at least four times a year" or "on a regular basis," the constant and unspecified nature of the hotel search requirement did not cut it. *Id*.

Here, in some sense, the black box reports location on a regular basis by logging the location of the boat every minute. That, it cannot do. For this reason, it is unconstitutional.

III.  **The black box tracking is an unlawful search of an industry not closely regulated.**

A. **Modern lobstering is not a closely regulated industry under *Patel*'s standards.**

"The closely regulated industry is the exception." *Patel*, 576 U.S. at 424 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)) (cleaned up). *Patel*, before clarifying *Burger*'s necessity test, also clarified the scope of the "closely regulated business" test, which applies a "more relaxed" standard to industries that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Patel*, 576 U.S. at 424 (quoting *Barlow's, Inc.*, 436 U.S. at 313). Hotels, per *Patel*, are not such an industry. In the Court's view, "[s]imply listing" the "only four industries" the Court had ever found to be closely regulated—liquor sales, firearm sales, mining, and running automobile junkyard—showed hotels did not fit the bill. A clear similarity arose from the four industries: that something "inherent in the operation" posed "a clear and significant risk to the public welfare." *Id.*

In other words, for an industry—even one with pervasive regulation—to be closely regulated, it must be inherently detrimental to the common weal, either by being criminally adjacent *by nature* or by being very hazardous *by nature*. Or, as the Fifth Circuit helpfully phrased it when explicating *Patel*, the question is "whether

the industry would pose a threat to the public welfare if left unregulated." *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019).

Commercial lobster fishing poses no such thing. And commercial lobster fishing is the industry in question. *See Mexican Gulf Fishing Co.*, 60 F.4th at 968 ("Because this exception is narrow, federal courts must not define the industry at issue at too high a level of generality."); *id.* (looking at the charter boat industry, not general commercial boating). Indeed, hotels are quite analogous to commercial lobster fishing boats. Justice Scalia, dissenting in *Patel*, pointed to the hotel risk of "criminal activity ranging from drug dealing and prostitution to human trafficking." 576 U.S. at 429 (Scalia, J., dissenting). True, "[h]otels—*like practically all commercial premises or services*—can be put to use for nefarious ends. But unlike the industries that the Court has found to be closely regulated, hotels are not intrinsically dangerous." *Id.* at 424 n.5 (majority op.) (emphasis added).

Same for commercial lobster fishing—drug and human trafficking are sensible concerns for commercial services on boats, but lobster fishing is not "intrinsically dangerous." *See Donovan v. Dewey*, 452 U.S. 594, 602 (1980) (describing the mining industry as "among the most hazardous in the country"). Maine lobstering is not the easiest job in the world, but it's no "Deadliest Catch." Nor is it inherently criminal-adjacent. *See Burger*, 482 U.S. at 709 ("Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and

36

vehicle parts"). The entire reason automobile junkyards are closely regulated in the first place is that the industry is historically a conduit for laundering the parts of stolen cars, similar to pawn shops. They are inherently risks for fencing stolen property.

Lobstering, not so much. Fishing is not theft. Notably, the government's concerns in regulating lobster fishing are not with criminality anyway, but with conservation, regulating the lobster fishery, and attempting to ensure "long-term viability" of the industry. *See* ECF No. 23 at 15–16 (Mot. to Dismiss). But even if they were, the types of criminality associated with boats—smuggling, trafficking, etc.—is not historically connected to lobster fishing. And "[h]istory is relevant when determining whether an industry is closely regulated." *Patel*, 576 U.S. at 425.

The question is whether lobster fishing is *by its nature* adjacent to criminal conduct (like chop shops) or *by its nature* extremely hazardous (like mining). It is not.

This Court has not yet expounded on the closely regulated industry test post-*Patel*. In *Rivera-Corraliza*, this Court found in the qualified-immunity context that it was not clearly established law that adult entertainment machines for gambling were not closely regulated. 794 F.3d at 219. It did, however, explicitly note that the argument that the gambling machine industry was *not* closely regulated "may have more traction given the Court's *Patel* decision." *Id*. at 213 n.5 (citing *Patel*'s

37

"intrinsically dangerous" language and implying that this language may have changed the Court's direction on the closely regulated industry question). This was followed by a caution: "recall that *Patel* had not yet been decided." *Id*. at 219 n.16. In other words, this Court made a narrow qualified-immunity decision, punting full analysis of *Patel*'s effect on the closely regulated test to a future panel—this one.

The Fifth Circuit has the best method, establishing a multi-factor inquiry post-*Patel*: "The history of warrantless searches in the industry, how extensive the regulatory scheme is, whether other states have similar schemes, and whether the industry would pose a threat to the public welfare if left unregulated." *Mexican Gulf Fishing Co*., 60 F.4th at 969 (quoting *Zadeh*, 928 F.3d at 465). The Tenth Circuit has explicitly adopted the Fifth Circuit's factors. *Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024). Rightfully so: That last factor gets at the very heart of the Supreme Court's framing in *Patel*.

In *Mexican Gulf Fishing Co*., another GPS boat tracking case, the Fifth Circuit found that charter boat fishing industry was not closely regulated, because there was (1) no "evidence of history of warrant-less searches within the charter boat fishing industry"; (2) "no evidence that States employ regulatory schemes respecting the charter boat fishing industry"; or (3) no evidence in the record that the charter boat industry would pose a threat to the public welfare if left unregulated. 60 F.4th at 969–70. So too here.

38

To Mr. Thompson's knowledge, no other State has such a pervasive, overbroad, and intrusive warrantless inspection scheme as the MDMR's tracking. Maine stands alone, and the only other analogous attempt at GPS tracking of boats was struck down by the Fifth Circuit in *Mexican Gulf Fishing Co*. The same result should follow.

Lobster fishing would not "pose a threat to the public welfare if left unregulated." This factor is the most important, because it strikes at the central point of the *Patel* Court—whether an industry is by its nature a threat to the public welfare, either by being criminally adjacent or extremely hazardous. By the Commissioner's own telling, leaving lobster fishing unregulated could result in overfishing and tautological lack of regulation. ECF No. 23 at 15–16 (Mot. to Dismiss). But those fears do not go to public safety. This is not like, for example, commercial trucking, where lack of regulation could endanger drivers on public highways. *See Owner-Operator Indep. Drivers Ass'n v. United States DOT*, 840 F.3d 879, 894–95 (7th Cir. 2016). Accordingly, this Court should find this industry not closely regulated for Fourth Amendment purposes.

**B. Under *Patel*'s non-closely regulated standard, the administrative search is unlawful.**

It is undisputed that the MDMR Rule does not feature precompliance review procedures. *See generally* ADD-101-115. Accordingly, because (1) the tracking is concededly a search, (2) lobster fishing is not closely regulated, and (3) the Rule

lacks precompliance review, the Rule is "facially unconstitutional." *See Patel*, 576

U.S. at 419; *id*. at 420 ("[A]bsent consent, exigent circumstances, or the like, in order

for an administrative search to be constitutional, the subject of the search must be

afforded an opportunity to obtain precompliance review before a neutral

decisionmaker.").

### C. The Court should exercise its discretion to hear this dispositive, meritorious argument on a constitutionally important issue almost certain to recur in future litigation.

Although, below, "the Plaintiffs concede[d] that commercial fishing is a

closely-regulated industry," ECF No. 7 at 21; ADD-72 n.19, exceptions to the

normal waiver rule apply, so Mr. Thompson now presses the argument that lobster

fishing is not a closely regulated industry. This Court "has the authority, in its

discretion, to consider theories not articulated below." *Reyes-Colón v. United States*,

974 F.3d 56, 62 (1st Cir. 2020) (quoting *B & T Masonry Constr. Co. v. Pub. Serv.*

*Mut. Ins. Co*., 382 F.3d 36, 41 (1st Cir. 2004)). Indeed, it "should address …

arguments despite the fact that they were not made below" when (1) "the new issue

is strictly a question of law;" (2) "it is almost certain to be presented in identical

terms in other cases"; (3) "the point can be resolved with certitude on the existing

record, a factor that often inclines a court to entertain a pivotal argument for the first

time on appeal"; and (4) the argument "raises an issue of constitutional magnitude

which, if meritorious, could substantially affect these, and future" litigants. *United States v. La Guardia*, 902 F.2d 1010, 1013 (1st Cir. 1990).

Hearing the argument on whether lobstering is closely regulated accords with this Court's precedents and judicial efficiency.

*First*, the closely regulated industry question is a pure question of law that can be resolved with certitude on the existing record. This Court has recognized that the purposes of a waiver rule are "that parties may have the opportunity to offer all the evidence they believe relevant to the issues" and "that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Kaufman v. Commissioner*, 784 F.3d 56, 71 (1st Cir. 2015) (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)). Because the closely regulated industry question is a purely legal one, these purposes are not implicated. The Commissioner will not be prejudiced in any way by briefing the issue on appeal, nor would a final decision based on this issue and *Patel* come as a surprise. Mr. Thompson will press his argument on this issue based on the record below, with no factual development needed.

*Second*, this issue is of constitutional magnitude, novel, and is certain to recur in future litigation should this Court not consider the argument. The question of tracking personal movements cuts to the very heart of the Fourth Amendment, the "basic purpose" of which "is to safeguard the privacy and security of individuals

41

against arbitrary invasions by governmental officials." *Carpenter*, 585 U.S. at 303. And the Commissioner's "unrestrained search for evidence of criminal activity" is the very type of "reviled" government action with which the Fourth Amendment is chiefly concerned. *See id*.

As a result, this issue is twice-over novel to this Court. This Court has never had the opportunity to examine the precise effects of *Patel* on its closely regulated industry jurisprudence, and this Court has not yet faced a *Carpenter*-esque modern tracking technology in the administrative search context. The question, therefore, is a new one of constitutional importance.

And if this Court were to rule against Mr. Thompson without deciding the closely regulated industry question, it will be raised identically by future litigants. For example, although this claim sought a pre-enforcement injunction, if it fails, then the Commissioner may bring enforcement proceedings against lobstermen who do not comply with the Rule. Such defendants could then raise the *exact same issue* of closely regulated industry in those future cases over and over, until it is decided. This is the precise type of near-certain situation with "identical terms" this Court has been concerned with when considering exceptions to the waiver rule.

Plaintiffs, including Mr. Thompson, have through all stages of this litigation maintained that the black box is an illegal administrative search, which is an exception to the warrant requirement, which is an element of the Fourth Amendment.

In other words, we are *already* two levels down of specificity within the Fourth Amendment's depths. Administrative search jurisprudence is no "general issue." *See United States v. Slade*, 980 F.2d 27, 31 (1st Cir. 1992); *cf. Emps. Ins. Co. of Wausau v. OneBeacon Am. Ins. Co.*, 744 F.3d 25, 29 (1st Cir. 2014) ("When a party places an issue as broad as 'contract interpretation' before the [district] court, it does not thereby preserve every argument that might fall under that rubric"). To the contrary, sticking with the administrative search theory—but modulating a sub-argument within it, is not "switching 'horses midstream' to offer an entirely new take on the [administrative search] issue." *See Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 455 (1st Cir. 2016).

Accordingly, Mr. Thompson presses the argument on appeal.

## CONCLUSION

For these reasons, the Court should reverse.

43

Dated: March 24, 2025

Respectfully submitted,

*/s/ Edward M. Wenger*
Edward M. Wenger
Caleb Acker
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
*emwenger@holtzmanvogel.com*
*cacker@holtzmanvogel.com*

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume and word-count limits of FRAP 37(a)(7), because, excluding the parts of the document exempted by FRAP 32(f), this document contains 9,367 words.

2.    This document complies with the typeface and type-style requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

45

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 24th day of March 2025, a true copy of the Initial Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER