# In the United States Court of Appeals
# for the First Circuit

FRANK THOMPSON,

*Plaintiff-Appellant,*

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH; JACK CUNNINGHAM,

*Plaintiffs,*

v.

CARL WILSON, in their official capacity as Acting
Commissioner, Maine Department of Marine Resources,

*Defendant-Appellee.*

**PLAINTIFF-APPELLANT'S INTIAL BRIEF**

On Appeal from the United States District Court
for the District of Maine (No. 1:24-cv-00001-JAW)

Edward M. Wenger
Caleb Acker
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiff-Appellant*

# DISCLOSURE STATEMENT

Appellant Frank Thompson is a natural person and represents no corporations.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................. I

TABLE OF CONTENTS ....................................................................... II

TABLE OF AUTHORITIES ............................................................... IV

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 5

STATEMENT OF THE ISSUE ............................................................ 6

STATEMENT OF FACTS &  THE COURSE OF PROCEEDINGS ...................... 7

SUMMARY OF THE ARGUMENT .................................................. 11

STANDARD OF REVIEW ................................................................ 14

ARGUMENT ...................................................................................... 14

    THE MDMR RULE'S BLACK BOX TRACKING VIOLATES THE FOURTH AMENDMENT AS AN ILLEGAL AND UNREASONABLE ADMINISTRATIVE SEARCH. ....................................................................... 14

    I.    The MDMR Rule's writ-of-assistance search is unreasonable regardless. .......................................................................... 16

    II.    The black box tracking fails under *Patel*'s requirements for searches within a closely regulated industry ............................ 25

        A.    *Patel* refined *Burger* by holding it to its own language: "necessary" means "necessary." ..................................... 26

        B.    The black box tracking is not necessary to pursue conservation and sustainability ...................................... 29

        C.    Even under a more relaxed pre-*Patel* standard, the search fails ................................................................................. 33

        D.    The black box tracking requirement is not like a specific warrant. ......................................................................... 33

    III.    The black box tracking is an unlawful search of an industry not closely regulated. ................................................................... 35

        A.    Modern lobstering is not a closely regulated industry under *Patel*'s standards. ................................................ 35

        B.    Under *Patel*'s non-closely regulated standard, the administrative search is unlawful. ................................... 39

C. The Court should exercise its discretion to hear this dispositive, meritorious argument on a constitutionally important issue almost certain to recur in future litigation. ........................................................................................40

CONCLUSION ...................................................................................43

CERTIFICATE OF COMPLIANCE ....................................................45

CERTIFICATE OF SERVICE ............................................................46

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Bruce v. Beary*,
498 F.3d 1232 (11th Cir. 2007) ..........................................................16

*New York v. Burger*,
482 U.S. 691 (1987) ........................................................25, 27, 28, 36

*Carpenter v. United States*,
585 U.S. 296 (2018) ...........................................................1, 20, 21, 42

*Carroll v. United States*,
267 U.S. 132 (1925) ...........................................................................17

*City of L.A. v. Patel*,
576 U.S. 409 (2015) ...... 3, 4, 10, 11, 14, 15, 24, 25, 27, 30, 33, 34, 35, 36, 37, 40

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...........................................................................17

*Donovan v. Dewey*,
452 U.S. 594 (1980) ...........................................................................36

*Emps. Ins. Co. of Wausau v. OneBeacon Am. Ins. Co.*,
744 F.3d 25 (1st Cir. 2014) ...............................................................43

*Fernandez v. California*,
571 U.S. 292 (2014) ...........................................................................16

*Johnson v. Smith*,
104 F.4th 153 (10th Cir. 2024) ....................................................13, 38

*Kaufman v. Comm'r*,
784 F.3d 56 (1st Cir. 2015) ...............................................................41

*Lang v. Wal-Mart Stores E., L.P.*,
813 F.3d 447 (1st Cir. 2016) .............................................................43

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ....................................................21, 22, 23

*Maryland v. King*,
569 U.S. 435 (2013) ..................................................................14, 16, 23

iv

*Mathis v. United States,*
579 U.S. 500 (2016) ......................................................................29

*Mexican Gulf Fishing Co. v. U.S. DOC,*
60 F.4th 956 (5th Cir. 2023) ..................................13, 15, 32, 36, 38

*Owner-Operator Indep. Drivers Ass'n v. U.S. DOT,*
840 F.3d 879 (7th Cir. 2016) ........................................................39

*Reyes-Colón v. United States,*
974 F.3d 56 (1st Cir. 2020) ...........................................................40

*Riley v. California,*
573 U.S. 373 (2014) ..................................................................1, 18

*Rivera-Corraliza v. Puig-Morales,*
794 F.3d 208 (1st Cir. 2015) ........................4, 13, 26, 28, 37

*SAS Int'l, Ltd. v. Gen. Star Indem. Co.,*
36 F.4th 23 (1st Cir. 2022) ............................................................14

*Stanford v. Texas,*
379 U.S. 476 (1965) ..................................................................17, 18

*Taylor v. City of Saginaw,*
11 F.4th 483 (6th Cir. 2021) ..........................................................33

*United States v. Almonte-Báez,*
857 F.3d 27 (1st Cir. 2017) ...........................................................14

*United States v. Bulacan,*
156 F.3d 963 (9th Cir. 1998) .........................................................14

*United States v. Jones,*
565 U.S. 400 (2012) ..................................................................21, 22

*United States v. La. Guardia,*
902 F.2d 1010 (1st Cir. 1990) .......................................................41

*United States v. Slade,*
980 F.2d 27 (1st Cir. 1992) ...........................................................43

*Verdun v. City of San Diego,*
51 F.4th 1033 (9th Cir. 2022) ........................................................17

*Vernonia Sch. Dist. 47J v. Acton,*
  515 U.S. 646 (1995) ........................................................................17

*Zadeh v. Robinson,*
  928 F.3d 457 (5th Cir. 2019) ............................................................36

**Statutes**

28 U.S.C. § 1291 ...........................................................................5, 9

28 U.S.C. § 1331 ..............................................................................5

**Other**

U.S. Const. amend. IV ...............................................................14, 15

Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures,*
  25 U. Mem. L. Rev. 483 (1995) .......................................................19

Nelson D. Lasson, The History And Development Of The Fourth Amendment To The United States Constitution (Leonard W. Levy, De Capo Press reprt. ed. 1970)..............................................................18

# INTRODUCTION

The proceedings below ended with a rare thing: The district court called for this appeal. While ruling against Mr. Thompson, who challenged the Maine Department of Marine Resources Commissioner's[1] rule requiring all federally permitted lobster boats to have an electronic tracking device on board at all times, the court recognized that "this case raises significant Fourth Amendment issues, and the court encourages the lobstermen to appeal this decision to the Court of Appeals for the First Circuit for an authoritative ruling." ADD-4. So torn was the court that it repeated its admonition: "The Court believes this is an issue that should be presented to the First Circuit on review." ADD-92.

This case began in spirit, though, a quarter millennium ago, when Customs officials serving the Crown in the Colonies would—empowered by "writs of assistance"—board private vessels (and invade private residences) without warrants and without suspicion of any crime. The purpose was to enforce Parliament's trade policies. That "reviled" behavior allowing "British officers to rummage" through homes and vessels "in an unrestrained search" triggered both the Revolution and the Fourth Amendment itself. *See Riley v. California*, 573 U.S. 373, 403 (2014).

---

[1] Carl Wilson has been named Acting Commissioner as of February 26, 2025, replacing Patrick Keliher. Patrick Keliher was the Commissioner during the course of the facts and proceedings described in this brief.

1

That behavior did not end with the Revolution, instead continuing into this era where "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter v. United States*, 585 U.S. 296, 305 (2018). In the words (again) of the district court: the challenged "MDMR Rule contemplates a constant search of each licensed lobster boat in the entire lobstering fleet." ADD-87. The Commissioner's conceded search does the following:

- Installs a tracking device directly into private citizen vessels;

- Records via the device the location (longitude and latitude within one-hundred meters) of private citizen vessels, every *minute* at sea and every six hours on land;

- Tracks citizen location in federal *and* nonfederal waters;

- Tracks all private citizen vessel activity, including unregulated activities, recreation, other fishing, and even search and rescue operations;

- Collects unknown amounts of data with no clear indication of how it will be used;

- Has the capacity to collect other data, like audio information; and

- Cannot be powered down for any period of time.

ADD-19-20. This behavior is—due to its high-tech nature—even worse than the unrestrained searches of Customs officials in the Colonies. The government, without a warrant and without suspicion, is searching the private vessels of citizens,

everywhere, all at once, and all the time. The similarities between British Custom official searches and the Commissioner's modern search jump out: (1) A government official (2) concerned with private vessels (3) enters and searches every part of any private vessel (4) without a warrant and (5) without individualized suspicion (6) to pursue the government's policy goals. In other words, the Commissioner is acting less like someone who backs the lobster industry and more like a lobsterback.

This district court's rare endorsement of an appeal likely stems from those problems in the nature of the Commissioner's search technology. Specifically, the district court's expressed concerns focused on the Supreme Court's *Burger* test, which allows for "warrantless inspections in closely regulated industries" when they satisfy three criteria: "(1) 'There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.'" *City of L.A. v. Patel*, 576 U.S. 409, 426 (2015) (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)) (cleaned up). The district court found this Court's application of the *Burger* test to create, in essence, a rational-basis, rubber-stamp review for administrative searches. ADD-80. Attempting to do its job and apply this Court's

precedents, the court found no Fourth Amendment violation, though begrudgingly so. *See* ADD-92 (defending its ruling against Mr. Thompson as "[c]onsistent with this Supreme Court and First Circuit jurisprudence" but quickly following that with a precatory "[t]he Court believes this is an issue that should be presented to the First Circuit on review"). There the court erred, because Mr. Thompson's argument "ha[s] more traction given the [Supreme] Court's *Patel* decision." *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 219 n.16 (1st Cir. 2015). This Court has so far kept its powder dry on *Patel*'s effect on *Burger*'s test, though it acknowledged the question. *See id.* at 217 n.12 (reserving for future determination "whether *Patel*—the Supreme Court's most recent decision dealing with *Burger*—changed the *Burger* test in any way."). *Patel* did change that test, making "necessary" mean "necessary." Now, an administrative search is necessary if its absence would "fatally undermine the scheme's efficacy." *Patel*, 576 U.S. at 427. And here, the Commissioner does not *need* the black box tracking system to pursue his legitimate ends of conservation and sustainability; he merely *wants* it because it will make life easier for him. But that is not enough to satisfy the *Patel* requirements for an administrative search.

In any case, it is undisputed that no precompliance review procedure is available under the MDMR Rule. Moreover, since Maine lobstering is not a closely regulated industry under *Patel*, the Rule is facially unconstitutional. *Patel*, 576 U.S. at 420–21.

## STATEMENT OF JURISDICTION

The district court had federal question subject-matter jurisdiction under 28 U.S.C. § 1331 for Mr. Thompson's Fourth and Fourteenth Amendment claim. The district court dismissed Mr. Thompson's claims on November 21, 2024. *See* ECF No. 33; ADD-100. On December 19, 2024, Mr. Thompson filed a timely notice of appeal. *See* ECF No. 35; APP-10. Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the Commissioner's black box tracking system violates the Fourth Amendment to the United States Constitution as incorporated by the Fourteenth Amendment.

## STATEMENT OF FACTS &
## THE COURSE OF PROCEEDINGS

The facts here are undisputed and well summarized by the district court. Plaintiffs below, Frank Thompson, Joel Strout, Jason Lord, Chris Smith, and Jack Cunningham, are lobstermen. Defendant Commissioner Keliher shares oversight of Atlantic coast lobster fisheries with the federal government and may regulate waters within three nautical miles of shore. Further waters are "federal waters." Also at play is the Atlantic States Marine Fisheries Commission ("ASMFC"), a multi-state regulatory entity through which Maine coordinates its conservation efforts.

In March 2022, the ASMFC published Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan. The Addendum required Maine to issue rules mandating federally permitted lobstermen to install an electronic tracking device on their vessels that will transmit spatial data via GPS. Addendum XXIX required compliance by December 15, 2023. The device needed to be installed directly on the vessel and never deactivated, with the purpose of continual location-data transmission. The tracker has a once-per-minute ping rate; in other words, it collects the longitude and latitude of the vessel, within one hundred meters, every minute. The Addendum's overall goal was to "improve special information data concerning the location of where the majority of fishing effort occurs by collecting spatial data more frequently and with more accurate precision." ADD-14.

The Commissioner and MDMR are responsible for enforcing ASMFC's guidance, including Addendum XXIX. Accordingly, MDMR published a Final Rule, "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders" (the "MDMR Rule"). While adopting the Addendum, the MDMR Rule also expressly made it illegal for any federally permitted lobsterman to fish without the tracking device, remove it, or otherwise tamper with it. The Rule also specified that the continuous tracking of lobstermen would extend to when they were not in federal waters and engaged in other, dissimilarly and unregulated activity, such as fishing for other fish, recreation, or any other use—even emergency search and rescues operations.

Under the Addendum and Rule, the Commissioner unveiled the Particle TrackerOne Device ("black box" or "device" or "tracker"). The black box is directly installed on vessels and collects the position of each vessel once per minute while moving, and once every six hours when the vessel is moored or docked. It does so in federal and nonfederal waters, and for any activity of the vessel, lobstering-related or not. It may never be turned off (unless repairs are needed). Further, the black box is Bluetooth-compatible and can collect audio information. Fishermen are not told what data will be collected or how it will be used. ADD-19-20.

The Plaintiffs (including Mr. Thompson) sued the Commissioner and asked the district court to declare that the MDMR Rule violated the Fourth Amendment,

was void for vagueness, violated due process, violated the Maine Constitution, and violated the Maine Administrative Procedures Act. They also asked the district court to enjoin the Commissioner from enforcing the Rule. ECF No. 1; APP-12-41. The Commissioner moved to dismiss, on which the court held a hearing. ECF Nos. 23, 32.

On November 21, 2024, the district court entered an order that dismissed the Maine APA claim for lack of subject-matter jurisdiction, dismissed the Equal Protection Clause constitutional claims for failure to state a claim,[2] and dismissed "the Fourth Amendment claim pursuant to Supreme Court and First Circuit caselaw on administrative searches." ADD-4. In so doing, the court opined that "this case raises significant Fourth Amendment issues, and the court encourages the lobstermen to appeal this decision to the Court of Appeals for the First Circuit for an authoritative ruling." *Id*.

Still, the court ruled against Mr. Thompson on the Fourth Amendment: "Consistent with [] Supreme Court and First Circuit jurisprudence, the Court accordingly concludes that Plaintiffs" failed to state a Fourth Amendment claim. ADD-92. It continued: "The Court believes this is an issue that should be presented to the First Circuit on review." *Id*. In so holding, the court first noted that

---

[2] Mr. Thompson presses only the Fourth Amendment claim on appeal and so will not further discuss the district court's handling of the other claims.

Commissioner Keliher conceded that the tracking requirements in the Rule constituted a search. Since no warrants issue, the court analyzed the Commissioner's theory that the black-box requirement constitutes an administrative search in a closely regulated industry. The court recited the three-prong *Burger* test as delivered in *Patel*: "(1) 'There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 702–03) (cleaned up).

Applying those three, the court upheld the search. First, everyone agreed that MDMR has an interest in sustaining and conserving the lobster fishery. Second, the court held that the Rule was "necessary" to further that interest. Last, the court concluded that the Rule was sufficiently limited to function as a warrant.

Having found the Rule facially valid, the district court nonetheless noted the Plaintiffs' "legitimate privacy concerns about the degree of governmental intrusion from the MDMR Rule." ADD-86. This "degree of state intrusion would be inimical to the restraint on government guaranteed by the Fourth Amendment but for the *Burger* exception for administrative searches of a closely regulated industry." ADD-87. The court, however, felt itself bound by that precedent, as explicated by this

Court. Ultimately, for the district court, "[w]hat trips the MDMR Rule from unconstitutional to constitutional is that the MDMR has represented that the collection of data from lobster boats cannot be effective without collecting both personal and lobstering data." ADD-89.

Frank Thompson, alone among the original Plaintiffs, filed a timely notice of appeal to this Court. ECF No. 35; APP-10. He brings solely the Fourth Amendment issue.

## SUMMARY OF THE ARGUMENT

It is undisputed that the black box tracking is a warrantless and suspicion-less search. It is further undisputed that the Rule features no precompliance review procedures. Therefore, the Rule is unconstitutional unless it is *both* reasonable *and* fits entirely within the "narrow exception" for administrative searches within a "closely regulated industry." *Patel*, 576 U.S. at 424.

Regardless of all the Fourth Amendment permutations this case features, the MDMR is unconstitutional because it is unreasonable. Its use of overbroad and intrusive tracking technology is not justified by the alleged policy and law enforcement concerns. The sweeping scope is manifest. The directly installed device:

- Records via the device the location (longitude and latitude within one hundred meters) of private citizen vessels, every *minute* at sea and every six hours on land;

- Tracks citizen location in federal *and* nonfederal waters;

- Tracks all private citizen vessel activity, including unregulated activities, recreation, other fishing, and even search and rescue operations;

- Collects unknown amounts of data with no clear indication of how it will be used;

- Has the capacity to collect other data, like audio information; and

- Cannot be powered down for any period of time.

ADD-19-20. The search of vessels is nothing less than a high-tech version of the very types of searches that birthed the American Revolution along with the Fourth Amendment. Because the search is itself unreasonable, the inquiry need not proceed further.

If, however, the Court does as the court below did and applies the test for administrative inspections within closely regulated industries, Mr. Thompson should still win. First, the MDMR rule is unnecessary for the Commissioner to pursue conservation and sustainability interests. *Patel* made clear that the test is not, as this Court had previously implied, "akin to rational basis review." ADD-80 (citing

*Rivera-Corraliza*, 794 F.3d at 216–17). Rather, the question is whether conservation and sustainability would be fatally undermined but for the search technology.

No one—party or court—thinks that, and indeed, no other state has successfully pushed any search technology like the Commissioner has. The Commissioner wants, but does not need, the black box to do his job and advance his legitimate policy pursuits. Furthermore, the search's sweeping reach, constancy, and near-unlimited scope is nothing like legal, particularized warrants, but rather much more like general ones. Accordingly, the MDMR Rule flunks *Burger*'s test for administrative searches, both under *Patel*'s more rigorous read of *Burger* and under this Court's more relaxed pre-*Patel* one.

Still, Mr. Thompson asserts on appeal that Maine lobstering is not a closely regulated industry. Under *Patel*'s clarified framework, the dispositive question should be "whether the industry would pose a threat to the public welfare if left unregulated." *See Mexican Gulf Fishing Co. v. United States DOC*, 60 F.4th 956, 969 (5th Cir. 2023); *accord Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024). Maine lobstering does not. It is neither intrinsically dangerous nor inherently criminally adjacent. Nor does it sit comfortably alongside the Supreme Court's four industries deemed closely regulated. For those reasons (and because it is undisputed that no precompliance review is available), the Rule is unconstitutional.

## STANDARD OF REVIEW

The Court reviews de novo a dismissal for failure to state a claim under Rule 12(b)(6). *SAS Int'l, Ltd. v. Gen. Star Indem. Co.*, 36 F.4th 23, 26 (1st Cir. 2022).

## ARGUMENT

### THE MDMR RULE'S BLACK BOX TRACKING VIOLATES THE FOURTH AMENDMENT AS AN ILLEGAL AND UNREASONABLE ADMINISTRATIVE SEARCH.

This Court's "analysis begins with bedrock: the Fourth Amendment protects individuals 'against unreasonable searches and seizures.' U.S. Const. amend. IV. Under this standard, warrantless searches of private premises are presumptively unreasonable." *United States v. Almonte-Báez*, 857 F.3d 27, 31 (1st Cir. 2017). Limited exceptions apply, such as administrative searches, but those must be narrow, lest they swallow the rule. *See Patel*, 576 U.S. at 424–25.

Even when "a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for *it must be reasonable in its scope and manner of execution*." *Maryland v. King*, 569 U.S. 435, 448 (2013) (emphasis added); *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998) ("While administrative searches are an exception to the Fourth Amendment's warrant requirement, they are not an exception to the Fourth Amendment's standard of reasonableness."). And even when an administrative search is reasonable, it must feature a precompliance review procedure. *Patel*, 576 U.S. at 420–21. If not, the search is flatly, facially unconstitutional. *Id*. at 421.

Even more exceptional still is the closely regulated industry exception to the precompliance review requirement to the administrative search exception to the Fourth Amendment's warrant requirement. Under this exception, a reasonable administrative search within a "closely regulated industry" is lawful. *Id.* at 424. But this has "always been a narrow exception." *Id*.

This case *is* exceptional, but in the sense that the black box is an exceptionally intrusive and overbroad search, and thereby a violation of the Fourth Amendment. The Commissioner's Rule violates the Fourth Amendment to the U.S. Constitution, incorporated against Maine, if the black box tracking requirement (1) is a search that (2) is unreasonable and unlawful. Commissioner Keliher concedes that the electronic tracking requirement in the MDMR Rule constitutes a Fourth Amendment search. ADD-35 (citing ECF No. 23 at 12 n.16 (Keliher Mot. to Dismiss)). So, this appeal turns solely on whether the conceded search is reasonable and therefore constitutional.

It is not. Mr. Thompson and other lobstermen "have a legitimate expectation of privacy to the whole of their movements while at sea." *See Mexican Gulf Fishing Co.*, 60 F.4th at 970. The black box "regulation violates that expectation." *Id*.

First off, regardless of exceptions, the search is per se unreasonable under Supreme Court precedent and the Amendment's history. And second, reviewing the

black box tracking under the Supreme Court's administrative-search test (as clarified in *Patel*) shows it to be unlawful. Either way, it must be stricken.

## I.    The MDMR Rule's writ-of-assistance search is unreasonable regardless.

Warrant or no warrant, exception or no exception, reasonableness remains the "ultimate touchstone of the Fourth Amendment." *Fernandez v. California*, 571 U.S. 292, 298 (2014). Therefore, even were the administrative-search exception to apply, this Court must still, no matter what, "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *King*, 569 U.S. at 448. "This application of traditional standards of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy." *Id*. (quotation marks and citation omitted and cleaned up).

"[E]ven when permitted, the Constitution requires that administrative inspections be 'appropriately limited.'" *Bruce v. Beary*, 498 F.3d 1232, 1240 (11th Cir. 2007) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). The authorizing regulation—here, the MDMR Rule, must "carefully limit" the "time, place, and scope" of the search. *Id*. (quoting *Burger*, 482 U.S. at 718) (Brennan, J., dissenting on other grounds). On its face, the Rule does no such thing.

Reasonableness, not just whether something constitutes a search, is subject to the meaning of reasonableness at the time of adoption, because the Fourth

Amendment "is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted." *Carroll v. United States*, 267 U.S. 132, 149 (1925); *see also District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008) ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). First off, "the individualized-suspicion requirement was a core feature of 'reasonableness' at the time of the Founding[,]" *Verdun v. City of San Diego*, 51 F.4th 1033, 1058 (9th Cir. 2022) (Bumatay, J., dissenting), "has a legal pedigree as old as the Fourth Amendment itself, and . . . may not be easily cast aside in the name of policy concerns[,]" *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 678 (1995) (O'Connor, J., dissenting). In the absence of individual suspicion, as here, the burden should be squarely on the government's shoulders to provide a historical analogue to justify the scope of the administrative search.

History, however, would be no ally to the Commissioner. A cursory look at the most basic, undisputed history of the Fourth Amendment quickly calls up a viable contender for a close analogy: writs of assistance for British Customs officials, much hated by the Founding generation.

History—and searching for historical analogues—can sometimes be a fickle mistress. But not here. "[T]he Fourth Amendment was most immediately the product of contemporary revulsion against a regime of writs of assistance[,]" *Stanford v.*

*Texas*, 379 U.S. 476, 482 (1965), and "was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search[,]" *Riley*, 573 U.S. at 403. The "unbridled authority of a general warrant[,]" *Stanford*, 379 U.S. at 481, stands in contravention to the Fourth Amendment's scope requirements for reasonableness.

Writs of assistance accompanied Parliament's attempts to enact certain English-industry-protectionist (i.e., not criminal law) policies against the Colonies. Accordingly, Parliament extended its Customs laws to the Colonies, including giving Customs officers the "same powers and authorities" and "like assistance" that the same officials had in England. NELSON D. LASSON, THE HISTORY AND DEVELOPMENT OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION 53 (Leonard W. Levy, De Capo Press reprt. ed. 1970). The writs functioned in part to enforce England's Navigation Acts against the Colonies (and were later reaffirmed in the Townshend Acts), which are counted among the list of Parliamentary Acts that prompted the Revolution.

One of the primary evils of the writs was the massive general scope of the search authority given them. "The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford*, 379 U.S. at 481. "The writs were issued

without any suspicion of illegal activity and permitted those holding a writ to go anywhere they chose. Each writ charged all officers of the crown with assisting those executing it and empowered messengers *to enter into any vessel*, house, warehouse, or cellar, search in any trunk or chest and breach any bulk whatsoever." Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. MEM. L. REV. 483, 497 (1995) (quotation marks and citation omitted) (emphasis added).

The upshot of the writs is that Customs officials could at any time search any vessel without a warrant and without individualized suspicion. And again, although the Customs officials were in part looking for criminal activity (e.g., smuggling), the true purpose of the writs was to pursue England's overarching administrative goals of limiting the Colonies' commerce.

The black box tracking is no less odious than the writs of assistance issued to Customs officials to have unbridled search authority over ships. Just as those writs granted officials unlimited, warrantless, suspicion-less access to vessels as part of the Customs officer's administrative work, so too here, the tracker gives the Commissioner unlimited access to the location—every minute of every day asea— of Mr. Thompson's vessel. The black box:

- Is placed on every single vessel of a federally permitted lobsterman;

- Records via the device the location (longitude and latitude within one hundred meters) of private citizen vessels, every *minute* at sea and every six hours on land;

- Tracks private citizen location in federal *and* nonfederal waters;

- Tracks all private citizen vessel activity, including unregulated activities, recreation, other fishing, and even search and rescue operations;

- Collects unknown amounts of data with no clear indication of how it will be used (the Commissioner revealed at oral argument that the data would be available for others within federal and state government);

- Has the capacity to collect other data, like audio information; and

- Cannot be powered down for any period of time.

If anything, the high-tech nature of the Commissioner's search renders it even more offensive to the Fourth Amendment. The British Customs officials could conduct warrantless, suspicion-less searches of vessels only once they came into port. But since those days, "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter*, 585 U.S. at 305. Here, the Commissioner's use of technology would make even the most Hobbesian Tory Customs official blush.

The *Carpenter* Court recognized "a person's expectation of privacy in [their] physical location and movements." *Id*. at 306. It similarly recognized that "[t]he

'basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Id*. at 303 (quoting *Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967)). *Carpenter* took the Founding principles cited above in *Riley* (odium against British officers' rummaging around in an "unrestrained search") and brought them to bear on "a new phenomenon: the ability to chronicle a person's past movements through the record" of pinging signals. *Id*. at 309.

In that case, the "retrospective quality" of the government's technology allowed it to "travel back in time to retrace a person's whereabouts." *Id*. at 312. The extremely broad tracking logged all locations such that the "newfound tracking capacity runs against everyone." *Id*. "*Carpenter* solidified the line between short-term tracking of public movements—akin to what law enforcement could do '[p]rior to the digital age'—and prolonged tracking that can reveal intimate details through habits and patterns. The latter form of surveillance invades the reasonable expectation of privacy that individuals have in the whole of their movements and therefore *requires a warrant*." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (emphasis added) (quoting *Carpenter*, 585 U.S. at 310).

Similarly, in *United States v. Jones*, 565 U.S. 400 (2012), a majority of the Justices recognized that location-tracking technology (there, a GPS-tracking device

remotely monitoring *all* a vehicle's movements over twenty-eight days) crossed the line from merely augmenting to impermissibly enhancing. Five Justices agreed that "longer term GPS monitoring . . . impinges on expectations of privacy." *Id*. at 430 (Alito, J., concurring); *accord id*. at 415 (Sotomayor, J., concurring). The same five further agreed that "society's expectation" was that law enforcement would not "secretly monitor and catalogue every single movement of an individual's [vehicle] for a very long period." *See id.* at 430 (Alito, J., concurring); *accord id*. at 415 (Sotomayor, J., concurring) (agreeing).

The Commissioner was right to concede that the MDMR Rule creates a search via the black box—its constant invasion of individual movement flatly sits within *Carpenter* and *Jones*. But the application of those cases does not stop there. First, as the Fourth Circuit suggests, such a search "requires a warrant." *Leaders of a Beautiful Struggle*, 2 F.4th at 341. Second, the fact that, as the Supreme Court made clear, constant searches like the black box go to the core of the Fourth Amendment, and that history should put a judicial finger on the scale in favor of the constitutional right in Mr. Thompson's case.

Mr. Thompson has not disputed and does not dispute the legitimate government interests, claimed by the Commissioner, of *conservation* and *sustainability* of the lobster industry, an interest shared by the industry itself. *See* ECF No. 23 at 15 ("DMR undoubtedly has a substantial interest in . . . ensuring [the

lobster industry's] long-term viability as an economic and cultural pillar of Maine society."). He *does* dispute that the claimed interest of "*regulating* the lobster fishery" is legitimate, *see id.* (emphasis added), considering it is tautological. In other words, he does not believe regulation for its own sake is a legitimate government interest.

Where the regulation fails is at the balancing. *See King*, 569 U.S. at 448. The tracking is simply not a reasonable counterpart to the conservation/sustainability interests. That alone ends this case.

The district court understood this to a large—but incomplete—extent, noting that "the MDMR Rule contemplates a constant search of each licensed lobster boat in the entire lobstering fleet." ADD-87. To wit: "The lobstermen have legitimate privacy concerns about the degree of governmental intrusion from the MDMR Rule." ADD-86. The court recognized that lobstermen "have their own lives" outside of federal lobster fishing, include using their "vessels to perform personal errands, to visit family and friends, and even in some cases to live on." ADD-86-87.

In the ordinary case, the government, whether state or federal, would not have the right to track a citizen's location and to force a citizen to wear an electronic monitoring device or to attach one to a company car. The degree of state intrusion would be inimical to the restraint on government guaranteed by the Fourth

Amendment but for the *Burger* exception for administrative searches of a closely regulated industry.

ADD-86-87. The district court's description of the privacy concerns is self-evidently correct. The tracking is overbroad and sweeping, tracking not just boats but the individuals who use them—and their lives.

But the district court failed to follow its own logic to the natural conclusion. The fact that the search is so bad as to be "inimical to the restraint on government guaranteed by the Fourth Amendment" means that the search is unconstitutional *regardless* of the *Burger* exception. Unreasonable searches are unreasonable searches. The *Burger* exception is *not* an exception to the Fourth Amendment's reasonableness requirement. Indeed, the Rule's search is so broad that it violates expectations of privacy even outside the lobster industry, since it tracks personal data and collects information of unregulated areas. Although the Commissioner has waved this away as (in essence) collateral damage, it is instead dispositive.

If the Commissioner, with no warrant, no suspicion, and no precompliance review, may constantly search the property of Mr. Thompson *every single minute* of *every single day* in *every part of the Atlantic Ocean*, then it's fair to say that the administrative search exception has "swallow[ed] the rule." *Patel*, 576 U.S. at 425. The Commissioner is acting less like a lobster-sustainer, his claimed interest, and

more like a lobsterback. The unlimited, constant search of Mr. Thompson's vessel is unreasonable and unlawful, which means it is unconstitutional.

## II. The black box tracking fails under *Patel*'s requirements for searches within a closely regulated industry.

Assuming for the sake of this Section that lobstering is closely regulated (*but see infra* Section C), the black-box requirement flunks the *Burger* test. This remains true whether or not the *Burger* test has been narrowed by *Patel*.

Without precompliance review, the administrative-search doctrine is ruled by the *Burger* test, and "warrantless inspections in closely regulated industries must still satisfy three criteria: (1) 'There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further the regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 702–03) (cleaned up).

For many years, that second criterion was saddled with an inherent contradiction: the Supreme Court had said such a search must be "necessary" but treated the test as a rational-basis one. *See Burger*, 482 U.S. at 709 (The "regulation of the vehicle-dismantling industry *reasonably serves* the State's substantial interest in eradicating automobile theft.") (emphasis added). For example, in applying the *Burger* test, this Court in the past has treated it as more-or-less toothless, holding

that the test for the second criterion is simply whether the administrative searches "advance" the substantial government interest. *Rivera-Corraliza*, 794 F.3d at 216–17. The district court thus concluded that this Court and the *Burger* Court "applied a standard akin to rational basis review to analyze this second prong." ADD-80.

This extremely relaxed standard clearly gave the district court significant heartburn. It described its holding against Mr. Thompson as "[c]onsistent with this Supreme Court and First Circuit jurisprudence." ADD-92. But the district court quickly followed that with a precatory request: "The Court believes this is an issue that should be presented to the First Circuit on review." *Id.*

The decision below did not go so far as to second guess its own reasoning or the holding of this or the Supreme Court. Still, it found this issue substantial and unclear enough to merit not one but *two published* suggestions to the Plaintiffs to bring this appeal to this Court. Even so, *Patel* has already clarified the issue.

## A. *Patel* refined *Burger* by holding it to its own language: "necessary" means "necessary."

Where the district court went awry was by not fully recognizing the impact of *Patel*. The decision below rightly recognized that this Court, following the waffling language in *Burger*, has basically applied a rational-basis test, whereby an administrative search satisfies the second *Burger* criterion if it reasonably advances a sufficiently important government interest.

*Patel*, however, clarified that the second criterion turns on *necessity*. It did so in three ways. *First*, it gives the *Burger* test with the necessity language: "'the warrantless inspections must be *necessary* to further the regulatory scheme.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 702–03) (emphasis added). *Second*, *Patel* does *not* quote the conflicting *Burger* language of "reasonably serves the State's substantial interest." 482 U.S. at 709. *Third*, and most dispositively, *Patel*'s actual application of the second prong confirms the implication of the Court's use of "necessity" by acting much more like strict scrutiny or least-restrictive-means test than a rational-basis one.

Specifically, in *Patel*, the Court dealt with whether, assuming *Burger* applied, Los Angeles's law—which required hotel operators to record extensive personal information about their guests and provide that information to any LAPD officer— was "necessary" to pursue the city's interest in ensuring hotels maintained accurate and complete registries. *Id*. at 412–13, 426. "No" was the clear answer; precompliance review would not "*fatally* undermine the scheme's efficacy by giving operators a chance to falsify their records." *Id*. at 427 (emphasis added). That argument was fatuous in part because it "could be made regarding any recordkeeping requirement." *Id*. In other words, the Court made clear: for a requirement to be *necessary*, its absence must be *fatal* to the government's interest.

Justice Scalia, in dissent, noted this change, complaining that an administrative search's tailoring to a government interest should "need only be reasonable." *Id.* at 438 (Scalia, J., dissenting). The *Patel* majority's approach, in his view, "import[ed] a least-restrictive-means test into *Burger*'s Fourth Amendment framework." *Id.* Justice Scalia expressed his frustration that the majority had put the "burden" on the government to show "that there are no less restrictive means of achieving the [the government's] purpose." *Id*.

This Court has not yet fully analyzed *Patel*'s effect on the *Burger* test. Indeed, in the only case by this Court to cite *Patel*, it arose narrowly in the qualified-immunity context such that *Patel* did "not apply in [that] case (because of the qualified-immunity overlay)." *Rivera-Corraliza*, 794 F.3d at 223. There, the Court noted that "the law governing administrative searches continues to develop and that the bench and bar must be on the lookout for situations where *Patel* does hold sway." *Id*. Accordingly, that panel explicitly reserved for future determination "whether *Patel*—the Supreme Court's most recent decision dealing with *Burger*—changed the *Burger* test in any way." *Id*. at 217 n.12; *accord id*. at 219 n.16 ("Plaintiffs' argument may have more traction given the Court's *Patel* decision"). In other words, the *River-Corraliza* Court seemed interested in—but left open—whether Justice Scalia was correct that the *Patel* Court had changed the *Burger* test.

This appeal squarely asks this Court that question. Mr. Thompson's position is that *Patel did* change the *Burger* test. Perhaps not so far as Justice Scalia suggests, but far enough that the Supreme Court has now made clear that rational basis is not the correct standard for the second criterion, as the district court thought. Rather, "necessary" means "necessary." *See Mathis v. United States*, 579 U.S. 500, 514 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same"). As *Patel* laid out, the question is whether the government's interest would be *completely defeated* by the lack of the challenged regulation.

## B. The black box tracking is not necessary to pursue conservation and sustainability.

The decision below applied the quasi-rational-basis test implied by *Burger*. It concluded that "the electronic tracker requirement articulated in the MDMR Rule and the Addendum on which it is based are 'necessary' to advance the long-term health and stability of the Maine lobster fishery." ADD-80. But this in turn broke down into two sub-premises: (1) that electronic tracker data collection is necessary to conserve the lobster fishery; and (2) "the MDMR's data collection system cannot be designed without the overaccumulation of both relevant and irrelevant data." ADD-89; ADD-90.

In other words, the district court incorrectly attenuated the search from the government interest. The question is *not*, as the district court here framed, whether

the absence of the black box search would be fatal to the data collection goals of the Commissioner. The question is whether the absence of the black box tracking would "fatally undermine" the Commissioner's conservation and sustainability efforts. *See Patel*, 576 U.S. at 427. Correctly framed as such, the answer is no, the absence of the overbroad and intrusive search would not entirely defeat the Commissioner's conservation goals.

Striking down the black-box tracking requirement would not fatally undermine conservation and sustainability interests. The electronic vessel tracking is not necessary to conservation. In fact, in the Commissioner's *own words*: "The application of electronic vessel tracking to this fishery *could significantly improve the information available* to fishery managers and stock assessment scientists." ADD-74; ADD-119 (emphasis added). This is a classic "want vs. need" scenario. Of course, the tracking could *improve* conservation efforts. Maintaining the fishery will always be easier with more information. And of course, the Commissioner *wants* to have constant tracking of all lobster boat locations in order to "improve" his fishery data. But he doesn't *need* it to do his job of conservation and sustainability.

This is why the district court erred by concluding that "[w]hat trips the MDMR Rule from unconstitutional to constitutional is that the MDMR has represented that the collection of data from lobster boats cannot be effective without collecting both personal and lobstering data." ADD-89. The court was wrong that

black-box tracking is the only way to collect data from lobster boats. Instead, the district court's flawed premise was that the MDMR black box tracking was the *only* effective way to gather data, and that black box's overbroad data collection was the only effective way to collect the lobstering data. Its syllogism looks like this:

i. **Premise I**: Improved data collection "could improve" the Commissioner's sustainability and conservation efforts;

ii. **Premise II**: The black box search is effective at improving the collection lobstering data;

iii. **Premise III**: The black box search only works by overbroad data collecting methods;

iv. **Conclusion**: Therefore, the black box search is necessary for conservation efforts.

That Conclusion does not follow from those three premises. The logical fallacy is rooted in Premise I: The question is not whether the black box *can improve* the sustainability efforts; of course it can. The question is also not the factual one of whether the black box only functions by overbroad data collection (Premise III); Mr. Thompson does not dispute the Commissioner's submission that the black box can only function by collecting personal data.

The correct question is whether the Commissioner's sustainability and conservation efforts would be fatally undermined by the absence of the black box.

The district court's syllogism works only if Premise I were as follows: "Improved data collection through the black box is *necessary* to further the Commissioner's efforts." Then the Conclusion would follow. But the Commissioner—and the district court—never found that the black box's improved data collection was *necessary* for conservation and sustainability efforts. Nor could they have.

The biggest giveaway is that *no one else* seems to be doing this in such an invasive way. The only other litigated attempt got smacked down in *Mexican Gulf Fishing Co.*, 60 F.4th 956. The reason is obvious: there are *far* less intrusive ways to improve the fishery data. For example, as Plaintiffs noted below, the Commissioner could have limited tracking to vessels fishing for lobsters in federal waters (ostensibly the whole point of the Rule in the first place) or employing lesser "ping rates," as is done in other contexts (like the scallop fishery). ECF No. 24 at 8. Similarly, the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") "does not require lobster boats to have a vessel tracker[,] nor does it mention or contemplate 24-hour location and movement surveillance of any vessel, whether by GPS or otherwise," no matter whether the vessel is fishing in federal waters under a federal permit or being used for any other, unregulated purpose. ADD-9.

If governments can find—and have—alternate avenues to pursue conservation and sustainability apart from the black box, then the black box is

unnecessary for the Commissioner. *Cf. Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021) ("[M]unicipalities have found ways to enforce parking regulations without implicating the Fourth Amendment. Thus, tire chalking is not necessary to meet the ordinary needs of law enforcement, let alone the extraordinary.") (internal citations omitted). For that reason, it flunks the *Burger* test (as clarified by *Patel*). The Court should thus reverse.

### C. Even under a more relaxed pre-*Patel* standard, the search fails.

If the question were whether the administrative search is a *reasonable* method of pursuing the government's interest, the tracking fails the *Burger* test anyway, for all the reasons stated in Part I.A. of this brief.

### D. The black box tracking requirement is not like a *specific* warrant.

The third criterion is whether the regulation is like a *legal*, *particularized* warrant—i.e., whether it is sufficiently tailored in scope and time to function akin to an actual specific warrant as contemplated in the Fourth Amendment. *Patel*, 576 U.S. at 426. As noted above, the black box tracking is much more like a *general* warrant, in the sense that it gives the Commissioner unlimited, plenary authority to constantly search the private property of Mr. Thompson. It is too unbridled.

This is not like an administrative search of commercial premises, where scheduled, limited inspections are imposed on commercial entities. Such searches are akin to specific warrants by having a limited scope. To the contrary, this is a

*constant*, *unlimited* search. This is no routine, or even surprise, inspection of a restaurant by a governmental health inspector. This is more as if the government placed an elf-on-the-shelf in the kitchen of a restaurant that recorded—and reported—everything done on the commercial premises. That is not like a specific warrant. That is a general warrant.

Similarly, in *Patel*, the LAPD officers had unlimited access to, at any time, all of the hotel's intrusively personal information about its guests. *Id*. at 426. That rendered the requirement "constitutionally deficient under the 'certainty and regularity' prong of the closely regulated industries test because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances." *Id*. The Court noted that, though it had previously "upheld inspection schemes of closely regulated industries that called for searches at least four times a year" or "on a regular basis," the constant and unspecified nature of the hotel search requirement did not cut it. *Id*.

Here, in some sense, the black box reports location on a regular basis by logging the location of the boat every minute. That, it cannot do. For this reason, it is unconstitutional.

**III. The black box tracking is an unlawful search of an industry not closely regulated.**

  **A. Modern lobstering is not a closely regulated industry under *Patel*'s standards.**

"The closely regulated industry is the exception." *Patel*, 576 U.S. at 424 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)) (cleaned up). *Patel*, before clarifying *Burger*'s necessity test, also clarified the scope of the "closely regulated business" test, which applies a "more relaxed" standard to industries that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Patel*, 576 U.S. at 424 (quoting *Barlow's, Inc.*, 436 U.S. at 313). Hotels, per *Patel*, are not such an industry. In the Court's view, "[s]imply listing" the "only four industries" the Court had ever found to be closely regulated—liquor sales, firearm sales, mining, and running automobile junkyard—showed hotels did not fit the bill. A clear similarity arose from the four industries: that something "inherent in the operation" posed "a clear and significant risk to the public welfare." *Id*.

In other words, for an industry—even one with pervasive regulation—to be closely regulated, it must be inherently detrimental to the common weal, either by being criminally adjacent *by nature* or by being very hazardous *by nature*. Or, as the Fifth Circuit helpfully phrased it when explicating *Patel*, the question is "whether

the industry would pose a threat to the public welfare if left unregulated." *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019).

Commercial lobster fishing poses no such thing. And commercial lobster fishing is the industry in question. *See Mexican Gulf Fishing Co.*, 60 F.4th at 968 ("Because this exception is narrow, federal courts must not define the industry at issue at too high a level of generality."); *id.* (looking at the charter boat industry, not general commercial boating). Indeed, hotels are quite analogous to commercial lobster fishing boats. Justice Scalia, dissenting in *Patel*, pointed to the hotel risk of "criminal activity ranging from drug dealing and prostitution to human trafficking." 576 U.S. at 429 (Scalia, J., dissenting). True, "[h]otels—*like practically all commercial premises or services*—can be put to use for nefarious ends. But unlike the industries that the Court has found to be closely regulated, hotels are not intrinsically dangerous." *Id.* at 424 n.5 (majority op.) (emphasis added).

Same for commercial lobster fishing—drug and human trafficking are sensible concerns for commercial services on boats, but lobster fishing is not "intrinsically dangerous." *See Donovan v. Dewey*, 452 U.S. 594, 602 (1980) (describing the mining industry as "among the most hazardous in the country"). Maine lobstering is not the easiest job in the world, but it's no "Deadliest Catch." Nor is it inherently criminal-adjacent. *See Burger*, 482 U.S. at 709 ("Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and

vehicle parts"). The entire reason automobile junkyards are closely regulated in the first place is that the industry is historically a conduit for laundering the parts of stolen cars, similar to pawn shops. They are inherently risks for fencing stolen property.

Lobstering, not so much. Fishing is not theft. Notably, the government's concerns in regulating lobster fishing are not with criminality anyway, but with conservation, regulating the lobster fishery, and attempting to ensure "long-term viability" of the industry. *See* ECF No. 23 at 15–16 (Mot. to Dismiss). But even if they were, the types of criminality associated with boats—smuggling, trafficking, etc.—is not historically connected to lobster fishing. And "[h]istory is relevant when determining whether an industry is closely regulated." *Patel*, 576 U.S. at 425.

The question is whether lobster fishing is *by its nature* adjacent to criminal conduct (like chop shops) or *by its nature* extremely hazardous (like mining). It is not.

This Court has not yet expounded on the closely regulated industry test post-*Patel*. In *Rivera-Corraliza*, this Court found in the qualified-immunity context that it was not clearly established law that adult entertainment machines for gambling were not closely regulated. 794 F.3d at 219. It did, however, explicitly note that the argument that the gambling machine industry was *not* closely regulated "may have more traction given the Court's *Patel* decision." *Id*. at 213 n.5 (citing *Patel*'s

"intrinsically dangerous" language and implying that this language may have changed the Court's direction on the closely regulated industry question). This was followed by a caution: "recall that *Patel* had not yet been decided." *Id*. at 219 n.16. In other words, this Court made a narrow qualified-immunity decision, punting full analysis of *Patel*'s effect on the closely regulated test to a future panel—this one.

The Fifth Circuit has the best method, establishing a multi-factor inquiry post-*Patel*: "The history of warrantless searches in the industry, how extensive the regulatory scheme is, whether other states have similar schemes, and whether the industry would pose a threat to the public welfare if left unregulated." *Mexican Gulf Fishing Co*., 60 F.4th at 969 (quoting *Zadeh*, 928 F.3d at 465). The Tenth Circuit has explicitly adopted the Fifth Circuit's factors. *Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024). Rightfully so: That last factor gets at the very heart of the Supreme Court's framing in *Patel*.

In *Mexican Gulf Fishing Co*., another GPS boat tracking case, the Fifth Circuit found that charter boat fishing industry was not closely regulated, because there was (1) no "evidence of history of warrant-less searches within the charter boat fishing industry"; (2) "no evidence that States employ regulatory schemes respecting the charter boat fishing industry"; or (3) no evidence in the record that the charter boat industry would pose a threat to the public welfare if left unregulated. 60 F.4th at 969–70. So too here.

To Mr. Thompson's knowledge, no other State has such a pervasive, overbroad, and intrusive warrantless inspection scheme as the MDMR's tracking. Maine stands alone, and the only other analogous attempt at GPS tracking of boats was struck down by the Fifth Circuit in *Mexican Gulf Fishing Co*. The same result should follow.

Lobster fishing would not "pose a threat to the public welfare if left unregulated." This factor is the most important, because it strikes at the central point of the *Patel* Court—whether an industry is by its nature a threat to the public welfare, either by being criminally adjacent or extremely hazardous. By the Commissioner's own telling, leaving lobster fishing unregulated could result in overfishing and tautological lack of regulation. ECF No. 23 at 15–16 (Mot. to Dismiss). But those fears do not go to public safety. This is not like, for example, commercial trucking, where lack of regulation could endanger drivers on public highways. *See Owner-Operator Indep. Drivers Ass'n v. United States DOT*, 840 F.3d 879, 894–95 (7th Cir. 2016). Accordingly, this Court should find this industry not closely regulated for Fourth Amendment purposes.

**B. Under *Patel*'s non-closely regulated standard, the administrative search is unlawful.**

It is undisputed that the MDMR Rule does not feature precompliance review procedures. *See generally* ADD-101-115. Accordingly, because (1) the tracking is concededly a search, (2) lobster fishing is not closely regulated, and (3) the Rule

lacks precompliance review, the Rule is "facially unconstitutional." *See Patel*, 576

U.S. at 419; *id.* at 420 ("[A]bsent consent, exigent circumstances, or the like, in order

for an administrative search to be constitutional, the subject of the search must be

afforded an opportunity to obtain precompliance review before a neutral

decisionmaker.").

### C. The Court should exercise its discretion to hear this dispositive, meritorious argument on a constitutionally important issue almost certain to recur in future litigation.

Although, below, "the Plaintiffs concede[d] that commercial fishing is a

closely-regulated industry," ECF No. 7 at 21; ADD-72 n.19, exceptions to the

normal waiver rule apply, so Mr. Thompson now presses the argument that lobster

fishing is not a closely regulated industry. This Court "has the authority, in its

discretion, to consider theories not articulated below." *Reyes-Colón v. United States*,

974 F.3d 56, 62 (1st Cir. 2020) (quoting *B & T Masonry Constr. Co. v. Pub. Serv.*

*Mut. Ins. Co.*, 382 F.3d 36, 41 (1st Cir. 2004)). Indeed, it "should address …

arguments despite the fact that they were not made below" when (1) "the new issue

is strictly a question of law;" (2) "it is almost certain to be presented in identical

terms in other cases"; (3) "the point can be resolved with certitude on the existing

record, a factor that often inclines a court to entertain a pivotal argument for the first

time on appeal"; and (4) the argument "raises an issue of constitutional magnitude

which, if meritorious, could substantially affect these, and future" litigants. *United States v. La Guardia*, 902 F.2d 1010, 1013 (1st Cir. 1990).

Hearing the argument on whether lobstering is closely regulated accords with this Court's precedents and judicial efficiency.

*First*, the closely regulated industry question is a pure question of law that can be resolved with certitude on the existing record. This Court has recognized that the purposes of a waiver rule are "that parties may have the opportunity to offer all the evidence they believe relevant to the issues" and "that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Kaufman v. Commissioner*, 784 F.3d 56, 71 (1st Cir. 2015) (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)). Because the closely regulated industry question is a purely legal one, these purposes are not implicated. The Commissioner will not be prejudiced in any way by briefing the issue on appeal, nor would a final decision based on this issue and *Patel* come as a surprise. Mr. Thompson will press his argument on this issue based on the record below, with no factual development needed.

*Second*, this issue is of constitutional magnitude, novel, and is certain to recur in future litigation should this Court not consider the argument. The question of tracking personal movements cuts to the very heart of the Fourth Amendment, the "basic purpose" of which "is to safeguard the privacy and security of individuals

against arbitrary invasions by governmental officials." *Carpenter*, 585 U.S. at 303. And the Commissioner's "unrestrained search for evidence of criminal activity" is the very type of "reviled" government action with which the Fourth Amendment is chiefly concerned. *See id*.

As a result, this issue is twice-over novel to this Court. This Court has never had the opportunity to examine the precise effects of *Patel* on its closely regulated industry jurisprudence, and this Court has not yet faced a *Carpenter*-esque modern tracking technology in the administrative search context. The question, therefore, is a new one of constitutional importance.

And if this Court were to rule against Mr. Thompson without deciding the closely regulated industry question, it will be raised identically by future litigants. For example, although this claim sought a pre-enforcement injunction, if it fails, then the Commissioner may bring enforcement proceedings against lobstermen who do not comply with the Rule. Such defendants could then raise the *exact same issue* of closely regulated industry in those future cases over and over, until it is decided. This is the precise type of near-certain situation with "identical terms" this Court has been concerned with when considering exceptions to the waiver rule.

Plaintiffs, including Mr. Thompson, have through all stages of this litigation maintained that the black box is an illegal administrative search, which is an exception to the warrant requirement, which is an element of the Fourth Amendment.

In other words, we are *already* two levels down of specificity within the Fourth Amendment's depths. Administrative search jurisprudence is no "general issue." *See United States v. Slade*, 980 F.2d 27, 31 (1st Cir. 1992); *cf. Emps. Ins. Co. of Wausau v. OneBeacon Am. Ins. Co.*, 744 F.3d 25, 29 (1st Cir. 2014) ("When a party places an issue as broad as 'contract interpretation' before the [district] court, it does not thereby preserve every argument that might fall under that rubric"). To the contrary, sticking with the administrative search theory—but modulating a sub-argument within it, is not "switching 'horses midstream' to offer an entirely new take on the [administrative search] issue." *See Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 455 (1st Cir. 2016).

Accordingly, Mr. Thompson presses the argument on appeal.

## CONCLUSION

For these reasons, the Court should reverse.

Dated: March 24, 2025    Respectfully submitted,

*/s/ Edward M. Wenger*
Edward M. Wenger
Caleb Acker
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
*emwenger@holtzmanvogel.com*
*cacker@holtzmanvogel.com*

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume and word-count limits of FRAP 37(a)(7), because, excluding the parts of the document exempted by FRAP 32(f), this document contains 9,367 words.

2.     This document complies with the typeface and type-style requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 31st day of March 2025, a true copy of the Initial Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

# In the United States Court of Appeals
# for the First Circuit

FRANK THOMPSON,

*Plaintiff-Appellant,*

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH; JACK CUNNINGHAM,

*Plaintiffs,*

v.

CARL WILSON, in their official capacity as Acting
Commissioner, Maine Department of Marine Resources,

*Defendant-Appellee.*

## PLAINTIFF-APPELLANT'S
## ADDENDUM

On Appeal from the United States District Court for
the District of Maine (No. 1:24-cv-00001-JAW)

Edward M. Wenger
Caleb Acker
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Order On Motion to Dismiss and Motion for Preliminary Injunction DKT 33 (11/21/2024) ........................................................................................3

Notice Of Agency Rule-Making Adoption DKT 16.1 (3/1/2024) ....................101

Addendum xxix to amendment 3 to the American Lobster Fishery Management Plan; addendum iv to the Jonah Crab Fishery Management Plan DKT 1.1 (1/2/2024) ..........................................................116

Federal Permit Holder Vessel Tracking Requirements DKT 1.3 (1/2/2024).134

Judgment of Dismissal DKT 34 (11/21/24 ......................................................139

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK THOMPSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00001-JAW |
| | ) | |
| PATRICK KELIHER, *in his official* | ) | |
| *capacity as* COMMISIONER, | ) | |
| MAINE DEPARTMENT OF | ) | |
| MARINE RESOURCES, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO DISMISS AND MOTION FOR PRELIMINARY INJUNCTION**

Maine lobstermen brought suit against the commissioner of the Maine Department of Marine Resources, seeking to enjoin the enforcement of a rule issued by the department that compels federally licensed lobstermen to install a tracking device on their fishing vessels.[1] The lobstermen challenge the rule under Maine's Administrative Procedure Act and on federal and state constitutional grounds as a violation of their right to be free from unreasonable searches and seizures and right to equal protection under the law. The defendant moves to dismiss the case for failure to state a claim and for lack of subject matter jurisdiction. The lobstermen seek a preliminary injunction, which the defendant also opposes. The court dismisses the plaintiffs' claim under the Maine Administrative Procedure Act for lack of subject matter jurisdiction and dismisses the Fourth Amendment and equal protection

---

[1] Throughout this order, the Court uses "lobstermen" as a gender-neutral term. *See* Maine Lobster Community Alliance, *A Lobsterman is a Lobsterman, Regardless of Gender* (Jul. 7, 2023), A Lobsterman is a Lobsterman, Regardless of Gender (mlcalliance.org).

claims for failure to state a claim on which relief can be granted. Although the court grants the motion to dismiss the Fourth Amendment claim pursuant to Supreme Court and First Circuit caselaw on administrative searches, this case raises significant Fourth Amendment issues, and the court encourages the lobstermen to appeal this decision to the Court of Appeals for the First Circuit for an authoritative ruling.

Having granted the defendant's motion to dismiss, the court dismisses the motion for preliminary injunction as moot.

## I.   PROCEDURAL HISTORY

On January 2, 2024, Frank Thompson, Joel Strout, Jason Lord, Christopher Smith, and Jack Cunningham (collectively, the Plaintiffs) filed a facial complaint against Patrick Keliher, in his official capacity as Commissioner of the Maine Department of Marine Resources (MDMR), seeking declaratory and injunctive relief against a rule issued by the MDMR that requires federally permitted lobstermen to install an electronic tracking device on their fishing vessels. *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*).

On January 12, 2024, the Plaintiffs filed a motion for preliminary injunction. *Pls.' Mot. for Prelim. Inj.* (ECF No. 7). On March 1, 2024, Commissioner Keliher responded in opposition to the motion for preliminary injunction. *Def.'s Opp'n to Mot. for Prelim. Inj.* (ECF No. 16). That same day, the Atlantic States Marine Fisheries Commission (ASMFC), as amicus curiae, also opposed injunctive relief. Amicus Curiae *Atl. States Marine Fisheries Comm'n's Mem. in Opp'n to Pls.' Mot. for Prelim.*

*Inj.* (ECF No. 15).  On March 12, 2024, the Plaintiffs replied.  *Pls.' Reply to Opp'n to Mot. for Prelim. Inj.* (ECF No. 17).

On April 8, 2024, Commissioner Keliher moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  *Def.'s Mot. to Dismiss* (ECF No. 23) (*Mot. to Dismiss*).  That same day, ASMFC filed an amicus curiae memorandum in support of Commissioner Keliher's motion to dismiss.  Amicus Curiae *Atl. States Marine Fisheries Comm'n's Mem. in Support of Def.'s Mot. to Dismiss* (ECF No. 22) (*Amicus Mem. in Support of Mot. to Dismiss*).  On April 29, 2024, the Plaintiffs responded in opposition to the motion to dismiss.  *Pls.' Opp'n to Def.'s Mot. to Dismiss* (ECF No. 24) (*Pls.' Opp'n*).  On May 13, 2024, Commissioner Keliher replied.  *Def.'s Reply to Pls.' Opp'n to Def.'s Mot. to Dismiss* (ECF No. 25) (*Def.'s Reply*).

On June 3, 2024, the Plaintiffs moved for oral argument on the motion for preliminary injunction and the motion to dismiss, *Unopposed Mot. for Oral Arg.* (ECF No. 26); the Court granted the motion for oral argument on the same day.  *Order* (ECF No. 27).  On June 19, 2024, ASMFC requested leave to participate in oral argument as amicus curiae.  *Mot. of* Amicus Curiae *Atl. States Marine Fisheries Comm'n for Leave to Participate in Oral Arg. on Mot. to Dismiss and Mot. for Prelim. Inj.* (ECF No. 28).  The Court granted the ASMFC's motion on June 25, 2024, *Order.* (ECF No. 29), and held oral argument on November 19, 2024.  *Min. Entry* (ECF No. 32).

## II.    FACTUAL BACKGROUND[2]

### A.    The American Lobster Fishery

The American Lobster fishery is one of the nation's most valuable fisheries. *Compl.* ¶ 1.  In 2016 alone, approximately 159 million pounds of lobster were landed within the fishery.  *Id.*  Over 97% of this haul was landed in the Gulf of Maine and Georges Bank, an area far offshore between Massachusetts and Nova Scotia.  *Id.*

Roughly 4,800 lobster license holders, 1,100 student license holders, and a great number of lobster dealers, processors, sternmen, bait dealers, trap builders, boat mechanics, shipyards, and local coastal merchants depend on the Maine lobster fishery for their very survival.  *Id.* ¶ 2.  Maine's lobster supply chain contributes $1 billion to the state's economy each year, in addition to the value of its actual lobster landings.  *Id.*  By virtue of custom and practice over generations of lobstering men and women, the placement of lobster traps and trip routes is akin to "coveted individual trade secrets used by lobstermen to optimize their harvest."  *Id.* ¶ 3.  Accordingly, this information has substantial economic value to each lobsterman.  *Id.*

Federal and state regulators share oversight of the Atlantic coast fisheries.  *Id.* ¶ 4.  Individual states regulate waters within three nautical miles of shore, while the National Marine Fisheries Service (NMFS), a sub-agency of the National Oceanic and Atmospheric Administration (NOAA), regulates the federal waters extending 200

---

[2]    Consistent with the motion to dismiss standard, the Court relied on the complaint's well-pleaded facts.  "[T]he court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

nautical miles from the inner boundary of state waters (known as the Exclusive Economic Zone or EEZ). *Id.*

**B.    The Magnuson-Stevens Fishery Conservation and Management Act**

The Magnuson-Stevens Fishery Conservation and Management Act (MSA) governs fishing within the EEZ. *Id.* ¶¶ 7, 29 (citing 16 U.S.C. § 1802). In recognition of the economic importance of commercial and recreational fishing, Congress adopted the MSA to protect, manage, and grow the United States' fishery resources. *Id.* ¶ 28. To these ends, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. *Id.* (citing 16 U.S.C. §§ 1801 *et seq.*). The MSA grants the U.S. Department of Commerce the ability to exercise "sovereign rights" to conserve and manage fishery resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the EEZ. *Id.* § 29 (citing 16 U.S.C. §§ 1801(b)(1), 1811(a)).

The MSA created eight Regional Fishery Management Councils (the Councils) and empowers both the regional councils and Secretary of Commerce to prepare fishery management plans (FMPs). *Id.* ¶ 30. Maine is governed by the New England Council, which also oversees the fisheries of New Hampshire, Massachusetts, Rhode Island, and Connecticut. *Id.* The New England Council has authority over fisheries in the Atlantic Ocean seaward from those states. *Id.* (citing 16 U.S.C. § 1852(a)(1)). Under the MSA, FMPs must be "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and

to protect, restore, and promulgate the long-term health and stability of the fishery."

*Id.* (citing 16 U.S.C § 1853).

Section 301 of the MSA lists ten "National Standards" that all FMPs, regardless of the drafting entity, are required to follow. *Id.* ¶ 33. At least six national standards are implicated by the Addendum at issue in the case at bar:

1. National Standard One, which requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."

2. National Standard Two, which requires that "[c]onservation and management measures shall be based upon the best scientific information available."

3. National Standard Four, which requires that all agency measures that allocate or assign fishing privileges among various … fisherm[e]n" should be "fair and equitable" and "reasonably calculated to promote conservation" …. Furthermore, "[n]o particular individual, corporation, or other entity [should] acquire[] an excessive share of such privileges."

4. National Standard Six, which requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."

5. National Standard Seven, which requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."

6. National Standard Eight, which requires that "[c]onservation and management measures shall, consistent with the conservation requirements … , take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (b) to the extent practicable, minimize adverse economic impacts on such communities."

*Id.* (citing 16 U.S.C. § 1851(a)(1), (2), (4), (6)-(8)) (internal citations omitted).

The MSA does not authorize or permit any collection of information on vessel movements when the vessel is not fishing under its permit. *Id.* ¶ 32. The MSA also "does not require lobster boats to have a vessel tracker[,] nor does it mention or contemplate 24-hour location and movement surveillance of any vessel, whether by GPS or otherwise," regardless of whether the vessel is fishing in federal waters under a federal permit or being used for an unregulated purpose. *Id.* ¶ 34. Rather, the MSA "only permits the collection of information that is beneficial for developing, implementing, or revising FMPs." *Id.* at ¶ 32 (citing 16 U.S.C. § 1881a(a)(1)[3]). If a Council determines information collection is necessary in order to prepare an FMP, it may request that the Secretary of Commerce implement such collection.[4] *Id.* (citing 16 U.S.C. § 1881a(a)(1)[5]).

## C.    The Atlantic States Marine Fisheries Commission

Both the federal and state governments regulate lobster fishing in U.S. waters through the Atlantic States Marine Fisheries Commission. *Id.* ¶ 4. The ASMFC is a multi-state collaborative organization through which fifteen Atlantic Coast states, including Maine, coordinate their conservation efforts and share in the management

---

[3]     Plaintiffs' complaint ¶ 32 cites 18 U.S.C. § 1881a(a)(1). This is incorrect. The proper citation is 16 U.S.C. § 1881a(a)(1).
[4]     "Only where the Secretary has determined that the collection is justified does he or she have a duty to promulgate regulations implementing the collection program." *Compl.* ¶ 32 (citing 16 U.S.C. § 1881a(a)(2)). The Secretary may also initiate an "information collection program . . . if deemed necessary." *Id.*

    The Court has again corrected Plaintiffs' citation from 18 U.S.C. § 1881a(a)(1) to 16 U.S.C. § 1881a(a)(1).
[5]     The Court has again corrected Plaintiffs' citation from 18 U.S.C. § 1881a(a)(1) to 16 U.S.C. § 1881a(a)(1).

of migratory fisheries within their state waters. *Id.* ¶¶ 4, 5. Pursuant to the Atlantic Coastal Fisheries Cooperative Act (ACA), "[t]he responsibility for managing Atlantic Coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the [ASMFC]." *Id.* ¶ 25 (citing 16 U.S.C. § 5101). The ACA says that it is the federal government's responsibility "to support such cooperative interstate management of coastal fishery resources." *Id.* (citing 16 U.S.C. § 5101).

The ACA encourages this shared responsibility by requiring the ASMFC to draft interstate FMPs, pursuant to which each of the member-states regulates that portion of the migratory fishery falling within their individual waters. *Id.* ¶ 5 (citing 16 U.S.C. § 5104(a)). Under the ACA, states are required to adopt and enforce fishery plans promulgated by the ASMFC. *Id.* ¶ 5. However, FMPs implemented by any of the NOAA Councils or the Secretary of Commerce pursuant to the MSA supersede any conflicting regulation issued by the ASMFC. *Id.* ¶ 31 (citing 16 U.S.C. § 5103). Thus, while the ACA empowers the ASMFC to draft regulations governing the EEZ, it cannot supplant regulations issued by NOAA, NMFS, or the Secretary of Commerce. *Id.* ¶ 36.

When the ASMFC drafts FMPs containing regulations and enforcement guidelines, it specifies the requirements for state compliance. *Id.* ¶ 6. The states then draft their own rules; in Maine, this work is done by the MDMR, which regulates lobster fishing in the state's waters pursuant to an FMP. *Id.* ¶¶ 5-6 (citing 12 M.R.S. §§ 6421-6482; 13-188 C.M.R. ch. 25, § 98). If a member state fails to timely enact

rules adopting the ASMFC's plan for a particular fishery, the Secretary of Commerce has the authority to impose a moratorium on fishing in that state's waters. *Id.* (citing 16 U.S.C. § 5106).

### D. Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan

In March 2022, the ASMFC published an addendum to an existing FMP entitled Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan; Addendum IV to the Jonah Crab Fishery Management Plan (the Addendum). *Id.* ¶ 8; *see also Compl.*, Attach. 1, *Addendum XXIX to Amend. 3 to the Am. Lobster Fishery Mgmt. Plan; Addendum IV to the Jonah Crab Fishery Mgmt. Plan* (ECF No. 1-1) (*Addendum XXIX*). The primary purpose of the Addendum is to support risk reduction efforts promulgated in NMFS's 2021 Atlantic Large Whale Take Reduction Plan (Take Reduction Plan), which is designed to reduce the risk of North Atlantic right whale entanglement in fishing lines. *Compl.* ¶ 8. As promulgated by NMFS, the Take Reduction Plan does not contain a vessel tracking requirement. *Id.*

In addition to protecting the North Atlantic right whale, the Addendum identifies three secondary objectives for its "'24/7' tracking requirement: 1) to improve information available to fishery managers and stock assessment scientists; 2) to support the development of offshore renewable energy and the conservation of U.S. waters; and 3) to promote improved fishery management and offshore enforcement of federal lobster fisheries in the EEZ." *Id.* ¶ 9.

The Addendum requires states to issue rules mandating federally permitted lobstermen to install an electronic tracking device onboard their respective fishing vessels that will transmit their spatial data using a Global Positioning System (GPS). *Id.* ¶ 10. "According to the Addendum, the 'vessel tracker must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished or target species.'" *Id.* The Addendum mandated compliance with the tracking program by December 15, 2023. *Id.*

### 1. The Origins and Drafting of Addendum XXIX

When the ASMFC published the Addendum, it gave no indication that it had consulted with any Council during the drafting process. *Id.* ¶ 53.

The Addendum was initiated from what the American Lobster Management Board (ALMB) characterized as a "critical need for high resolution spatial and temporal data." *Id.* ¶ 54. At the time of the Addendum's drafting, however, the ALMB's purported need for more spatial data had been previously addressed by a prior addendum published in February 2018, Addendum XXVI. *Id.*; *see also Compl.*, Attach. 2, *Addendum XXVI to Amend. 3 to the Am. Lobster Fishery Mgmt. Plan; Addendum III to the Jonah Crab Fishery Mgmt. Plan* (ECF No. 1-2) (*Addendum XXVI*). Addendum XXVI initiated a pilot program for electronic tracking of vessels that required all federally permitted vessels to self-report harvester data either electronically or manually. *Id.*

Addendum XXVI mandated that federally licensed lobstermen self-report: 1) a unique trip identification number; 2) a vessel identification number, 3) the trip start

date, the location (by NMFS Statistical Area) of the trip; 4) the lobster management area; 5) a ten-minute square level; 6) the number of traps hauled on the trip; 7) the number of traps set on the trip; 8) the species harvested; 9) the quantity (in pounds) of the harvest; 10) the length of the trip; 11) the number of traps employed per trawl; 12) the number of buoy lines employed; and 13) the soak time of the traps. *Compl.* ¶ 55; *see also Addendum XXVI.*

At the end of Addendum XXVI's one-year pilot program, the ASMFC was directed to assess the effectiveness of different tracking technologies and consider whether the adoption of an electronic vessel tracking requirement was appropriate. *Compl.* ¶ 56. The ASMFC did so, formally adopting the vessel tracking program piloted under Addendum XXVI when it issued Addendum XXIX. *Id.* ¶ 57.

## 2. The Requirements of Addendum XXIX

As noted, the Addendum requires that federally licensed lobstermen install and activate an electronic tracking device on their vessels by December 15, 2023. *Id.* The device must be installed directly on the vessel and remain activated so that it can continually transmit location data at all times, even when the vessel is not in use (i.e., when it is docked) or when it is not fishing in federal waters (i.e., when the vessel is being operated by a lobsterman for personal use). *Id.* The electronic tracking data is in addition to data that lobstermen are already required to self-report about their location. *Id.*

The Addendum requires the electronic tracker to have a once-per-minute "ping rate"; this means that the device will "ping," or collect the device's longitude, latitude,

corresponding vessel identifier, and the date, at one-minute intervals. *Id.* ¶ 58. The Addendum also requires lobstermen to use a device that can track their vessel's location within 100 meters of accuracy. *Id.*

Per the Addendum:

> To date, the majority of spatial analyses of lobster . . . fishery data ha[s] been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transit routes and fishing grounds. The application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists. In particular, a number of challenges the fishery is currently facing pose a critical need for electronic tracking data in the offshore fishery.

*Id.* ¶ 59.

### 3.     The Goals of Addendum XXIX

The Addendum enumerates four goals of its electronic tracking requirement:

1. To improve spatial information data concerning the location of where the majority of fishing effort occurs by collecting spatial data more frequently and with more accurate precision;

2. To improve risk reduction efforts under the [Take Reduction Plan] that are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution;

3. To promote and prioritize the development of offshore renewable energy and the conservation of federal waters, including wind energy, aquaculture, and marine protected areas that may all create marine spatial planning challenges for the lobster and Jonah crab fisheries; and

4. To combat difficulties associated with locating gear for compliance checks and to increase the efficiency and efficacy of enforcement efforts in offshore federal management areas.

*Id.* ¶ 60. *See also Addendum XXIX* at 2.

"The Addendum further addresses the ASMFC's offshore enforcement goals by enabling the ASMFC to use this newly available data to identify subjects for investigations into potential illegal fishing practices." *Compl.* ¶ 61. The Addendum states, in part, that:

> Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear. Even if location data are not reported in real-time, once a fishing location can be identified from vessel tracking data, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. Given finite enforcement resources, information on distinct fishing locations would improve the efficiency and capability of offshore enforcement efforts.

*Id.*

### 4. Data Sharing Pursuant to Addendum XXIX

The data collected from the tracking devices is shared with and managed by the Atlantic Coastal Cooperative Statistics Program (ACCSP), which maintains a database referred to as the Standard Atlantic Fisheries Information System (SAFIS). *Id.* ¶ 62. SAFIS currently hold self-reported data from lobstermen as required by Addendum XXVI in the form of "SAFIS reports" or "trip tickets." *Id.* SAFIS will be the repository of both self-reported trip data (eVTR data) and the new electronic monitoring data collected by the vessel trackers. *Id.* The Addendum indicates that ACCSP will match the two sources of data by means of trip identification numbers and other vessel registration information. *Id.* ¶ 63.

The Addendum "contains little to no information on how this data will be protected from unauthorized use and disclosure." *Id.* ¶ 64. There are no references

to encryption, and there is no data governance policy detailing the specific intended use of the data. *Id.* Instead, "the Addendum gives the ASMFC and MDMR broad discretion on how they can use the data collected, without assurances that the data will be immune from third party subpoena or how access by third parties will be limited, even though ACCSP data has been subject to subpoenas in the past." *Id.*

Unlike electronic devices or tracking applications available in the private marketplace, the Addendum does not provide lobstermen with the ability to view the reporting dashboards associated with the tracking data or to agree to terms of service describing the data collection process, nor does it provide any limits regarding how and in what format the data can be used. *Id.* ¶¶ 65-66. It also does not place any upward limits on how sophisticated the data collection can be, "i.e., whether the data collected is limited to spatial data or whether other types of data such as voice, speed, and other data categories can be collected." *Id.* ¶ 66.

The Addendum enumerates only two exceptions to the tracking requirement. *Id.* ¶ 67. First, the requirement does not apply to vessels in Trap Area 6, which covers state waters off the coast of New York and Connecticut, because a federal permit is not required for lobster fishing in that area. *Id.* Second, the Addendum exempts holders of state-only lobster permits without a federal commercial trap gear area permit. *Id.*

The Addendum states that the ASMFC "recommends that the federal government promulgate all necessary regulations in Section 3.0 to implement complementary measures to those approved in this addendum" and "requests that

NOAA Fisheries publish the final rule on vessel tracking by May 1, 2023, with implementation no later than December 15, 2023." *Id.* ¶ 68. At the time of the Plaintiffs' filing of the complaint, no such final federal rule has been published by NOAA fisheries, much less implemented.[6] *Id.*

## E. The MDMR Rule

As noted, MDMR is responsible for enforcing ASMFC's amendments in the state of Maine. *Id.* ¶ 69. On September 13, 2023, MDMR complied with the Addendum by publishing a final rule entitled "Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders" (the MDMR Rule). *Id.* ¶ 11 (citing 13-188 C.M.R. ch. 25, § 98). The MDMR Rule required all Maine lobstermen holding federal lobster permits to comply with the tracking device installation requirement by December 15, 2023. *Id.* ¶¶ 10, 70.

The MDMR Rule adopts the Addendum and also lists five new actions that MDMR deems unlawful:

1. It is unlawful for a federally permitted lobster . . . fishing license holder to fish for, take, possess, or land lobster . . . taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license.

2. It is unlawful for a federally permitted lobster . . . fishing license holder to remove or have removed the approved tracking device from the permitted vessel listed on their license without written approval from the [MDMR].

3. It is unlawful for a federally permitted lobster . . . fishing license holder to allow the permitted vessel listed on their license to be operated in the coastal waters of the State without the approved

---

[6] The Court recites this fact as recounted by Plaintiffs in their complaint, *Compl.* ¶ 68; however, NOAA appears to have implemented a final rule on May 30, 2024. *See* Removal of American Lobster Effort Control Measures, 89 Fed. Reg. 46825 (May 30, 2024) (to be codified at 50 C.F.R. pt. 697).

tracking device being powered by an external power source at all times; an exception to this requirement exists when the vessel is moored or docked at berth.

4. The approved tracking device must remain in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or removed from the water. The license holder shall notify the [MDMR] prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device.

5. It is unlawful for a person to tamper with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position. Tampering with an approved tracking device is not considered to occur in circumstances where an approved tracking device is being repaired or replaced provided the license holder has written approval from the [MDMR].

*Id.* ¶ 69.

The MDMR Rule does not list specific punishments for failure to comply with its requirements. *Id.* ¶ 71. Rather, the rule "simply states that individuals will not be punished for a device malfunction if the fisherman notifies MDMR of the issue and makes efforts to restore it to operation in an unspecified 'timely manner.'" *Id.* Because the MDMR Rule does not specify how enforcement will be handled in any other exigent circumstance, "it remains unclear what responsibilities and repercussions will be applied to fishermen unaware of malfunction of their electronic tracking device." *Id.* Plaintiffs emphasize this as a particular concern given that lobstermen are not given access to the settings on the device itself, or in the instance where a lobsterman is unable to repair the device. *Id.* It is also unclear if lobstermen

are entitled to appeal any fines, penalties, or other enforcement actions levied against them regarding the MDMR Rule. *Id.*

Like the Addendum, the MDMR Rule requires continuous tracking and monitoring of lobstermen even when they are not fishing in federal waters, despite the fact that lobstermen use their vessels in other commercial capacities (such as scallop, tuna, and menhaden fishing) as well as recreationally. *Id.* ¶ 72. Thus, lobstermen's "movements will be tracked on a minute-by-minute basis even during emergency search and rescue operations." *Id.*

"Upon information and belief, the scope of potential privacy and security intrusions associated with the MDMR Rule far exceed those of any other vessel (or motor vehicle) tracking requirement ever implemented in [Maine]." *Id.* ¶ 73. The existing scallop tracking requirement, for example, mandates that a tracker be active only when the vessel is entering the federal scallop fishery and requires a once-per-hour ping rate. *Id.*

### 1.     The Particle TrackerOne Device

In November 2023, MDMR began sending federally permitted lobstermen electronic trackers that complied with the MDMR Rule. *Id.* ¶ 74. MDMR received funding for the electronic trackers and the associated data plans through a NOAA and National Fish Wildlife Grant. *Id.* MDMR represents that it will pay for the associated data plan for the first three years of the program; it is unclear who will fund the data plan beyond that period. *Id.*

MDMR used these grant funds "to select and purchase one of the many available electronic trackers meeting the specifications called for by the Addendum." *Id.* ¶ 75. The tracking device MDMR selected is the "TrackerOne," an electronic tracker distributed by Particle, a U.S.-based company. *Id.* Particle intends to store the data on their U.S.-based servers and offers "dashboards" that allow users visibility into the data being collected by the TrackerOne device in real time. *Id.* The TrackerOne is manufactured in China based on Particle's design. *Id.*

In the materials that accompany each TrackerOne device, *see Compl.*, Attach. 3, *Fed. Permit Holder Vessel Tracking Requirements* (ECF No. 1-3) (*Vessel Tracking Requirements*), MDMR requires that the TrackerOne be installed directly on fishing vessels either via a USB port or by hardwiring the tracker to the vessel. *Compl.* ¶ 76. After installation, the lobsterman is then responsible for ensuring that the tracker remains activated at all ties, either by running a generator or by using the vessel's house batteries. *Id.*

MDMR did not provide lobstermen with any of the manufacturer's specifications, privacy agreements, dashboard access, or other information associated with the tracker. *Compl.* ¶ 77. Lobstermen are thus unaware of what data will be collected, how that data will be used, or the circumstances under which that data can be shared. *Id.* Plaintiffs note "[t]his is particularly worrisome given that, in addition to determining a user's GPS coordinates, the TrackerOne appears to be Bluetooth compatible, may be adapted in order to collect audio information, and employs a predictive algorithm that can anticipate vessel movements." *Id.*

### F.  Plaintiffs' Attempts to Raise their Concerns

In the fall of 2023, the Plaintiffs voiced their concerns about the Addendum to the Sustainable Maine Fishing Foundation (SMFF), a non-profit entity established to support efforts to sustain the lobster fishery and protect the rights of the fishing communities that depend on the lobster industry.  *Id.* ¶ 78.

In response to the confidentiality, privacy, and enforcement concerns voiced by many affected lobstermen, SMFF corresponded with Commissioner Keliher, in his official capacity, on December 13, 2023 to detail the lobstermen's apprehensions and to request further information on the TrackerOne and how its data would be collected, stored, maintained, and protected.  *Id.* ¶ 79; *see also Compl.*, Attach. 4, *Dec. 13, 2023 Correspondence* (ECF No. 1-4).  SMFF also requested an extension of the December 15, 2023 implementation date.  *Id.*  At the time of filing, SMFF had not received a formal response to its correspondence.[7]  *Id.*  However, Commissioner Keliher "informed a member of the [Maine Lobstermen's Union] that the tracking requirement was 'out of his hands.'" *Id.*

### G.  The Parties

The Plaintiffs in this case are individual Maine lobstermen subject to the tracking device requirements of the MDMR Rule.  *See id.* ¶¶ 13-18.

Plaintiff Frank Thompson is an individual residing in Vinalhaven, Maine. *Compl.* ¶ 13.  Mr. Thompson and his spouse, Jean Thompson, are co-owners of Fox Island Lobster Company LLC (FILCO).  *Id.*  He is also a federally permitted

---

[7]  The Court restates this fact as recounted in Plaintiffs' complaint.  *Compl.* ¶ 79.

lobsterman and fishes 800 traps in federal waters. *Id*. MDMR gave Mr. Thompson a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id*.

Plaintiff Joel Strout is an individual lobsterman residing in Harrington, Maine and the President of the District 4 Lodge of the International Association of Machinist and Aerospace Workers, Local Lodge 207, formerly known as IAMAW Maine Lobstering Union – Local 207 (MLU). *Id*. ¶ 14. All MLU members hold active Maine commercial lobster and crab fishing licenses. *Id*. Mr. Strout himself is a federally permitted lobsterman who fishes 800 traps in federal waters. *Id*. MDMR gave Mr. Strout a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id*.

Plaintiff Jason Lord is an individual lobsterman residing in Pemaquid, Maine. *Id*. ¶ 15. Mr. Lord is a federally permitted lobsterman who fishes 800 traps in federal waters. *Id*. MDMR gave Mr. Lord a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id*.

Plaintiff Christopher Smith is an individual residing in Jonesport, Maine. *Id*. ¶ 16. Mr. Smith is a federally permitted lobsterman who fishes 800 traps in federal waters. *Id*. MDMR gave Mr. Smith a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id*.

Plaintiff Jack Cunningham is an individual residing in Bar Harbor, Maine. *Id*. ¶ 17. Mr. Cunningham is a federally permitted lobsterman who fishes 800 traps in

federal waters. *Id.* MDMR gave Mr. Cunningham a vessel tracker and required that he install the device on his vessel by December 15, 2023. *Id.*

Defendant Patrick Keliher is the Commissioner of the MDMR, appearing as a Defendant in his official capacity. *Id.* ¶ 18. Commissioner Keliher is also a member of the ASMFC. *Id.* In his official role, Commissioner Keliher "supervises and directs all business conducted by the MDMR and is responsible for ensuring that the actions, decisions, and rules of that agency comply with all applicable laws and regulations." *Id.*

## III. THE PARTIES' POSITIONS ON WHETHER DISMISSAL IS APPROPRIATE

### A. The Plaintiffs' Allegations

Plaintiffs challenge the adoption and enforcement of the MDMR Rule on three grounds. *Compl.* ¶ 12. They argue, first, that the MDMR Rule's requirement of a twenty-four-hour-a-day vessel tracker is an unreasonable search and seizure in violation of due process protections in the Fourth and Fourteenth Amendments to the U.S. Constitution. *Id.* They argue, second, that the MDMR Rule violates Plaintiffs' equal protection rights pursuant to the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, § 6-A of the Maine Constitution by failing to describe any of the conditions under which it will be enforced and the penalties for noncompliance, such that the Court should find it to be void for vagueness.[8] *Id.* Third, Plaintiffs aver

---

[8] The Plaintiffs state in their complaint that they bring their federal equal protection claim pursuant to Articles V and XIV of the U.S. Constitution. *Compl.* ¶ 12. As Plaintiffs' counsel acknowledged at oral argument, the references to Articles V and XIV, not Amendments V and XIV, are an obvious typographical error, and the Court has treated the references to be to the Amendments.

that the MDMR Rule violates the Maine Administrative Procedure Act (the Maine APA), 5 M.R.S. §§ 8001 *et seq.*, because it is arbitrary and capricious and contrary to law. *Id.*

### 1. Count One: The Fourth Amendment

Plaintiffs begin by informing the Court that the Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures; a search or seizure is "unreasonable" when the government trespasses into personal property, without a warrant, in violation of a reasonable expectation of privacy. *Id.* ¶ 21 (citing U.S. CONST. amend. IV). Plaintiffs aver that the use of information or evidence obtained through an unconstitutional search and seizure is a violation of the due process protections in the Fourteenth Amendment. *Id.* ¶ 22 (citing U.S. CONST. amend. XIV).

Plaintiffs point out that the United States Supreme Court has held that long-term "GPS monitoring of even a vehicle traveling on public streets constitutes a search," and that individuals have a reasonable expectation of privacy in physical movements captured by GPS monitoring. *Id.* ¶ 23 (citing *Carpenter v. United States*, 585 U.S. 296, 309, 314-15 (2018) ("Whether the Government employs its own surveillance technology . . . or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements").

The Court also notes that allegations of "void for vagueness" are typically argued as a violation of due process rights, not equal protection. However, the Court views the complaint "in the light most favorable to the plaintiff," *Germanowski*, 854 F.3d at 71, and infers that Plaintiffs intended to bring Count Two as a violation of their rights to due process.

These constitutional protections extend, Plaintiffs argue, to an individual's right to conduct a business free from government incursion. *Id.* ¶ 24 (citing *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 487-88 (S.D.N.Y. 2019) (finding businesspeople "ha[ve] a constitutional right to go about [their] business free from unreasonable official entries upon [their] private commercial property")). To comply with the Fourth Amendment, Plaintiffs contend, "an administrative search of a business must have a limited scope, a relevant purpose, specificity in its demands, and a neutral arbiter." *Id.*

Turning to the case at hand, Plaintiffs contend that, under the Fourth Amendment's protection against unreasonable searches and seizures, they "have a reasonable expectation of privacy in the movements of their fishing vessels and the precise location of their lobster traps." *Id.* ¶ 81. Plaintiffs argue that they also have a reasonable expectation of privacy "in the data produced by the tracker itself." *Id.* ¶ 82. They assert that they have a constitutional right to be free from unreasonable official entries upon their private commercial property when acting in a business capacity, *id.* ¶ 83, and that the tracking requirements set forth in the Addendum and the MDMR Rule constitutes a Fourth Amendment search "insofar as the Defendant, without a warrant, is tracking the Plaintiffs' movements while conducting business activities within federally regulated waters, as well as their personal movements while in state-controlled waters." *Id.* ¶ 84.

They aver that neither the ASMFC nor MDMR have articulated the "limited scope, relevant purpose, and specificity required to otherwise obtain this satellite

tracking data through a constitutional administrative search." *Id.* ¶ 85. "Because ASM[F]C and MDMR intend to use the tracker's surveillance data in connection with offshore enforcement efforts," they opine, "the information being collected without [a] warrant from the Plaintiffs, and potentially used punitively against them, violates their right to be free from the deprivation of life, liberty, and property without due process of law." *Id.* ¶ 86.

### 2.    Count Two: Equal Protection

Plaintiffs assert that the guarantee of equal protection enshrined in the Fifth and Fourteenth Amendments of the federal Constitution and Article I, § 6-A of the Maine Constitution, "applies to the conduct and action of the Defendant and its officials and employees." *Id.* ¶ 88. They aver that they "have a constitutionally protected right to equal protection under the law when the government regulates their private property, movements, and business activities." *Id.* ¶ 89.

The MDMR Rule, Plaintiffs contend, does not provide this constitutionally required protection and is thus "void for vagueness in that it is designed to enforce criminal and regulatory offenses without defining the contours of offenses with sufficient definiteness such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* ¶ 91.

"By way of example," Plaintiffs continue, "the MDMR Rule does not list the penalties for noncompliance, indicate what offenses can be prosecuted based on the data that is collected, what enforcement efforts can be used in connection with the

tracking device, or whether any non-compliance has implications on their fishing licensure." *Id.* ¶ 92. They also argue that the MDMR Rule does not state what penalties, if any, may be imposed for unintentional, as opposed to intentional, violations, "whether MDMR will make efforts to distinguish server-side errors from fisherman error," or what appellate rights plaintiffs have pursuant to the rule. *Id.* ¶ 93. "Given the lack of clarity on how MDMR intends to incorporate the 'offshore enforcement' efforts called for by the Addendum, and the fact that there are no detailed penalties in the MDMR rule for noncompliance," Plaintiffs conclude that "the MDMR Rule is void for vagueness in that it violates the equal protection guarantees provided by both the [U.S.] and Maine constitutions." *Id.* ¶ 94.

### 3.     Count Three: The Maine APA

Plaintiffs inform the Court that rules promulgated by a Maine administrative agency can be challenged under the Maine APA on procedural and substantive grounds, *id.* ¶ 49 (citing 5 M.R.S. § 8058(1)), and that a court reviewing a challenged agency action:

> must set aside an agency rule that 1) does not contain the written statement required by Section 8057-A; 2) involves a procedural effort that is substantial and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if the error had not occurred; or 3) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Id.* ¶ 96 (citing 5 M.R.S. § 8058).

First, Plaintiffs establish that the Maine APA requires agencies engaged in rulemaking to publish a written statement explaining the factual and policy basis for

the proposed rule.[9]  *Id.* ¶ 48 (citing 5 M.R.S. § 8052(5)).  They assert that the MDMR

Rule violates 5 M.R.S. § 8052(5) by failing to "specify the operation, fiscal impact, or

information considered by MDMR in its promulgation of the Rule," in particular

regarding the MDMR Rule's 1) specific enforcement provisions or data governance

policy, 2) "specification of the fiscal implications to fisherm[e]n once the grant funding

for the trackers expires," and 3) "specification as to how MDMR arrived at a required

ping rate or determined a need for the tracking of licensees beyond the scope of their

lobster fishing activity."  *Id.* ¶ 97.

Second, Plaintiffs contend that the MDMR Rule also violates the Maine APA

because it is arbitrary and capricious for being "inconsistent with the goals of the

MSA," offering the following examples of the MDMR Rule's failures:

1. Does not contain an adequate explanation for why minute-by-minute
   surveillance (as opposed to the hourly surveillance called for by the
   scallop tracking program) of federally permitted lobster fishing
   vessels is required to protect, conserve, grow or manage the
   American lobster fishery;

2. Authorizes the tracking of lobster vessels in state waters, when the
   vessel is being used for other commercial purposes unrelated to
   lobster fishing, and/or when the vessel is being used recreationally;

3. Calls for a substantial increase in surveillance without an
   explanation as to why the self-reported spatial information that
   fishermen have gathered since 2018 under [the Addendum] is
   insufficient information for purposes of [Magnuson-Stevens Act]
   compliance and/or does not violate National Standard 7, which

---

[9]     Plaintiffs note that Maine APA § 8052(5) further requires the written statement include
information identifying persons who commented on the proposed rule, including the organizations they
represent and a summary of their comments.  *Compl.* ¶ 48 (citing 5 M.R.S. § 8052(5)).  They note that
the same section mandates agencies publish "their rationales for adopting, or failing to adopt, any
changes to proposed rules, or when they draw findings and recommendations different from those
expressed by commentators."  *Id.* (citing 5 M.R.S. § 8052(5)).

specifically states that any fishery plan shall "avoid unnecessary duplication";

4. Risks exposing the Plaintiffs' trade secrets to third-parties without any explanation of what efforts, if any, are being taken to encrypt and protect that information from third parties, including whether third parties will be able to subpoena this information or whether this information will be available as part of the administrative record in challenges to other agency actions;

5. States that the information collected will be shared with "appropriate state or federal agencies" without defining those agencies that MDMR deems to be appropriate, limit what these agencies can subsequently do with that information, or state whether this information will be available to other agencies or private parties interested in developing wind energy projects in lobster fishing grounds;

6. Has a stated purpose of furthering renewable energy projects, including wind energy, that is well beyond the goals of FMPs authorized by the [Magnuson-Stevens Act];

7. Requires a tracker that can be Bluetooth enabled and is capable of collecting nonspatial data; and

8. Is more expensive and intrusive than necessary to achieve the Addendum's stated goals.

*Id.* ¶ 98.

Third, Plaintiffs argue that the MDMR Rule violates the Maine APA by being contrary to law. *Id.* ¶¶ 12, 99. They specifically assert that the MDMR Rule is contrary to the Consolidated Appropriations Act, 2023 Pub. L. No. 117-328, Div. JJ, 136 Stat. 4459, 6089-92 (2022) (CAA), which includes a provision specifying that the Take Reduction Plan is "sufficient to ensure that the continued Federal and State authorizations of the American Lobster . . . fisher[y] are in full compliance with both

the Marine Mammal Protection Act [MMPA] and the Endangered Species Act [ESA] until December 31, 2028." *Id.* ¶ 12 (internal quotation marks omitted).

Plaintiffs assert that the MDMR Rule is contrary to the CAA because the former is not an extension of an emergency rule existing at the time of the CAA's passage, but rather is a new regulation or administrative action designed to bring the lobster industry into compliance with the ESA and MMPA in violation of the CAA's express provision that the existing amendments to the Take Reduction Plan are to be deemed sufficient for compliance until December 2028. *Id.* ¶ 99. Plaintiffs further claim that the MDMR Rule is contrary to law because "Section . . . 101 creates field preemption over regulations of federally licensed lobster and Jonah Crab fisheries such that MDMR has no authority to create state regulations affecting them." *Id.* Finally, Plaintiffs argue that the Addendum and the MDMR Rule are both inconsistent with the mandatory National Standards articulated in the MSA. *Id.*

After acknowledging that federal review of state administrative action or rules is "generally inappropriate when a federal court is asked to answer questions specific to state law concerns and administration," *id.* ¶ 50, Plaintiffs insist that their challenge to the MDMR Rule "does not involve questions specific to Maine state law because the MDMR Rule adopts the federal policy contained in the . . . Addendum that Maine is required to adopt under federal law." *Id.* ¶ 100. Plaintiffs suggest that their challenge thus survives the narrowly tailored *Burford*[10] abstention doctrine, which requires federal courts to show deference to state administrative processes

---

[10]    *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

when "the rule or action involved pertains *only* to state-law issues that serve a significant local interest." *Id.* ¶ 51 (citing *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 29 (1st Cir. 2011) (emphasis added by Plaintiffs).

### B.  Commissioner Keliher's Motion to Dismiss

Commissioner Keliher moves to dismiss Counts One and Two in Plaintiffs' complaint for failure to state a claim upon which relief can be granted and Count Three for lack of subject matter jurisdiction. *Mot. to Dismiss* at 9-24.

### 1.  Federal Rule of Civil Procedure 12(b)(1)

### a.  Count Three: The Maine APA

Commissioner Keliher begins by moving to dismiss Count Three against him on jurisdictional grounds pursuant to Federal Rule of Civil Procedure 12(b)(1). *Id* at 9-10. Commissioner Keliher argues that "[t]he Complaint on its face . . . establishes that the Court does not have jurisdiction over [Count Three] because the Eleventh Amendment to the U.S. Constitution 'denies federal courts jurisdiction to award . . . relief against state officials based upon violations of state law." *Id.* at 9 (quoting *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 (1st Cir. 2009) (collecting cases). When a plaintiff asks a federal court to compel state officers to comply with state law, Commissioner Keliher says that "the only appropriate response is to dismiss the state law claims," "even in a suit also bringing claims grounded in federal law." *Id.* (citing *Cuesnongle v. Ramos*, 835 F.2d 1486, 1497 (1st Cir. 1987) ("If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option"); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984)

("neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment")).

In response to Plaintiffs' argument that "[a] challenge to the [MDMR] Rule does not involve questions specific to Maine state law because the [MDMR] Rule adopts . . . federal policy," *Compl.* ¶ 100, Commissioner Keliher says this "does not help them for two reasons." *Mot. to Dismiss* at 9. First, Commissioner Keliher says, Plaintiffs' suggestion that the MDMR Rule "is a creature of state law is simply incorrect" because the MDMR Rule arises from the Addendum, "which is itself a creation of the multistate [ASMFC] and not of any federal entity." *Id.* (citing *Mot. to Dismiss, supra*, sect. II). On this point, Commissioner Keliher also avers that the MDMR Rule does not have to be consistent with the MSA's National Standards. *Id.* (citing *Mot. to Dismiss, supra*, n. 5).

"Second, and most importantly," he says, the relevant issue is whether Count Three seeks relief against a state official based on violations of state law, not whether the count involves "questions specific to Maine law." *Id.* at 9-10 (citing *Guillemard-Ginorio*, 585 F.3d at 529). In other words, Commissioner Keliher opines, "the major problem with Count III is this Court's lack of jurisdiction under the Eleventh Amendment, not the principles underlying *Burford* abstention." *Id.* at 10 (citing *Compl.* ¶¶ 50-52; *Chico Serv. Station, Inc.*, 633 F.3d at 29 ("the fundamental concern in *Burford* is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution"); *Burford*, 319 U.S. 315).

Concluding that the complaint, on its face, shows that the Court lacks jurisdiction over Plaintiffs' third count because of Defendant's sovereign immunity, Commissioner Keliher accordingly asks the Court to dismiss Count Three pursuant to Federal Rule of Civil Procedure 12(b)(1). *Id.*

### 2. Federal Rule of Civil Procedure 12(b)(6)

### a. Count One: The Fourth Amendment

Commissioner Keliher next argues the facts alleged in Count One of Plaintiffs' complaint, "even drawing all reasonable inferences in Plaintiffs' favor, show no plausible path to relief because the [MDMR] Rule unquestionably meets the requirements for a lawful 'administrative search'" and thus does not violate the Fourth Amendment. *Id.* at 10-11.

The Fourth Amendment's prohibition on "unreasonable searches and seizures," Commissioner Keliher admits, has long established that "warrantless searches of private premises are presumptively unreasonable." *Id.* at 11 (quoting *United States v. Almonte-Baez*, 857 F.3d 27, 31 (1st Cir. 2017)) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)). However, Commissioner Keliher continues, courts have recognized several exceptions to this presumption of unreasonableness. *Id.* "Of relevance here," he says, the United States Supreme Court has found that "an 'administrative search' is a warrantless search that 'serve[s] a "special need" other than conducting criminal investigations.'" *Id.* (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015)). Commissioner Keliher asserts that, generally, these warrantless searches do not run afoul of the Fourth Amendment if the subject of the

search is afforded an opportunity for pre-compliance review before a neutral arbiter. *Id.* (citing *Patel*, 576 U.S. at 420).

When the search involves commercial premises in a "closely regulated" industry, Commissioner Keliher continues, "an even 'more relaxed standard' applies." *Id.* (citing *Patel*, 576 U.S. at 424). These searches do not violate the Fourth Amendment so long as (1) there is a substantial government interest behind the regulatory scheme pursuant to which the search is made; (2) the search is necessary to furthering that interest; and (3) the regulatory scheme "perform[s] the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* (citing *Burger*, 482 U.S. 691, 702-03 (1987); *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216-17 (1st Cir. 2015) (articulating the "*Burger* test"); *United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) (same)).

Commissioner Keliher explains that this "more relaxed standard" is applied to administrative searches of closely regulated industries because "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home [and] is particularly attenuated in commercial property employed in 'closely regulated' industries." *Id.* at 11-12 (citing *Burger*, 482 U.S. at 700; *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010) ("[T]he owner of commercial property in a closely regulated industry has a reduced expectation of privacy in those premises")). Commissioner Keliher notes that this diminished

expectation of privacy also applies when the "premises" being searched is a vehicle. *Id.* at 12, n. 14 (citing *United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) ("For purposes of the *Burger* doctrine, we see no meaningful distinction between commercial premises and commercial vehicles")).

Turning to the instant case, Commissioner Keliher concedes that the electronic tracking requirement in the MDMR Rule constitutes a Fourth Amendment search. *Id.* at 12 n.16. However, he contests Plaintiffs' contention that the MDMR Rule amounts to an unreasonable search in violation of the Fourth Amendment. *Id.* at 12. Commissioner Keliher argues that by requiring the installation of devices on commercial lobster fishing vessels that transmit vessel location data while the vessel is lobstering in federal and state waters, "the [M]DMR Rule constitutes an administrative search of a commercial premises engaged in a closely regulated industry." *Id.* at 12.

Commissioner Keliher first argues that the American lobster fishery is a closely regulated industry, and then, by analyzing the MDMR Rule under the three elements of the *Burger* test, submits the MDMR Rule "complies with the well-established requirements for such a search, . . . is consistent with reasonable expectations of privacy[,] and does not violate the Fourth Amendment."[11] *Id.*

---

[11] In a footnote, Commissioner Keliher says that his motion to dismiss, "like Plaintiffs' Complaint," focuses on Plaintiffs' privacy expectations in their movements while engaged in the lobster fishery, and in the location of their lobster traps. *Mot. to Dismiss* at 12 n.17 (citing *Compl.* ¶¶ 81-83).

He notes that "Plaintiffs assert in passing that fishing vessels covered by the [M]DMR Rule are also occasionally used for other purposes . . . . [b]ut these allegations do not support a plausible inference that they have a reasonable expectation of privacy in their movements while fishing for non-lobster species – activity within the scope of the pervasively regulated commercial fishing industry – or engaging in search-and-rescue operations at sea." *Id.* at 12-13 n.17.

### i.    Closely Regulated Industry

An industry is "closely regulated" when it is subject to pervasive regulation and inspection, says Commissioner Keliher. *Id.* at 13 (citing *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 734 (1st Cir. 2022). Commissioner Keliher contends that courts have recognized commercial fishing as a closely regulated industry. *Id.* at 13 (citing *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) ("Commercial fishing has a long history of being a closely regulated industry"); *Lovgren v. Byrne*, 787 F.2d 857, 865 & n.8 (3d Cir. 1986) ("the fishing industry has been the subject of pervasive governmental regulation since the founding of the Republic").

While he acknowledges that the Supreme Court has not deemed commercial fishing to be closely regulated, Commissioner Keliher opines that "a comparison with other closely regulated industries demonstrates that commercial fishing is closely regulated."[12]    *Id.* at 13.   In *Burger*, he says, the Supreme Court concluded that automobile junkyards were closely regulated because operators must obtain a license, must maintain records and make them available for government inspection, must

---

Commissioner Keliher continues, "To the extent Plaintiffs have a reasonable expectation of privacy in their commercial fishing vessels' movements while using these vessels for personal travel, Plaintiffs' allegations do not support a plausible inference the collection of location data from these trips as occasional incident to the lawful administrative search regime falls outside the de minimis exception to the Fourth Amendment's warrant requirement." *Id.* at 13 n.17 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Taylor v. City of Saginaw*, 620 F. Supp. 3d 655, 664 (E.D. Mich. 2022); *United States v. Jacobsen*, 466 U.S. 109, 125 (1984)).

[12]    Commissioner Keliher acknowledges in a footnote that the U.S. Supreme Court in *Patel*, 576 U.S. at 424, questioned the scope of the closely regulated industry doctrine and noted that it had only recognized four industries (liquor sales, firearms dealing, mining, and automobile junkyards) as "closely regulated." *Mot. to Dismiss* at 13 n.18. However, Commissioner Keliher says, "the Court's actual holding in *Patel* was only that 'hotels' … do not constitute a closely regulated industry," *id.* citing *Patel*, 576 U.S. at 425-26, and, "post-*Patel*, courts have continued to recognize various industries as closely regulated." *Id.* (collecting cases).

display their registration number in various ways, and are subject to criminal penalties, loss of license, or civil fees for failure to comply. *Id.* at 13-14 (citing *Burger*, 482 U.S. at 704-05). Commissioner Keliher argues that "[a] sample of the federal and state laws and regulations governing commercial lobster fishing in Maine, of which this Court may take judicial notice, . . . demonstrates requirements that are just as stringent and wide-ranging as those in *Burger*, if not more so."[13] *Id.* at 14. He includes examples of lobster fishery regulations which, he says, support finding the industry to be "closely regulated":

1. The ACFCMA, 16 U.S.C. §§ 5101-5108, requires the [ASMFC] to adopt [FMPs] and, should a member state fail to comply with a [FMP], gives the U.S. Secretary of Commerce authority to declare a moratorium on that state's fishery;

2. 50 C.F.R. Part 697 manages lobster fisheries by, among other things, requiring vessel permits, trap limits and tags, restricting gear in certain areas, and providing for at-sea sampler/observer coverage.

3. Under 46 C.F.R. Chapter 1, the U.S. Coast Guard and the Department of Homeland Security require commercial fishing vessels to carry certain safety equipment.

4. Title 12, Chapter 619, of the Maine Revised Statutes and Chapter 25 of [M]DMR's rules, 13-188 C.M.R. ch. 25, manages the lobster fishery by, among other things, requiring licensure, limiting the size of lobsters that may be taken, requiring that certain lobsters be notched and thrown back, and managing how lobster gear is tagged and handled and how traps are constructed.

---

[13]     Commissioner Keliher argues that "[a] court may take judicially noticeable 'matters of public record' without converting a motion to dismiss to a motion for summary judgment." *Mot. to Dismiss* at 14, n.19 (citing *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000)). "In general," he continues, "federal courts may take judicial notice of federal and state laws and regulations. *Id.* (citing 21B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 5102.1 (2d ed.); *Greene v. Rhode Island*, 398 F.3d 45, 48-49 (1st Cir. 2005) (taking judicial notice of a federal statute at the motion to dismiss stage)).

5. Maine law provides that any person who "receives a [marine resources] license . . . has a duty to submit to inspection and search for violations related to the licensure activities by a marine patrol officer" and that "[w]atercraft or vehicles . . . used primarily in a trade or business requiring a license . . . may be searched or inspected at any time." 12 M.R.S. § 6306(1).

*Mot. to Dismiss* at 14-15.

In addition to the above, Commissioner Keliher asserts that "people operating vessels at sea—whether or not they are engaging in commercial fishing—are subject to a network of regulations that allow officials to board and inspect vessels." *Id.* at 15. While reasonable suspicion is needed to stop a personal vehicle on a highway or a pedestrian on a public street, "a vessel at sea . . . can be stopped for document checks and safety inspections at any time even without reasonable suspicion." *Id.* (citing *United States v. Villamonte-Marquez*, 462 U.S. 579, 592-93 (1983); *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982); *State v. Giles*, 669 A.2d 192, 193 (Me. 1996)). He informs the Court that "Maine law specifically provides that '[m]arine patrol officers may stop and board any watercraft at any time to inspect its documents, licenses, and permits of the occupants of the watercraft and to conduct a safety inspection." *Id.* (citing 12 M.R.S. § 6133(1)).

Based on the foregoing, Commissioner Keliher concludes that commercial fishing is a closely regulated industry and Plaintiffs thus have a "greatly reduced expectation of privacy." *Id.* He further notes that Plaintiffs "have alleged no facts that would support a different conclusion," emphasizing that "in their Motion for Preliminary Injunction, Plaintiffs 'concede that commercial fishing is a closely[] regulated industry.'" *Id.; id.* at 15 n.20 (citing *Pls.' Mot. for Prelim. Inj.* at 12).

Commissioner Keliher proceeds to the first prong of the *Burger* test.

### ii.      Substantial Government Interest

Commissioner Keliher acknowledges that, to comply with the Fourth Amendment, "[a] lawful administrative search of a closely regulated industry must be necessary to furthering a substantial government interest." *Id.* at 15 (citing *Burger*, 482 U.S. at 702). He then avers that the MDMR "undoubtedly has a substantial interest in regulating the lobster fishery and ensuring its long-term viability as an economic and cultural pillar of Maine society." *Id.* (citing 12 M.R.S. § 6021 (establishing MDMR in part to "conserve and develop marine . . . resources"); *Tarabochia v. Adkins*, 766 F.3d 1115, 1123 (9th Cir. 2014) ("To be sure, protecting the fishery is an important governmental interest")).

### iii.      Necessary to Further Substantial Government Interest

Proceeding to the second prong of the *Burger* test, Commissioner Keliher argues that the MDMR Rule is necessary to further the government's substantial interest in the lobster fishery because, as stated in the Addendum, "the detailed data based on a one-ping-per-minute rate that will be collected from the electronic trackers is necessary to accurately characterizing activity in the fishery . . . which is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock assessment." *Id.* at 16 (citing *Mot. to Dismiss*, Attach 1., *Addendum XXIX to Amend. 3 to the Am. Lobster Fishery Mgmt. Plan; Addendum IV to the Jonah Crab Fishery Mgmt. Plan* § 2.1 (ECF No. 23-1) (*Addendum XXIX*)). Further, the "current system of self-reported data lacks the accuracy,

reliability, and precision that would all [M]DMR and other fishery managers to characterize a fishery occurring over vast areas and far from shore." *Id.* (citing *Addendum XXIX* § 2.1). He concludes by asserting that not only is MDMR required to implement the MDMR Rule pursuant to its obligations as a member of the ASMFC, but MDMR has also concluded, based on scientific evidence and its fishery management expertise, that the electronic tracking requirement is necessary to protect and manage the fishery. *Id.* Plaintiffs, he says, "have not alleged facts supporting a plausible inference to the contrary." *Id.*

### iv.     Functions as Warrant

Commissioner Keliher argues that the MDMR Rule also satisfies the third prong of the *Burger* test because it "perform[s] the two basic functions of a warrant" by "[1] advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and . . . [2] limit[ing] the discretion of the inspecting officers." *Id.* (citing *Burger*, 482 U.S. at 703). Regarding the first element, Commissioner Keliher avers that the MDMR Rule "clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the [MDMR] Rule's terms." *Id.* at 16-17 (citing *Tart v. Commonwealth of Mass.*, 949 F.2d 490, 498 (1st Cir. 1991) (finding adequate notice where the regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports")). Turning to the second element, Commissioner Keliher says that the MDMR Rule "properly limits government

discretion by tracking only location data of licensed commercial fishing vessels." *Id.* at 17. Citing cases in which courts found administrative searches to comply with this element, he asserts that the MDMR Rule is analogous to other administrative search regimes courts have deemed lawful. *Id.*

Acknowledging that the MDMR Rule requires vessel location data to be collected "around-the-clock whenever a vessel is in operation," Commissioner Keliher opines that this does not violate the *Burger* test: "the *Burger* [C]ourt . . . made clear that temporal limitations on administrative searches are only relevant to the extent they demonstrate that the administrative search regime 'place[s] appropriate restraints upon the discretion of the inspecting officers.'" *Id.* (citing *Burger*, 482 U.S. at 711). Commissioner Keliher interprets the Supreme Court's holding to mean that "timing restrictions for timing restrictions' sake are not necessary," and points to two cases where federal courts of appeal have approved administrative searches with no time limitations. *Id.* at 17-19 (citing *Tart*, 949 F.2d at 497-99; *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009)).

Commissioner Keliher argues that the MDMR Rule "presents the circumstances identified in *Tart* and *Ponce-Aldona*." *Id.* at 19. As in *Tart*, he asserts, the MDMR Rule's collection of location data is "minimally intrusive in the context of the 'entire regulatory scheme applicable to the commercial fishing industry,'" *id.* (citing *Tart*, 949 F.2d at 499), and is notably "less intrusive than the suspicionless boarding and search of a vessel, which is already authorized [in the lobster industry] under state and federal law." *Id.* (citing 16 U.S.C. §§ 5101-5108; 50 C.F.R. Part 697;

46 C.F.R. ch. 1; 12-619 M.R.S.; 13-188 C.M.R. ch. 25; 12 M.R.S. § 6306(1)). In addition, he says, timing restrictions on the MDMR Rule's electronic data collection would not be feasible because, like the commercial trucking industry at issue in *Ponce-Aldona*, commercial lobstering does not follow regular business hours," *id.* (citing *Ponce-Aldona*, 579 F.3d at 1226), such that timing restrictions, or the ability of vessel owners to turn the tracker on and off at their discretion, would "seriously undermine the reliability and administrability of the entire data collection program." *Id.*

Further, Commissioner Keliher notes, the MDMR Rule takes steps to limit its data collection. *See id.* at 6-7. The Particle TrackerOne collects the position of the vessel once per minute while the vessel is moving, but only once every six hours when the vessel is moored or docked. *Id.* at 6 (citing *Vessel Tracking Requirements* at 1). In addition, he says, although the MDMR Rule makes it generally unlawful for license holders to fish for lobster without an installed and operating tracking device on their vessel, several exceptions apply: (1) the license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked; (2) the device may be inoperative when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from MDMR while the situation is addressed. *Id.* at 6-7 (citing *Mot. to Dismiss*, Attach. 2, *Certificate of Authenticity §§ (B)-(D)* at § (C) (ECF No. 23-2) (*MDMR Rule*)).

Furthermore, Commissioner Keliher says, vessel location data is transmitted to the ACCSP, which maintains the SAFIS database. *Id.* at 7 (citing *Compl.* ¶ 62). Commissioner Keliher avers that "ACCSP has protected confidential information relating to fisheries—including self-reported Vessel Trip Report data—for years using the same electronic transmittal systems (approved by NMFS) and SAFIS database, as described in Addendum XXIX." *Id.* (citing *Addendum XXIX* § 3.2.3). Further, he says, "the vessel location data is 'designated as confidential through Maine law and regulation.'" *Id.* (quoting *Vessel Tracking Requirements* at 2). Specifically, Commissioner Keliher continues, "Maine law requites that fisheries data be kept confidential and not be disclosed in a manner that permits identification of any person or vessel." *Id.* (citing 12 M.R.S. § 6173). "[MDMR] regulations also require that publicly released data do not identify individual vessels or license holders." *Id.* (citing 13-188 C.M.R. ch. 5).

### v.       Reasonable Expectation of Privacy

Based on the foregoing, Commissioner Keliher argues that the Plaintiffs' contention that the MDMR Rule violates their reasonable expectation of privacy is "unavailing" because the administrative search doctrine holds that a warrantless search of commercial premises in a closely regulated industry is reasonable within the meaning of the Fourth Amendment so long as it meets the requirements for an administrative search. *Id.* at 19-20 (citing *Burger*, 482 U.S. at 700).

In response to Plaintiffs' citation of *Carpenter* in support of an individual's expectation of privacy "in the record of his physical movements" as captured through

cell-site location information, Commissioner Keliher responds "that case is entirely inapposite" because, first, *Carpenter* involved data collected as part of a criminal investigation and, second, the data at issue in *Carpenter* "provide[d] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 20 (citing *Carpenter*, 585 U.S. at 310-11).

Commissioner Keliher next responds to Plaintiffs' contention that the location of their lobster traps amounts to a "trade secret." *Id.* (citing *Compl.* ¶ 3). He argues, first, that Plaintiffs "have not pleaded any facts supporting [this] general assertion," and "it is difficult to comprehend how the location of Plaintiffs' lobster traps could constitute a 'secret' considering that (1) traps must be marked for identification . . . and (2) traps are placed in the open ocean, where marker buoys are subject to visual identification by anyone in the vicinity." *Id.* at 20-21 (citing *Oliver v. United States*, 466 U.S. 170, 179 (1984) (noting that so-called "open fields" "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance")). Second, Commissioner Keliher says that "every lawful administrative search may reveal to the government how an entity does business; the target of an administrative search is often precisely those documents and other materials containing such information." *Id.* at 21 (citing *Ricco Jonas*, 24 F.4th at 734). Third, he posits that Plaintiffs do not plausibly allege how the MDMR Rule, "which only exposes vessel-specific data to the government and keeps such data

confidential from the broader public, including fishing competitors," will violate their expectation of privacy in their "trade secrets." *Id.*

In a footnote, Commissioner Keliher responds to Plaintiffs' concern with the potential use of vessel location data in criminal or civil enforcement proceedings. *Id.* at 21 n. 22 (citing *Compl.* ¶ 86). He contends that "they have not pleaded any facts supporting a plausible claim to relief," and "[b]inding precedent forecloses any argument that the use of information collected through an administrative search in separate enforcement proceedings renders an otherwise lawful administrative search unconstitutional." *Id.* (citing *Burger*, 482 U.S. at 704-05 (discussing an administrative search regime where business owners were subject to criminal penalties, loss of license, or civil fines for violations of the regulations the searches were conducted to enforce); *Burger*, 482 U.S. at 716 ("Nor do we think this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself")).

Commissioner Keliher concludes that Plaintiffs have failed to plausibly allege the MDMR Rule's tracking requirement exceeds a lawful administrative search of a closely regulated industry and asks the Court to dismiss Plaintiffs' Fourth Amendment claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. *Id.*

### b.     Count Two: Equal Protection

Commissioner Keliher next addresses Plaintiffs' contention that the MDMR Rule violates the equal protection clauses of the U.S. and Maine Constitutions because it is vague.  *Id.* at 22.  Noting first that a "void-for-vagueness" claim is usually analyzed under the Due Process Clause, *id.* at 22 n.23, Commissioner Keliher maintains that a rule is unconstitutionally vague "only when it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited[] or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Id.* at 22 (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)).  Further, he says, "the Supreme Court has applied a less strict vagueness test to commercial regulation . . . [a]nd vagueness review is less exacting still where the law at issue carries no criminal penalties."  *Id.* at 22 (citing *ACA Connects – Am.'s Commc'ns Assoc. v. Frey*, 471 F. Supp. 3d 318, 330 (D. Me. 2020)).

Turning to the case at hand, Commissioner Keliher contends that Plaintiffs' complaint does not identify "what terms of the [M]DMR Rule are unconstitutionally vague, in what way a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement."  *Id.*  Rather, he says, Plaintiffs say that the rule is impermissibly vague because "the consequences of violating it are unclear." *Id.* at 22-23.  To this, Commissioner Keliher responds that, "even assuming the precise penalties a person may incur from violating a rule are the subject of constitutional vagueness analysis, the consequences of violating this Rule are clearly

set out in State law." *Id.* at 23. "Like many civil violations," he says, the MDMR Rule "prohibits certain conduct, regardless of whether it is intentional." *Id.* (citing *MDMR Rule* § (C)). He notes that, under Maine law, a violation of the MDMR Rule is a "civil violation for which a fine of not less than $100 for each violation may be adjudged." *Id.* at 7 n.12 (citing 12 M.R.S. § 6174(3)). A violation of the MDMR Rule, Commissioner Keliher claims, is thus "subject to the same process and procedures— including appellate procedures—as a violation of any other [M]DMR Rule." *Id.* at 23. He further informs the Court that a civil violation of the M.R.S. "is subject to the due process provided through a court adjudication, and the [MDMR] may suspend a license after such adjudication." *Id.* at 7 n.12 (citing 12 M.R.S. § 6351(1)(D)). He says 12 M.R.S. § 6371(3)(A) alternatively provides that the MDMR may administratively suspend a license without a prior court adjudication based on the license holder's commission of a marine resource violation; an administrative suspension is subject to procedural requirements and judicial review on appeal. *Id.* (citing 12 M.R.S. §§ 6371(3)(A), 6374). Commissioner Keliher concludes that "[i]t is simply not plausible that covered vessel owners are in the dark about the potential consequences of their conduct, especially considering that they operate in a highly regulated industry and can be expected to know the applicable regulations." *Id.* at 23 (citing *United States v. Facteau*, 89 F.4th 1, 33 (1st Cir. 2023)).

Based on the foregoing, Commissioner Keliher opines that the complaint "simply does not contain factual allegations that support a plausible void-for-

vagueness claim" and the Court should thus dismiss Count Two pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Id.* at 24.

**C.    Amicus Curiae Atlantic States Marine Fisheries Commission's Memorandum in Support of Defendant's Motion to Dismiss**

The ASMFC submitted an amicus curiae memorandum in support of Commissioner Keliher's motion to dismiss Count One. *Amicus Mem. in Support of Mot. to Dismiss* at 1.

### 1.    Count One: The Fourth Amendment

The ASMFC asserts that Plaintiffs' Fourth Amendment argument, if accepted by the Court, "would severely hamper governments' ability to manage fisheries in the public interest and to respond in an informed manner to the serious challenges and conflicts that often mark modern marine fishery management—and would cause that harm without sound support in Fourth Amendment precedent or principle." *Id.*

The ASMFC argues, first, that commercial fishing in marine waters "is, and has long been, a highly regulated activity" and "a privilege that comes with conditions and limitations to protect the public's interests in maintaining sustainable fisheries, the marine environment, and other resources that could be affected by commercial fishing." *Id.* at 1-2. Commercial permit holders, it continues, "reasonably understand that their activities on the water are subject to observation (including by law enforcement)," are typically required to "carry conspicuous markings on their vessels and on their gear," and may also be required to allow a governmental agent or third-party observer onboard throughout a fishing trip to monitor catch and bycatch,

document marine mammal interactions, and ensure regulations compliance. *Id.* at 2.

Second, the ASMFC asserts that the Addendum's requirement of licensees does not conform to the traditional premise of Fourth Amendment search cases, which is that the government will gain "access to 'private' things," because the location of a vessel "required to be marked prominently with various identifiers" is not private. *Id.* In contrast with the "constant video surveillance continually ongoing in myriad workplaces (mass transit locations, banks, building lobbies, etc.)," the Addendum's tracking requirement amounts to a limited intrusion which "matches the legitimate management needs but does not intrude unreasonably on any limited privacy interests." *Id.*

The ASMFC next emphasizes that it "did not establish this minimally intrusive requirement lightly or arbitrarily"; rather, it "had compelling reasons for wanting to correct a long-recognized gap in information about lobster fishing activity," as "the [ASMFC] repeatedly explained in the lengthy public process that led to the Addendum's adoption." *Id.* at 3. Plaintiffs "barely acknowledge and never seriously try to refute the legitimacy or importance of the ASMFC's purposes in establishing the monitoring requirement—or the direct way in which the monitoring program will serve those purposes," the ASMFC avers. *Id.*

Turning to Plaintiffs' concerns as to data collection, the ASMFC points out that Plaintiffs bring a facial challenge against the MDMR Rule, despite "hav[ing] not

shown there is an imminent risk it will be unreasonable in *any* case, even their own."

*Id.* at 4 (emphasis in original).  The ASMFC says:

> The theoretical harms that [Plaintiffs] raise are speculative and only arise based upon speculations about someone other than the Defendant doing something improper.  For example, their concerns that – despite being kept in accord with procedures and by institutions that have handled such data successfully – data could be accidentally disclosed or misused, is entirely conjectural and disregards the robust and proven confidentiality regime that governs the data collecting already taking place in the program.  Plaintiffs fail to adduce any real-world examples – whether from the pilot version of the program, from other jurisdictions where electronic tracking is in effect, or even from more intrusive fishery monitoring programs – to support their speculative, theoretical fears.

*Id.* at 4-5.

Based on the foregoing, the ASMFC urges the Court to reject the Plaintiffs' Fourth Amendment claim and grant Commissioner Keliher's motion to dismiss.  *Id.* at 5.

### D.    The Plaintiffs' Opposition

The Plaintiffs oppose Commissioner Keliher's motion to dismiss and the ASMFC's amicus curiae memorandum in support of dismissal.  *Pls.' Opp'n* at 1.

Before addressing the Defendant's arguments for dismissal of the three counts included in their complaint, the Plaintiffs first reassert their position that "[t]he constant monitoring required by the MDMR Rule is what can only be characterized as a drastic departure from past reporting requirements." *Id.* at 2.  The data collected pursuant to the MDMR Rule, they say, "will be uploaded into a digital map interface that then can be queried by any number of 'authorized federal and state administrators,' as well as other 'state or federal entities with confidential data

access,' to 'query and visualize trip locations' indiscriminately and apparently for any purpose." *Id.* (citing *Addendum XXIX* § 3.2.3). Indeed, they say, recent reports "suggest that this data has already been provided to students at Maine's public universities studying the fishery, as well as to the U.S. Department of Energy's National Renewable Energy Laboratory as part of its efforts to develop floating wind energy projects in the Gulf of Maine." *Id.* (citing *Pls.' Opp'n*, Attach. 1, *Considerations for Floating Wind Energy Dev. in the Gulf of Me.* at 10 (ECF No. 24-1) (*NREL Rep.*) (describing how "[e]fforts are being made to gain more knowledge around commercial fishing activities in federal waters including through a new reporting requirement for lobstering in federal waters.")).

With this preface, the Plaintiffs turn to the arguments made by Commissioner Keliher in his motion to dismiss.

### 1. Federal Rule of Civil Procedure 12(b)(1)

#### a. Count Three: The Maine APA

In response to Commissioner Keliher's argument that Count Three must be dismissed for lack of subject matter jurisdiction pursuant to the Eleventh Amendment's bar on federal courts granting relief against state officials for violations of purely state law, the Plaintiffs assert that Commissioner Keliher "cites no authority for [its] proposition" that the MDMR Rule "does not arise under federal law." *Id.* at 4 (citing *Mot. to Dismiss* at 9). Plaintiffs contend that "[t]he MDMR Rule specifically incorporates the requirements of federal Addendum XXIX," and "specifies that it will apply to all 'federally permitted' lobster license holders regardless of

whether or not they are fishing within MDMR's jurisdiction." *Id.* (citing 13 C.M.R. 188, ch. 25, § 98). Thus, Plaintiffs contend, their challenge to the MDMR Rule "necessarily and obviously exceeds the scope of a simple challenge to a state action under a purely state regulatory scheme," because it concerns "the adoption of a federal policy, promulgated under a federal rule, that is aimed solely at *federally* permitted fishing vessels for the purpose of protecting a *federal* fishery." *Id.* at 4-5 (emphasis in original).

Finally, Plaintiffs remind the Court that "[w]hile the Eleventh Amendment prohibits a party from bringing suit against a state in federal court, it does not prohibit a party from bringing suit against a state officer in federal court for prospective declaratory or injunctive relief under federal law." *Id.* (quoting *Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 24 (1st Cir. 2007) (internal citations omitted)).

### 2. Federal Rule of Civil Procedure 12(b)(6)

### a. Count One: The Fourth Amendment

Plaintiffs contend the Court should deny Commissioner Keliher's motion to dismiss as to Count One because their complaint "properly pleads a violation of the Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures." *Id.* at 5 (capitalization altered). The Plaintiffs argue that "viewing the [MDMR] Rule in [its] full context reveals it as both unnecessary to achieve its overarching purpose and as having a scope greatly exceeding that permitted for a constitutional administrative search." *Id.* at 6.

Plaintiffs first address Commissioner Keliher's argument that they have a "greatly reduced expectation of privacy when engaging in an industry that is subject to such pervasive regulation." *Id.* (quoting *Mot. to Dismiss* at 15). To this, they argue that "[w]hile an expectation of privacy may admittedly be *reduced* in a closely regulated industry, this does not equate to a non-existent expectation of privacy." *Id.* (citing *United States v. Hamad*, 809 F.3d 898, 904 (7th Cir. 2016)) (emphasis added by Plaintiffs). In addition, they argue their reasonable expectation of privacy is heightened in the present case because the scope of MDMR's search extends beyond commercial vessels fishing for lobsters in federal waters, "the only closely-regulated industry the [MDMR] Rule seeks to govern," to encompass the tracking of vessels "while they are docked or used for any number of other utterly unregulated purposes." *Id.*

Turning to the *Burger* test, the Plaintiffs argue that the MDMR Rule is invalid because the "administrative search" the rule authorizes is not necessary to further a substantial government interest. *Id.* at 6-7. While Plaintiffs concede that MDMR has a substantial interest in "regulating the lobster fishery and ensuring its long-term viability," *Mot. to Dismiss* at 15, they aver that the MDMR Rule fails for lack of necessity to protect the long-term health of the lobster fishery. *Pls.' Opp'n* at 7. In response to MDMR's assertion that the one-ping-per-minute rate "is necessary to accurately characterize[e] activity in the fishery, including the locations and density of commercial fishing gear, which 'is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock

assessment,'" *id.* (citing *Mot. to Dismiss* at 16), Plaintiffs insist that "[t]he ASMFC's own statistics . . . reveal that the lobster fishery currently is not in danger of being overfished." *Id.* at 7. Plaintiffs characterize MDMR's description of "future threats" as an "inherently vague allegation" for which MDMR "has made no effort to identify . . . , let alone articulate how its existing data collection efforts . . . are insufficient to address these 'threats.'" *Id.*

Plaintiffs also assert that the MDMR Rule fails the *Burger* standard for a reasonable search because it is not sufficiently limited in scope. *Id.* It is unclear, Plaintiffs assert, what "current threats" exist that "could justify the near-constant surveillance of Maine lobstermen and women that could not be addressed through less intrusive means (such as limiting tracking to vessels fishing for lobsters in federal waters or to the lesser 'ping rates' employed by trackers in other fisheries like the scallop fishery)." *Id.* at 8. Acknowledging MDMR's argument that its rule is necessary because "common sense" supports that a less-intrusive method "would compromise reliability and increase the chances of operator error or intentional evasion," *Mot. to Dismiss* at 16, the Plaintiffs say this "flies in the face of evidence that Maine lobster fishermen have a history of regulatory compliance." *Pls.' Opp'n* at 8.

Relatedly, Plaintiffs argue the "indefinite" "duration of the search" shows that the MDMR Rule "does not serve the same functions as a warrant." *Id.* at 9 (capitalization altered). "Unlike traditional warrants," they say, "the scope of the 'warrant' authorized by the [MDMR] Rule is almost limitless." *Id.* Plaintiffs

distinguish the MDMR Rule from the cases cited by MDMR on this basis, submitting (1) "the searches undertaken in those cases are best described as 'spot checks' narrowly designed to enforce specific regulations, and each search was only approved when the premises searched were actually engaged in the regulated activity," *id.* at 10 (citing *Burger*, 482 U.S. 691), and (2) the agencies permitted to conduct the search in the cases cited by MDMR were limited to those authorized to regulate the industry itself. *Id.* at 10.

### b.      Count Two: Equal Protection

Plaintiffs reassert that "questions remain about how and to what extent MDMR will enforce the [MDMR] Rule." *Id.* at 11. Amendment 3 underlying the Addendum allows MDMR and other agencies to use the data collected pursuant to the MDMR Rule for "offshore enforcement" purposes; however, Plaintiffs say, "despite all of the ink spilled in defense of the [MDMR] Rule, MDMR still fails to define what it means by 'offshore enforcement' and whether this [two]-word phrase is limited to regulations that MDMR is tasked with enforcing or whether it extends to regulations promulgated by other agencies." *Id.* "Because the permutations are endless," Plaintiffs contend, the MDMR Rule is "'so standardless as to encourage discriminatory enforcement' because it lacks articulated standards and 'fails to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Id.* (quoting *Mot. to Dismiss* at 24).

Based on the foregoing, Plaintiffs request that the Court deny Commissioner Keliher's motion to dismiss as to all three counts in their complaint. *Id.*

### E.    Commissioner Keliher's Reply[14]

As a preliminary matter, Commissioner Keliher asserts that Plaintiffs' complaint and opposition to his motion to dismiss "blatantly misquote" the Addendum and "thus mischaracterize" its purpose and the purpose of the MDMR Rule.  *Def.'s Reply.* at 2.  He continues to say that the Addendum explains that collection of high-resolution data regarding activities in the American lobster fishery is necessary to respond to various challenges facing the industry, "including, but not limited to, the development of offshore renewable energy and the inevitable imposition on the industry of further whale risk reduction measures."  *Id.* (citing *Addendum XXIX* § 2.1).  However, he says, the Addendum and the MDMR Rule "in no way purport to promote the development of offshore renewable energy development or the implementation of whale risk reduction efforts."  *Id.* Commissioner Keliher says, "Plaintiffs take one section of the Addendum out of context to assert that data collected pursuant to the [M]DMR Rule will be accessed 'indiscriminately and apparently for any purpose'," and argues this "assertion is squarely contradicted by the Addendum itself."  *Id.* (quoting *Pls.' Opp'n* at 2) (citing *Addendum XXIX* §§ 1.0, 2.1).

---

[14]    Commissioner Keliher informs the Court that his reply incorporates his opposition to the motion for preliminary injunction (ECF No. 16) and "limits [itself] to addressing Plaintiffs' few new substantive arguments and correcting misstatements presented in their Opposition [to dismissal]." *Def.'s Reply* at 1.

Ȁ    The Court accordingly compared Commissioner Keliher's reply to the Plaintiffs' opposition to the motion to dismiss with Commissioner Keliher's opposition to the motion for preliminary injunction. However, the Court did not find any arguments in Commissioner Keliher's opposition to injunctive relief that did not also appear in his reply in the motion to dismiss sequence.  Thus, the Court confines its restatement of Defendant's Reply to the assertions raised in that submission.

Commissioner Keliher similarly asserts that the NREL Report attached by Plaintiffs to their opposition to the motion to dismiss is "entirely inapposite," arguing it "has no bearing on Defendant's Motion to Dismiss," "was produced by two entities not involved with [the Addendum] or the [M]DMR Rule," and its "distinct purpose" is to discuss considerations for developing offshore wind energy. *Id.* at 3 (citing *NREL Rep.* at iv, vii). To the extent the NREL Report discusses the Addendum, he avers, it is as an example of "investments in data collection for lobster and other commercial fishing activities [to] begin to close important ocean-use knowledge gaps," *id.* (citing *NREL Rep.* at 40); this "does not in any way support Plaintiffs' suggestion that data collected pursuant to the [M]DMR Rule is being shared with 'students.'" *Id.* (citing *Pls.' Opp'n* at 2).

### 1. Federal Rule of Civil Procedure 12(b)(1)

### a. Count Three: The Maine APA

Turning to Plaintiffs' response to the motion to dismiss Count Three for lack of subject matter jurisdiction, Commissioner Keliher argues that "Plaintiffs continue to fail to grapple with the fact that Count Three alleges that Defendant has violated *state law*, Maine's [APA]." *Id.* at 4 (emphasis in original). Commissioner Keliher argues that "[o]n its face, Count III asks a federal court to order a state agency to comply with state law."[15] *Id.* Precedent is clear that the Court lacks jurisdiction over

---

[15] Commissioner Keliher additionally opines that Plaintiffs' argument is inconsistent with their characterization of the MDMR Rule as "involve[ing] the adoption of a federal policy, promulgated under a federal rule." *Def.'s Reply* at 4 (citing *Pls.' Opp'n* at 4-5).

this claim, he says, and "Plaintiffs have not cited a single case supporting abrogation here of this principle of black letter law."[16] *Id.*

## 2. Federal Rule of Civil Procedure 12(b)(6)

### a. Count One: The Fourth Amendment

Addressing Plaintiffs' response in opposition to his motion to dismiss Count One, Commissioner Keliher argues the Plaintiffs "substantively shift away from the Fourth Amendment theory pleaded in their complaint, to no avail." *Id.* (capitalization altered). He opines that while Plaintiffs' complaint focused on their privacy interests in the location of their lobster traps ("that is, their privacy interests while engaging in commercial lobstering"), their opposition to the motion to dismiss instead focuses on the implications of the tracking requirement when their vessels are being used for purposes other than commercial lobstering. *Id.* at 4-5. This shift, he says, "does not help Plaintiffs, for two reasons": first, in assessing a Rule 12(b)(6) motion, a court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences *that fit the plaintiff's stated theory of liability*." *Id.* at 5 (quoting *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 5 (1st Cir. 2005) (emphasis added by Defendant). "This Court therefore must assess the plausibility of the theory *pleaded in Plaintiffs' Complaint*," which is that "the [M]DMR Rule violates the Fourth

---

[16]     Commissioner Keliher asserts that Plaintiffs' citation to cases involving *Burford* abstention, including *Chico Serv. Station, Inc.*, 633 F.3d 20, are inapposite. *Def.'s Reply* at 4, n.4. Plaintiffs' citation to *Flores Galarza*, 484 F.3d 1, he says, "also is inapposite because that case dealt with a federal court's jurisdiction to order relief 'against a state officer … *under federal law*." *Id.* (citing *Flores Galarza*, 484 F.3d at 24) (emphasis added by Defendant).

Amendment because it impinges on Plaintiffs' reasonable expectation of privacy while engaging in commercial lobstering." *Id.* (emphasis added by Defendant).

Second, he says the arguments Plaintiffs advance in their opposition "have failed to plausibly *plead*" that either Plaintiffs specifically, or federally permitted commercial lobstering vessels generally, typically use their licensed lobstering vessels for non-lobstering purposes such that the MDMR Rule raises either "accuracy concerns (when a vessel is used for commercial fishing purposes other than lobstering)" or "non-incidental privacy concerns when a vessel is used for non-commercial fishing purposes)." *Id.* (emphasis in original). On the issue of accuracy, Commissioner Keliher says that Plaintiffs have not, for example, pleaded that scallop fishing by commercial lobstering vessels is so prevalent, and that the movement patterns of vessels while scalloping is so indistinguishable from the patterns of vessels while lobstering, that the American lobster fishery data "will be substantially inaccurate." *Id.* Regarding non-incidental privacy concerns, he contends "it is simply not plausible that grocery runs or a family picnic in a cove would be misinterpreted as lobstering." *Id.* (citing *Pls.' Opp'n* at 8). Commissioner Keliher adds that the MDMR adopted the ping-per-minute data collection rate "precisely because it best allows for distinguishing between the distinctive movement pattern of setting and hauling lobster traps and other activities, such as 'steaming' (transitioning) and remaining stationary." *Id.* at 5-6 (citing *Addendum XXIX* at §§ 2.2.1, 2.2.5; 15-16, 36-37).

Commissioner Keliher further contends privacy concerns miss the point, arguing that "Plaintiffs' newfound emphasis on their purported privacy interests while not engaging in commercial fishing is misplaced because the premises in question—commercial fishing vessels—already may be boarded and inspected *at any time* by government authorities without reasonable suspicion of a violation." *Id.* at 6 (citing *Mot. to Dismiss* at 15) (emphasis added by Defendant). Commissioner Keliher characterizes the Plaintiffs' insistence of their right to a heightened expectation of privacy when using their vessels for non-commercial purposes as "simply false." *Id.*

Responding to Plaintiffs' argument that active management of the American lobster fishery is unnecessary because the fishery "currently is not in danger of being overfished," *id.* (citing *Pls.' Opp'n* at 7), Commissioner Keliher says Plaintiffs' citation in support is a 2020 stock assessment, and "it is axiomatic that the state of a fishery changes over time due to harvesting practices, natural conditions, and anthropogenic environmental impacts, like climate change." *Id.* In addition, he says, Plaintiffs "are entirely off-base in suggesting that the future imposition of regulations concerning right whales is not a legitimate concern." *Id.* (citing *Pls.' Opp'n* at 8).

### b.    Count Two: Equal Protection

Turning to Count Two, Commissioner Keliher says that although Plaintiffs "speculate about future uses of the location data collected pursuant to the [M]DMR Rule," they "have not pleaded that the [M]DMR fails to provide affected lobstermen with fair notice of *what the Rule itself requires*." *Id.* at 6-7 (emphasis in original). The MDMR Rule, he states, "plainly requires installation of tracking devices on certain

licensed lobster vessels and prohibits disabling those devices while the vessels are in operation." *Id.* at 7 (citing *MDMR Rule* §§ (B)-(D)).  Thus, Plaintiffs' "[s]peculation about future uses of the location data collected by the tracking devices is not properly a part of the constitutional vagueness analysis regarding the [M]DMR Rule." *Id.*

Based on the foregoing, Commissioner Keliher requests that the Court grant his motion and order the dismissal of the Plaintiffs' complaint.

## IV.  MOTION TO DISMISS LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss an action under Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005) (internal citation omitted).  "The burden falls on the plaintiff to clearly allege facts demonstrating that he is a proper party to invoke federal jurisdiction." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996) (citation and internal quotation marks omitted); *see also Me. Council of the Alt. Salmon Fed'n v. Nat'l Marine Fisheries Serv. of the Nat'l Oceanic Atmospheric Admin.*, 203 F. Supp. 3d 58, 75 (D. Me. 2016) ("The plaintiff, as the party asserting subject matter jurisdiction, has the burden of demonstrating its existence"); *Fábrica de Muebles J.J. Álvarez, Incorporado v. Inversiones Mendoza, Inc.*, 682 F.3d 26, 33-34 (1st Cir. 2012) ("The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction").  In ruling on a Rule 12(b)(1) motion, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and indulging all

reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209-10 (1st Cir. 1996). "If the Court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3).

## B.     Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, at minimum, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz*, 669 F.3d at 55); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Evaluating the plausibility of a claim is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual

allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán*, 734 F.3d at 103 (quoting *Morales-Cruz*, 676 F.3d at 224; *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V. MOTION TO DISMISS DISCUSSION

### A. Federal Rule of Civil Procedure 12(b)(1)

#### 1. Count Three: The Maine APA

In its entirety, the Eleventh Amendment to the U.S. Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

In *Hans v. Louisiana*, 134 U.S. 1 (1890), the Supreme Court "determined that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.' In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1983) (internal citations omitted) (quoting *Hans*, 134 U.S. at 1); *see*

*also Alden v. Maine*, 527 U.S. 706, 728-29 (1999) ("The Eleventh Amendment confirmed, rather than established sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not only by the text of the Amendment alone but by fundamental postulates implicit in constitutional design"). The Supreme Court's "decisions [] establish that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'" *Pennhurst*, 465 U.S. at 100 (quoting *Emps. v. Missouri Pub. Health Dep't*, 411 U.S. 279, 280 (1973)). "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.*

Given the "vital role of the doctrine of sovereign immunity in our federal system," the Supreme Court has "required an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Id.* at 99 (quoting *Quern v. Jordan*, 440 U.S. 332, 342 (1979)). Otherwise, "a State may at its pleasure waive its sovereign immunity by consenting to suit." *Coll. Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

The Maine Department of Marine Resources is not named in the complaint, but Commissioner Keliher is sued in his official capacity as Commissioner of the department. "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* at 101 (quoting *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam)); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) (official capacity suits are "another way of pleading an action against an entity of which an officer is an agent").

"The doctrine of *Ex parte Young,* which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (discussing *Ex parte Young*, 209 U.S. 123 (1908)). But this "exception is narrow." *Id.* (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985); *Cory v. White*, 457 U.S. 85, 90-91 (1982)).

The Supreme Court explained, "[t]he theory of [*Ex parte Young*] was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'" *Pennhurst*, 465 U.S. at 102 (third alteration in original) (quoting *Ex parte Young*, 209 U.S. at 160). The *Pennhurst* Court continued, "[s]ince the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected to the consequences of his official conduct'" in *Ex parte Young*. *Id.* (quoting *Ex parte Young*, 209 U.S. at 160).

Following the reasoning in *Ex parte Young*, the Supreme Court held in *Edelman v. Jordan*, 415 U.S. 651 (1974) "that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct." *Pennhurst*, 465 U.S. at 103. This is the doctrine pursuant to which the Plaintiffs bring Count Three.

In *Pennhurst*, the Supreme Court was faced with "the question [of] whether a federal court may award injunctive relief against state officials on the basis of state law." 465 U.S. at 91.  It answered no.  The *Pennhurst* Court wrote:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.  We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Id.* at 106.  The Supreme Court continued, "*Larson* thus made clear that, at least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it." *Pennhurst*, 465 U.S. at 113 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690, 695 (1949)).

On this preliminary point, the parties disagree as to whether the Plaintiffs seek relief under state or federal law.  Commissioner Keliher asserts that Plaintiffs seek relief for a violation of state law, and the Court must dismiss Count Three pursuant to Federal Rule of Civil Procedure 12(b)(1) because the Eleventh Amendment to the U.S. Constitution grants sovereign immunity to the MDMR as a state entity. *Mot. to Dismiss* at 9-10.  The Eleventh Amendment, Commissioner Keliher says, "denies federal courts jurisdiction to award relief against state officials based upon violations of state law." *Id.* at 9 (citing *Guillemard-Ginorio*, 585 F.3d at 529).  When a plaintiff asks a federal court to compel state officers to comply with

state law, Commissioner Keliher says that "the only appropriate response is to dismiss the state law claims . . . even in a suit also bringing claims grounded in federal law." *Id.* (citing *Cuesnongle*, 835 F.2d at 1497) ("If the plaintiff wishes the federal court to address the federal claims, bifurcation will be the only option."); *Pennhurst*, 465 U.S. at 121 ("neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment")).

Plaintiffs, for their part, respond that their challenge to the MDMR Rule "necessarily and obviously exceeds the scope of a simple challenge to a state action under a purely state regulatory scheme because it involves the adoption of a federal policy, promulgated under a federal rule, that is aimed solely at *federally* permitted fishing vessels for the purpose of protecting a *federal* fishery." *Pls.' Opp'n* at 4-5 (emphasis in original). Commissioner Keliher replies that "Plaintiffs continue to fail to grapple with the fact that Count [Three] alleges that Defendant has violated *state law*, Maine's [APA]." *Def.'s Reply* at 4 (emphasis in original).

The Court agrees with Commissioner Keliher. Although a court considering a Rule 12(b)(1) motion "must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff," *Aversa*, 99 F.3d at 1209-10, the Court sees it as decisive that Plaintiffs themselves, in their Complaint, classify Count Three as a "violation of the Maine Administrative Procedure Act (5 M.R.S. 8058)." *Compl.* at 26. The Maine APA is a Maine state law. *Larson* and *Pennhurst* thus make clear that Commissioner Keliher, in his official capacity, insofar as the Plaintiffs are suing for injunctive relief pursuant to a

challenge to state law, has sovereign immunity; thus, Commissioner Keliher cannot be sued absent the state consenting to suit or Congress unequivocally expressing their congressional intent to abrogate the State's immunity.

14 M.R.S. § 8818 states "[n]othing in this chapter or any other provision of state law shall be construed to waive the rights and protections of the State under the Eleventh Amendment to the United States Constitution, except where such waiver is explicitly stated by law." In the case at bar, the Plaintiffs do "not direct us to any law to the contrary, nor do they argue that the [State] has waived its immunity by any other means." *See Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 34 (1st Cir. 2006). The Plaintiffs also have not provided any evidence of an unequivocal congressional intent to overturn the state of Maine's immunity.

Accordingly, the Court concludes Count Three is barred by state sovereign immunity and the Court therefore lacks jurisdiction to enjoin Commissioner Keliher acting in his official capacity based on an alleged misinterpretation of *state* law.[17] Thus, the Court grants the Defendant's motion to dismiss Count Three.

---

[17] The Court is aware of the United States Supreme Court's recent holding in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (June 28, 2024), which similarly concerned a rule promulgated pursuant to the MSA. *See Loper Bright*, 144 S. Ct. at 2254-57. Although the parties do not raise *Loper Bright* in their motions to this Court (understandably, as the Supreme Court published its decision after parties submitted the two present motions) and also chose to not amend their motions to incorporate *Loper Bright*, the Court nonetheless considered whether *Loper Bright* may be decisive in this case, as the Court is, of course, bound by the holdings of the United States Supreme Court.

In *Loper Bright*, Atlantic herring fishermen argued that a rule promulgated by the National Marine Fisheries Service (NMFS) pursuant to the MSA unconstitutionally exceeded the bounds of what the MSA empowers the NMFS to do. *Id.* at 2255-56. The District Court granted summary judgment to the Government, concluding that the MSA authorized the Rule, but noting that "even if these petitioners' 'arguments were not enough to raise an ambiguity in the statutory text,' deference to the agency's interpretation would be warranted under *Chevron*," *id.* at 2256 (quoting *Loper Bright Enters. v. Raimondo*, 544 F. Supp. 3d 82, 107 (D.D.C. 2021) (citing *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984)); the Court of Appeals for the D.C. Circuit

## B.      Federal Rule of Civil Procedure 12(b)(6)

The Court begins with a preliminary statement on the scope of the record.  "[A] motion to dismiss under Rule 12(b)(6) generally provides no occasion upon which to consider documents other than the complaint." *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 8 (1st Cir. 2020); *see also James D. Julia, Inc. v. Dan Murphy Auctions, LLC*, No. 1:21-cv-00025-JAW, 2021 U.S. Dist. LEXIS 115124, at *21 (D. Me. June 21, 2021) ("Ordinarily, a court ruling on a motion to dismiss may only consider whether the factual allegations within the four corners of the plaintiff's complaint state a plausible claim for relief").  Here, the Plaintiffs attach the Addendum as an exhibit to the complaint, *Addendum XXIX*, and refer to, but do not attach, the MDMR Rule.  *See Compl.*  Commissioner Keliher did, however, attach the MDMR Rule to his motion to dismiss.  *MDMR Rule.*  The parties have submitted arguments about the language of the Addendum and the MDMR Rule in favor of and against the pending motion to dismiss, and the Court has accepted the authenticity of those documents for purposes of ruling on the motion.  *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) (when, as now, "a complaint's factual allegations are expressly linked to—

---

affirmed. *Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 370 (D.C. Cir. 2022).  The Supreme Court reversed, overturning the doctrine of *Chevron* deference.  *Loper Bright*, 144 S. Ct. at 2273 ("*Chevron* is overruled").

This Court concludes that *Loper Bright* is distinguishable from the claims the parties raised in their motions, and it does not rely on *Loper Bright* in ruling on Commissioner Keliher's motion to dismiss.  *Loper Bright* involved a question of statutory interpretation; more specifically, whether an agency's rulemaking was lawful, pursuant to the agency's understanding of the authority granted to it by the Magnuson-Stevens Act – a federal law.  While Plaintiffs in the present case argue that the MDMR Rule violates the Maine APA for being both arbitrary and capricious and contrary to law, the Maine APA is a state law, not a federal one.  Because the Court concludes that it does not have subject matter jurisdiction over Count Three pursuant to the Eleventh Amendment, it does need to (and, in fact, cannot) consider whether MDMR's interpretation of their authority in promulgating the MDMR Rule was unlawful in violation of the Maine APA.

and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)").

The claims currently before the Court turn on the terms of the Addendum and the MDMR; thus, the Court considers the Addendum attached by the Plaintiffs and the MDMR Rule attached by the Defendant, both of which the parties agree are authentic without challenge.

### 1.    Count One: The Fourth Amendment[18]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause."  U.S. CONST. amend. IV.  The Supreme Court has repeatedly held that "searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Arizona v. Grant*, 556 U.S. 332, 338 (2009) (quoting *Katz v.*

---

[18]    Any analysis of whether Government conduct violates the Fourth Amendment must first determine that the conduct at issue is a search or seizure, and thus within the bounds of Fourth Amendment protections.  It is only after determining that conduct constitutes a search or seizure that the next question is considered: is the search or seizure reasonable?  *See, e.g., Terry v. Ohio*, 392 U.S. 1, 26, 27-28 (1968) (first finding an officer's "brief, though far from inconsiderable intrusion" in patting down two men to be a search, and then finding the officer's search to be reasonable where he reasonably feared for his safety); *Torres v. Madrid*, 592 U.S. 306, 309, 325 (2012) (finding officers' application of force to the defendant's body with the intent to restrain to constitute a seizure; remanding the question of whether the seizure was unreasonable in violation of the Fourth Amendment).

As Commissioner Keliher explicitly conceded in a footnote that the electronic tracking requirements in the MDMR Rule in fact constitutes a search, the Court proceeds as the parties do, and begins with the analysis of whether the search is reasonable. *See Mot. to Dismiss* at 12 n.16. Commissioner Keliher confirmed this concession at oral argument.

*United States*, 389 U.S. 347, 357 (1967)).  This rule "applies to commercial premises as well as to homes."  *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978).

The Supreme Court has also held that "[s]earch regimes where no warrant is ever required may be reasonable where 'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Patel*, 576 U.S. at 420 (citing *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989)) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)), and "where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control.'" *Id.* (citing *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)).  The Supreme Court treats this kind of search as an "administrative search."  *See id.*; *Camara v. Municipal Court of City and Cnty. of San Francisco*, 387 U.S. 523, 534 (1967).  "Absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker."  *Patel*, 576 U.S. at 420.

Here, the MDMR Rule's electronic tracking device requirement serves a "special need" other than conducting criminal investigations, *see Patel*, 576 U.S. at 420, and the parties accordingly agree it is an administrative search.  *Mot. to Dismiss* at 11 ("the [MDMR] Rule unquestionably meets the requirements for a lawful 'administrative search'"); *Compl.* ¶ 85 (arguing that "neither the ASMC nor MDMR have articulated the limited scope, relevant purpose, and specificity required to otherwise obtain this satellite tracking data through a constitutional administrative search").  The parties also seem to agree that the lobster fishery is a "closely

regulated" industry.[19]  *See Mot. to Dismiss* at 13-15; *Pls.' Opp'n.* at 5-6.  The Court thus proceeds to analyze the MDMR Rule from this premise.

The Supreme Court has adopted a "more relaxed standard" for "closely regulated" industries.  *Patel*, 576 U.S. at 424.  The Supreme Court held that administrative searches of closely regulated industries do not violate the Fourth Amendment so long as (1) there is a substantial government interest behind the regulatory scheme pursuant to which the search is made; (2) the search is necessary to furthering that interest; and (3) the regulatory scheme "perform[s] the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  *Id.* (citing *Burger*, 482 U.S. at 702-03).

---

[19]     In their response in opposition to the motion to dismiss, Plaintiffs say:

> At bottom, MDMR argues that, under . . . *Patel* … and *New York v. Burger* . . . , its Rule is a valid administrative search of a closely regulated industry because the Rule is necessary to further a substantial government interest and is sufficiently limited in scope. . . .  Contrary to MDMR's argument, however, viewing the Rule in full context reveals it as both unnecessary to achieve its overarching purpose and as having a scope greatly exceeding that permitted for a constitutional administrative search."

*Pls.' Opp'n* at 5-6.  Plaintiffs then proceed to analyze the MDMR Rule under the *Burger* test.  *Id.* at 5-11.

The Court reads Plaintiffs' assertion as rejecting Commissioner Keliher's conclusion that the MDMR Rule's electronic tracking device requirement is a lawful administrative search; however, Plaintiffs do not reject Commissioner Keliher's conclusion that the MDMR Rule should be analyzed pursuant to the Fourth Amendment test for "closely regulated" industries.  The Court reads Plaintiffs' analysis of the MDMR Rule pursuant to the *Burger* test as further indication that Plaintiffs concede the MDMR Rule should be analyzed as a closely regulated industry.  The Plaintiffs confirmed their understanding of the lobster fishery as a "closely regulated" industry at oral argument.

The Court now proceeds to analyze the MDMR using the *Burger* test. *See id.*; *Burger*, 482 U.S. at 702-03.

### a.     Substantial Government Interest

The Plaintiffs do not dispute Commissioner Keliher's assertion that MDMR has a substantial interest in regulating the lobster fishery and ensuring its long-term viability. *Pls.' Opp'n* at 6-7. They say, "MDMR argues that its interest in 'regulating the lobster fishery and ensuring its long-term viability' supports the scope of the Rule . . . . While there is no dispute that this interest is substantial—the long-term health of the fishery is essential to the livelihoods of Maine's lobster fleet—the real issue is whether the Rule as applied is indeed necessary to protect the long-term health of the fishery." *Id.* at 7.

The Court proceeds to the second prong of the *Burger* test.

### b.     Necessary to Further a Substantial Government Interest

As noted, the Plaintiffs disagree with Commissioner Keliher that the MDMR Rule is necessary to furthering a substantial government interest. *Id.* Plaintiffs say that "the lobster fishery currently is not in danger of being overfished," and thus that the "future threats" MDMR warns of are "inherently vague." *Id.* Beyond the "alleged dangers to the North Atlantic right whale population," which Plaintiffs say Congress has already addressed through the Consolidated Appropriations Act, *id.* at 8, "MDMR has made no effort to identify these 'future harms,' let alone articulate how its existing data collection efforts . . . are insufficient to address these 'threats.'" *Id.* at 7 (citing *Compl.* ¶ 55).

In determining the Rule's necessity, it is helpful to return to the text of the MDMR Rule and the Addendum on which it is based. As Plaintiffs explain in their complaint, once the ASMFC drafts an FMP containing regulations and enforcement guidelines, it specifies the requirements for state compliance. *Compl.* ¶ 6. The states then draft their own rules to meet these requirements; in Maine, the rules are drafted by the MDMR. *Id.* If a member state fails to implement an essential element of an ASMFC plan for a particular fishery, the Secretary of Commerce has the authority to declare a moratorium on that fishery in that state's waters. *Keliher Decl.* ¶ 6; *Compl.* ¶ 6 (citing 16 U.S.C. § 5106).

While the MDMR Rule does not include a statement of the problem the rule sets out to address, the Addendum does. *See Addendum XXIX* at 1-5. Because the MDMR Rule is legally required to be consistent with the Addendum, the Court looks to the text of the Addendum to determine whether the MDMR Rule is necessary to further the substantial government interest articulated in the Addendum. The Addendum begins with Section 2.1 (Statement of the Problem) which discusses the four problems the FMP seeks to address. *Addendum XXIX* at 1-2. Section 2.1 begins:

> To date, the majority of spatial analyses of lobster . . . fishery data have been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transmit routes and fishing grounds. The application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists.

*Id.* Section 2.1 goes on to identify "a number of challenges the fishery is currently facing [that] pose a critical need for electronic tracking data in the offshore fishery":

1. The stock assessment is currently limited by the coarse spatial scale of available harvest data for American lobster. NOAA Fisheries statistical areas and latitude/longitude coordinates are collected on the NOAA Fisheries Greater Atlantic Regional Fisheries Office (GARFO) Vessel Trip Report (VTR)[;] however, the collected spatial data represent the location of where the majority of the fishing effort occurred. The nature of the coarse spatial data is insufficient for management and scientific purposes. Though harvester reporting at the 10-minute square level was adopted for federally-permitted lobster vessels reporting to the states and the federal VTR continued to collect latitude and longitude data for each trip, the precision of spatial information is not consistent across federal permit holders. This finer scale does not provide the precision to accurately apportion effort within the stock units.

2. Due to interactions between protected marine resources and the lobster … fisher[y], the fisher[y] will be required to implement significant risk reduction efforts under the . . . Take Reduction Plan. These risk reduction efforts are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution.

3. Recent executive orders have prioritized the development of offshore renewable energy and the conservation of US waters. The development of emerging ocean uses such as wind energy, aquaculture, and marine protected areas may all create marine spatial planning challenges for the lobster … fisher[y].

4. The large geographic footprint and low density of lobster gear in the offshore federal management area makes it difficult to locate gear for compliance checks, reducing the efficiency and efficacy of offshore enforcement efforts.

*Id.* at 2. "Each of these issues," Section 2.1 continues, "pose an acute need for high-resolution data on where and when fishery effort in the federal fleet occurs. Electronic tracking requirements in the federal fishery would fill this information gap and support fishery managers in addressing the aforementioned challenges." *Id.*

Regarding the issue of stock assessment, enumerated at § 2.1(1), the Addendum proceeds to explain that "[a] complicating factor in the management of lobster is that the boundaries of the [Lobster Conservation Management Areas] do

not align with the biological boundaries of the stocks ([Gulf of Maine/Georges Bank v. Southern New England]).” *Id.* at 3.  This is particularly problematic in LCMAS 2 and 3 which span both stocks, the Addendum continues.  *Id.*  “To date,” the Addendum says, “the stock assessment has only been able to analyze stock composition data at the spatial resolution of the NOAA statistical area.”  *Id.*  This is because not all lobster permit holders report at a more granular level than the NOAA statistical area; for each trip, some provide a single latitude and longitude point meant to represent where the majority of fishing occurred, some provide 10-minute squares fished, and others provide only the statistical area fished.  *Id.*  The Addendum explains,

> This creates challenges for the assessment because some parameters in the stock assessment model vary at a finer spatial scale than statistical area . . . .  Improved spatial resolution of total harvest data from vessel tracking will improve size composition data used in the stock assessment models to improve the accuracy of exploitation and reference abundance estimates.

*Id.* at 3-4.

As to § 2.1(2), the Addendum says that one of its aims is to comply with the goals of the Marine Mammal Protection Act, the Endangered Species Act, and the Take Reduction Plan.  *Id.* at 4.  The Take Reduction Plan, which sets out to reduce the risks to endangered North Atlantic right whales and other large whales associated with the presence of fishing gear in waters where these animals occur, includes a significant reduction in the number of vertical buoy lines in the fishery in order to reduce right whale encounters with such buoy lines, weak-link rope requirements to reduce mortalities and serious injuries when entanglements do occur, and changes to seasonal restricted areas closed to pot/trap gear that use

stationary vertical buoy lines. *Id.* These risk reduction approaches in the Take Reduction Plan, the Addendum explains, "are informed by the co-occurrence model, which pairs information regarding the distribution of whales and commercial fishing gear to predict areas where whales may be prone to entanglement." *Id.* The Addendum asserts that "[e]lectronic vessel tracking data would significantly improve the models used to assess the location of vertical lines in the fishery and their associated risk to right whales in the [Take Reduction Plan]." *Id.* The Addendum describes the need as "critical" to "gather and provide updated and enhanced spatial effort data to improve the associated risk reduction models" ahead of the timeline mandated by the May 2021 Biological Opinion's Conservation Framework.[20] *Id.*

On § 2.1(3), the Addendum says that "[i]t is critically important to record the footprint of the U.S. lobster fishery as spatial allocation discussions occur as a result of emerging ocean uses such as aquaculture, marine protected areas, and offshore energy development." *Id.* The Addendum gives the example of the New England Fishery Management Council's (NEFMC) Omnibus Deep-Sea Coral Amendment, which looked to provide protection to corals in the northwest Atlantic Ocean through the creation of discrete regions and/or broad depth zones. *Id.* When NEFMC "took action" on the amendment in 2016, it asked the Commission to provide information on the magnitude of lobster catch in specific regions in order to understand potential economic impacts. *Id.* At the time, the Addendum explains, the lobster FMPs

---

[20] The Addendum cites the Biological Opinion issued on May 27, 2021, which "outlines a Conservation Framework that intends to reduce morality and serious injury to North Atlantic Right Whales by 95% over ten years. Within this Framework, additional risk reductions could be required in the US lobster fishery starting in 2025." *Addendum XXIX* at 4.

required harvesters to report landings via NOAA statistical areas, regions much larger than those being considered for coral protection. *Id.* at 4-5. The spatial resolution of catch and effort data for the lobster fishery "proved too coarse; without fine scale spatial information, impacts to the lobster . . . fisher[y] had to be estimated by piecing together information from harvester reports, industry surveys, and fishermen interviews." *Id.* at 5. The Addendum says that similar challenges occurred when the Northeast Canyons and Seamounts Marine National Monument was established in 2016, and that "it is expected that these challenges will continue given increased activity surrounding offshore wind, aquaculture, and oil and gas exploration." *Id.* The Addendum adds that "documentation of the US lobster fishery footprint" is also essential for compliance with recent executive action taken towards addressing climate change. *Id.*

On § 2.1(4), the Addendum says that a "potential benefit" of collecting electronic vessel tracking data is the ability to improve enforcement in the offshore area, as "[i]t has long been recognized that enforcement efforts in the offshore federal lobster fishery need to be improved." *Id.* The Addendum says that enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when lobstermen are using illegal gear. *Id.* Once a fishing location can be identified using vessel tracking data, the Addendum says, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. *Id.* "Given finite enforcement resources, information on distinct fishing

locations would improve the efficiency and capability of offshore enforcement efforts." *Id.*

The Addendum continues to state that "[f]ederal lobster . . . vessels issued commercial trap gear permits are required to install an approved electronic tracking device to collect and transmit spatial data in order to participate in the trap gear fishery." *Id.* It continues to say that the installation and activation of an approved device must happen prior to beginning a lobster trip with trap gear, and the device must then remain on board the vessel and powered at all times when the vessel is in the water, "unless the device is authorized to power down by the principal port state." *Id.* at 5-6. The Addendum then proceeds to discuss exceptions, which the Court addresses below.

In *Burger*, the Supreme Court explained that warrantless inspections are permitted only as "necessary to further [the] regulatory scheme." *Burger*, 482 U.S. at 702 (quoting *Donovan v. Dewey*, 452 U.S. 594, 600 (1980)). In *Dewey*, the Court deemed warrantless inspections "necessary to further [the] regulatory scheme" when it found that forcing mine inspectors to obtain a warrant before every inspection might alert mine owners or operators to impending inspection, thus frustrating the Mine Safety and Health Act's purposes of detecting and deterring safety and health violations. *Dewey*, 452 U.S. at 603. And in *Burger* itself, the Court found the second prong satisfied upon concluding that "regulation of the vehicle-dismantling industry reasonably serves the State's substantial interest in eradicating automobile theft." *Burger*, 482 U.S. at 709.

The *Burger* Court applied a standard akin to rational basis review to analyze this second prong, saying that, because it is well established that vehicle theft can be effectively addressed by controlling the receiver of, or market in, stolen property, "the State rationally may believe that it will reduce car theft by regulations that prevent automobile junkyards from becoming markets for stolen vehicles and that help trace the origin and detention of vehicle parts." *Id.* The First Circuit took a similar approach in *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 220 (1st Cir. 2015), finding the second prong of the *Burger* test satisfied when "Plaintiffs . . . do not say how reasonable officials . . . would have reasonably thought that warrantless inspections do not advance the just-described state interest." The *Rivera-Corraliza* Court concluded that the second prong was satisfied by "administrative searches that advance this [substantial government] interest." *Id.* at 216-17.

Applying these precedents to the present case, the Court concludes that the electronic tracker requirement articulated in the MDMR Rule and the Addendum on which it is based are "necessary" to advance the long-term health and stability of the Maine lobster fishery. It agrees with Commissioner Keliher that the Addendum clearly outlines four reasons why it, and the MDMR Rule which adopts it, are necessary means to protect its substantial interest in the lobster fishery. *Mot. to Dismiss* at 4-5. The ALMB wrote and implemented the Addendum to address four "challenges the fishery is currently facing [that] pose a critical need for electronic tracking data." *Addendum XXIX* § 2.1. First, the ALMB explained that currently available data is insufficiently detailed for management and scientific purposes,

including stock assessments. *Id.* §§ 2.1, 2.2.2. Second, the ALMB noted that the current data's limitations make it difficult to contribute valuable information about commercial lobster fishing to the NMFS's whale reduction efforts pursuant to the Take Reduction Plan. *Id.* §§ 2.1, 2.2.3. Third, the ALMB explained that better data will improve assessment of the potential effects on the lobster fishery of competing uses, including aquaculture, creation of new marine protected areas, offshore wind energy development, and offshore oil and gas exploration. *Id.* §§ 2.1, 2.2.4. The ALMB noted that the lack of sufficiently detailed fishery activity data currently hinders analysis of the potential effects of proposed projects on the lobster fishery. *Id.* Fourth, the Addendum says that better fishery activity data will improve the efficiency and effectiveness of limited enforcement resources in federal waters, with their "large geographic footprint and low density of lobster gear," thus conserving the lobster resource and ensuring the ongoing viability of the commercial fishery. *Mot. to Dismiss* at 5 (quoting *Addendum XXIX* § § 2.1, 2.2.5).

Plaintiffs have failed to plead plausible facts sufficient for the Court to conclude the MDMR Rule is unnecessary to respond to these regulatory needs as Supreme Court and First Circuit precedent requires.

The Court is not persuaded this bar is met by Plaintiffs' argument that the "future threats" the MDMR Rule seeks to address are "inherently vague" and that the MDMR "has made no effort to identify . . . , let alone articulate how its existing data collection efforts . . . are insufficient to address these 'threats'." *See Pls.' Opp'n*

at 7.  The Addendum, with which the MDMR Rule is legally required to comply, addresses each of these concerns in detail, as discussed above.  *See Addendum XXIX*.

Having found the second prong of the *Burger* test satisfied, the Court continues to prong three.

### c.    Functions as Warrant

The third prong of the *Burger* test for an administrative search of a closely regulated industry is that the challenged regulation must "perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  *Burger*, 482 U.S. at 702-03; *Rivera-Corraliza*, 794 F.3d at 216-17.  To satisfy this first function, the *Burger* Court explained that "the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'"  *Burger*, 482 U.S. at 703 (quoting *Dewey*, 452 U.S. at 600).  As to the second function, "in defining how a statute limits the discretion of the inspectors . . . it must be 'carefully limited in time, place, and scope.'"  *Id.* (citing *United States v. Biswell*, 406 U.S. 311, 315 (1987)).

Both the Plaintiffs and the Defendant treat these two functions together in their respective motion and responsive filings; thus, the Court follows their approach. The Plaintiffs on this point essentially argue that the MDMR Rule fails because it is not sufficiently limited.  *Pls.' Opp'n* at 7.  Plaintiffs question why the Government could not have limited tracking to vessels fishing for lobster in federal waters or

adopted "the lesser 'ping rates' employed by trackers in other industries like the scallop fishery." *Id.* at 8. The MDMR Rule, they say, "requires constant surveillance of vessels while they are fishing for other species, or even when they are not fishing at all"; the "indefinite . . . duration of the search" shows that the MDMR Rule "does not serve the same functions as a warrant." *Id.* at 8-9 (capitalization altered).

Commissioner Keliher, in contrast, avers that the MDMR Rule "clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms." *Mot. to Dismiss* at 16-17 (citing *Tart,* 949 F.2d at 498 (finding adequate notice where the regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports").

Commissioner Keliher also argues that the MDMR Rule functions as a warrant because it "properly limits government discretion." *Id.* at 17. He argues that the MDMR Rule is limited, first, because it "track[s] only location data of licensed commercial fishing vessels." *Id.* Although he acknowledges that the MDMR Rule requires vessel location data to be collected whenever a vessel is in operation, he argues that the rule still complies with *Burger* because its collection of location data is "minimally intrusive in the context of the 'entire regulatory scheme applicable to the commercial fishing industry,'" *id.* at 19 (citing *Tart*, 949 F.2d at 499), and is particularly "less intrusive than the suspicionless boarding and search of a vessel, which is already authorized under state and federal law." *Id.* (citing 16 U.S.C. §§

5101-5108; 50 C.F.R. Part 697; 46 C.F.R. ch. 1; 12-619 M.R.S.; 13-188 C.M.R. ch. 25; 12 M.R.S. § 6306(1)).  In addition, he says, timing restrictions on the MDMR Rule's electronic data collection would not be feasible because "commercial lobstering does not follow regular business hours" and timing restrictions would thus "seriously undermine the reliability and administrability of the entire data collection program." *Id.* (citing *Ponce-Aldona*, 579 F.3d at 1226).

Commissioner Keliher also avers that the MDMR Rule functions as a warrant because it takes steps to limit the collection of data.  *See id.* at 6-7.  First, the Particle TrackerOne collects the position of the vessel once per minute while the vessel is moving, but only once every six hours when the vessel is moored or docked.  *Id.* at 6 (citing *Vessel Tracking Requirements* at 1).  Second, although the MDMR Rule makes it generally unlawful for license holders to fish for lobster without an installed and operating tracking device on their vessel, the Rule enumerates specific exceptions.[21] *Id.* at 6-7 (citing *MDMR Rule* § (C)).

In response to Plaintiffs' argument that the MDMR Rule does not take sufficient care to protect the location data it collects, Commissioner Keliher explains that vessel location data is transmitted to the ACCSP which "has protected confidential information relating to fisheries—including self-reported Vessel Trip Report data—for years using the same electronic transmittal systems (approved by

---

[21]     As discussed above, Mr. Keliher notes that the MDMR Rule Section (C) enumerates the following exceptions: (1) the license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked; (2) the device may be inoperative when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from MDMR while the situation is addressed.  *Mot. to Dismiss* at 6-7 (citing *MDMR Rule* § (C)).

NMFS) and SAFIS database, as described in Addendum XXIX." *Id.* at 7 (citing *Addendum XXIX* § 3.2.3). Further, he says, "the vessel location data is 'designated as confidential through Maine law and regulation,'" *id.* (quoting *Vessel Tracking Requirements* at 2); "Maine law requires that fisheries data be kept confidential and not be disclosed in a manner that permits identification of any person or vessel." *Id.* (citing 12 M.R.S. § 6173). Commissioner Keliher avers that MDMR's own regulations also "require that publicly released data do not identify individual vessels or license holders." *Id.* (citing 13-188 C.M.R. ch. 5).

The Court is persuaded by Commissioner Keliher and the ASMFC's arguments and finds the MDMR Rule complies with the third prong of the *Burger* test. First, the Court concurs with Commissioner Keliher that MDMR Rule "clearly puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms." *Mot. to Dismiss* at 16-17. When the MDMR sent Particle TrackerOne devices to federally licensed lobstermen, it included in these mailings a document entitled Federal Permit Holder Vessel Tracking Requirements, which Plaintiffs attached to their complaint, that clearly inform licensees of what the Addendum requires and that these requirements apply to them because of their license. *See Fed. Permit Holder Vessel Tracking Requirements.* The mailing includes information on the kind of data the tracker will collect, who will pay for the tracking device and the data program (the latter, for the first three years), why ASMFC established the tracker requirement, whether the collected data will be kept confidential, and whether tracking is mandatory. *See id.* at 1-2. The mailing also

includes a link to a form for lobstermen who believe the MDMR Rule should not apply to them because their vessel is powered down, instructions on how the tracker can be connected and installed, and ways to tell if the tracker is operating correctly. *See id.* at 1-5. The mailing also contains a phone number and email address that lobstermen may use to contact the MDMR for troubleshooting or additional support. *Id.* at 5. Finally, the document provides a link to the full text of the Addendum. *Id.* at 5. Thus, the Court concludes that covered lobstermen were sufficiently on notice of the MDMR Rule.

The Court also agrees with Commissioner Keliher and the ASMFC that the MDMR Rule has "a properly defined scope" and "limit[s] the discretion of the inspecting officers." *Burger*, 482 U.S. at 702-03. As discussed above, the MDMR Rule complies with Maine's existing requirements for data collection which are designed to protect individual information, *see Fed. Permit Holder Vessel Tracking Requirements* at 2; *Addendum XXIX* § 3.2.3; 12 M.R.S. § 6173; 13-188 C.M.R. ch. 5; the rule includes exemptions for individuals not subject to its provisions, *MDMR Rule* § (C); and it only collects data on "the time and position" of fishing vessels, *Fed. Permit Holder Vessel Tracking Requirements* at 1, not "audio information" or a "predictive algorithm that can anticipate vessel movements" as Plaintiffs feared. *See Compl.* ¶ 77.

### d.    Other Privacy Concerns

The lobstermen have legitimate privacy concerns about the degree of governmental intrusion from the MDMR Rule. Lobstermen are not always fishing on

their boats.  They have their own lives.  Even though they use their boats to fish for lobsters, they also use these vessels to perform personal errands, to visit family and friends, and even in some cases to live on.  In the ordinary case, the government, whether state or federal, would not have the right to track a citizen's location and to force a citizen to wear an electronic monitoring device or to attach one to a company car.  The degree of state intrusion would be inimical to the restraint on government guaranteed by the Fourth Amendment but for the *Burger* exception for administrative searches of a closely regulated industry.

Despite this significant state intrusion, the state correctly rejoins that it has the legal authority to enter onto a lobster boat without a search warrant to inspect the boat for compliance with the numerous regulations that constrain lobster fishing.  However, a MDMR search of a particular lobster boat must be limited to one boat at a single time.  Here, the MDMR Rule contemplates a constant search of each licensed lobster boat in the entire lobstering fleet.  The data collection under the MDMR Rule is vastly different in kind and intensity to past MDMR practice.

The lobstermen's concern is not limited to data collection.  It extends to the use of the data and who will have access to it.  The Commissioner revealed at oral argument that the data would be available for others within federal and state government.  The state could share this data with other governmental agencies, whose concerns are distinct from lobstering and could involve such areas as protections of the right whale and the siting of wind power facilities.

Moreover, although the Commissioner properly observed that Maine's privacy and confidentiality laws apply to the collected data, the data, including personal location data, remain vulnerable to potential revelation through the legal process. For example, if the location of a lobsterman's boat at a particular time became relevant to a criminal investigation or a civil action, such as a divorce or commercial dispute, the seeker of the information, such as a law enforcement agency or civil adversary, could make a case for its disclosure. Thus, unlike virtually any other businessperson, data exist for Maine lobstermen that can confirm his or her precise location at a particular time, which may be discoverable and held against the personal interests of the lobsterman.

In addition, although the state promises to place the collected data in secure information vaults so that lobstermen's personal information will not be available to the general public, it is apparent, given the magnitude of the hacking of data in other scenarios, including government-held data, that there can be no guarantee the collected information will be absolutely secure.

Lastly, the lobstermen fear that after three years, when state funding for the monitoring program runs dry, the state will not only cease its funding but will foist the cost of the monitoring onto the lobstermen themselves, essentially mandating the lobstermen pay the state to invade their privacy. The Commissioner acknowledged at oral argument that it could be that the state will look to the lobstermen to pay for monitoring, but the Commissioner sees this program in a fundamentally different way than the fishermen do. The Commissioner sees the program as assuring the

long-term viability of the lobster as a resource, whereas the lobstermen see the program as an unwarranted governmental restriction on their way of life.

### e. The Lobstermen's Privacy Concerns and the Government's Necessity for the Information

As noted earlier, in *Burger*, the Supreme Court explained that warrantless inspections are permitted only as "necessary to further [the] regulatory scheme." *Burger*, 482 U.S. at 702. From the Court's perspective, the closer the data are to lobstering, the clearer the state justification for its collection, and conversely, the further the data are from lobstering, the more attenuated the necessity "to further [the] regulatory scheme." *Id.* Conceding that the MDMR Rule would fit comfortably within *Burger* for the collection of information on actual lobstering, the justification for collecting data about where lobster boats are when they are not lobstering in federal water is more difficult to square with the *Burger* Court's requirement of necessity.

What trips the MDMR Rule from unconstitutional to constitutional is that the MDMR has represented that the collection of data from lobster boats cannot be effective without collecting both personal and lobstering data. For example, the Commissioner stated at oral argument that the MDMR considered a system whereby a lobsterman could turn on the system when fishing and turn it off when not fishing. But because it is essential that the data be accurate, the fact that lobstermen could forget to turn on the device would skew the results. Similarly, there is no indication in this record that the system could be altered so that it begins to collect data once a

lobster boat crosses the three-mile limit into federal waters and then stops collection when the vessel re-enters state waters.

In addition, the Plaintiffs have failed to allege that there are other available systems of data collection that would protect their personal privacy and satisfy the government's legitimate interest in the collection of accurate lobstering data. At oral argument, the Plaintiffs asserted the Vessel Trip Reports lobstermen currently self-report are sufficient to provide the government with data on the lobster fishery while also intruding less into lobstermen's individual privacy. The Government strenuously objects that the current data collection system captures sufficient data to meet the evolving needs of the lobster fishery. For the reasons discussed elsewhere in this order, the Court accepts the Government's statement and additionally concludes that the Plaintiffs have not argued there is another available system of data collection would protect lobstermen's privacy while satisfying the Government's interest.

Thus, the Court cannot conclude that the MDMR Rule is gratuitously invasive of lobstermen's personal privacy. The Court must instead conclude that the MDMR's data collection system cannot be designed without the overaccumulation of both relevant and irrelevant data. Furthermore, the Commissioner has represented that the current level of data accumulation is scientifically inadequate to the task of lobster preservation. As the lobstermen work in a closely regulated industry, the Court concludes that given the choice between the overaccumulation of data and the

accumulation of inadequate data, the law favors preservation of the resource over the lobstermen's rights of privacy.

The Court understands Plaintiffs' frustration with this additional requirement of licensure. However, the First Circuit has explained that "'when an entrepreneur embarks upon such a business [in a closely regulated industry], he has voluntarily chosen to subject himself to a full arsenal of government regulation,' and thus a warrantless search to enforce that regulatory regime is not unreasonable." *Rivera-Corraliza*, 794 F.3d at 216 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)). Commissioner Keliher points to the numerous regulatory regimes governing the federal lobster fishery, including mandates on licensure, trap limits and tags, limits on the size of lobsters that may be taken, requirements that certain lobsters be notched and thrown back, and requirements that licensees submit to inspection. *Mot. to Dismiss* at 14-15. (citing 16 U.S.C. §§ 5101-5108; 50 C.F.R. Part 697; 46 C.F.R. ch. 1; 12-619 M.R.S.; 13-188 C.M.R. ch. 25; 12 M.R.S. § 6306(1)). 12 M.R.S. § 6306(1) specifically provides that any person who "receives a [marine resource] license . . . has a duty to submit to inspection and search for violations related to the licensed activities by a marine patrol officer" and that "[w]atercraft or vehicles . . . used primarily in a trade or business requiring a license . . . maybe searched or inspected at any time." *Mot. to Dismiss* at 14-15. In addition, Commissioner Keliher rightly reminds the Court that all people operating vessels at sea, independently of whether or not they are engaging in a commercial enterprise, "are subject to a network of regulations that allow officials to board and inspect vessel." *Id.* at 15. "A vessel at

sea, unlike a personal vehicle on a highway or a pedestrian on a public street, can be stopped for document checks and safety inspections at any time even without reasonable suspicion." *Id.* (citing *Villamonte-Marquez*, 462 U.S. at 92-93; *United States v. Green*, 671 F.2d at 53; *Giles*, 669 A.2d at 193). These observations are instructive and accurate.

Consistent with this Supreme Court and First Circuit jurisprudence, the Court accordingly concludes that Plaintiffs in Count One have not pleaded "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its fact.'" *Iqbal*, 556 U.S. at 678. The Court believes this is an issue that should be presented to the First Circuit on review.

## 2.   Count Two: Equal Protection

The crux of Plaintiffs' argument in their second count is that the MDMR Rule is void for vagueness "in that it is designed to enforce criminal and regulatory offenses without defining the contours of offenses with sufficient definiteness such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[22]   *Compl.* ¶ 91. They

---

[22]   Plaintiffs bring Count Two, which they classify as an equal protection violation, pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, § 6-A of the Maine Constitution. *Compl.* ¶ 12. Section 6-A of the state constitution contains Maine's version of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; the state and federal clauses "provide co-extensive protection." *Bailey v. State*, 900 F. Supp. 2d 75, 87 n.20 (D. Me. 2012); *Town of Frye Island v. State*, 2008 ME 27, ¶ 14, 940 A.2d 1065 ("[T]he two clauses provide co-extensive protection"); *see* MARSHALL TRINKLE, THE MAINE STATE CONSTITUTION: A REFERENCE GUIDE at 38-40 (1992).

Given this precedent, and that Plaintiffs presented no argument distinguishing these clauses, the Court analyzes the Plaintiffs' claims pursuant to the U.S. Constitution and the Maine Constitution as identical.

assert that the MDMR Rule specifically leaves unanswered the penalties for noncompliance, the offenses they might be prosecuted with based on the data collected, what penalties maybe imposed for unintentional violations, and whether non-compliance could affect their fishing licenses. *Id.* ¶¶ 92-93. Commissioner Keliher, in addition to reminding the Court that void for vagueness claims should be brought as due process violations rather than equal protection, argues that Plaintiffs' claim fails because they do not articulate what terms in the MDMR Rule are so unconstitutionally vague that "a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement." *Mot. to Dismiss* at 22, 22 n.23. Plaintiffs' response reasserts that "questions remain about how and to what extent MDMR will enforce the [MDMR] Rule." *Pls.' Opp'n* at 11.

As an initial matter, Commissioner Keliher is correct that void for vagueness claims are typically brought pursuant to the due process clause, not equal protection. At oral argument, the Plaintiffs explained the basis of their equal protection theory is that the MDMR Rule affects one group of lobstermen (those with federal permits) differently from another group of lobstermen (those with state permits).

The Equal Protection Clause of the Fourteenth Amendment "requires states to treat alike all persons similarly situated." *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such

selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)).

The Supreme Court has instructed that a heightened standard of review is proper for classifications based on characteristics "beyond the individual's control and bearing no relation to the individual's ability to participate in and contribute to society," such as gender and illegitimacy. *City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985). However, "[u]nless state action burdens a suspect class or impinges upon a fundamental right [the First Circuit] review[s] equal protection claims for rational relationship between the disparity of treatment and a legitimate government purpose." *Toledo*, 454 F.3d at 33. In other words, "[i]n order to state a claim for discrimination that violates equal protection, [a plaintiff] must allege that he was intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment." *Pope v. Bernard*, No. 10-1443, 2011 U.S. App. LEXIS 2764, at *6 (1st Cir. Feb. 10, 2011) (quoting *Toledo* at 34).

Here, the Plaintiffs' equal protection claim does not get out of the starting gate. The Plaintiffs have not argued, pleaded facts, or cited caselaw finding that federally permitted lobstermen are a suspect class or that the MDMR Rule impinges upon a fundamental right. Absent a suspect class, which the distinctions between these classes of lobstermen certainly are not, there is an obvious rational basis for the

MDMR Rule to distinguish between lobstermen who fish close to shore in the waters of the state of Maine and those who fish in the territorial waters of the United States. The Court does not see an equal protection issue as the Plaintiffs have framed the lawsuit.

Nevertheless, viewing the complaint "in the light most favorable to the plaintiff," *Germanowski*, 854 F.3d at 71, the Court proceeds to analyze count two as a due process void-for-vagueness claim.

As count two turns on the terms of the MDMR Rule, the Court considers the rule attached to the motion to dismiss by Commissioner Keliher, which he introduces as authentic and Plaintiffs do not challenge. *See Beddall*, 137 F.3d at 17. Chapter 25.98 is titled "Electronic Tracking Requirements for Federally-Permitted Lobster and Jonah Crab License Holders." *MDMR Rule* at 3. The Rule says that "[e]ffective December 15, 2023, the following electronic tracking device requirements apply to all federally permitted lobster and crab license holders, as defined in Section A." *Id.* Section A (Definitions) includes two definitions:

1. Approved Tracking Device means any electronic device that meets all the specifications outlined in Section 3.1 of the [ASMFC] Addendum XXIX to the American Lobster Fishery Management Plan ....
2. Federally permitted lobster ... license holder means an individual who is eligible for a commercial Maine state license or who is licensed to fish commercially for lobster ... under 12 MRS 6421 or 12 MRS 6302-A who also holds a federal lobster ... commercial trap gear permit for any of the Lobster Conservation Management Areas (LCMAs) 1, 2, 3, 4, 5, or the Outer Cape Cod on the vessel identified on their lobster ... fishing license.

*Id.*

The MDMR Rule proceeds to Section B (Electronic Tracking Device Requirements), which states that, "1. [p]rior to their first lobster . . . fishing trip following December 15, 2023, federally permitted lobster and crab fishing license holders are required to install an approved tracking device." *Id.* Section B.2 informs federally permitted lobster . . . fishing license holders that they are required to certify to the MDMR when they have completed the installation of the approved tracking device; it also says that certification must be completed via an electronic form available through the MDMR's publicly accessible website. *Id.* at 4.

Section C (Prohibitions) says that the following prohibitions apply "[u]nless a federally permitted lobster and crab fishing license holder has made modification to the Department as provided in (E)." *Id.* Section C proceeds to list 5 enumerated prohibitions:

1.   It is unlawful for a federally permitted lobster . . . license holder to fish for, take, possess, or land lobster or Jonah crab taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license.

2.   It is unlawful for a federally permitted lobster . . . license holder to remove or have removed the approved tracking device from the permitted vessel listed on their license without written approval from the [MDMR].

3.   It is unlawful for a federally permitted lobster . . . license holder to allow the permitted vessel listed on their license to be operated in coastal waters of the State without the approved tracking device being powered by an external power source at all times; an exception to this requirement exists when the vessel is moored or docked at berth.

4.   The approved tracking device must remain in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or removed from the water. The

license holder shall notify the [MDMR] prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device.

5. It is unlawful for a person to tamper with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position. Tampering . . . is not considered to occur in circumstances where an approved tracking device is being repaired or replaced provided the license holder has written approval from the [MDMR].

*Id.*

The MDMR Rule then lists, under Section D (Exceptions), two specific groups of federally permitted lobster and crab fishing license holders who are exempt from the electronic tracking requirement.[23]

Section E (Device Failure) says that "[i]n the event of an electronic tracking device failure, a violation of the prohibition in section (C) shall not exist when the federally permitted lobster . . . fishing license holder makes notification of the failure to the [MDMR] by phone, text message, or email prior to beginning a fishing trip with the inoperable device." *MDMR Rule* at 5. Section E further states that the license

---

[23] Section D exempts:

1. A federally permitted license holder who holds a federal commercial trap gear permit that has been placed in confirmation of permit history (CPH), a permit status for when a vessel with limited access permits has sunk, been destroyed, or has been sold to another person without its permit history.

2. A federally permitted license holder who holds a federal lobster commercial trap gear permit that does not fish trap gear at any point in the fishing year (i.e., only fishes other gear under a federal lobster commercial/non-trap permit, charter/party non-trap permit, and/or does not fish any trap gear at any point in the fishing year.

*Certified MDMR Rule* at 4.

holder must work with the MDMR "in good faith and in a timely manner to restore device operability as soon as possible." *Id.* Section E also indicates that it is unlawful for a license holder to begin subsequent fishing trips with an inoperable device without written approval from MDMR. *Id.* In circumstances where a federally permitted lobster fishing license holder "has reported frequent or repeated tracking device failures aboard a permitted vessel, a Marine Patrol Officer, after having given notice to that license holder, may require that license holder to obtain written approval from the Department prior to beginning a fishing trip with an inoperable tracking device." *Id.* The Court notes that Section E directly addresses Plaintiffs' questions about how the MDMR Rule treats on "unintentional, as opposed to intentional, violations." *Compl.* ¶ 93.

After reviewing the MDMR Rule, the Court concurs with Commissioner Keliher's position that the Plaintiffs do not "identify what terms of the [M]DMR Rule are unconstitutionally vague, in what way a person of ordinary intelligence would not have fair notice of what conduct the Rule prohibits, or how the Rule is so standardless as to encourage seriously discriminatory enforcement." *Mot. to Dismiss* at 22.

On the issue of vague penalties, the Court sides with Commissioner Keliher. While Plaintiffs correctly note that the MDMR Rule itself does not list a penalty or cross-reference a penalty provision, Commissioner Keliher provides the Court with the general statutory provisions governing the penalties for civil violations. First, he informs the Court that a violation of the MDMR Rule, like violations of the other rules promulgated by the MDMR, is a "civil violation for which a fine of not less than $100

for each violation may be adjudged." *Mot. to Dismiss.* at 7 n.12 (citing 12 M.R.S. § 6174(3)).

He further informs the Court that a civil violation of the M.R.S. "is subject to the due process provided through a court adjudication, and the [MDMR] may suspend a license after such adjudication," *id.* (citing 12 M.R.S. § 6351(1)(D)); 12 M.R.S. § 6371(3)(A) alternatively provides that the MDMR may administratively suspend a license without a prior court adjudication based on the license holder's commission of a marine resource violation, and this administrative suspension is subject to procedural requirements and judicial review on appeal. *Id.* (citing 12 M.R.S. §§ 6371(3)(A), 6374). Commissioner Keliher argues that "[i]t is simply not plausible that covered vessel owners," who operate in a highly regulated industry, "are in the dark about the potential consequences of their conduct." *Id.* (citing *Facteau*, 89 F.4th at 33).

The Court concludes the MDMR Rule states what conduct is proscribed and, further, concludes it is reasonable to believe that federally licensed lobstermen are sufficiently on notice that violations of the MDMR Rule will be punished in the same way as violations of MDMR's other regulations, as provided for in the general statutory penalty provisions listed by Commissioner Keliher. The Court thus concludes that the MDMR Rule states the "contours of offenses with sufficient definiteness such that ordinary people can understand what conduct is prohibited." *Compl.* ¶ 91.

The Court accordingly finds Count Two of Plaintiffs' Complaint has not pleaded "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## VI.  CONCLUSION

The Court GRANTS Defendant Patrick Keliher's Motion to Dismiss (ECF No. 23) in its entirety and accordingly DISMISSES as moot Plaintiffs' Motion for Preliminary Injunction (ECF No. 7).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of November, 2024

MAPA-4

## NOTICE OF AGENCY RULE-MAKING ADOPTION

**AGENCY:**     Department of Marine Resources

**CHAPTER NUMBER AND TITLE:**   Chapter 25.98 Electronic Tracking Requirements for Federally Permitted Lobster and Jonah Crab License Holders

**ADOPTED RULE NUMBER:**
(LEAVE BLANK-ASSIGNED BY SECRETARY OF STATE)

**CONCISE SUMMARY:**
This rule-making incorporates the requirements in Addendum XXIX (American Lobster) and Addendum IV (Jonah crab) that were approved by the Atlantic States Marine Fisheries Commission (ASMFC) in March 2022. Specifically, for compliance with the Interstate Fisheries Management Plans, this regulation requires all federally-permitted lobster and Jonah crab license holders with commercial trap gear area permits to have approved electronic tracking devices. This requirement applies to all federally-permitted lobster and crab license holders with commercial trap gear for Lobster Conservation Management Areas (LCMAs) 1, 2, 3, 4, 5, and the Outer Cape Cod.

**EFFECTIVE DATE:**
(LEAVE BLANK-ASSIGNED BY SECRETARY OF STATE)

**AGENCY CONTACT PERSON:**   Deirdre Gilbert
**AGENCY NAME:**                Department of Marine Resources
**ADDRESS:**                     21 State House Station
                                 Augusta, Maine 04333
**WEB SITE:**                    http://www.maine.gov/dmr/rulemaking/
**E-MAIL:**                      dmr.rulemaking@maine.gov
**TELEPHONE:**                   (207) 624-6553
**FAX:**                         (207) 624-6024
**TTY:**                         207-624-6500 (Deaf/Hard of Hearing)

*Please approve bottom portion of this form and assign appropriate MFASIS number.*

APPROVED FOR PAYMENT_____DATE:_____

| FUND | AGENCY | S-UNIT | APP | OBJT | AMOUNT | |
|------|--------|--------|-----|------|--------|---|
| *Please forward invoice to: Natural Resource Service Center, 155 SHS, Augusta* | | | | | | |
| 010 | 13A | 1120 | 10 | | 4946 | regulations |

**ADD-101**

**DEPARTMENT OF MARINE RESOURCES**

**Chapter 25:     LOBSTER AND CRAB REGULATIONS**

---

## TITLE INDEX

25.01    Lobster Fishing in Waters Adjacent to Criehaven

25.02    Definitions

25.03    Taking of Lobsters in York River

25.04    Lobster Trawl Limits

25.05    Lobster Trap Removal

25.06    Vessel Ownership

25.07    ASMFC Lobster Management Areas and Limitations

25.08    Lobster Trap Tag System

25.09    Procedure for Issuing Seed Lobster Permits

25.10    Lobster Trap Limits Established by Lobster Management Zones

25.11    Lobster and Crab Bait Review Process

25.12    Alternative Bait Labeling

25.15    V-notching Lobsters

25.20    Protected Resources *(see Chapter 75)*

25.40    Green Crabs

25.45    Crab Fishing Limitations

25.50    Closed Season Regulation on Fishing for Crabs in Sheepscot River

25.55    Closed Season on Fishing for Crabs in Damariscotta River

25.60    Closed Season on Fishing for Crabs in Medomak River

25.65    Lobster and Crab Closure in Penobscot River

25.70    Legal Lobster Tails

25.75    Lobster Import/Export Permit

25.80    Lobster Trap Construction Regulation

25.82    Lobster Trap Maximum Size

25.85    Lobster Trap Escape Vent Dimensions

25.90    Swans Island Area Lobster Trap Regulation

25.93    Management Framework for Limiting Lobster Fishing Effort on a Local or Regional Basis - Operational Rules

25.94    Lobster Management Zones

25.95    Monhegan Island Area Lobster Trap Regulation

25.96    Lobster Apprentice Program

25.97    Management Framework for Island Limited Entry Program

25.98    Electronic Tracking Requirements for Federally-Permitted Lobster and Jonah Crab License Holders

**25.98   Electronic Tracking Requirements for Federally-Permitted Lobster and Jonah Crab License Holders**

Effective December 15, 2023, the following electronic tracking device requirements apply to all federally permitted lobster and crab license holders, as defined in section A.

A.  **Definitions**

　　1.  Approved Tracking Device means an electronic device that meets all the specifications outlined in Section 3.1 of the Atlantic States Marine Fisheries Commission Addendum XXIX to the American Lobster Fishery Management Plan and which has been approved for use by the Atlantic States Marine Fisheries Commission.

　　2.  Federally permitted lobster and crab fishing license holder means an individual who is eligible for a commercial Maine state license or who is licensed to fish commercially for lobster and crab under 12 MRS 6421 or 12 MRS 6302-A who also holds a federal lobster and crab commercial trap gear permit for any of the Lobster Conservation Management Areas (LCMAs) 1, 2, 3, 4, 5, or the Outer Cape Cod on the vessel identified on their lobster and crab fishing license.

B.  **Electronic Tracking Device Requirements**

　　**1.**  Prior to their first lobster and crab fishing trip following December 15, 2023, federally permitted lobster and crab fishing license holders are required to install an approved tracking device.

　　**2.**  Federally permitted lobster and crab fishing license holders are required to certify to the Department of Marine Resources when they have completed the installation of the approved tracking device.   To submit their certification, federally permitted lobster and crab fishing license holders must complete an electronic form available through the Department of Marine Resources publicly accessible website.

C.  **Prohibitions**

Unless a federally permitted lobster and crab fishing license holder has made notification to the Department as provided in (E.) the following prohibitions apply.

　　1.  It is unlawful for a federally permitted lobster and crab fishing license holder to fish for, take, possess, or land lobster or Jonah crab taken with trap gear without having an approved tracking device installed aboard the permitted vessel listed on their license.

　　2.  It is unlawful for a federally permitted lobster and crab fishing license holder to remove or have removed the approved tracking device from the permitted vessel listed on their license without written approval from the Department of Marine Resources.

　　3.  It is unlawful for a federally permitted lobster and crab fishing license holder to allow the permitted vessel listed on their license to be operated in the coastal waters of the State without the approved tracking device being powered by an external power source at all

times; an exception to this requirement exists when the vessel is moored or docked at berth.

4. The approved tracking device must remain in an operational condition, minimally powered by an internal battery, when a permitted vessel is docked, moored, or removed from the water. The license holder shall notify the Department of Marine Resources prior to an approved tracking device being rendered inoperative in instances where the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device.

5. It is unlawful for a person to tamper with an approved tracking device or device signal; tampering includes any activity that may affect the unit's ability to operate or signal properly or to accurately compute or report the vessel's position. Tampering with an approved tracking device is not considered to occur in circumstances where an approved tracking device is being repaired or replaced provided the license holder has written approval from the Department of Marine Resources.

D. **Exemptions**

The following federally permitted lobster and crab fishing license holders are exempt from the electronic tracking requirements.

1. A federally permitted license holder who holds a federal commercial trap gear permit that has been placed in confirmation of permit history (CPH), a permit status for when a vessel with limited  access permits has sunk, been destroyed, or has been sold to another person without its permit history.

2. A federally permitted license holder who holds a federal lobster commercial trap gear permit that does not fish trap gear at any point in the fishing year (i.e., only fishes other gear under a federal lobster commercial/non-trap permit, charter/party non-trap permit, and/or does not fish any trap gear at any point in the fishing year).

E. **Device Failure**

In the event of an electronic tracking device failure, a violation of the prohibitions in section (C) shall not exist when the federally permitted lobster and crab fishing license holder makes notification of the failure to the Department by phone, text message, or email prior to beginning a fishing trip with the inoperable device.   The license holder must work with the Department in good faith and in a timely manner to restore device operability as soon as possible. It is unlawful for a license holder to begin subsequent fishing trips with an inoperable device without written approval from the Department.

In circumstances where a federally permitted lobster and crab fishing license holder has reported frequent or repeated tracking device failures aboard a permitted vessel, a Marine Patrol Officer, after having given notice to that license holder, may require that license holder to obtain written approval from the Department prior to beginning a fishing trip with an inoperable tracking device.

**Basis Statement:**

This rule-making incorporates the requirements in Addendum XXIX (American Lobster) and Addendum IV (Jonah crab) that were approved by the Atlantic States Marine Fisheries Commission (ASMFC) in March 2022. Specifically, for compliance with the Interstate Fisheries Management Plans, this regulation requires all federally-permitted lobster and Jonah crab license holders with commercial trap gear area permits to have approved electronic tracking devices. This requirement applies to all federally-permitted lobster and crab license holders with commercial trap gear for Lobster Conservation Management Areas (LCMAs) 1, 2, 3, 4, 5, and the Outer Cape Cod. The regulation identifies the specific requirements, as well as prohibitions and exemptions to the requirement. The regulation was amended from the original proposal in the following ways:

- It was amended in response to a comment requesting greater clarity regarding the ability of a federally permitted license holder to proceed with a fishing trip in the event of a device failure, and that this will not result in a violation;
- The definition of a "federally permitted lobster and crab fishing license holder" was amended to include a person who is eligible to purchase a commercial license, so that an individual who has not yet purchased their license for the year remains subject to the requirements;
- The definition of a "federally permitted lobster and crab fishing license holder" was amended to specify a commercial license, so that individuals with a federal permit but only a noncommercial lobster license would not be subject to the requirement to have an electronic tracking device.

**Summary of Comments:**

Notice of this proposed rulemaking appeared on September 13, 2023 in the 5 major daily newspapers as published by the Secretary of State. Also on September 13, 2023 the rule was posted on the DMR website, and electronic messages were sent to individuals who subscribe to DMR notices. The public hearing was held on October 5, 2023 at 5:00 pm in person at the DMR offices at the Marquardt Building, 32 Blossom Lane, Augusta, Maine and remotely via Microsoft Teams. The comment period closed October 16, 2023.

**Attendance at the Public Hearing:**

| Members of the Public | DMR Staff |
|---|---|
| Virginia Olsen, Matthew Gilley, Alan Poland, Nick Morley, Patrice McCarron, Rebecca Nuzzi, Amalia Harrington, Chris Cash, Ashley, Joseph Fessenden, Anonymous<br><br>*Note: The names listed above reflect the information the participant provided when they signed into the remote proceeding. Some* | Commissioner Patrick Keliher, Deputy Commissioner Meredith Mendelson, Deirdre Gilbert, Megan Ware, Jeff Nichols, William DeVoe, Lorraine Morris |

| | |
|---|---|
| *participants did not provide a last name or other identifying information.* | |

**Thomas Boudin, submitted via email, September 14, 2023**

This requirement will be very costly and put additional burdens on the industry.

Without evidence that rope entanglement is a severe threat to the Whale population I feel this requirement is overkill and very harmful to the Lobster industry that is already being threatened by global warming and other issues.

Is there any research information about the effect of prop strikes on whales?

**Andrew Taylor, submitted via email, September 14, 2023**

This rule is completely ridiculous , there is really nothing to be gained by this and is yet another great inconvenience to fisherman and senseless cost to the government. I have been fishing for over 40 years and with each of these new rules I'm closer to the end . There is also noththing to be gained  by the mandatory reporting that isn't already known also . Seems marine patrol is out there and can tell you where everyone is fishing , it's not a big secret . We also already report landings to dealers . Just redundant info and great inconvenience to fisherman. NO NEED FOR ANY OF THIS!!!!!!!

**Myles Bierman, submitted via email, September 14, 2023**

Good afternoon, as a gulf of maine federal lobsterman I would like to let it be known that I am FIRMLY against any sort of vessel tracking, I believe it to be a serious invasion of privacy. We as fisherman in the state already have daily harvester reporting that show fishing effort and location of said efforts. I am not entirely sure what vessel tracking would accomplish besides be a complete invasion of privacy. Please consider these points, Have a good day
Thank you

**Walter Willey, submitted via email, September 14, 2023**

Tracking I am not goin to buy a tracking device, I have had my permit since Early 80 , you are asking too much from the fishermen !!!!!!!!!!! If you can see what you have done to our fishing bottom out side side of Crie heaven 😠

**Wade Faulkingham, submitted via email, September 15, 2023**

No black box tracking system. We don't need big brothers help period.

**cocoandjace@aol.com,  submitted via email, October 2, 2023**

I'm a third generation fisherman from Cushing Maine. I have 5 sons who are planning to be lobsterman one who is 3 yrs old w a play boat and a trap in the yard trying to be like his family. I ask when does this end? You first start w whale regulations we comply w then and still have been zero fault proven yet we are continued to comply w new regulations why? Zero data against us. You then make us report our catch daily when the buyer already does this again why? There

is a new ceiling in effect if we see a reduction in catch out of ventless traps we will have a measure increase again why? Those traps also are no deeper then 35 fathom to my knowledge we all know the waters are warming n the stock is deeper again why? This to me seems like more regulation and more government control on our industry while I think some people may over fish this to me seems no more then days to be used by the government to be put against us. I am opposed to a tracker because every other fishery that has complied w this is now a dying industry. We have complied w everything asked n this is not something we need to do. Why? Because as I stated above my five boys hope to have a living at sea as our whole family has we already report our dealers report DMR can track boats already w no warrant so I see zero advantage for fisherman in this proposal. I hope the Maine lobsterman have a bite on what happens to Maine lobsterman but I'm sure we won't. For you bureaucrats I say this if you keep allowing them to restrict us guess what you'll be the next  profession w no job. Maine lobstering will regulate itself it always has if there's no profit we won't go stop regulating us this is more unnecessary regulation

**Wade Faulkingham, submitted via email, October 2, 2023**
Big brother doesn't need to know every move we make. I would say this garbage we are getting shoved down our throats is due to future closures in the lobster/ crab fisheries.  Leave us alone.

**Roger Chipman, submitted via email, October 3, 2023**
We do not need anything like this we are doing a lot now that another

**Kate O, submitted via email, October 5, 2023**
I just want to say for one it says I can log on remotely to see the meeting, but it will not give me a link. And you absolutely do not need to have a tracker in anybody's votes. It's not a law it's a rule nobody needs to do it. If it's not a law and nobody will do it. It's absolutely ridiculous.

**Virginia Olsen (Stonington), Public Hearing, October 5, 2023**
I guess my comment is fishermen are frustrated with looking at gear modifications. Three years later, we've got to pay again.  Everything that we catch is costing us more money and we're not able to get it on the other end. So it's a lot of frustration in, you know, looking at gauge changes and vent changes, adding a cell program or a satellite program after the three years which from what I hear it's about three years, they seem to get out of the gear, the unit.
So we would then need to buy a unit on our own and pay for that time. The information that we hold dear is how we fish and where we fish. So just the idea of giving that to somebody else is very difficult to do, especially when we feel like it's going to be used for siting offshore wind and none of us approve of offshore wind. It's just sad that we've come to this point, that we have to go down this route when for hundreds of years Maine has been harvesting sustainably. I feel like we're the gold standard of sustainability, but now doing reports everything we have to do if it takes time, it costs money and we're like we just can't get that out of the other end.
Thank you.

**Matthew Gilley, Public Hearing, October 5, 2023**

I wanted to echo some of what Ginny said. This is, I've spent my entire life figuring out what I figured out out there. I still don't even have it all figured out. You guys are just asking to hand over a multimillion-dollar business. There's this, there's no way that this can be. I wish we had more money because if we did, we'd sue you in court. This can't be constitutionally legal. I mean, we're being treated like we're criminals at this point. The only people I know that are tracker people are people that have broken the law. We haven't broken any law. And we're gonna be followed everywhere we go now. I mean, I've already doubled it with the reporting, you know, I know I'm gonna deal with it with the vessel tracker thing when I decide to go out there tuna fishing. And then I get a phone call because I don't have a report for that day because I wasn't lobstering out there, I was tuna fishing. It's, like Ginny said. That's more time out of my thing. Out of my day, that's time out of my business. I spend more time at these hearings, and just, we just wanna go fishing and be left alone.

We leave the whales alone. We don't like, it's just so redundant at this point. It's becoming sickening.

I can go on and on, but I'm sure there's others that echo the same sentiments.

Thank you.

**Alan Poland (Cushing), Public Hearing, October 5, 2023**

There's one word I keep hearing that just aggravates me every day. When I do that report online, compliance. I gotta keep compliant. Compliant. Where are we? China, Russia? What is this? Compliant - always got be compliant. It's frustrating. I don't tell nobody what to do, but I get told what to do all the time. Do this. Do this. Do this. Do this. Getting old. Well, that's all I got to say, yeah. I've said what I need to say earlier. Good.

**Nicholas Morley (Boothbay), Public Hearing, October 5, 2023**

I guess my like big thing from all of this is just like if we start getting this data and it's enough, then lets get rid of the harvesting data just if we can make it as easy on us as possible at this point, it seems like everything like exactly he said would comply, comply, comply if the tracking device gets me out of having to report at the end of the day. It's not great, but it's better than where we're at now.

**Virginia Olsen, Public Hearing, October 5, 2023**

Follow up with one more thing. A lot of us live in island communities and have you know, we go to Vinal Haven. We go to Isle Au Haut, we go to Matinicus, we do that with our families. It just feels like such an invasion of my privacy to know every time I start up that boat that I pay the payments on every month someone else knows what I'm doing. It just feels wrong.

**Anonymous, Public Hearing (remote individual who did not provide name), October 5, 2023**

I think you guys are going to regret doing this because you have so much bad data with one minute pings. I mean, your lines are going to be squiggly and there's, you know, like that guy says set and drift. I mean, there's all kinds of things going on out there, but that one question I had is, is this actually a law? Because I keep hearing rule, mandate. Those aren't laws, like is this actually a law? And it is it gonna be a law by December 15?

**Jeff Putnam, submitted via email, October 8, 2023**

Dear Deirdre Gilbert,

I am writing to comment on the proposed rule Chapter 25.98, electronic tracking. I am in favor of electronic tracking for federally permitted lobster boats , but I feel that there has been an omission in the proposed language in regards to the inevitable equipment malfunctions.

My reason for supporting the tracking is that the spatial data benefit lobstermen in the long term ocean planning conversation. We have long stated that the islands and coastal towns maritime heritage depend on access to the waters of the gulf of Maine, this is where we make our living. Offshore wind and conservation groups have used the lack of lobstering data to their advantage in the ocean planning process. Accurate data will be a tool to better our case that we cannot have fishing exclusion areas. I have trialed a tracker for the past year and a half and have found that it is not a burden.

My concern is the rigidity of the language under C: Prohibitions number 3. Tracking has been discussed many times at the various lobster zone and advisory councils over the past few years. At every opportunity, lobstermen have stated that we cannot be prohibited from going lobstering if there is a malfunction with the equipment. Every time this was brought up DMR has agreed and ensured us that we would still be able to fish if the tracker was not operational. I have personally seen boats that are required to have VMS for NGOM or groundfish permits not be able to go out when their federally required boxes stopped working. That is unacceptable for this Maine rule. It is unfortunate that given all of the time DMR has had to plan for this implementation, this was not covered in the language.

Most lobsterman have extensive electronics that we depend on daily, and most of us have had failures in one piece or another. It is no fun to go out when the autopilot stops working, or the chart plotter doesn't turn on, but in general if the fishing is hot we can get by and get the day in. It is inevitable that there will be power failures or hardware failures with the trackers, but we cannot be prohibited from fishing because of it.

The department could have an internal policy that states that if a tracker malfunctions and the Captain emails or leaves a voicemail then there wont be a violation if they do go fishing, but I don't believe that is a strong enough assurance for lobstermen. I think there has to be language included in the rule that allows for a certain number of days per year that we can haul if the tracker is not operational. My recommendation is to include language under D exemptions that states; up to once per quarter, federally permitted lobster and crab fishing license holders may fish for, take, possess, or land lobster without an operational tracking device if they have notified the Department in writing or by phone that the tracker or power supply has malfunctioned. In this instance the license holder will have two business days to have the unit replaced or the power issue fixed.

Thank you for considering this recommendation.

Sincerely yours,
Jeff Putnam

**Carl Guyton, submitted via email, October 10, 2023**

hi there im writing in regards to the "trackers" you are trying to mandate me to have on my vessel. Firstly this mandate is completely 100% unconstitutional!!!!!!!!! second mandating me to give up my business proprietary information to a government authority without a warrant is unprecedented third other than figuring out exactly where i go and where i place my traps what will you gain from this i am already required to  report daily where i fish. This is an absolute intrusion into my privacy on the flip side i firmly believe all government employees should be required to have an ankle monitor on at all times so that the public can have some accountability from rouge gov employees

**Michael Gagnon, submitted via email, October 12, 2023**

Here we go again. The government complains of massive deficits and they go out of thee way to waist more money. I'm a72 year lobsterman with a federal permit attached to my boat. I don't lobster in  federal waters  federal waters I don't even lobster outside of the exemption zone. I have very few years of lobstering left in me. I kept the permit in order to enhance the value of my boat. You well know that with all the failed ideas that have been presented to us in the last few have done nothing to change the mortality of Right whales considering there hasn't been any in the Gulf of Maine. We have jut started to report every trip location, landings, buoy, end lines, old shell, new shell , even soak times its absolutely ridiculous. You have succeeded to devaluate  our permits and our lobster boat values by more than fifty percent. We thank you for that. If you are so concerned about putting us out of business why don't you just buy us out. The Biden administration not long ago just  released  six billion dollars to Iran. go figure and look what there using it for now. I'm only trying to supplement my retirement income and big brother just keeps on taking. I'm positive that I'm far from the only Maine lobsterman in my predicament. In closing why put so much burden on our ability  to keep our heads above water financially when you are inventing a cure for a non existent malady. What a waist time, money, and effort.
Michael A. Gagnon

**Chip Johnson, submitted via email, October 13, 2023**

Hello.
I do not think tracking data given to gov officials at all times is anywhere near appropriate, or legal for that matter. The line has been crossed with this one. This is the United States of America. This type of thing is over reach, too much has already slipped by to date. This data will be used for driving agendas contrary to fishing and feeding Americans, and keeping a local economy alive. Yes I have heard all the excuses. This communist move lines right up with all the rest of the Anti Capitalist and Anti Independent agendas of late. Read the Constitution and you will understand.
Chip Johnson

**Jarod Bray, submitted via email, October 14, 2023**

You should allow lobsterman to call into state or federal departments and declare "not fishing" if they are not using their permit. That would stop them from having to use the tracker if they don't intend to be offshore for the year. The lobsterman should be allowed to reverse that decision given an appropriate amount of time.

I hope the tracker doesn't need to be on 24/7 and only needs to be powered up when the boat is on. I have several friends with VMS who end up with dead batteries in the winter when they don't use their boat for weeks.

-Jarod Bray

**Bob Jr., submitted via email, October 14, 2023**
These tracking devices are totally unnecessary! A violation of privacy. It's government overreach. Would they like it if we put trackers on their cars or on their persons  to make sure they're going to work at their federal job on our tax dollars? They might hit an endangered owl with their car on their way to work ! Haha totally ignorant . It's not good for a Maine !!! It's more government control on Maine fisherman to try and shut us down like they've been doing. I strongly protest against it ! Not good for a Maine!

**Thomas Bell, submitted via email, October 14, 2023**
I am writing in opposition to the proposed rule, making federal lobster/crab fishing vessels required to have a tracking device.

This rule feels completely unnecessary considering the same information on vessel activity is available now via 100% reporting requirements.

This seems like regulation redundancy that is unwarranted for a fishery that is already being battered from every angle.

I know this is basically a done deal, but I hope this is taken into consideration.

Thank you

Sincerely,
Thomas W. Bell
B.S. Maine Maritime Academy '14
Vessel Operations & Technology
454 South Gouldsboro Road
Gouldsboro, ME 04607
(207) 479-1720
thomas.bell1280@gmail.com

**Darren Turner, submitted via email, October 14, 2023**
Dear Deirdre,

Please add these comments to the public hearing for Chapter 25.98, Tracking of Federally Permitted Lobster and Jonah Crab License Holders:

This proposal is unnecessary.  It will not save whales.  It is another expensive program for tax payers.  And is most likely a violation of privacy and unconstitutional.

There is no justification for tracking vessels in the lobster fishery.  The recent court case ruling (MLA/State of Maine vs NMFS), stated that the NMFS used data that was not in line with reality.  Why should we give them more information to twist and use against us.  The judicial system is a check and balance on your power and has already ruled the agency can and will abuse power by manipulating date to support their agenda.  The NMFS did not even follow the law (ESA) when developing right whale regulations. ASMFC and Maine should back off this issue and not pass this tracking rule.

I have dealt with tracking systems before and they are a nuisance.  I'm a sure all of you bureaucrats would not like to deal with checking in and being tracked every day you go to work.

Darren Turner

**badpenny.ew@gmail.com, submitted via email, October 15, 2023**
I'm actually in disbelief that lobstering has actually come down being watched by the government all the time you're on your boat. I can't believe that this is even legal since I do more than just lobster outside of 3 miles in MY boat that I worked and paid for. Makes me sick that I will be watched while scalloping, tuna fishing, pogying fishing and recreational fishing. How is any of that anybody else's business? Especially the state and federal government? This is the biggest pile of b.s. i have heard yet. Best way I can think of to make people feel like criminals is to treat them as such. What is next? Ankle bracelets? Chips for I.d.? How about some serial numbers tattooed on the forearm? If at all possible I will be consulting a lawyer to seek compensation for the loss of my rights as a u.s. citizen. Congratulations on making me hate a job I used to love.

## DMR Response to Comments

**Concerns on Cost of the Device and Data Plan:**
Several commenters stated their concerns on the cost of the electronic tracking device and data plan.  In March 2022, the Department was allocated $4 million through a congressional appropriation to assist with the expenses related to the use of trackers. The Department used these funds to purchase Particle TrackerOne vessel tracking devices, and three years of cellular data service for all federally permitted lobster and crab fishing license holders.   It is possible there could be additional funds available in the future, but at this time a minimum of three years of costs associated with this requirement will be covered for permit holders.   Costs are relatively modest for this type of system, with the tracking unit currently costing approximately $150 and

the annual data plan costing ~$130 per participant.  Requirements to allow for monitoring of vessel movements (e.g. VMS) is very common in other federally managed species, and it is typically the responsibility of the permit holder to cover those costs.

**Unnecessary Data Collection:**
Several commenters stated that these data are not necessary, and the requirement to provide it represents government overreach.  This requirement was established in the Atlantic States Marine Fisheries Commission (ASMFC) Addendum XXIX to the Lobster Fishery Management Plan (FMP).    States are required to maintain compliance with the FMP.   A finding of non-compliance jeopardizes a state's ability to engage in interstate commerce for that species.   In addition, there will be a federal regulation establishing this same requirement for federal permit holders.

The reason for this requirement is to collect high resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries for management and enforcement needs. These data will improve stock assessment, inform discussions and management decisions related to protected species and marine spatial planning, and enhance offshore enforcement.   Several commenters expressed that the fishery is not impacting whales, and should not have to submit to this requirement.   The data collected is intended to help the Department better represent the industry in management discussions and ensure that any management measures are appropriately targeted.  The lack of spatial data for this fishery is currently a challenge in representing the industry in management discussions.

These data are better resolution than the spatial data currently provided through harvester reports, so are not duplicative of data that the Department is already receiving.    As this system is implemented, the Department will be looking for opportunities to streamline harvester reporting in consideration of the spatial data provided through the trackers, as suggested in one comment.

**Invasion of Privacy and Confidentiality:**
Several commenters stated that where and how they fish is proprietary data.   The Department understands this position, but it is a common requirement of federal fisheries permitting to provide spatial data associated with the vessel activities for management and enforcement purposes.   The Atlantic Coastal Cooperative Statistics Program (ACCSP) maintains the confidentiality of trip and location data that have been submitted to ACCSP via API. Data is accessible to the appropriate state or federal entities with confidential data access. The spatial information collected through the electronic tracking devices is designated as confidential through Maine law and regulation.

**Lobster Fishing vs. Other Activities/Fishing:**
Several commenters stated their concern of having the electronic tracking device continuing to collect data during times they are fishing for other species, or activities not related to lobstering. The ping rate of the electronic tracking device while the vessel is underway (1 ping per minute) allows the ability to distinguish between different activities such as a vessel steaming or setting/hauling traps.  While the vessel is at berth and no longer moving, the ping rate will switch

to one ping every six hours.  In addition, there are reporting requirements for other fisheries.  The harvester reports will allow the Department to determine days at sea and which fishery was targeted. It is important to note that given the volume of data produced by this requirement, these data will typically be used in aggregate analyses, and the Department would use harvester reports to exclude tracking data from non-fishing days.

**Tracking Device Technical Concerns:**
Several commenters stated concerns that they will be prohibited from fishing if their electronic tracking device malfunctions.  In preparation to meet this requirement, the Department began a pilot program to test the functionality of these types of trackers in the Maine lobster fishery in 2019.   To date, we have worked with 25 fishermen to test devices and learn what problems can occur.   Based on that work, we believe that the trackers should generally be reliable, provided they are consistently connected to the external power source.

In addition, the Department has established a hotline and email that will be monitored daily. In the event there are technical difficulties with the electronic tracking device, a fisherman can call, text or email this hotline to notify Department staff of their device's issue.  It has never been the Department's intent that a fisherman be prohibited from fishing if their device malfunctions through no fault of their own.  The rule has been amended from the original proposal to clearly specify that this situation will not result in a violation for the permit holder, provided they notify the Department and work in good faith with Department staff to have the device restored to operability.

If a fisherman expects the tracking device to be powered down due to not fishing and or the vessel needs to be removed from the water for maintenance, the Department has developed a form for fisherman to fill out that will be provided on the Department's website. "Powered down" is defined as the electronic tracking device not receiving external power from the vessel for longer than 1 month.

# Rule-Making Fact Sheet

*(5 M.R.S., §8057-A)*

AGENCY:  Department of Marine Resources

NAME, ADDRESS, PHONE NUMBER OF AGENCY CONTACT PERSON:
Deirdre Gilbert, Department of Marine Resources, 21 State House Station, Augusta, Maine 04333-0021 Telephone:
(207) 624-6553; web address: http://www.maine.gov/dmr/rulemaking/

CHAPTER NUMBER AND RULE:   Chapter 25.98 Electronic Tracking Requirements for Federally
Permitted Lobster and Jonah Crab License Holders

STATUTORY AUTHORITY:  12 MRS 6171

DATE AND PLACE OF PUBLIC HEARING(S): October 5, 2023: 5:00 pm in person at the DMR offices at the
Marquardt Building, 32 Blossom Lane, Augusta, Maine and remotely via Microsoft Teams.  Remote Access
information is posted to the DMR's website under "Meetings"

COMMENT DEADLINE: October 16, 2023

PRINCIPAL REASON(S) OR PURPOSE FOR PROPOSING THIS RULE:  [*see* §8057-A(1)(A)&(C)] This rule is
proposed to ensure compliance with Addendum XXIX (American Lobster) and Addendum IV (Jonah crab) that
were approved by the Atlantic States Marine Fisheries Commission (ASMFC) in March 2022.  Specifically, for
compliance with the Interstate Fisheries Management Plans, this regulation would require all federally-permitted
lobster and Jonah crab license holders with commercial trap gear area permits to have electronic tracking devices.
This requirement extends to all federally-permitted license holders with commercial trap gear for Lobster
Conservation Management Areas (LCMAs) 1, 2, 3, 4, 5, and the Outer Cape Cod.

IS MATERIAL INCORPORATED BY REFERENCE IN THE RULE?   ___YES_X__ NO  [§8056(1)(B)]

ANALYSIS AND EXPECTED OPERATION OF THE RULE:   [*see* §8057-A(1)(B)&(D)] Maine lobster and crab
fishing license holders who also hold a federal permit to fish for lobster and Jonah crab with trap gear will be required
to install and keep operational an approved tracking device.

BRIEF SUMMARY OF RELEVANT INFORMATION CONSIDERED DURING DEVELOPMENT OF THE
RULE (including up to 3 primary sources relied upon) [see §§8057-A(1)(E) & 8063-B]: ADDENDUM XXIX TO
AMENDMENT 3 TO THE AMERICAN LOBSTER FISHERY MANAGEMENT PLAN; ADDENDUM IV TO THE
JONAH CRAB FISHERY MANAGEMENT PLAN and input from Maine Marine Patrol.

ESTIMATED FISCAL IMPACT OF THE RULE:   [*see* §8057-A(1)(C)]
Enforcement of these proposed amendments will not require additional activity in this agency. Existing enforcement
personnel will monitor compliance during their routine patrols.

# EXHIBIT A

# ***Atlantic States Marine Fisheries Commission***

## ADDENDUM XXIX TO AMENDMENT 3 TO THE AMERICAN LOBSTER FISHERY MANAGEMENT PLAN; ADDENDUM IV TO THE JONAH CRAB FISHERY MANAGEMENT PLAN

### *Electronic Vessel Tracking for Federal Permit Holders*



**March 2022**



*Sustainable and Cooperative Management of Atlantic Coastal Fisheries*

**ADD-116**

## Table of Contents

1.0 INTRODUCTION ........................................................................................................... 1

2.0 OVERVIEW .................................................................................................................... 1

2.1 Statement of the Problem ........................................................................................... 1

2.2 Background ................................................................................................................... 2

    2.2.1 Electronic Tracking Pilot Program ......................................................................... 2

    2.2.2 Stock Assessment .................................................................................................. 3

    2.2.3 Fishery Interactions with Right Whales and Protected Resources ........................ 4

    2.2.4 Marine Spatial Planning ......................................................................................... 4

    2.2.5 Offshore Enforcement ........................................................................................... 5

3.0 MANAGEMENT PROGRAM ........................................................................................... 5

3.1 Tracker Specifications and Approval ............................................................................ 7

    3.1.1 Required Components and Minimum Technological Standards .............................. 7

    3.1.2 Device Approval Process ........................................................................................ 9

3.2 Administrative Processes ........................................................................................... 10

    3.2.1 State-Level Administrative Processes ................................................................... 10

    3.2.2 Federal-Level Administrative Processes ............................................................... 11

    3.2.3 Data Reporting, Validation and Management Processes ...................................... 12

4.0 COMPLIANCE .............................................................................................................. 14

5.0 RECOMMENDATIONS FOR ACTIONS IN FEDERAL WATERS ...................................... 14

6.0 REFERENCES ............................................................................................................... 14

Appendix A. Ping Rate Analysis ....................................................................................... 15

Appendix B. Standard Affidavit Language for Tracking Device Certification ................... 38

## 1.0 INTRODUCTION

The Atlantic States Marine Fisheries Commission (Commission) has coordinated the interstate management of American lobster (*Homarus americanus)* and Jonah crab (*Cancer borealis*) from 0-3 miles offshore since 1996 and 2015, respectively. American lobster is currently managed under Amendment 3 and Addenda I-XXVI to the Fishery Management Plan (FMP). Jonah crab is managed under the Interstate Fishery Management Plan and Addenda I-III. Management authority in the Exclusive Economic Zone (EEZ) from 3-200 miles from shore lies with NOAA Fisheries. The management unit for both species includes all coastal migratory stocks between Maine and Virginia. The management unit encompasses seven Lobster Conservation Management Areas (LCMAs) and two lobster stocks: the Gulf of Maine/Georges Bank (GOM/GBK) stock and the Southern New England (SNE) stock (Figure 1).

The American Lobster Management Board (Board) initiated Addendum XXIX to the American lobster FMP and Addendum IV to the Jonah crab FMP (here forth, the Addenda) to consider implementing electronic vessel tracking requirements for federally-permitted vessels in the lobster and Jonah crab fisheries to collect location and spatial effort data. For several years, the Board has recognized the critical need for high-resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries. In February 2018, the Board approved Addendum XXVI to improve the spatial resolution of lobster and Jonah crab harvester data to address ongoing marine spatial planning activities and assessment challenges. At the same time, the Board approved a one-year pilot program to test electronic tracking devices in the lobster and Jonah crab fishery. The intent of this pilot program was to identify appropriate tracking devices for use in the fishery and inform a Board decision on whether electronic tracking should be pursued in part, or all, of the lobster and Jonah crab fishery. Simultaneously, the Board supported additional work focusing on data integration and hardware testing. These projects lay the groundwork for implementing electronic tracking in the fishing fleet.

Based on recommendations from a work group comprising representatives from NOAA Fisheries, state and federal law enforcement, and members of the Board, the Addenda were initiated to consider requirements for electronic vessel tracking for federally-permitted vessels in the lobster and Jonah crab fishery under the authority of the Atlantic Coastal Fishery Cooperative Management Act (ACFCMA). The goal of the addendum is to collect high-resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries for management and enforcement needs. These data will improve stock assessment, inform discussions and management decisions related to protected species and marine spatial planning, and enhance offshore enforcement.

## 2.0 OVERVIEW

### 2.1 Statement of the Problem

To date, the majority of spatial analyses of lobster and Jonah crab fishery data have been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transit routes and fishing grounds. The

application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists. In particular, a number of challenges the fishery is currently facing pose a critical need for electronic tracking data in the offshore fishery:

1) The stock assessment is currently limited by the coarse spatial scale of available harvest data for American lobster. NOAA Fisheries statistical areas and latitude/longitude coordinates are collected on the NOAA Fisheries Greater Atlantic Regional Fisheries Office (GARFO) Vessel Trip Report (VTR), however the collected spatial data represent the location of where the majority of the fishing effort occurred. The nature of the coarse spatial data is insufficient for management and scientific purposes. Though harvester reporting at the 10-minute square level was adopted for federally-permitted lobster vessels reporting to the states and the federal VTR continued to collect latitude and longitude for each trip, the precision of spatial information is not consistent across federal permit holders. This finer scale data does not provide the precision to accurately apportion effort within the stock units.

2) Due to interactions between protected marine resources and the lobster and Jonah crab fisheries, the fisheries will be required to implement significant risk reduction efforts under the Atlantic Large Whale Take Reduction Plan. These risk reduction efforts are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution.

3) Recent executive orders have prioritized the development of offshore renewable energy and the conservation of US waters. The development of emerging ocean uses such as wind energy, aquaculture, and marine protected areas may all create marine spatial planning challenges for the lobster and Jonah crab fisheries.

4) The large geographic footprint and low density of lobster gear in the offshore federal management area makes it difficult to locate gear for compliance checks, reducing the efficiency and efficacy of offshore enforcement efforts.

Each of these issues pose an acute need for high-resolution data on where and when fishery effort in the federal fleet occurs. Electronic tracking requirements in the federal fishery would fill this information gap and support fishery managers in addressing the aforementioned challenges.

## 2.2 Background

### 2.2.1 Electronic Tracking Pilot Program
When Addendum XXVI/III to the Lobster and Jonah Crab FMPs, respectively, were approved in February 2018, a one year pilot program was established to test electronic tracking devices on lobster and/or Jonah crab fishing vessels. Given the variety of vessels and the spatial distribution of the fishery (both in distance from shore and breadth along the coast), the pilot

program tested multiple tracking devices in various conditions to identify technologies for use the lobster and Jonah crab fisheries.

The project assessed tracking devices from several different vendors by placing them on volunteer vessels from Maine and Massachusetts with lobster permits from June 2019 to May 2020. The project evaluated the technologies by looking at ease of compliance (or non-compliance), ability to determine trap hauls from steaming activity, industry feedback, cost-per fisherman, and law enforcement feedback. The results of the pilot showed that though the devices differed somewhat in features and performance, they all were able to deliver vessel positions and detect individual trap hauls. It also found that cellular based systems were both lower in cost and permitted faster ping rates than satellite systems. For example, the costs associated with cellular tracking devices tested during the pilot program range from $150 to $650 for the initial purchase of the tracking unit, and annual data service plans that would meet the proposed tracking requirements range from $191 to $420 per year. These costs are provided as examples only and may change dependent on which devices are approved for use in the fishery.

In addition to the pilot program testing tracking devices, the Board supported work on data integration and additional hardware testing. Specifically, this project focused on linking spatial data collected on vessel tracking devices to harvester reports submitted on eTrips Mobile. Recognizing the critical need for data to characterize spatial and temporal effort of the lobster fishery and the potential of available technology to address this need at low costs, the Board initiated Addendum XXIX in August 2021 to consider the adoption of electronic tracking devices in the federal fleet of the lobster and Jonah crab fisheries.

### 2.2.2 Stock Assessment

A complicating factor in the management of lobster is that the boundaries of the LCMAs do not align with the biological boundaries of the stocks (GOM/GBK vs. SNE). This is particularly problematic in LCMAs 2 and 3 which span both stocks. The intricacy of the stock boundaries is further complicated by the fact that many vessels fishing out of Rhode Island and Massachusetts that harvest lobsters on Georges Bank, must travel through the SNE stock area to reach their port of landing. In addition, these vessels may be permitted to fish in multiple management areas, including areas that span both lobster stocks.

To date, the stock assessment has only been able to analyze stock composition data at the spatial resolution of the NOAA statistical area. This is because not all lobster permit holders report at a finer scale than the NOAA statistical area; for each trip some provide a single latitude and longitude point meant to represent where the majority of fishing occurred, some provide 10 minute square(s) fished, and some provide only the statistical area fished. This creates challenges for the assessment because some parameters in the stock assessment model vary at a finer spatial scale than statistical area. For example, size composition data for lobster catch are currently generated by matching statistical area-specific total harvest data and biosampling data, but preliminary work has indicated size composition varies at a finer spatial scale. Improved spatial resolution of total harvest data from vessel tracking will improve size

composition data used in the stock assessment models to improve the accuracy of exploitation and reference abundance estimates.

### 2.2.3 Fishery Interactions with Right Whales and Protected Resources

To meet the goals of the Marine Mammal Protection Act and the Endangered Species Act, NOAA Fisheries recently published a final rule to amend the regulations implementing the Atlantic Large Whale Take Reduction Plan (ALWTRP) to reduce the incidental mortality and serious injury to North Atlantic right whales (*Eubalaena glacialis*), fin whales (*Balaenoptera physalus*), and humpback whales (*Megaptera novaeangliae*) in commercial lobster and Jonah crab trap/pot fisheries in the Northeast Atlantic ([86 FR 51970](#)). This action is being taken to reduce the risks to endangered North Atlantic right whales and other large whales associated with the presence of fishing gear in waters where these animals occur. The ALWTRP includes a significant reduction in the number of vertical buoy lines in the fishery in order to reduce right whale encounters with buoy lines. Weak rope requirements are included to reduce mortalities and serious injuries when entanglements do occur by increasing the chance of right whales freeing themselves from gear. The ALWTRP also includes changes to seasonal restricted areas closed to pot/trap gear that uses stationary vertical buoy lines. Current and future requirements for gear modifications are expected to have a substantial economic impact on the fishing industry.

The required risk reductions included in the ALWTRP are informed by the co-occurrence model, which pairs information regarding the distribution of whales and commercial fishing gear to predict areas where whales may be prone to entanglement. Electronic vessel tracking data would significantly improve the models used to assess the location of vertical lines in the fishery and their associated risk to right whales in the ALWTRP. The Biological Opinion[1] released in May 2021 outlines a Conservation Framework that intends to reduce mortality and serious injury to North Atlantic Right Whales by 95% over ten years. Within this Framework, additional risk reductions could be required in the US lobster fishery starting in 2025. Therefore, it is critical to gather and provide updated and enhanced spatial effort data to improve the associated risk reduction models ahead of this timeline.

### 2.2.4 Marine Spatial Planning

It is critically important to record the footprint of the US lobster fishery as spatial allocation discussions occur as a result of emerging ocean uses such as aquaculture, marine protected areas, and offshore energy development. For example, in 2016, the New England Fishery Management Council (NEFMC) took action on an Omnibus Deep-Sea Coral Amendment, which looked to provide protection to corals in the northwest Atlantic Ocean through the creation of discrete regions and/or broad depth zones. Given the harvest of lobster and Jonah crab occurs offshore, the Commission was asked to provide information on the magnitude of lobster and Jonah crab catch in specific regions in order to understand potential economic impacts. At the

---

[1] The Biological Opinion issued on May 27, 2021 can be found here:
https://www.greateratlantic.fisheries.noaa.gov/public/nema/PRD/Final%20Fisheries%20BiOp_05_28_21.pdf?fbclid=IwAR3ombXyORsm5o0aFYuoU84W-oUUIEMQUIK5_bqv2FnmVRuEBV3p_pFOenA

time, the lobster and Jonah crab fishery management plans required harvesters to report landings via NOAA statistical areas, regions much larger than those being considered for coral protection. As a result, the spatial resolution of catch and effort data for the lobster and Jonah crab fishery proved too coarse; without fine scale spatial information, impacts to the lobster and Jonah crab fishery had to be estimated by piecing together information from harvester reports, industry surveys, and fishermen interviews. Similar challenges occurred when the Northeast Canyons and Seamounts Marine National Monument was established in 2016, and it is expected that these challenges will continue given increased activity surrounding offshore wind, aquaculture, and oil and gas exploration. Additionally, in January 2021 President Biden issued an Executive Order on Tackling the Climate Crisis at Home and Abroad. Included in this Executive Order is a goal of protecting 30% of US waters by 2030. Given this goal, documentation of the US lobster fishery footprint is essential for consideration in future discussions and decisions regarding marine protected areas.

### 2.2.5 Offshore Enforcement

A potential benefit of collecting electronic vessel tracking data is the ability to improve enforcement in the offshore area. It has long been recognized that enforcement efforts in the offshore federal lobster fishery need to be improved, a particular concern given the rapid increase in landings and value during the last decade. As a result, there are ongoing efforts to enhance enforcement capabilities, including discussions around an offshore enforcement vessel capable of hauling and re-setting long trawls.

Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear. Even if location data are not reported in real-time, once a fishing location can be identified from vessel tracking data, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. Given finite enforcement resources, information on distinct fishing locations would improve the efficiency and capability of offshore enforcement efforts.

## 3.0 MANAGEMENT PROGRAM

*This section adds to Section 3.1 of Addendum XXVI to American Lobster Amendment 3 and Section 3.4.1 of the FMP for Jonah Crab under the adaptive management procedures established in section 3.6 of the FMP for American Lobster and 4.4 of the FMP for Jonah Crab. The intent of the selected management program is to enhance harvester effort data collection.*

Addendum XXIX (American lobster) and IV (Jonah crab) implement electronic tracking requirements for federally-permitted lobster and Jonah crab vessels with commercial trap gear area permits.

Federal lobster and Jonah crab vessels issued commercial trap gear area permits are required to install an approved electronic tracking device to collect and transmit spatial data in order to participate in the trap gear fishery. This means any federally-permitted vessel without an approved electronic tracking device is prohibited from landing lobster or Jonah crab taken with

trap gear. Federal permit holders are required to install and activate an approved device prior to beginning a lobster or Jonah crab fishing trip with trap gear. The device must remain on board the vessel and powered at all times when the vessel is in the water, unless the device is authorized to power down by the principal port state. Possible reasons for authorization to power down include but are not limited to vessel haul out/repairs and device failure reported to the principal port state. Tampering with an approved tracking device or signal is prohibited; tampering includes any activity that may affect the unit's ability to operate or signal properly, or to accurately compute or report the vessel's position. These requirements apply to all federal permit categories included in Table 1.

**Table 1. Applicable Federal Permit Categories***

| Federal Permit Category Name | Federal Permit Category Abbr. | Description |
|---|---|---|
| Commercial Trap Gear Area 1 | A1 | May harvest lobster in Federal Lobster Management Area 1 using trap gear |
| Commercial Trap Gear Area 2 | A2 | May harvest lobster in Federal Lobster Management Area 2 using trap gear |
| Commercial Trap Gear Area 3 | A3 | May harvest lobster in Federal Lobster Management Area 3 using trap gear |
| Commercial Trap Gear Area 4 | A4 | May harvest lobster in Federal Lobster Management Area 4 using trap gear |
| Commercial Trap Gear Area 5 | A5 | May harvest lobster in Federal Lobster Management Area 5 using trap gear |
| Commercial Trap Gear Outer Cape Area | AOC | May harvest lobster in Federal Lobster Management Outer Cape Area using trap gear |

Commercial Trap Gear Area 6 is excluded, as the area occurs in state waters and requires a valid CT or NY state lobster license to fish in this area. If a vessel is permitted for Commercial Trap Gear Area 6 only, these requirements do not apply. Additionally, these requirements do not apply to vessels that hold an Area 5 Waiver Permit[2] and no other lobster trap gear area permits.

For additional clarity on situations for which the electronic tracking requirements do <u>not</u> apply, several examples are provided below:
- A person with a state-only lobster permit and no federal commercial trap gear area permit
- A permit holder with federal commercial trap gear permit that has been placed in confirmation of permit history (CPH), a permit status for when a vessel with limited

---

[2] The Area 5 Waiver is a permit category that may be selected by federal lobster permit holders with an Area 5 trap allocation who also hold a federal black sea bass permit. By opting into the Area 5 Waiver, permit holders are exempted from the more restrictive lobster trap gear specifications and trap tagging requirements to target black sea bass with unbaited traps. While in the Area 5 Waiver category, the vessel may retain the non-trap possession limit of 100 lobsters per day or up to 500 lobsters for a trip of 5 or more days.

access permits has sunk, been destroyed, or has been sold to another person without its permit history
- A vessel with a federal lobster commercial trap gear permit listed in Table 1 that <u>does not fish trap gear at any point in the fishing year</u> (i.e., <u>only</u> fishes other gear under a federal lobster commercial/non-trap permit, charter/party non-trap permit, and/or does not fish any trap gear at any point in the fishing year)

Specifications required of tracking devices to be approved for use in the fishery are described in Section 3.1. Administrative processes for the tracking program are described in Section 3.2. A separate document will be developed that will include additional details and standard operating procedures to guide the management agencies in implementing the vessel tracking requirements.

## 3.1 Tracker Specifications and Approval

### 3.1.1 Required Components and Minimum Technological Standards

The minimum criteria that must be met by tracking devices and product vendors for approval for use in the fishery are summarized in Table 2. Additional details on these requirements is included in the subsequent sections.

**Table 2. Required criteria for approval of vessel tracking devices and vendors**

| *Requirements of Tracking Devices and Vendors* |
|---|
| • Collection of location data at a minimum rate of one ping per minute for at least 90% of the fishing trip |
| • Data events must contain device's current datetime, latitude, longitude, device and vessel identifier |
| • Minimum accuracy of 100 m (328.1 ft) accuracy and position fix precision to the decimal minute hundredths |
| • Ruggedness specifications allowing function in the marine environment |
| • Ability to PUSH location data to the ACCSP trip locations API |
| • Vendor customer service requirements |
| • Vendor must maintain the confidentiality of personally identifying information and other protected data in accordance with federal law |

*Data Collection Rates*

A tracking device must collect location data at a minimum rate of one ping per minute for at least 90% of the fishing trip. A "ping" refers to a data event created by a tracking device containing the device's current datetime, latitude, longitude, device/vessel identifier and other optional data fields. The above rate is necessary to distinguish lobster fishing activity from transiting activity and can allow estimation of the number of traps per trawl (See Appendix A). Data transmission from the tracking device to the vendor should be initiated as soon as possible but no more than 60 minutes from the time the fishing trip is completed.

If the tracking device can determine when the vessel is in its berth, the device may automatically decrease the tracker ping rate. If the device is unable to automatically detect a berth location, the device must remain connected and pinging at one ping per minute at all times. This recommendation is designed to permit vendors' efforts to minimize cellular data and power consumption while the vessel is in port. For example, if pinging at a slower rate in the port, the tracking device could run on an internal battery and sleep between pings to save power versus being hard-wired to the vessel's power system. Additionally, this feature would improve data quality and allow for validation of track data against self-reported VTR trip start and end times.

*Precision and Accuracy Requirements*

A tracking device must meet minimum precision and accuracy requirements, specifically a minimum of 100 m (328.1 ft) accuracy and position fix precision to the decimal minute hundredths. It is expected that most modern tracking devices will be capable of significantly higher accuracies than 100 m.

*Tracking Hardware Considerations*

A tracking device must have ruggedness specifications that allow it to function in the marine environment, which may depend on where the device is installed on the vessel.

No specific requirement is specified for how a device shall be powered, provided that the tracking device can satisfy the technical requirements set forth in this section. Devices will likely be powered by some combination of vessel power, internal battery, and/or solar. The Commission level work group will be responsible for determining whether a device satisfies hardware requirements.

*Data Submission Requirements*

Tracking vendors must be able to PUSH location data to the Atlantic Coastal Cooperative Statistics Program (ACCSP) trip locations API and meet all specifications of this interface (https://accsp-software.github.io/spec-unified-api-prod/#tag/eTrips/paths/~1trip_locations/post). In addition to the device identifier, datetime, latitude, and longitude, vendors must also include a vessel identifier (Coast Guard number or state registration number) in the API submission. This data element is necessary to identify the vessel the device is tracking at the time of the ping. Data transmission from the vendor to the ACCSP trip locations API should occur in near real time upon receipt.

Tracking vendors must send test data to the ACCSP trip locations API as proof of the ability to satisfy the data submission requirements. The vendor is expected to have a mechanism for setting the vessel identifier in the administrative web interface to their tracking system.

*Customer Service Requirements*

Device vendors serve as the primary contact for the vessel tracking devices distributed by their company. This includes technical support related to hardware and any device-specific software. Vendors should provide diagnostic and troubleshooting support to permit holders, state agencies, and ACCSP, which is available seven days per week and year-round. Response times for customer service shall not exceed 24 hours. Detailed installation instructions must be provided to permit holders or their designated agents by vendors. Procedures must be established that assist permit holders to properly maintain their device. In the event of tracker malfunction, vendors must be available to troubleshoot, repair, or replace the device. Vendors must have the capability to diagnose and resolve communication anomalies with permit holders or state agencies. Upon request of ACCSP, state partners, or NOAA Fisheries, vendors must be available to assist with vessel tracking system operation, resolving technical issues, and related data analyses.

### 3.1.2 Device Approval Process

The approval of vendors and devices is undertaken by a Commission-level work group process. The work group is comprised of state, federal, and Commission staff. Changes to the requirements of tracking devices can be made by this working group with approval of the Lobster Board. The work group reviews device specifications to determine if a device meets the required components and minimum technological standards. Vendors are required to provide the ASMFC work group with the information in Table 3.

**Table 3. Information that must be submitted by vendors to device approval work group**

| *Information to be provided by vendors for work group review and device approval* |
|---|
| • Company information (name, contact, etc.) |
| • Customer service policy/capabilities (what assistance can be provided for troubleshooting) |
| • Complete cost information for devices and data |
| • Devices capable of a one ping per minute rate |
| • Whether devices can detect when the vessel is berthed/in port |
| • Precision (fixed) of 5 decimal places and accuracy capability (100 m max) |
|     o Does device evaluate quality of positional fix prior to pinging or does it just ping every minute? |
|     o Is the device capable of reporting horizontal accuracy and/or any other ping metadata? |
| • Which cellular providers and bands the device utilizes |
| • Whether vendor can PUSH the vessel ID (Coast Guard number or state registration number) as part of the location data to the ACCSP trip locations API, as well as meet all additional provisions of this interface: (https://accsp-software.github.io/spec-unified-api-prod/#tag/eTrips/paths/~1trip_locations/post) |
| • Power supply specifications |
| • Installation instructions/requirements |
| • Ruggedness specifications |
| • Ability to maintain the confidentiality of personally identifying information and other protected data in accordance with federal law |

**3.2 Administrative Processes**

This section describes the required administrative processes that must be implemented at the state and federal level to facilitate the collection and management of data under the electronic vessel tracking requirements for federal permit-holders in the lobster and Jonah crab pot/trap fisheries. Additionally, it describes the recommended roles and responsibilities of the states, federal agencies, and ACCSP in the processes involved in data reporting, validation, and management.

### 3.2.1 State-Level Administrative Processes

*Certification of Device Installation*

States must certify the installation and activation of approved vessel tracking devices for permit holders whose principal port listed on the federal fishery permit is within their state. Principal port is contained in the GARFO permit data which will be made accessible to states. An affidavit with uniform language is distributed by the states to permit holders (see Appendix B for affidavit language). This affidavit certifies an approved tracking device is installed on each vessel and is activated for transmitting spatial data. These requirements apply to all fishing trips regardless of the landing state, trip type, location fished, or target species. Each affidavit must be signed and returned to states prior to departing on the first fishing trip after the program implementation date. For initial implementation of this project, states will collaborate to define a deadline by which permit holders will need to have a certified tracker installed. A state may require additional information to certify installation such as photographs, notarized affidavits, or inspections, but this is not required.

GARFO provides states with American lobster-trap gear area permit ownership information, enabling states to contact permit holders and complete the process of certification of installation. In the event a vessel tracker is transferred between permit holders, states will instruct harvesters to contact tracking device vendors to complete the transfer of a vessel tracker.

*Permit Holder Support*

State agencies will communicate with permit holders to assist them in properly complying with the vessel tracking requirements. States are expected to respond to general inquiries from permit holders that land in their state, troubleshoot where feasible, and transfer inquires to the appropriate body for answers as needed (e.g., device issues to the vendors, electronic reporting app issues to the appropriate electronic vessel trip report provider help desk, etc.). Staff should be available to confirm with harvesters that vessel tracks are being received by ACCSP. States are not required to aid with the installation or troubleshooting of vessel trackers. If there is an issue with hardware or software related to tracker, states may assist the permit holder in contacting device vendors. It is the permit holder's responsibility to work with the vendor when they discover or are notified by the state of an issue.

Data validation and compliance monitoring is the responsibility of the states. States contact permit holders to resolve data issues for trips landing in their state. Specifically, state agencies are tasked with resolving mismatches between vessel trip reports and associated vessel tracking information, or when tracking data are missing or incomplete. Additionally, states must validate that the data collected from a tracker meets the specifications defined by ASMFC. The administrative processes for permit holder support will be further developed and refined prior to implementation of the management program. A final data validation system and protocol will be developed by ACCSP and state and federal partners. This will include developing and testing data QA/QC for each jurisdiction prior to implementation of the program.

### 3.2.2 Federal-Level Administrative Processes
The following processes are the responsibility of GARFO to facilitate the implementation of the tracking program:

*Federal Permit Data*

To successfully administer a vessel tracking program, states will need access to up-to-date Federal American lobster permit data. GARFO will provide states with American lobster-trap gear area permit ownership information. The following information will be available:
- Vessel permit number
- Vessel name
- Hull ID (state registration or US Coast Guard Documentation Number)
- Permit endorsement
- Permit issuance date
- Permit expiration date
- Permit-holder name
- Permit-holder contact information
- Principal port and state

*Electronic Vessel Trip Report Data Processing*

Upon completion of rulemaking to implement federal harvester electronic vessel trip report (eVTR) requirements for federal lobster permits, GARFO will incorporate federal lobster eVTR data into its quality assurance program. Electronic reporting applications ensure the submission of complete and valid vessel trip reports, but do not ensure quality. Upon submission, eVTRs will be further validated to ensure a high level of data quality. Errors identified through the quality assurance program will be resolved through GARFO outreach efforts resulting in corrections and resubmissions of eVTR. Federal eVTR data will be available to ACCSP in near real-time, which can be used by ACCSP and state partners in identifying fishing activity in the vessel tracking data.

### 3.2.3 Data Reporting, Validation and Management Processes

This section outlines the expected processes for data reporting, validation and management for electronic vessel tracking. It also identifies the recommended roles and responsibilities of state and federal agencies and partner organizations in administrating these data processes.

*Data Dissemination and Confidentiality*

ACCSP maintains the confidentiality of trip and location data that have been submitted to ACCSP via API in addition to the trip data already maintained under its authority. Data is accessible to the appropriate state or federal entities with confidential data access. A map interface will be available in the SAFIS Management System (SMS) for authorized federal and state administrators to query and visualize trip locations.

*Data Flow*

ACCSP supports data flows for integrated and non-integrated trip report and location data from American lobster and Jonah crab federal permit holders required to collect location data via an approved tracking device. Figure 1 shows the flow of trip data and location data (vessel tracks) from the vessel to the ACCSP SAFIS database. Each step is broken down and described below.



**Figure 1. Vessel Tracking Data Flow**

*Trip Data*

EVTR data must be submitted using a NOAA Fisheries GARFO approved eVTR application. All eVTR submissions are available in SAFIS at or near real-time.

*Location Data (Vessel Tracks)*

Tracking vendors must submit location data to the SAFIS database via the ACCSP trip locations API. Vendors will need to obtain the necessary API key, and devices must be capable of providing data in accordance with the API specifications.

*SAFIS API*

All parties, including ACCSP partners and vendors, submitting trip data and/or location data to the SAFIS Unified API (https://accsp-software.github.io/spec-unified-api-prod/) will need to obtain the necessary API keys and must be able to provide data in accordance with the API specifications.

*Data Management*

ACCSP maintains the database structures and processing required to store trip and location data. ACCSP will develop a process to match non-integrated trip and location data after they have been submitted to ACCSP. The trip ID will be assigned to the appropriate trip location data. The system will require the following by each partner:

- NOAA Fisheries is responsible for providing vessel registration (hull ID) and vessel permit number data contained in eVTR data to ACCSP. All eVTR data submitted to GARFO will be sent to ACCSP via API at or near real-time.
- State management agencies are responsible for working with tracking vendors to ensure data are being sent to ACCSP in accordance with the requirements outlined for certification. Two levels of coordination will be in place.
  - In Level 1, the device approval work group will coordinate with the vendor to address overall device issues that have arisen post certification.
  - In Level 2, individual state management agencies will work with the permit holder(s) to resolve issues specific to a single or small number of isolated devices.
  - Details on the roles and responsibilities for specific issues are outlined in the standard operating procedures document.
- Vendors will submit accurate vessel registration information and other required data elements to the ACCSP Trip Location API.

ACCSP is responsible for running trip matching programs at specified intervals. Criteria for matching reported trip data with location data will be developed with federal and state input. Data auditing reports, as specified in the standard operating procedures document, will be made available to the appropriate state and/or federal entities with confidential data access.

*Data Quality*

GARFO and the state management agencies are responsible for data reporting compliance; GARFO is responsible for validation of eVTR data, and state management agencies are responsible for validation of trip location data. The matching of trip and location data by ACCSP is subject to the accuracy of the trip report data.

## 4.0 COMPLIANCE

This Addendum is effective on December 15, 2023.

## 5.0 RECOMMENDATIONS FOR ACTIONS IN FEDERAL WATERS

The management of American lobster in the EEZ is the responsibility of the Secretary of Commerce through the National Marine Fisheries Service. The Atlantic States Marine Fisheries Commission recommends that the federal government promulgate all necessary regulations in Section 3.0 to implement complementary measures to those approved in this addendum. The Commission requests that NOAA Fisheries publish the final rule on vessel tracking by May 1, 2023, with implementation no later than December 15, 2023.

## 6.0 REFERENCES

Atlantic States Marine Fisheries Commission (ASMFC). 1997. Amendment 3 to the Interstate Fishery Management Plan for American Lobster.

ASMFC. 2015. American Lobster Benchmark Stock Assessment and Peer Review Report.

ASMFC. 2020. American Lobster Benchmark Stock Assessment and Peer Review Report.

**Appendix A. Ping Rate Analysis**

**Appendix B. Standard Affidavit Language for Tracking Device Certification**

**NOTICE TO FEDERAL AMERICAN LOBSTER COMMERCIAL TRAP GEAR AREA PERMIT HOLDERS**

Under the authority of the Atlantic Coastal Fisheries Cooperative Management Act, Addendum XXIX to Amendment 3 to the Interstate Fishery Management Plan for American Lobster and Addendum IV to the Fishery Management Plan for Jonah crab requires all vessels with a federal American Lobster Trap Gear Area permit to have an approved vessel tracker installed as of *Month DD, YYYY*. Tracking devices must be installed prior to the permit holder's first fishing trip. This vessel tracker must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished, or target species. All devices must follow the specifications outlined in Section 3.1 of Addendum XXIX. A list of approved devices along with vendor contact information is attached to this document.

The principal port on your Federal Fishery Permit lies within the [*Principal Port State*], thus the [*Principal Port State Agency*] will be tasked with certifying the installation of your vessel tracking device. In the event you believe your tracker is not functioning correctly and must be serviced, please contact [*Principal Port State Agency*], and inform them of your situation.

Please complete, sign and return this form once an approved device has been installed on your vessel.

**Federal Fishery Permit Number:**

**Documentation or Vessel Registration Number:**

**Vessel Name:**

**Vessel Tracking Device Vendor:**

**Vessel Tracking Device Identifier:**

I certify that the above vessel tracking device is installed and properly functioning to the best of my knowledge.

Permit Holder Signature:

Permit Holder Printed Name:

Date:

**ADD-133**



STATE OF MAINE
DEPARTMENT OF MARINE RESOURCES
MARINE RESOURCES LABORATORY
P.O. BOX 8, 194 MCKOWN POINT RD
W. BOOTHBAY HARBOR, MAINE
04575-0008

# EXHIBIT C

JANET T. MILLS
GOVERNOR

PATRICK C. KELIHER
COMMISSIONER

## Federal Permit Holder Vessel
## Tracking Requirements

You are receiving the enclosed Particle TrackerOne vessel tracking device because DMR's records indicate you are the holder of a federal lobster and crab commercial trap gear permit for one of the Lobster Conservation Management Areas. Atlantic State Marine Fisheries Commission (ASMFC) Addendum XXIX requires all federal lobster and crab gear permit holders to install a type-approved tracker by December 15th, 2023. For compliance with the Addendum, DMR currently has a proposed rule that would require federally permitted lobster harvesters to have a tracker operational prior to the first fishing trip after December 15, 2023.

The tracker enclosed is intended for installation on the vessel named on the shipping label of this package. Additionally, the hull number (state registration or USCG documentation number) of the vessel this tracker should be installed on is shown below the barcode on the shipping label. If this number is incorrect, please contact DMR at Tracking.DMR@maine.gov or (207) 579-4214.



**Maine Department of Marine Resources**
194 McKown Pt Rd PO Box 8
West Boothbay Harbor, ME 04575-0008

**Federal Lobster Harvester**
**c/o F/V Some Boat**
**123 Main St**
**Any Harbor, ME 00000**



ME12345   Your Hull Number

## What data will the tracker collect?

The tracker provided collects the time and position of your vessel once per minute while the vessel is moving. While the vessel is tied up, the tracker collects the time and position of your vessel every 6 hours, until in motion again.

## Who will pay for tracking?

The enclosed tracker and 3 years of cellular data service is provided to you at no cost through congressional appropriations provided to DMR.

ADD-134

## Why did ASMFC establish the tracker requirement?

The goal of the addendum is to collect high resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries for management and enforcement needs. These data will improve stock assessment, inform discussions and management decisions related to protected species and marine spatial planning, and enhance offshore enforcement.

## Will my tracker data be confidential?

Yes.   As with the landings information reported to the Department by harvesters and dealers, the spatial information collected through the trackers is designated as confidential through Maine law and regulation.

## When will tracking be mandatory?

You must have your tracker operational prior to your first lobster fishing trip after December 15, 2023. You will also need to certify to DMR that you have installed your tracker and that it is functional. Once your tracker is installed, please fill out the certification affidavit using the link below or by scanning the QR code on a mobile device:

## https://forms.microsoft.com/g/PxNJ0npq6Z



## What if I am not actively fishing or take my boat out of the water?

If you expect your tracker to be powered down, please fill out the form below. "Powered down" is defined as the tracker not receiving external power from your vessel for longer than 1 month.

## https://forms.microsoft.com/g/g6jnEJgFWj



Maine DMR Tracker Power Down
Authorization

## How should the tracker be connected and installed?

The TrackerOne unit can be connected using either the included USB cable (like a cellphone) or the included M8 cable (which can be hardwired to the vessel circuitry). For most vessels, the USB installation is recommended.

### USB Install

The USB cable can be connected to any USB port on the vessel that is powered while the vessel is moving. An AC adapter is included in this package if your vessel has an AC power port available. The USB cable can also be connected to an available port on a computer or plotter; this port must be powered while your vessel engine is on.

1. Connect the USB cable to the port on the right side of the front of the tracker.



2. Connect the other end of the cable to an available USB A port or to an AC outlet with the provided adapter.



## Direct Wire Install

A second installation option is to hardwire the tracker using the M8 cable provided. It can be connected to any 5-30 volt DC power source; **the red wire is positive and the black wire is negative. Do not connect anything to the other wires.** The other wires can be clipped off or taped back. You will likely need additional length of wire beyond the short wiring harness provided and may also want to use a fuse.

1. Remove the rubber cover from the M8 port connection on the left of the tracker (next to the USB port). Connect the round silver end of the M8 cable. The connector is keyed and can be rotated until it plugs in. The knurled silver connector should be turned clockwise to secure the cable to the tracker.



2. Connect the red wire to a positive voltage source (5-30V DC, typically ~12V) and the black wire to negative/ground.



## How should the tracker be positioned?

The TrackerOne unit should be in a location within your vessel's wheelhouse where it is approximately level and is near a window. It is not recommended to install the tracker in a vertical position or upside down. It can be optionally held in place with adhesive pads. If the indicator lights are too bright at night, they may be covered with tape; do not turn the tracker over.

## How can I tell that the tracker is operating correctly?

There are three indicator lights on the front of the TrackerOne:

- **Charge** light is on at any point during which the tracker battery is charging.
- **GPS** light will be blink blue while the tracker is trying to connect to GPS satellites and will be solid blue once a GPS position had been obtained.
- **Cloud** light indicates if the tracker is connected to a cell tower. When connected to cellular, this light will "breathe" cyan. When out of cell service, this light will blink green. This light may blink green for up to an hour the first time you power up your tracker.
- **If the cloud light is blinking green while at the dock, or is blinking red, please contact DMR for further support.**

## What if the tracker does not turn on?

If you start your engine and the lights on the tracker do not turn, please check that the outlet it is connected to has power. An additional troubleshooting step is to unplug the tracker and plug it back in. If this does not work, please contact DMR for additional support.

**For technical issues or help installing your tracker, please contact:**

Tracking.DMR@maine.gov or (207) 579-4214

## Other Resources

- Addendum 29 full text -
  https://asmfc.org/uploads/file/63d2f215AmLobsterAddendumXXIX_JonahCrabAddendumIV_March2022.pdf

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK THOMPSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:24-cv-00001-JAW |
| | ) | |
| PATRICK KELIHER, | ) | |
| | ) | |
| Defendant, | ) | |

JUDGMENT OF DISMISSAL

In accordance with the Order on Motion to Dismiss and Motion for Preliminary

Injunction entered by Judge John A. Woodcock, Jr. on November 21, 2024,

JUDGMENT of Dismissal is hereby entered.

CHRISTA K. BERRY
CLERK

By:    /s/ Julie W. Rodrigue
Deputy Clerk

Dated: November 21, 2024

ADD-139