No. 25-1007

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

FRANK THOMPSON,

*Plaintiff-Appellant*,

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH;
JACK CUNNINGHAM,

*Plaintiffs*,

v.

CARL WILSON, in their official capacity as Acting Commissioner, Maine
Department of Marine Resources,

*Defendant - Appellee.*

On Appeal from the U.S. District Court for the District of Maine
No. 1:24-cv-00001-JAW, Judge John A. Woodcock, Jr.

## BRIEF OF *AMICI CURIAE*
## ENVIRONMENTAL AND MARINE LAW SCHOLARS
## IN SUPPORT OF MAINE AND AFFIRMANCE

ANDREW C. MERGEN
SOMMER H. ENGELS
ROSA HAYES*
SHANNON NELSON*
AARON KLEINER, *clinical student**
RILEY PFAFF, *clinical student**
SPENCER WEISER, *clinical student**
Emmett Environmental Law & Policy Clinic
Harvard Law School
6 Everett St., Suite 5116
Cambridge, MA 02138
sengels@law.harvard.edu
(617) 384-0464

*Counsel for Amici Curiae*

May 1, 2025                    *Not admitted to practice in the First Circuit

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...........................................................................................5

I.    Reasonableness is the touchstone of any Fourth Amendment
      analysis...........................................................................................5

      A.    Reasonable searches under the Fourth Amendment
            balance public and private interests. ....................................5

      B.    Administrative searches in closely regulated industries do
            not require a warrant to be reasonable. ................................7

II.   The commercial fishing industry has been subject to close
      government oversight for centuries. .............................................11

      A.    The greater commercial fishing industry has been closely
            regulated since before the founding. ...................................11

      B.    Like the broader commercial fishing industry, the
            commercial lobster fishing industry has long been subject
            to extensive regulation. ......................................................14

III.  The DMR Rule fits comfortably within the regulatory history
      and appropriately balances public and private interests..............20

      A.    The DMR Rule protects longstanding and important
            government and public interests...........................................20

      B.    The DMR Rule is a narrow intrusion on Mr. Thompson's
            diminished expectation of privacy. .....................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Almeida-Sanchez v. United States*,
  413 U.S. 266 (1973)........................................................................9

*Balelo v. Baldrige*,
  724 F.2d 753 (9th Cir. 1984) ...........................................................8

*Brigham City v. Stuart*,
  547 U.S. 398 (2006)........................................................................6

*Calzone v. Olson*,
  931 F.3d 722 (8th Cir. 2019) ...........................................................8

*Camara v. Mun. Ct. of City & Cnty. of San Francisco*,
  387 U.S. 523 (1967).....................................................................5, 6

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015)................................................................7, 9, 10

*Colonnade Catering Corp. v. United States*,
  397 U.S. 72 (1970)................................................................6, 7, 10

*Donovan v. Dewey*,
  452 U.S. 594 (1981).....................................................................7, 9

*Illinois v. McArthur*,
  531 U.S. 326 (2001).....................................................................5, 9

*Johnson v. Smith*,
  104 F.4th 153 (10th Cir. 2024) ........................................................7

*Lange v. California*,
  594 U.S. 295 (2021)........................................................................6

*Liberty Coins, LLC v. Goodman*,
  880 F.3d 274 (6th Cir. 2018) ...........................................................7

*Lovgren v. Byrne*,
    787 F.2d 857 (3d Cir. 1986) ................................................................8, 11, 27

*Marshall v. Barlow's, Inc.*,
    436 U.S. 307 (1978)..............................................................................6, 9

*Maryland v. King*,
    569 U.S. 435 (2013)..............................................................................5, 19

*Massey v. Apollonio*,
    387 F. Supp. 373 (D. Me. 1974).................................................................20

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ....................................................................7

*New York v. Burger*,
    482 U.S. 691 (1987)..................................................................7, 9, 10, 26

*Oliver v. United States*,
    466 U.S. 170 (1984).................................................................................27

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*,
    840 F.3d 879 (7th Cir. 2016) ...................................................................7

*Rivera-Corraliza v. Morales*,
    794 F.3d 208 (1st Cir. 2015).....................................................................6, 7

*The Nymph*,
    18 F. Cas. 506 (C.C. D.Me. 1834)..............................................................12

*United States v. Biswell*,
    406 U.S. 311 (1972)................................................................................10

*United States v. Green*,
    671 F.2d 46 (1st Cir. 1982).....................................................................14, 27

*United States v. Kaiyo Maru No. 53*,
    699 F.2d 989 (9th Cir. 1983) ..................................................................8, 27

*United States v. Raub*,
    637 F.2d 1205 (9th Cir. 1980) .................................................................8, 12

*United States v. Villamonte-Marques*,
    462 U.S. 579 (1983)................................................................19, 27

*Virginia v. Moore*,
    553 U.S. 164 (2008)....................................................................6

*Wyoming v. Houghton*,
    526 U.S. 295 (1999)................................................................6, 10

## Statutes

16 U.S.C. § 1801 ........................................................................20

16 U.S.C. § 5104 ........................................................................22

1812 Mass. Acts 39 ....................................................................15

1828 Me. Laws 1151 ..................................................................15

1933 Me. Laws 54 ......................................................................16

1947 Me. Laws 404 ....................................................................17

1947 Me. Laws 408 ....................................................................17

1961 Me. Laws 257 ....................................................................17

1977 Me. Laws 2897 ..................................................................17

1987 Me. Laws 1105 ..................................................................17

1995 Me. Laws 943 ....................................................................17

Me. Stat. tit. 12, § 6173 ............................................................26

Me. Stat. tit. 12, §§ 6421–6494 ................................................18

    Me. Stat. tit. 12, § 6421 ......................................................18

    Me. Stat. tit. 12, § 6431 ......................................................18

Me. Stat. tit. 12, § 6431-A ..................................................................18

Me. Stat. tit. 12, § 6432 .....................................................................18

Me. Stat. tit. 12, § 6432-A ..................................................................18

Me. Stat. tit. 12, § 6440 .....................................................................18

Me. Stat. tit. 12, § 6445 .....................................................................18

## Regulations

50 C.F.R. § 697.4 ...............................................................................18

50 C.F.R. § 697.7 ...............................................................................19

13-188 C.M.R. ch. 5, §§ 5.01–5.35 ....................................................26

13-188 C.M.R. ch. 25, §§ 25.01–25.98 .............................................. 18

13-188 C.M.R. ch. 25 § 25.04 ..................................................... 18

13-188 C.M.R. ch. 25 § 25.08 ..................................................... 18

13-188 C.M.R. ch. 25 § 25.10 ..................................................... 18

13-188 C.M.R. ch. 25 § 25.94 ..................................................... 18

13-188 C.M.R. ch. 25, § 25.98 ..................................................... 26

## Other Authorities

James Acheson, *The Politics of Managing the Maine Lobster Industry: 1860 to the Present*, 25 Hum. Ecol. 3 (1997) .......................... 15-17

James Acheson & Roy Gardner, *Fishing Failure and Success in the Gulf of Maine: Lobster and Groundfish Management*, 13 Mar. Studies (2014)........................................................................17, 18

Adam Bartow, *Maine's Commercial Fishery Grows in Value, Thanks Largely to Lobster Prices*, WMTW (Feb. 28, 2025)....................................24

W. Jeffrey Bolster, *The Mortal Sea* (2012) ...................................................... 12-16

Comm'n of Sea & Shore Fisheries of the State of Maine, *First Biennial Report* (1918) ................................................................................ 16

Arnault Le Bris et al., *Climate Vulnerability and Resilience in the Most Valuable North American Fishery*, 115 PNAS 1831 (2017) ................................................................................................................ 24

Me. Dep't of Nat. Res., *Historical Maine Lobster Landings* (2025) ..................... 24

Arthur F. McEvoy, *The Fisherman's Problem* 140 (1986) .................................... 13

NOAA Fisheries, *American Lobster* (last updated Apr. 18, 2025) ........................ 24

NOAA Fisheries, *Fish Stock Assessment 101 Series: Part 1—Data Required for Assessing U.S. Fish Stocks* (May 23, 2012) ............................. 20

NOAA Fisheries, *Regional Vessel Monitoring Information* (Sept. 11, 2024) ............................................................................................... 18-19

Andrew Pershing et al. *Climate Impacts on the Gulf of Maine Ecosystem: A Review of Observed and Expected Changes in 2050 from Rising Temperatures,* 9 Elementa: Sci. of the Anthropocene 1 (2021) ...................................................................................... 23

Alison Rieser, Charlotte G. Hudson, & Stephen E. Roady, *The Role of Legal Regimes in Marine Conservation*, *in Marine Conservation Biology: The Science of Maintaining the Sea's Biodiversity* (Elliot Norse & Larry B. Crowder eds., 2005) ......................... 22

Andrew Rosenberg et al., *Shifting Baselines* 184 (Jeremy B.C. Jackson et al. eds., 2011) ............................................................................ 12

Jon T. Schnute & Laura J. Richards, *Use and Abuse of Fishery Models*, 58 Can. J. Fisheries Aquatic Scis. 10 (2001) ................................... 21

Alice Thomas-Smyth, *Assessing the Accuracy of Logbook Data Using VMS Data in the California Groundfish Fishery* (2013) .............................. 21

Mary Turnipseed et al., *Legal Bedrock for Rebuilding America's Ocean Ecosystems*, 324 Science 183 (2009) .................................................25

Richard A. Wahle et al., *The American Lobster in a Changing Ecosystem: A US-Canada Science Symposium, 27-30 November 2012, Portland Maine*, Can. J. of Fisheries and Aquatic Scis. (Oct. 9, 2013).................................................................................23

Christopher White, *The Last Lobster* (2018) ..........................................23

## STATEMENT OF INTEREST

*Amici curiae* are scholars who write and teach about natural resources management, conservation, fisheries management, and marine law and policy.

Professor Alison Rieser is a nationally recognized expert in ocean and coastal law and is an *emerita* professor at the University of Maine School of Law. As the founding director of the university's Marine Law Institute, she previously advised the State of Maine on its intertidal and submerged lands policies and its fisheries and aquaculture rules. She is also *emerita* professor of political geography and the environment at the University of Hawai`i at Mānoa. Her book, Alison Rieser, Donna R. Christie, Sarah Adams-Schoen, and Annie Brett, *Ocean and Coastal Law: Cases and Materials* (6th ed. 2024), is the leading casebook in the field.

Professor Annie Brett is an associate professor of law at the University of Florida Levin College of Law. She teaches and writes in the areas of environmental law, ocean and coastal law, and the intersection of law, science, and technology. Her scholarship focuses on how emerging technologies and information sources can be used to improve environmental management, as well as how novel environmental technologies should be regulated, specifically in the oceans. Her work has been published in the *California Law Review* and *Harvard Environmental Law Review*, and she is a co-author of *Oceans and Coastal Law* with Professor Rieser.

1

Professor Dave Owen is the Associate Dean for Research and the Harry Sunderland '61 Professor of Law at University of California Law San Francisco, where he teaches courses in environmental, water, land use, energy, and administrative law. He has published widely on environmental regulation, natural resource management, and sustainability and has received numerous awards for his academic writing. Professor Owen began his teaching career in 2007 at the University of Maine School of Law before joining the UC Law San Francisco faculty in 2015.

Professor Justin Pidot holds the Ashby Lohse Chair in Water & Natural Resources at the University of Arizona James E. Rogers College of Law, where he also co-directs the Environmental Law, Science and Policy Program. Professor Pidot's teaching and scholarship focuses on environmental and natural resources law, administrative law, and related fields. Professor Pidot served as General Counsel for the White House Council on Environmental Quality during the Biden Administration.

Professor Stephen Roady is both a Senior Lecturing Fellow at the Duke University School of Law, and a Professor of the Practice of Marine Science and Conservation at Duke's Nicholas School of the Environment. He has taught a graduate course in ocean and coastal law and policy at Duke annually since joining the faculty in 2016. He directed the Ocean Law Project during 1998-2001, served as

the first president of the marine conservation organization Oceana in 2001-2002, and led the oceans program at the public interest law firm Earthjustice from 2002 to 2016.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The rule under review (the "DMR Rule") appropriately balances the State of Maine's interest in protecting a natural resource essential to the State's people and economy with the Plaintiff's interest in avoiding improper searches and seizures. The search contemplated by the DMR Rule is therefore reasonable, and the district court's judgment dismissing this case should be affirmed.

The history of the lobster fishery reflects both the importance—and the necessity—of government regulation and oversight of commercial lobster fishing. For centuries, regulators have promulgated regulations intended to respond to technical, environmental, and industrial changes affecting the health of fishery resources and the industry that relies on them. History shows that an effective and informed regulatory scheme is necessary to avert calamities that could decimate Maine's lobster industry. The DMR Rule collects information at the level of detail

---

[1] No party's counsel authored this brief in whole or in part, and no party nor party's counsel contributed money that was intended to fund preparing or submitting the brief. No other individual or organization contributed money that was intended to fund preparing or submitting the brief. Plaintiff-Appellant and Defendant-Appellee both consented to the filing of this brief.

necessary for the State to manage the fishery effectively and to protect it and the industry from threats.

The regulatory history also underscores that, although participants in the lobster industry do not shed their constitutional right to privacy upon entry, they choose to participate with the understanding that their activities will be monitored, tracked, and carefully managed—as they have been for centuries. Indeed, the minimal intrusions contemplated by the DMR Rule fit comfortably alongside the sorts of regulations to which the commercial lobster fishing industry and the commercial fishing industry more generally have long been subject; they appropriately reflect—and respect—the industry participants' expectations of privacy.

In an industry with a centuries-long history of consistent and extensive regulation, the DMR Rule is entirely reasonable and is only the latest regulatory evolution intended to maintain a robust lobster stock and lobster industry. The district court's judgment should therefore be affirmed.

## ARGUMENT

**I.    Reasonableness is the touchstone of any Fourth Amendment analysis.**

 **A.    Reasonable searches under the Fourth Amendment balance public and private interests.**

The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). The Amendment "constrain[s], not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Maryland v. King*, 569 U.S. 435, 446–47 (2013) (citation omitted).

Generally, this principle means that the government must obtain a warrant before conducting a search. But this presumption is not without exceptions. The warrant requirement does not apply, for example, when a party is already on notice that "some reasonable police intrusion on his privacy is to be expected," or when "the public interest is such that neither a warrant nor probable cause is required." *Id.* at 447 (citation omitted). Indeed, "certain general, or individual, circumstances may render a warrantless search or seizure reasonable," including "diminished expectations of privacy, minimal intrusions, or the like." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001).

5

In evaluating the constitutionality of any search regime, the "ultimate touchstone . . . is 'reasonableness.'" *Lange v. California*, 594 U.S. 295, 301 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Courts consider, "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which [the search] is needed for the promotion of legitimate government interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999); *see Rivera-Corraliza v. Morales*, 794 F.3d 208, 215–16 (1st Cir. 2015) (explaining that "reasonableness" in this context requires "weighing the government's need for the search against the degree of intrusion into a citizen's privacy interests").

History is an important guide in that analysis. Reviewing courts look to "the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008); *see, e.g.*, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 75–77 (1970) (considering regulation of the liquor industry during "pre-Fourth Amendment days"). Search regimes or practices with a "long history of judicial and public acceptance" are more likely to be deemed reasonable. *Camara*, 387 U.S. at 537. These long histories can also illuminate the nature and magnitude of the government and public interests in play, *see, e.g.*, *id.*, as well as the form and degree of the private privacy interests at stake, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978).

6

**B.    Administrative searches in closely regulated industries do not require a warrant to be reasonable.**

The presumption that warrantless searches are unreasonable under the Fourth Amendment does not extend to administrative searches, where the "primary purpose" is not a "general interest in crime control" and "special needs . . . make the warrant and probable-cause requirement impracticable." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) (citation omitted).

Administrative searches of "closely regulated industries" are subject to a particularly relaxed standard of reasonableness. These industries include, but are not limited to, those that have historically featured regular inspections, *see, e.g.*, *Colonnade Catering*, 397 U.S. at 75–77 (liquor industry); those that present dangers to health and safety, *see, e.g.*, *Donovan v. Dewey*, 452 U.S. 594, 602 (1981) (mining industry); and those that require oversight to limit potential criminal activity, *see, e.g.*, *New York v. Burger*, 482 U.S. 691, 709 (1987) (running an automobile junkyard); *see also Rivera-Corraliza*, 794 F.3d at 216 n.8 (collecting other examples).[2]

---

[2] Mr. Thompson suggests that an industry must pose a threat to the public welfare to be closely regulated, Opening Brief at 13, 35, but most circuit courts that have considered the issue have held that the dangerousness of an industry is but one factor to consider. *See, e.g.*, *Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024); *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 967–68 (5th Cir. 2023); *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 284 (6th Cir. 2018); *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 893–94 (7th Cir. 2016); *cf. Rivera-Corraliza*, 794 F.3d at 219 n.16 (noting but not opining on the

Relevant here, closely regulated industries can also include industries that have the potential to deplete shared natural resources, like fish stocks. In these contexts, courts have reasoned, the government plays an important role in ensuring that natural resources available for the public's use and enjoyment remain so. *See, e.g.*, *Lovgren v. Byrne*, 787 F.2d 857, 866 (3d Cir. 1986) (noting the long history of government regulation of the commercial fishing industry and recognizing the "strong federal interest" in protecting fishery resources); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 995 (9th Cir. 1983) (recognizing the "strong federal interest in protecting natural resources within" fishery conservation zones and concluding that "warrantless inspections authorized by [federal law] do not offend the fourth amendment"); *United States v. Raub*, 637 F.2d 1205, 1210–11 (9th Cir. 1980) (recognizing that salmon conservation is "an important federal interest"); *see also Balelo v. Baldrige*, 724 F.2d 753, 766 (9th Cir. 1984) (concluding that the "[u]se of observers advances the legitimate government interest of meaningful protection of the porpoise population," and that "safeguards built into the observer program" adequately protect Fourth Amendment interests).

Searches in closely regulated industries are subject to a relaxed reasonableness standard because in these industries, "the privacy interests of the

---

issue); *contra Calzone v. Olson*, 931 F.3d 722, 724 (8th Cir. 2019) (suggesting without deciding that risk to public welfare is necessary). In any event, it is hardly self-evident that the lobster industry would fail to meet a dangerousness standard.

owner are weakened and the government interests in regulat[ion] . . . are concomitantly heightened." *Burger*, 482 U.S. at 702; *see Illinois*, 531 U.S. at 330 (recognizing that "diminished expectations of privacy" may weigh in favor of finding a warrantless search reasonable). Indeed, many closely regulated industries have "such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Marshall*, 436 U.S. at 313; *see Patel*, 576 U.S. at 425–26 (explaining that in assessing whether an industry is closely regulated, "history is relevant"); *Burger*, 482 U.S. at 707 (concluding that an industry's long "history of government regulation . . . argue[d] strongly in favor of" calling it "closely regulated").

If the traditional regulation of a particular industry—or a predecessor to that industry, *see Burger*, 482 U.S. at 705–06—is "sufficiently comprehensive and defined," the doctrine teaches, then an industry participant who owns "commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan*, 452 U.S. at 600. In other words, a person entering the industry "accept[s] the burdens as well as the benefits of their trade" and "in effect consents to the restrictions placed upon him." *Almeida-Sanchez v. United States*, 413 U.S. 266, 271 (1973); *see also Marshall*, 436 U.S. at 313 (similar).

Once the "closely regulated" status of an industry has been established, a search regime within that industry is reasonable if, like all searches deemed reasonable under the Fourth Amendment, *see Wyoming*, 526 U.S. at 299–300, the regime appropriately balances public and private interests. In searches of closely regulated industries, the balance tips in the government's favor if the search (1) serves a regulatory scheme informed by a substantial governmental interest like protecting public health, limiting property theft, or preserving a public resource; (2) is necessary to further that regulatory scheme; and (3) provides a constitutionally adequate substitute for a warrant by providing notice to the business owner and limiting the inspecting officer's discretion. *Burger*, 482 U.S. at 702–03; *accord Patel*, 576 U.S. at 426.

In the end, the three-part *Burger* test captures the traditional Fourth Amendment reasonableness analysis described above by balancing the government's interest in conducting searches informed by substantial public interests with the private party's reasonable expectation of privacy and looking to history as appropriate. *See United States v. Biswell*, 406 U.S. 311, 315–16 (1972) (upholding warrantless search of closely regulated industry where "[l]arge interests" were at stake and the search regime "pose[d] only limited threats" to the business owner's "justifiable expectations of privacy"); *Colonnade Catering*, 397 U.S. at 75, 77 (deeming search of industry with "long history of . . . regulation" reasonable).

II.    **The commercial fishing industry has been subject to close government oversight for centuries.**

The regulatory history of the commercial lobster fishing industry and the greater commercial fishing industry inform how both public and private interests enter the Fourth Amendment reasonableness analysis. The history underscores the longstanding public interest in regulating fisheries—to safeguard fishery resources and the industries that rely on them—and the important role the government plays in protecting that interest. The history also demonstrates that commercial lobster fishermen enter the industry with the understanding that their activities will be subject to extensive regulation, thereby diminishing any expectation of privacy.[3]

A.    **The greater commercial fishing industry has been closely regulated since before the founding.**

"Pervasive governmental regulation" has been a feature of the commercial fishing industry for centuries. *Lovgren*, 787 F.2d at 865. The "expectation of finding the game warden looking over one's shoulder at the catch is virtually as old as fishing itself." *Id.* at 866; *see id.* at 865 n.8 (collecting examples).

As early as 1639, local officials in Massachusetts implemented the "first fishery regulation in New England aimed specifically at conservation," recognizing

---

[3] This history also underscores that Mr. Thompson was correct to concede in the district court that the commercial lobster fishing industry, like the broader commercial fishing industry, is closely regulated. Given that concession—and the fact-specific nature of the inquiry—Mr. Thompson has waived his ability to resurrect the issue on appeal and no exceptions apply. *Contra* Opening Brief at 35-43.

the "threat of local depletion" as settlers began to exert greater pressure on cod and bass stocks. W. Jeffrey Bolster, *The Mortal Sea* 55 (2012). These regulations included limits on the days and seasons when fishermen could fish, which fish they could harvest, and the methods they could use. Andrew Rosenberg et al., *Shifting Baselines* 184 (Jeremy B.C. Jackson et al. eds., 2011). Based on their experience with resource depletion in Europe, these early settlers recognized the importance of careful stewardship. *See* Bolster at 58.

These regulations continued to develop in the centuries that followed. In 1793, Congress passed a licensing requirement for vessels engaged in cod and whale fishing. *United States v. Raub*, 637 F.2d 1205, 1209 n.5 (9th Cir. 1980) (describing the Act of Feb. 18, 1793, 1 Stat. 305). Vessels caught violating these licensing requirements could be forced to forfeit their vessel and harvests. *See The Nymph*, 18 F. Cas. 506, 507 (C.C. D.Me. 1834) (No. 10,388).

In the late 1800s, several stocks began to show signs of collapse as fishing gear became more sophisticated. In 1879, for example, "[d]isaster struck," when fishermen struggled to find menhaden—a once-plentiful fish—in the Gulf of Maine. Bolster at 176. Fishermen identified the burgeoning use of steamships as one reason for the collapse. *Id.* at 175–76; *see id.* at 177 (concluding that the collapse resulted from "intersection of the human extractive economy and natural fluctuations in the

coastal ecosystem"). Other stocks suffered too, including mackerel and halibut, due at least in part to changes in gear. *Id.* at 190, 197.

These technological changes and associated declines in fish stocks prompted states to impose gear-specific regulations. In Maine, for example, certain fisheries were not allowed to use purse seine nets—long nets that allow fishermen to encircle entire schools of fish. Bolster at 130; *see also* Arthur F. McEvoy, *The Fisherman's Problem* 140 (1986) (describing the spread of such nets in the sardine fishery). States also built out comprehensive regulatory schemes that included licensing fees, game warden enforcement, pollution and waterway operation requirements, and regulations "tailored" for specific fishing districts. McEvoy at 114.

Nineteenth century regulations also required fishermen to submit detailed information to regulators. Indeed, information sharing was "the norm." Bolster at 135. For example, fishermen in the Gulf of Maine were required to submit logs detailing their catch, effort, and sometimes their exact location to customs houses to obtain a "federal bounty payment." *Id.* at 151. Commercial fishermen operating in the offshore Scotian Shelf fishery submitted even more comprehensive logbooks detailing their vessel's position each day, the number of fish caught per person per day, the presence of other species, and the other fishing vessels observed while at sea. *Id*. at 135, 151. As one fishery scholar put it, "the thoroughness of this data—

day by day, boat by boat, year by year—illuminates the Scotian Shelf fishery in the 1850s with the precision of a satellite camera." *Id.* at 135.

These information-sharing practices reflect an important point: on the open ocean, the "circumstances and exigencies of the maritime setting" have long been recognized to "afford people on a vessel a lesser expectation of privacy than in their homes." *United States v. Green,* 671 F.2d 46, 53 (1st Cir. 1982). As a result, the degree of permissible regulation and surveillance associated with operations at sea exceeds what would be typical on land. *See infra* Part III.B.

### B. Like the greater commercial fishing industry, the commercial lobster fishing industry has long been subject to extensive regulation.

Unlike other catches, the lobster was "ignored as a commercially valuable species until the nineteenth century," Bolster at 206, despite being "astonishingly numerous among the northwest Atlantic's littoral fauna," *id.* at 207. A commercial lobster fishery seemed unimaginable at a time when lobsters were fed to livestock and used as fertilizer. *Id*. Fishermen targeting striped bass saw lobster meat as bait, not an intrinsically valuable resource. *Id*. Demand was also limited by technological restraints: it was almost impossible to preserve and ship lobster meat, let alone live lobster, outside of coastal markets. *Id*.

Attitudes began to change, however, with the emergence of small vessels called "well smacks," which allowed commercial lobster fishermen to transport live

lobster for days and even weeks in the cargo holds of their ships. *Id*. As catches increased, concerns about depleting stocks prompted states to act, and they promulgated the same sorts of regulations that had long been part of the commercial fishing industry. James Acheson, *The Politics of Managing the Maine Lobster Industry: 1860 to the Present*, 25 Hum. Ecol. 3, 7 (1997). In 1812, for example, Massachusetts began requiring nonresidents to obtain a permit before lobstering in certain state waters. Bolster at 207–08; *see also* 1812 Mass. Acts 39–40. In 1828, Maine passed a similar law requiring nonresidents to obtain permits before lobstering in *any* state waters. Bolster at 208; 1828 Me. Laws 1151–52.

The advent of the canning industry in the 1840s caused an "immediate and lasting" impact on lobster stocks. Bolster at 208. Canning technologies allowed lobster catches to be stored for longer periods and shipped over longer distances, driving new demand. *Id*. By the 1860s, stocks showed signs of strain, forcing lobstermen to work harder to maintain consistent catch levels. Acheson at 6.

In the 1870s and 1880s, therefore, legislators across New England enacted laws intended to protect breeding populations by limiting the harvest of adolescent and egg-bearing lobsters. Bolster at 212; *accord* Acheson at 7–8. The regulatory scheme for the industry that emerged at this time, consisting of conservation laws across New England, initiated a century and a half of comprehensive regulation of the lobster fishery. These laws included size limits, prohibitions on selling egg-

bearing lobsters, and seasonal closures. *See* Comm'n of Sea & Shore Fisheries of the State of Maine, *First Biennial Report* 9–15 (1918), https://lldc.mainelegislature.org/Open/Rpts/PubDocs/PubDocs1918v2/PD1918v2_08.pdf.

Even those laws were "routinely ignored," however, Bolster at 212, and the fishery was damaged by decades of harvesting immature lobster to satisfy the canneries' demands, *id.* at 212–14. Lobster landings in Maine fell by half from 1889 to 1899, even though lobstermen set three times as many traps. *Id.* at 214. Stocks remained in decline into the early 1900s following the development of a "lively and remunerative"—if unlawful—interstate trade in undersized "short lobster." Acheson at 9. In the 1920s, Maine eventually closed the lobster fishery along part of its coast altogether. *Id.* When the fishery reopened, catches remained low and lobstermen expressed concern about their ability to "earn enough for a living[,] not to mention keeping up their gear." *Id.* at 10.

These concerns prompted Maine to adopt the world's first "double gauge" law in 1933, setting both a minimum and maximum catch size limit. *Id.* at 13; *see* 1933 Me. Laws 54. This law was intended to protect both underdeveloped adolescents and large breeding lobsters. It reflected concerns about conservation, but it ultimately passed because it reflected the belief—shared by state officials and many

commercial lobster fishermen—that protecting lobsters was essential for the industry to survive. *See* Acheson at 13–14.

In 1947, the State passed a legislative package that included an enhanced recordkeeping requirement and a v-notch provision, which required lobstermen to "notch" the tails of egg-bearing females before release. James Acheson & Roy Gardner, *Fishing Failure and Success in the Gulf of Maine: Lobster and Groundfish Management*, 13 Mar. Studies, 10 (2014); *see* 1947 Me. Laws 408. As a condition of a lobster permit, lobstermen had to inform the commissioner of their previous year's catch and provide sales receipts. 1947 Me. Laws 404–05. These reforms helped stabilize the fishery for the next several decades. Acheson at 14–15.

Additional laws and regulations followed. In 1961, Maine required that only traps be used to target lobster. 1961 Me. Laws 257. In 1978, it mandated the use of escape vents. 1977 Me. Laws 2897. And beginning in 1990, the State required all traps to have escape panels. 1987 Me. Laws 1105. These laws reflected a shift in the attitude of the lobster industry: after decades in which regulatory violations were commonplace, a "conservation ethic" took hold as commercial lobster fishermen recognized their shared interest in protecting stocks. *See* Acheson at 14–15.

Regulation of the lobster industry continued to evolve into the mid-1990s, when Maine passed the "Zone Management Bill." 1995 Me. Laws 943–44. The bill divided Maine's coastal areas into discrete fishing "zones" and enabled license

holders within each zone to enact their own rules, subject to State approval. *Id.*;
Acheson & Gardner at 11.

Today, the lobster industry is subject to a host of additional requirements. *See*
Me. Stat. tit. 12, §§ 6421–6494; 13-188 C.M.R. ch. 25, §§ 25.01–25.98. The zone
structure remains in place: each zone limits the number of traps any lobsterman may
set, and most have enacted limited-entry rules, which limit where lobstermen can
fish. 13-188 C.M.R. ch. 25 §§ 25.10, 25.94. State laws also limit the number of traps
industry participants can sink and the number of permits any one vessel can receive.
Me. Stat. tit. 12, §§ 6421, 6431-A; 13-188 C.M.R. § 25.04. They dictate when traps
can be hauled, Me. Stat. tit. 12, § 6440, the sorts of traps that can be used, *id.* § 6432,
the kinds of bait that may be used, *id.* § 6432-A, and the sizes of lobster that may be
retained, *id.* § 6431. State laws also require any person with a lobster fishing license
to maintain a logbook, *id.* § 6445, and they dictate that marine patrol officers "may
inspect, at any time, any trap or related equipment to ensure compliance" with
relevant regulations, 13-188 C.M.R. § 25.08(D)(1).

Federal regulations impose additional requirements. Like other commercial
fishing vessels with federal permits, federally permitted lobster fishing vessels in the
Atlantic must provide an electronic vessel log for each trip. 50 C.F.R. § 697.4(q).[4]

---

[4] This sort of monitoring requirement is hardly unique to the lobster fishing industry.
NOAA Fisheries, *Regional Vessel Monitoring Information* (Sept. 11, 2024),

This report must detail, for example, the location "where the majority of fishing effort occurred" by longitude and latitude, catch size, traps fished, and time leaving and returning to port. *Id.* Lobstermen with federal permits are also required to carry an on-board observer "if requested to do so." *Id.* § 697.7(c)(1)(xix).

*  *  *

As this history makes clear, close regulation is a longstanding and essential part of commercial lobster fishing. Historical and contemporary evidence demonstrate the need for a robust regulatory scheme to protect lobster stocks from the same environmental, economic, and technological challenges that have caused fisheries to collapse. And although segments of the modern lobster fishery remain healthier than some of their counterparts, history also shows that the fishery is not immune from external pressures and underscores the importance of continued careful regulation.[5]

---

https://www.fisheries.noaa.gov/national/enforcement/regional-vessel-monitoring-information#northeast-greater-atlantic-region (detailing requirements by region).

[5] Mr. Thompson would have the Court ignore the regulatory history of the lobster industry and consider instead the general history of writs of assistance. *See* Opening Brief at 16-25. That history is irrelevant for three reasons. First, in the marine context, the first Congress "clearly authorized the suspicionless boarding of vessels, reflecting its view that such boardings are not contrary to the Fourth Amendment." *United States v. Villamonte-Marques*, 462 U.S. 579, 592-93 (1983). Second, the broad and intrusive writ of assistance bears little similarity to the narrow and superficial search contemplated by the DMR Rule. *See infra* Part III.B. Third, "reasonableness" is context dependent. *Maryland*, 569 U.S. at 462. Thus, it makes more sense to consider the history of the lobster fishery and industry than it does to consider governmental search practices in the abstract.

III.   **The DMR Rule fits comfortably within the regulatory history and appropriately balances public and private interests.**

The DMR Rule is a reasonable and tailored amendment to the existing regulatory scheme and supports the same government interests that have long driven regulation of the industry: first, an interest in safeguarding lobster stocks—a limited and shared public resource—amid natural, technological, and economic changes; and second, an interest in protecting the industry from underinformed regulations and external threats. The DMR Rule also fits comfortably within a comprehensive regulatory framework that has prudently managed the industry and the conduct of its participants from the very beginning.

A.   **The DMR Rule protects longstanding and important government and public interests.**

Consider, first, the ways in which the DMR Rule is intended to protect the lobster fishery as a public resource—a resource "Maine has a valid interest in preserving." *Massey v. Apollonio*, 387 F. Supp. 373, 377 (D. Me. 1974); 16 U.S.C. § 1801 (declaring the sound management and conservation of fishery resources a federal interest as well). As the State itself has explained, the collection of more granular information about where lobster is being harvested is necessary for the State to prepare more accurate stock assessments. ADD-118–19. Stock assessments involve the collection, analysis, and assessment of a lobster population at a given time. NOAA Fisheries, *Fish Stock Assessment 101 Series: Part 1—Data Required*

*for Assessing U.S. Fish Stocks* (May 23, 2012), https://www.fisheries.noaa.gov/feature-story/fish-stock-assessment-101-series-part-1-data-required-assessing-us-fish-stocks. They are an essential part of responsible fishery management, used to evaluate the stock's abundance, growth, and status. *Id.*

Stock assessments require high quality data inputs, including "catch data" that show the number of fish removed from a stock by fishing. *Id.* Logbooks have long been a critical source of this data, although over the past two decades, fishery managers have increasingly adopted GPS-enabled vessel monitoring systems to improve data quality. *See* Alice Thomas-Smyth, *Assessing the Accuracy of Logbook Data Using VMS Data in the California Groundfish Fishery* 4 (2013), https://dukespace.lib.duke.edu/server/api/core/bitstreams/01de2923-7e10-4206-8fd3-887a2fa9f504/content. Maine has explained that current assessments are "limited by the coarse spatial scale of available harvest data." ADD-119–21; *see* ADD-118 (discussing the "critical need" for high-resolution spatial and temporal data). Improved tracking data would ensure that stock assessments accurately reflect where lobsters are being harvested. ADD-119; *see* Jon T. Schnute & Laura J. Richards, *Use and Abuse of Fishery Models*, 58 Can. J. Fisheries Aquatic Scis. 10, 14 (2001) (noting how an "extensive knowledge of facts" can help to improve usefulness of fishery models and reduce model bias).

The collection of more granular data in the Gulf of Maine's lobster fishery is particularly important because the lobster's migration between federal, state, and Canadian waters necessitates coordinated, science-based management. ADD-120 (explaining that a "complicating factor in the management of lobster" is that management areas "do not align with the biological boundaries of the stocks"). Fisheries are dynamic, so inadequate data or incorrect assumptions can leave regulators and fishermen guessing at the wrong target. *See* Alison Rieser, Charlotte G. Hudson, & Stephen E. Roady, *The Role of Legal Regimes in Marine Conservation*, in *Marine Conservation Biology: The Science of Maintaining the Sea's Biodiversity*, 371 (Elliot Norse & Larry B. Crowder eds., 2005) (discussing the importance of acting on the best scientific information available). The Atlantic States Marine Fisheries Commission is also statutorily obligated to ensure that coastal fishery management plans "are based on the best scientific information available." 16 U.S.C. § 5104(a)(2)(A). In this regard, Mr. Thompson's assertion that the DMR Rule exists simply to "make life easier" for regulators, Opening Brief at 4, misstates reality.

Implementation of the DMR Rule will also facilitate State efforts to adequately enforce laws intended to conserve and responsibly manage fishery resources. ADD-119; *see* ADD-122 (explaining that enforcement efforts "need to be improved" and are particularly important now given recent changes in the fishery).

In an industry where lax enforcement has led to catastrophic collapses in the past, *see supra* Part II, commercial lobster fishermen and the State have recognized that measures that help officials monitor the vast expanse of the North Atlantic for violations are essential to protect the public interest. *See* Acheson at 14 (describing the conservation ethic that took hold in the lobster industry following fishery damage from rampant violations in the early 20th century). The measures required by the DMR Rule will help the State ensure the future viability of the lobster stock in the face of changing environmental and economic conditions by tracking where productive lobster fishing is occurring. ADD-121–22.

This information will only become more important over time as climate change renders lobster stocks more difficult to manage. The Gulf of Maine is warming "faster than 99.85% of the planet's oceans." Christopher White, *The Last Lobster* 65 (2018). Rising temperatures are at least partially responsible for changes in lobster distribution from southern New England to the Gulf of Maine. Andrew Pershing et al. *Climate Impacts on the Gulf of Maine Ecosystem: A Review of Observed and Expected Changes in 2050 from Rising Temperatures,* 9 Elementa: Sci. of the Anthropocene 1, 9 (2021).

Thus, although lobster stocks in the Gulf of Maine are currently abundant, they may not remain so. In Canada, warming summer temperatures have "triggered mass die-offs." Richard A. Wahle et al., *The American Lobster in a Changing*

*Ecosystem: A US-Canada Science Symposium, 27-30 November 2012, Portland Maine*, Can. J. of Fisheries and Aquatic Scis. (Oct. 9, 2013). Stocks in the Southern New England lobster fishery are already at "record low abundance." *See* NOAA Fisheries, *American Lobster*, https://www.fisheries.noaa.gov/species/american-lobster (last updated Apr. 18, 2025). Scientists estimate that rising temperatures in the Gulf of Maine could result in population declines of 40 to 60 percent compared to 2014, Arnault Le Bris et al., *Climate Vulnerability and Resilience in the Most Valuable North American Fishery*, 115 PNAS 1831, 1832 (2017), when the fishery experienced near-record landings, Me. Dep't of Nat. Res., *Historical Maine Lobster Landings* (2025), https://www.maine.gov/dmr/sites/maine.gov.dmr/files/inline-files/lobster.table_.pdf.

Collection of tracking data is also intended to protect the industry itself. After all, lobster is the most valuable species for Maine's commercial fisheries, and the State has stated its interest in "ensuring the fishery's long-term viability as an economic and cultural pillar of Maine society." DE16-1 at 1 (Keliher Decl. ¶3).[6] Thus, the State intends to use the data it collects to ensure that future federal

---

[6] In 2024, Maine's commercial lobster harvest was valued at $528 million, an increase of $74 million from 2023, even though the total catch declined by more than 10 million pounds. Adam Bartow, *Maine's Commercial Fishery Grows in Value, Thanks Largely to Lobster Prices*, WMTW (Feb. 28, 2025), https://www.wmtw.com/article/maine-commercial-fishery-grows-value-lobster/63972983.

decisionmaking involving other activities in the same marine areas is based upon an accurate characterization of the location and extent of current lobster fishing effort. For example, the data will help the State ensure that expected federal regulations intended to prevent large whales from becoming entangled in fishing gear are based on accurate models that reflect the location of lobster traps and their realistic risks to right whales. ADD-121–22. Here, to be clear, the interests of the government and industry participants are aligned: the DMR Rule exists primarily to protect the industry from unduly burdensome regulations and to ensure that regulations reflect actual fishery conditions. *Id.*

The data will also allow the State to shield the industry more effectively from encroachment by competing ocean uses like "aquaculture, marine protected areas, and offshore energy development" where lobster harvesting would not be allowed. ADD-121, *see* ADD-122. The Gulf of Maine is a crowded place, with ferry routes, shipping lanes, marine sanctuaries, offshore energy facilities, and U.S. Navy operating areas scattered throughout. *See* Mary Turnipseed et al., *Legal Bedrock for Rebuilding America's Ocean Ecosystems*, 324 Science 183, 183 (2009) (map detailing "uncoordinated sectoral ocean governance" in the Gulf of Maine). Managing these competing uses is not an easy task and will involve disentangling different variables. A more variable and busier ocean will require reliable and up-to-date information to account for changes and allow for adaptation.

**B.    The DMR Rule is a narrow intrusion on Mr. Thompson's diminished expectation of privacy.**

As just explained, the DMR Rule carries out important government interests in a manner consistent with longstanding practice. Notably, it also includes inherent limits and safeguards to respect industry participants' expectations of privacy, diminished as they may be.

For one, the regulation leaves *no* discretion to searching officers, as it applies to all industry participants who opt to obtain a federal permit. 13-188 C.M.R. ch. 25, § 25.98(B); *see Burger*, 482 U.S. at 703. The search is also no broader than necessary. As the district court correctly recognized, the plaintiffs could not identify another system of data collection that would protect their privacy while satisfying the public interest in protecting the fishery and fishery resources. ADD-89–90. Likewise, the GPS units collect data on the "time and position" of fishing vessels only, and that information will be retained and protected in accordance with all existing data collection requirements enshrined in Maine law. ADD-129–31, 134; 12 Me. Stat. tit. 12, § 6173; 13-188 C.M.R. ch. 5, §§ 5.01–5.35.

Further, although Mr. Thompson suggests otherwise, the DMR Rule does not allow the State to "rummage" through homes and vessels, or "encroach upon areas normally guarded from inquisitive eyes," Opening Brief at 1–2, 18, 20, 24 (internal citations omitted). The DMR Rule authorizes no physical intrusion into the fishing

vessel itself. It tracks only the location of the vessel, not its contents, the activities of those on board, or any associated audio. ADD-129–31, 134.

Nor does the DMR Rule authorize the collection of information normally kept private. In many ways, it simply uses technology to carry out a preexisting task. Industry participants have long reported their whereabouts via logs; now they must do so digitally. *See supra* pp.18–19. The DMR Rule only facilitates the collection of information readily available to anyone in the vicinity and able to see the lobster boat's location or the lobster traps it left behind. Like an open field, the open ocean—a public space—"do[es] not provide the setting for those intimate activities" the Fourth Amendment "is intended to shelter from government interference or surveillance." *Oliver v. United States*, 466 U.S. 170, 179 (1984).

As noted above, moreover, the particularities of the marine setting further diminish the expectation of privacy held by mariners. *See supra* p.14 (citing *Green*, 671 F.3d at 53). Easy means of escape can render at-sea enforcement particularly difficult, *Villamonte-Marquez*, 462 U.S. at 593, and the "physical difficulty of obtaining and presenting a search warrant" can be "overwhelming," *Kaiyo Maru*, 699 F.2d at 995; *accord Lovgren*, 787 F.2d at 866. This context further underscores the DMR Rule's reasonableness.

\*   \*   \*

27

The DMR Rule ensures that the State can continue to carry out its centuries-old role in ensuring that lobster stocks remain viable for the benefit of the public and the lobster industry alike. It also ensures that the State can carry out this role unobtrusively and in a manner that appropriately respects industry participants' reasonable, if diminished, expectations of privacy. Thus, the DMR Rule reasonably balances public and private interests and is consistent with the Fourth Amendment.

## CONCLUSION

For these reasons, the district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Sommer H. Engels*

ANDREW C. MERGEN
SOMMER H. ENGELS
ROSA HAYES*
SHANNON NELSON*
AARON KLEINER, *clinical student*\*
RILEY PFAFF, *clinical student*\*
SPENCER WEISER, *clinical student*\*
Emmett Environmental Law & Policy Clinic
Harvard Law School
6 Everett St., Suite 5116
Cambridge, MA 02138
sengels@law.harvard.edu
(617) 384-0464

*Counsel for Amici Curiae*

May 1, 2025                    *Not admitted to practice in the First Circuit

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B). The brief contains 6,346 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in proportionally spaced typeface using Microsoft Word and 14-point Times New Roman font.

Respectfully submitted,

*/s/ Sommer H. Engels*

ANDREW C. MERGEN
SOMMER H. ENGELS
ROSA HAYES*
SHANNON NELSON*
AARON KLEINER, *clinical student*\*
RILEY PFAFF, *clinical student*\*
SPENCER WEISER, *clinical student*\*
Emmett Environmental Law & Policy Clinic
Harvard Law School
6 Everett St., Suite 5116
Cambridge, MA 02138
sengels@law.harvard.edu
(617) 384-0464

*Counsel for Amici Curiae*

May 1, 2025                    *Not admitted to practice in the First Circuit

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2025, I served the foregoing brief on all registered parties through the First Circuit's electronic case filing (CM/ECF) system.

Respectfully submitted,

*/s/ Sommer H. Engels*

SOMMER H. ENGELS
*Attorney*
sengels@law.harvard.edu
(617) 384-0464

*Counsel for Amici Curiae*

May 1, 2025