No. 25-1007

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

FRANK THOMPSON,

*Plaintiff - Appellant*,

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH;
JACK CUNNINGHAM,

*Plaintiffs,*

v.

CARL WILSON, in their official capacity as Commissioner,
Maine Department of Marine Resources

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT DISTRICT OF MAINE
No. 1:24-cv-00001-JAW (Hon. Judge John A. Woodcock, Jr.)

**BRIEF OF AMICI CURIAE IN SUPPORT OF
DEFENDANT-APPELLEE AND AFFIRMANCE**

Erica A. Fuller
Chloe C. Fross*
Sarah Shahabi*
CONSERVATION LAW FOUNDATION
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org

May 2, 2025

*Counsel for Amici Curiae Conservation Law
Foundation and Ocean Conservancy*

*Not admitted to practice in the First Circuit

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Conservation Law Foundation and Ocean Conservancy state that the proposed *Amici Curiae* are non-profit 501(c)(3) corporations with no parent corporation, and no person or corporate entity own ten percent or more of the respective associations.

Respectfully submitted this 2nd day of May, 2025,

*/s/ Erica A. Fuller*
Erica A. Fuller
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org

*Counsel for Amici Curiae Conservation Law*
*Foundation and Ocean Conservancy*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY ................................................................................ vi

STATEMENT OF IDENTITY, INTEREST, AND SOURCE OF AUTHORITY...1

INTRODUCTION ........................................................................4

ARGUMENT ..............................................................................7

I.     Reliable Data Is Essential for Sustainable Fishery Management...............7

    A.    Lack of Reliable Data Led to Fishery Collapses...................7

    B.    Congress Established Science-Based, Data-Driven Programs ............9

    C.    Fisheries are Regulated for a Variety of Purposes............................11

    D.    Monitoring Programs are an Effective Management Tool ................12

    E.    Vessel Trackers are a Reasonable and Necessary Measure...............13

II.    The Commission Has Ample Legal Authority to Require Vessel Trackers in this Closely Regulated Industry...............................................15

III.    Vessel Trackers are Necessary to Protect the Government's Substantial Interest in the Health of the Lobster Fishery ........................17

    A.    Government has a Substantial Interest in the Health of the Fishery...17

    B.    Vessel Trackers are Necessary to Achieve Conservation and Management Objectives ....................................................18

       1. Vessel Trackers are Necessary to Improve Stock Assessments .........19

       2. Vessel Trackers are Necessary to Accurately Estimate Entanglement Risk ................................................................20

       3. Vessel Trackers are Necessary for Spatial Planning..........................20

       4. Vessel Trackers are Necessary to Improve Enforcement ..................22

CONCLUSION ..........................................................................23

CERTIFICATE OF COMPLIANCE..........................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973) ......................................................................... 16

*Balelo v. Baldrige*,
724 F.2d 753 (9th Cir. 1984).............................................................. 11

*Campanale & Sons, Inc. v. Evans*,
311 F.3d 109 (1st Cir. 2002) ............................................................. 17

*Conserv. Law Found. v. Evans*,
209 F.Supp.2d 1 (D.D.C. 2001) ........................................................... 1

*Conserv. Law Found. v. Pritzker*,
37 F.Supp.3d 254 (D.D.C. 2014) ......................................................... 1

*Lovgren v. Byrne*,
787 F.2d 857 (3rd Cir. 1986) ............................................................. 11

*New York v. Burger*,
482 U.S. 691 (1987)................................................................... 16, 17

*Ocean Conservancy v. Gutierrez*,
394 F.Supp.2d 147 (D.D.C. 2005) ........................................................ 7

*R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt.*,
585 F.3d 42 (1st Cir. 2009) ................................................................ 9

*United States v. Kaiyo Maru No. 53*,
699 F.2d 989 (9th Cir. 1983).............................................................. 11

*United States v. Raub*,
637 F.2d 1205 (9th Cir. 1980)............................................................ 11

**Statutes**

12 M.R.S. § 6173 ............................................................................ 19

16 U.S.C. §§ 1801–1891d .................................................................... 10

16 U.S.C. § 1801(a) ............................................................................. 17

16 U.S.C. §§ 1801(a)(1), (b)(4) .......................................................... 10

16 U.S.C. § 1801(a)(8) ........................................................................ 10

16 U.S.C. § 1852(h)(6) ........................................................................ 10

16 U.S.C. §§ 1853(a)(1), (15) ............................................................. 10

16 U.S.C. § 1853(b)(14) ...................................................................... 11

16 U.S.C. § 1854(e) ............................................................................. 10

16 U.S.C. §§ 5101–5108 ....................................................................... 9

16 U.S.C. § 5101(a)(6) ........................................................................ 17

16 U.S.C. §§ 5104(a)(1), (2)(A) .................................................... 10, 12

44 U.S.C. §§ 3541 ............................................................................... 19

Pub.L. No. 77–539, 56 Stat. 267 (1942) ............................................... 9

Pub.L. No. 81–721, 64 Stat. 467 (1950) ............................................... 9

**Regulations**

7 Del. Admin. Code § 3755-4.0 ........................................................... 11

13-188 C.M.R. ch. 25, § 25.98 ......................................................... 4, 10

50 C.F.R. § 648 ................................................................................. 6, 14

250-R.I. Code Regs. 90-00-5.5.8 ......................................................... 11

322 Mass. Code Regs. § 7.11 ................................................................ 10

Md. Code Regs. 08.02.08.10(G) ........................................................... 11

N.H. Code Admin R. Fis 612.01 ........................................................... 10

N.J. Admin. Code § 7:25-14.16(a)(12) .................................................. 10

**Other Authorities**

ASMFC, *2020 American Lobster Benchmark Stock Assessment and Peer Review Report*, (Oct. 19, 2020), https://asmfc.org/resources/science/stock-assessment/american-lobster-benchmark-stock-assessment-and-peer-review-report/ ............................................................................................... 5

ASMFC, *Addendum VIII to Amendment 3 to the American Lobster Fishery Management Plan*, (2006), https://asmfc.org/wp-content/uploads/2025/01/addendumVIII.pdf ......................................... 9

ASMFC, *Addendum XXVI to Amendment 3 to the American Lobster FMP; Addendum III to the Jonah Crab FMP*, (Feb. 2018), https://asmfc.org/wp-content/uploads/2025/01/AmLobsterAddXXVI_JonahCrabAddIII_Feb2018.pdf ................................................ 13

ASMFC, *Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan*, (Mar. 2022) ............................................... passim

ASMFC, *American Lobster Draft Addendum XXIX/Jonah Crab Draft Addendum IV for Public Comment*, (Feb. 2022), https://archive.asmfc.org/files/Meetings/AmLobsterBoardFeb2022/AmLobsterBoardMaterials_Feb2022.pdf. ......................................... 2

ASMFC, *FAQs on Electronic Vessel Tracking for American Lobster and Jonah Crab*, (Apr. 1, 2022), https://asmfc.org/news/faqs-on-electronic-vessel-tracking-for-american-lobster-and-jonah-crab/ ................................... 14

ASMFC, *Lobster Management Stock Area Map*, https://asmfc.org/wp-content/uploads/2025/02/LobsterManagement_StockArea_Map_Nov2016.jpeg (last visited May 2, 2015) ........................................ 22

BOEM, *Gulf of Maine Offshore Wind Lease Sale*,
https://www.boem.gov/renewable-energy/state-activities/maine/gulf-maine
(last visited Apr. 14, 2025) ................................................................... 21

BOEM, *Offshore Renewable Activities,* https://www.boem.gov/renewable-
energy/offshore-renewable-activities (last visited Apr. 14, 2025) ...................... 21

Lockhart, F., Estrella, B., *Amendment 3 to the Interstate Fishery
Management Plan for American Lobster*, ASFMC, (1997),
https://archive.asmfc.org/uploads/file/lobsterAmendment3.pdf ........................ 13

NOAA Fisheries, *American Lobster*,
https://www.fisheries.noaa.gov/species/american-lobster
(last updated Apr. 18, 2025) ................................................................... 6

NOAA Fisheries, *American Lobster: Management*, *Regulatory History*,
https://www.fisheries.noaa.gov/species/american-lobster/management
(last updated Apr. 18, 2025) ................................................................... 16

NOAA, *American Lobster: Seafood*,
https://www.fisheries.noaa.gov/species/american-lobster/seafood
(last updated Apr. 18, 2025 ................................................................... 17

NOAA Fisheries, *Regional Vessel Monitoring Information*,
https://www.fisheries.noaa.gov/national/enforcement/regional-vessel-
monitoring-information (last updated Sept. 11, 2024) ................................. 6, 14

W. Jeffrey Bolster, THE MORTAL SEA:
FISHING THE ATLANTIC IN THE AGE OF THE SAIL (2012) ................................. 8, 9

Zou, C., Thunberg, E., Ardini, G., *Economic profile for American lobster
(Homarus Americanus) fleets in the Northeastern United States*,
NATIONAL MARINE FISHERIES SERVICE: 21-03, (2021),
https://doi.org/10.25923/z82r-sv87 ....................................................... 17

# GLOSSARY

| | |
|---|---|
| ACFCMA | Atlantic Coastal Fisheries Cooperative Management Act |
| Addendum | Addendum XXIX to Amendment 3 to the Fishery Management Plan for American Lobster |
| CLF | Conservation Law Foundation |
| Commission | Atlantic States Marine Fisheries Commission |
| FMP | Fishery Management Plan |
| Lobster fishery | American lobster and Jonah crab fishery |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| NOAA Fisheries | National Oceanic and Atmospheric Administration |
| VMS | Vessel Monitoring System |

## STATEMENT OF IDENTITY, INTEREST, AND
## SOURCE OF AUTHORITY TO FILE

*Amici curiae* Conservation Law Foundation (CLF) and Ocean Conservancy are nonprofit organizations with longstanding interests and expertise in fishery management. They recognize that the government's ability to sustainably manage our nation's fisheries depends on accurate and timely scientific data to prevent the collapse of those fisheries and to protect all who depend on them.

CLF is a nonprofit environmental advocacy organization with offices in Maine, Massachusetts, Vermont, New Hampshire, Rhode Island, and Connecticut. Its mission is to protect and restore New England's environment for the benefit of all people for generations to come. It has worked for decades to end overfishing, protect ecologically important marine habitat, and restore key forage species by advocating for effective conservation and management measures in federal fisheries. It has also sought to advance equitable marine spatial planning and to ensure that offshore wind development is appropriately sited and that its effects on the marine ecosystem are sufficiently mitigated.

CLF has litigated to ensure that state and federal governments use the best available science in their decision-making, consistent with the law, and incorporates innovations in fish catch monitoring, reporting, and data into management. *See e.g., Conserv. Law Found. v. Pritzker*, 37 F.Supp.3d 254 (D.D.C. 2014); *Conserv. Law Found. v. Evans*, 209 F.Supp.2d 1 (D.D.C. 2001).

1

Over the last decade, CLF has provided numerous public comments to the National Oceanic and Atmospheric Administration (NOAA Fisheries) and the Atlantic States Marine Fisheries Commission (Commission) related to its management of the American lobster and Jonah crab fishery (hereinafter "lobster fishery") in federal waters. Specifically, it submitted written comments on Addendum XXIX to Amendment 3 to the American Lobster Fishery Management Plan in early 2022.[1]

Ocean Conservancy is a nonprofit organization headquartered in Washington, D.C., with staff in ten coastal states and over 140,000 members worldwide. It works to protect the ocean from today's greatest global challenges. For more than 50 years, Ocean Conservancy has created evidence-based solutions for a healthy ocean and the wildlife and communities that depend on it. Ocean Conservancy has been at the forefront of ocean conservation since 1972 and remains dedicated to working with partners, volunteers, and decision-makers to find solutions to the biggest threats facing our ocean.

Ocean Conservancy has a longstanding, demonstrated commitment to securing healthy fisheries which support the well-being of coastal communities. In

---

[1] *See* ASMFC, *American Lobster Draft Addendum XXIX/Jonah Crab Draft Addendum IV for Public Comment*, 70, (Feb. 2022), https://archive.asmfc.org/files/Meetings/AmLobsterBoardFeb2022/AmLobsterBoardMaterials_Feb2022.pdf.

2

this day and age, the technologies available to commercial and recreational fishermen are so advanced that it is possible to rapidly deplete our fish stocks. One of Ocean Conservancy's goals is to ensure the best available science is used in fishery management, including innovations in fish catch monitoring, reporting, and data management. High quality fishery data leads to better outcomes for fish, fishing communities, and ocean ecosystems. In the last several years, Ocean Conservancy has provided numerous public comments to NOAA Fisheries and the Regional Fishery Management Councils related to data modernization and regularly advocates for improvements to electronic catch reporting and on-board observer programs. Ocean Conservancy works to make sure the best science and data is at the table when policy and management decisions are made and works with partners to develop and implement innovative tools to fill gaps in our understanding of fisheries and the marine ecosystems they rely on.

This brief seeks to assist the Court's understanding of (1) monitoring as an essential tool in federal fisheries management; and (2) the substantial government interest in the health of the lobster fishery and the need for electronic tracking devices on federally permitted vessels to further those interests.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), CLF and Ocean Conservancy affirm that no counsel for a party authored this brief in whole or in part and that no one other than proposed *Amici Curiae*, their members, and

their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

By emails dated April 4 and April 30, 2025, counsel for Defendant-Appellee and Plaintiff-Appellant consented to filing this brief. *See* Fed. R. App. P. 29(a)(2).

## INTRODUCTION

Off the coast of Maine, brightly colored buoys mark where millions of lobster traps have been dropped to the seafloor and iconic lobster vessels ply the waters to pick them up. A billion-dollar industry, the lobster fishery drives Maine's economy and serves as a culinary and cultural icon. The lobster fishery (which targets three biological stocks—the Southern New England, Georges Bank, and Gulf of Maine stocks) has been regulated for more than a century. In recent years, however, it faced a myriad of complex issues that could only be solved with fine scale spatial data on when, where, and how fishing was occurring. Maine's decision to further regulate the fishery, by implementing the Atlantic States Marine Fisheries Commission's (Commission) electronic vessel tracker requirement for its federal permit holders engaged in the commercial fishery, was both reasonable and necessary. *See* 13-188 C.M.R. ch. 25, § 25.98 (Maine's electronic tracking regulation—the "DMR rule"—incorporating the requirements in Addendum XXIX that were approved by the Commission in March 2022).

When the Commission initiated Addendum XXIX to Amendment 3 to the

4

Fishery Management Plan for American Lobster ("Addendum" or "Add. XXIX")

in 2021,[2] it had identified significant management concerns and determined that

data gaps were impeding its interests in the health of the lobster fishery. *See*

Addendum of Defendant-Appellee ("Comm'r Add.") at 3–42. Among other things,

coarse or insufficient spatial data impedes stock assessment modeling,[3] managers'

ability to develop appropriate marine spatial planning tools, and results in

inefficient and ineffective enforcement.

Today, lobsters continue to move offshore due to warming waters and

fishing effort continues to expand north and east into federal waters.[4] The fine

scale spatial data collected by electronic vessel trackers will more accurately

establish the fishing "footprint" and allow managers to respond to these

increasingly complicated issues. Although the Gulf of Maine stock enjoyed a

boom, there are concerns that this trend may not continue. Climate change impacts

on water temperature, currents, and salinity, coupled with the decline of juvenile

---

[2] The Commission manages the lobster fishery pursuant to Amendment 3 to the Fishery Management Plan and its subsequent Addenda (I – XXVI).

[3] The Commission conducts stock assessments on Commission-managed species to determine the health and status of fish stocks and to provide scientific advice to fisheries managers.

[4] *See* ASMFC, *2020 American Lobster Benchmark Stock Assessment and Peer Review Report*, 6 (Oct. 19, 2020), https://asmfc.org/resources/science/stock-assessment/american-lobster-benchmark-stock-assessment-and-peer-review-report/.

lobsters, has already collapsed the iconic Southern New England stock.[5]

Appellant's resistance to the electronic vessel tracker requirement was unwarranted as participants in most federal fisheries are required to install an even more expensive NOAA Fisheries-approved vessel monitoring system (VMS) unit on their vessels. These VMS units send position points via satellite at varying intervals 24/7 and provide critical monitoring data.[6] His resistance was also misplaced. Managers and the industry were facing a plethora of challenges that could *only* be solved cheaply and efficiently by obtaining the fine-scale spatial and temporal data on fishing effort that vessel trackers denote.

Appellant's assertion that vessel trackers are equivalent to British officers "rummag[ing]" through "private vessels" "in an unrestrained search," and triggering the American Revolution misses the mark. Plaintiff-Appellant's Initial Brief ("Appellant Br.") at 1. The Commissioner of the Maine Department of Marine Resources[7] was lawfully implementing a regulation required by the Commission to track federally permitted commercial fishing vessels (not a person) after determining they were necessary, and after a "thorough review of all the

---

[5] *See* NOAA Fisheries, *American Lobster*, https://www.fisheries.noaa.gov/species/american-lobster (last updated Apr. 18, 2025).

[6] *See* 50 C.F.R. § 648; *see also* NOAA Fisheries, *Regional Vessel Monitoring Information*, https://www.fisheries.noaa.gov/national/enforcement/regional-vessel-monitoring-information (last updated Sept. 11, 2024).

[7] Carl Wilson was confirmed as Commissioner on April 8, 2025.

relevant information available at the time decision was made." *See Ocean Conservancy v. Gutierrez*, 394 F.Supp.2d 147, 157 (D.D.C. 2005), *aff'd sub nom. Oceana, Inc. v. Gutierrez*, 488 F.3d 1020 (D.C. Cir. 2007).

The Commission's requirement to place electronic vessel trackers on commercial lobster vessels was the latest application of a consistently held view that fishery managers are permitted to collect the data they need to manage our nation's fisheries. Rather than an unconstitutional search and seizure, vessel trackers are a reasonable tool that is necessary to respond to the ongoing challenges in the fishery. *Amici curiae* ask this Court to find that Maine was lawfully allowed to collect this data on federally permitted lobster vessels, operating in this closely regulated and valuable fishery, harvesting a public resource.

## ARGUMENT

### I.    Reliable Data Is Essential for Sustainable Fishery Management.

The history of U.S. fisheries management illuminates the need for reliable data and the reasons why Congress gave NOAA Fisheries and the Commission broad authority to require reasonable reporting and monitoring programs in their fishery management plans (FMP).

### A. Lack of Reliable Data Led to Fishery Collapses.

This country realized the value of effective fishery management the hard way. In the 1800s, it lacked basic information on commercially valuable stocks—

7

we did not know when they matured; where they bred, spawned, traveled, and were caught; or how quickly they were being caught. *See* W. Jeffrey Bolster, THE MORTAL SEA: FISHING THE ATLANTIC IN THE AGE OF THE SAIL, 122 (2012). Even the question of whether "fishing *could* destroy" stocks was up for debate. *Id.* at 178. "Scientific regulation" of fisheries was "impossible in the absence of such knowledge." *Id.* at 122 ("Systematic landings data much less landings data with reference to place, simply did not exist.").

The result was one fishery collapse after another, wreaking "economic disaster" on the coastal communities that depended on them. *Id.* at 177, 216 (describing serial collapses of menhaden, mackerel, halibut, and lobster in the 1870's, 1880's, and 1890's, prompting the first federal regulations to protect sea fish in 1887). Collapses followed a "typical" sequence, described here for menhaden. *Id.* at 181. In the 1850s, menhaden offered a new source of oil after the whale stocks collapsed and small boat fishermen drove a growing economy and created new markets. After some time, however, industrial-scale technologies developed which allowed larger vessels to catch whole schools of fish at once, over and over again. Eventually, vessels were forced to go farther and farther out to sea in search of fish, despite the fact that the species had once "swarm[ed] near the shore." *Id.* at 179. Within 30 years of these new technologies, menhaden were overfished. *Id.* at 181; *see also id.* at 133–139 (similarly describing the 1850s

collapse of the New England cod fishery). The small boat fishermen who had built the markets in the first place were left with no meaningful way to recover. *Id.* at 177. Other fisheries similarly failed under a patchwork of federal, state, and international laws.

### B. Congress Established Science-Based, Data-Driven Programs.

To provide better fisheries management of our coastal resources, Congress enacted the Atlantic States Marine Fisheries Compact in 1942—this agreement between Atlantic coastal states, including Maine, was intended to "exercise joint regulatory oversight of their fisheries through the development of interstate fishery management plans." *R.I. Fishermen's All. Inc. v. R.I. Dep't of Env't Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009). The Commission implements the Compact; the states implement the Commission's required conservation and management measures under the Atlantic Coastal Fisheries Cooperative Management Act (ACFCMA). *See* Pub.L. No. 77–539, 56 Stat. 267 (1942), *as amended by* Pub.L. No. 81–721, 64 Stat. 467 (1950); *see* 16 U.S.C. §§ 5101–5108. The Commission has long recognized that "insufficient data [i]s the primary limitation on the ability to manage the [lobster] fishery" and further this interest.[8]

In 1976 Congress enacted the Magnuson-Stevens Fishery Conservation and

---

[8] ASMFC, *Addendum VIII to Amendment 3 to the American Lobster Fishery Management Plan*, 2 (2006), https://asmfc.org/wp-content/uploads/2025/01/addendumVIII.pdf.

Management Act (MSA)—the statute that underpins management in federal waters (3-200nm from shore) to this day. *See* 16 U.S.C. §§ 1801–1891d. Its purpose is to protect our nation's "valuable and renewable natural resources" on a "continuing basis." *Id.* §§ 1801(a)(1), (b)(4). And it requires fishery managers to meet a series of data-driven requirements including setting science-based annual catch limits at levels that avoid overfishing, and rebuilding overfished stocks. *Id.* §§ 1852(h)(6); 1853(a)(1), (15); 1854(e). As Congress stated when it enacted the MSA, "[t]he collection of reliable data is essential" to effective management. *Id.* § 1801(a)(8).

Although the lobster fishery was managed by NOAA Fisheries under the MSA until 1997, it has been managed cooperatively by the Commission and NOAA Fisheries under ACFCMA since that time. Under ACFCMA, the 45-member Commission establishes conservation management measures that are implemented by the 15 coastal states as needed and according to their state regulatory authorities. *See* 16 U.S.C. §§ 5104(a)(1), (2)(A). Contrary to Appellant's assertion that Maine was the sole state to require trackers, Appellant Br. at 39, shortly after the Commission adopted Addendum XXIX, other Atlantic states implemented similar electronic vessel tracking regulations.[9]

---

[9] 322 Mass. Code Regs. § 7.11 (Massachusetts regulations effective May 1, 2023); 13-188 C.M.R. ch. 25, § 25.98 (Maine regulations effective Nov. 5, 2023); N.H. Code Admin R. Fis 612.01 (New Hampshire regulations effective Feb. 21, 2024); N.J. Admin. Code § 7:25-14.16(a)(12) (New Jersey regulations effective Mar. 8,

### C.  Fisheries are Regulated for a Variety of Purposes.

The fishing industry has been regulated for law enforcement purposes and to ensure conservation objectives for hundreds of years. *See United States v. Raub*, 637 F.2d 1205, 1209 n.5 (9th Cir. 1980) (collecting examples of fishing industry regulation spanning from 1793 to 1976); *see also Balelo v. Baldrige*, 724 F.2d 753, 755 (9th Cir. 1984) (upholding use of government observers aboard tuna fishing vessels to gather management and enforcement data for the Marine Mammal Protection Act under closely regulated industry exception); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 996 (9th Cir. 1983) (upholding warrantless searches of foreign fishing vessels by U.S. Coast guard under the MSA because "[t]here is strong federal interest in protecting natural resources within the FCZ. The Act was adopted upon a clear showing that the supply of foodfish was dangerously depleted. Congress was aware that an important national asset was at stake and that strong measures were necessary."); *Lovgren v. Byrne*, 787 F.2d 857, 865 n.8 (3rd Cir. 1986) (noting "pervasive regulation" of the fishing industry "since the founding of the Republic." (citing Act of Feb. 18, 1793) (a 1700s regulation requiring licenses for vessels fishing for cod and mackerel fishing and allowing

---

2024); 7 Del. Admin. Code § 3755-4.0 (Delaware regulations effective Mar. 11, 2024); 250-R.I. Code Regs. 90-00-5.5.8 (Rhode Island regulations effective Apr. 28, 2024); Md. Code Regs. 08.02.08.10(G) (Maryland regulations effective Aug. 5, 2024).

searches of such licensed vessels)). Those engaged in the business of fishing in federal waters understand that business traditionally and necessarily comes with close federal management and regulation.

### D. Monitoring Programs are an Effective Management Tool.

Fishery managers have long relied on reporting requirements (including logbook and vessel trip reporting), as well as monitoring programs to implement their FMPs—some require a VMS unit to be installed, others require a camera, and others require a human observer to obtain reliable data.

Under the MSA, managers are allowed to include measures "determined to be necessary and appropriate for the conservation and management of the fishery" in their FMPs. 16 U.S.C. § 1853(b)(14). Similarly, under ACFCMA, FMPs "shall specify the requirements necessary for States to be in compliance with the plan" that will "promote the conservation of fish stocks" using "the best scientific information available." 16 U.S.C. §§ 5104(a)(1), (2)(A). These monitoring tools address an inherent problem in fisheries: self-reported data can be unreliable, and in some cases monitoring programs are the only way to verify certain important data—such as what species of fish were caught, where they were caught, what type of gear was used, or the density of such fishing gear.

**E. Vessel Trackers are a Reasonable and Necessary Measure.**

Prior to initiating the Addendum, the Commission's efforts to obtain fine scale lobster fishing location data had fallen short. Noting that an "absence of data" did "not allow strong conclusions" about the lobster population, and that "a program to collect accurate and comprehensive statistics on the lobster fishery is critical to support the area management system," the Commission initiated Amendment 3 in 1997.[10] One of its objectives was to "improve data [and] improve stock assessment models." *Id*. at ii. The Commission later developed Addendum I (1999) (establishing new data collection guidelines), Addendum VIII (2006) (establishing reporting and monitoring requirements), and Addendum X (2007) (establishing a coastwide reporting and data collection program). When Addendum XXVI (2018) was implemented, however, the Commission was still identifying the lack of high-resolution spatial data as "[o]ne of the foremost deficiencies" in the lobster fishery.[11]

To solve these data deficiencies, the Commission began exploring electronic tracking devices in 2018. *See* Comm'r Add. at 6–7 (Add. XXIX). During a one-

---

[10] Lockhart, F., Estrella, B., *Amendment 3 to the Interstate Fishery Management Plan for American Lobster*, ASFMC, 5, 27 (1997), https://archive.asmfc.org/uploads/file/lobsterAmendment3.pdf.
[11] ASMFC, *Addendum XXVI to Amendment 3 to the American Lobster FMP; Addendum III to the Jonah Crab FMP*, 1 (Feb. 2018), https://asmfc.org/wp-content/uploads/2025/01/AmLobsterAddXXVI_JonahCrabAddIII_Feb2018.pdf.

year pilot program on lobster and Jonah crab vessels in Maine, devices from three different vendors were tested on 18 lobster vessels and several marine patrol (enforcement) vessels. This study demonstrated that proper implementation of the FMP required high-resolution spatial data that only a vessel tracking monitoring system pinging at one-minute intervals could provide. *See* Comm'r Add. at 40–41 (Ping Rate Analysis). In addition, Rhode Island tested multiple cellular tracking devices on three state-owned research vessels as part of an Atlantic Coastal Cooperative Statistics Program-funded research project between 2019 and 2021, and over 25 cellular tracking devices were deployed on commercial fishing vessels, including lobster vessels, trawlers, gillnetters, and others as part of a pilot aggregate landing program.[12]

Unlike the expensive, satellite-based VMS systems required in most federal fisheries—that ping at varying intervals depending upon management objectives for the individual FMPs[13]—the electronic vessel tracking devices are cellular-based, relatively inexpensive to purchase (in this case they were purchased using federal funds and provided to Maine fishermen with three years of cellular data service at no cost). The "ping" created a data event containing datetime, latitude,

---

[12] *See* ASMFC, *FAQs on Electronic Vessel Tracking for American Lobster and Jonah Crab*, (Apr. 1, 2022), https://asmfc.org/news/faqs-on-electronic-vessel-tracking-for-american-lobster-and-jonah-crab/.

[13] *See* 50 C.F.R. § 648; *see also* NOAA Fisheries, *Regional Vessel Monitoring Information, supra* note 6.

longitude, and device/vessel identifier at one-minute intervals. *See* Comm'r Add. at 11 (Add. XXIX). Contrary to Appellant's assertions, Appellant Br. at 2, 8, 12, the required devices did not collect any audio data, ECF No. 33 at 84 (Order), and they were (and still are) a particularly well-suited management tool to fill the significant data gaps needed for effective management.

## II. The Commission Has Ample Legal Authority to Require Vessel Trackers in this Closely Regulated Industry.

As previously discussed, fishery managers have broad authority to develop and implement management measures necessary and appropriate to implement their FMPs. *See supra* § I.B. The problem with the Lobster FMP was that even decades after Amendment 3 was implemented, managers continued to grapple with the persistent lack of reliable spatial and temporal data necessary to respond to challenges. Thus, in August 2021, the Commission initiated Addendum XXIX specifically to require trackers and collect the "high-resolution spatial and temporal data" it had determined are necessary to characterize fishing effort and address identified management and enforcement needs. Comm'r Add. at 5 (Add. XXIX). While competing ocean activities may shift, this data will always be needed.

At the district court, the parties agreed that electronic vessel trackers are a search, ECF No. 33 at 68 n. 18, and that the lobster fishery is a closely regulated industry, *id.* at 69–70, n.19. The Supreme Court allows for warrantless inspections in closely regulated industries provided three criteria are met: (1)  there is "a

substantial government interest that informs the regulatory scheme pursuant to which the inspection is made;" (2) that is "necessary to further the regulatory scheme;" and (3) "the statute's inspection program, in terms of the certainty and regularity of its application must provide a constitutionally adequate substitute for a warrant." *New York v. Burger*, 482 U.S. 691, 702-03 (1987) (cleaned up). All of those criteria are met here.

Although Appellant now claims the lobster fishery is not a closely regulated industry, Appellant's Br. at 35-39, that argument comes too late. Regardless, the vessels tracked for regulatory purposes are participating in the commercial lobster fishery, an industry that has been subject to intense regulation for decades. There is no reasonable expectation of privacy when a vessel can be boarded by the Coast Guard at any time and in any U.S. waters without cause. Further, federally permitted lobstermen are subject to a suite of regulations including 100-percent reporting requirements, strict trap limits and vent sizes, fishing only within designated areas, marking their gear in several specific ways, following minimum gauge sizes, and v-notching all egg-bearing females.[14] *See Almeida-Sanchez v. United States*, 413 U.S. 266, 271 (1973) ("accept[ing] the burdens as well as the benefits of their trade" and "in effect consent[ing] to the restrictions placed upon

---

[14] *See* NOAA Fisheries, *American Lobster: Management*, *Regulatory History*, https://www.fisheries.noaa.gov/species/american-lobster/management (last updated Apr. 18, 2025).

him"). Finally, the "certainty and regularity" of the vessel trackers (e.g., every minute at sea and every 6 hours in port) provide a predictable and guided federal regulatory approach. *Burger*, 482 U.S. at 703. Vessel trackers constitute a reasonable administrative search.

## III.   Vessel Trackers are Necessary to Protect the Government's Substantial Interest in the Health of the Lobster Fishery.

### A. Government Has a Substantial Interest in the Health of the Fishery.

Lobster is Maine's "most famed resource" and one of the nation's most "valuable fisheries." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 110 (1st Cir. 2002); ECF No. 33 at 4 (Order). As Congress highlighted in ACFCMA, there is a "national interest" in the effective conservation and management of coastal resources. 16 U.S.C. § 5101(a)(6); *accord* 16 U.S.C. § 1801(a) ("fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities"). Here, lobster offers vital health benefits as part of the food chain.[15] Lobster is a billion-dollar industry that fuels local, state, and regional economies from New York to Maine.[16] In the coastal New England States,

---

[15] *See* NOAA, *American Lobster: Seafood*, https://www.fisheries.noaa.gov/species/american-lobster/seafood (last updated Apr. 18, 2025.

[16] *See* Zou, C., Thunberg, E., Ardini, G., *Economic profile for American lobster (Homarus Americanus) fleets in the Northeastern United States*, NATIONAL MARINE FISHERIES SERVICE: 21-03, 1 (2021), https://doi.org/10.25923/z82r-sv87.

hundreds of residents take the opportunity to recreationally fish for lobster.

Both before this Court and at the district court, Appellant "concede[s] that [Maine] has a substantial interest in 'regulating the lobster fishery and ensuring its long-term viability.'" ECF No. 33 at 51, 71 (Order); *see* Appellant Br. at 22. Appellant "does not dispute the legitimate government interests . . . of *conservation* and *sustainability* of the lobster industry" but agrees this is "an interest shared by the industry itself" Appellant Br. at 22 (emphasis not added).

## B. Vessel Trackers are Necessary to Achieve Conservation and Management Objectives.

By the time this Addendum was initiated, the Commission had already long struggled with inadequate data, established a need for precise fishing location data, determined that some kind of vessel tracking system was the only way to get such data cost-effectively, and was resolved to require cellular-based trackers that would "ping" with the certainty and regularity necessary to achieve FMP objectives. *See* Comm'r Add. at 5–7 (Add. XXIX).

The Commission was facing four significant conservation and management challenges: (1) the previously limited, coarse data that was dependent on spatial assumptions resulted in flawed stock assessment models that did not accurately apportion fishing effort to the correct biological stock units; (2) the low spatial effort data made it difficult to accurately estimate the risk of right whale entanglement; (3) the lack of understanding of the spatial footprint did not align

18

with the boundaries of new ocean activities such as offshore wind development, aquaculture farms, or new marine protected areas making planning and compensation for lost fishing opportunities difficult; and (4) the large but poorly understood footprint and low density of the lobster fishery previously made it difficult to locate lobster gear in the offshore fishery during routine compliance checks.

Rather than "collect[ing] unknown amounts of data with no clear indication of how it will be used,"[17] Appellant Br. at 2, the Commission reasonably determined that the FMP could not otherwise be properly implemented without such data and indicated precisely how it would be used. *See* Comm'r Add. at 5–6 (Add. XXIX). The Commission adopted Addendum XXIX to Amendment 3 to address the "recognized [] *critical need* for high-resolution spatial and temporal data" necessary to improve fishery managers ability to tacker the challenges facing the lobster industry. *Id*. (emphasis added).

1. Vessel Trackers are Necessary to Improve Stock Assessments.

Prior to electronic vessel trackers, stock assessment scientists used fishing location data that was not aligned with the lobster stock's biological boundaries

---

[17] The vessel tracking data is collected by the Atlantic Coastal Cooperative Statistics Program and protected by state and federal confidentiality laws that prohibit disclosure of confidential data. *See* 44 U.S.C. §§ 3541, *et seq*. (Federal Information Security Management Act); *see* 12 M.R.S. § 6173 (Maine Confidentiality of statistics).

and was further complicated by lobstermen fishing in multiple areas with different reporting requirements (e.g., some lobster permit holders reported by statistical area fished and some provided 10-minute square(s) fished). *See* Comm'r Add. at 7–8 (Add. XXIX). The end result of this varied fishing behavior and differing reporting requirements by state and/or lobster management area resulted in coarse data that produced stock assessment models fraught with uncertainty and poor performance. *See Id*. Higher resolution spatial data—collected by vessel tracking devices—will significantly improve management, reducing the likelihood of further stock declines.

2.  <u>Vessel Trackers are Necessary to Accurately Estimate Entanglement Risk</u>.

Improving the understanding of the lobster fishery's spatial footprint will better inform management decisions related to protected species obligations for the fishery. The trap/pot gear used in the lobster fishery includes ropes (vertical lines) that connect traps set on the seafloor with buoys at or near the surface. These vertical lines pose an entanglement risk to protected species. For example, electronic vessel tracking data will improve risk reduction models used to assess the location of vertical lines in the fishery. *See* Comm'r Add. at 8 (Add. XXIX).

3.  <u>Vessel Trackers are Necessary for Spatial Planning.</u>

A host of marine spatial planning issues related to other industrial ocean users present significant challenges for the lobster fishery. Unfortunately,

boundaries for new activities do not consistently align with current lobster

reporting boundaries (either by 10-minute square, statistical area, or other

requirement) making it difficult to assess impacts.

Under the Biden Administration, offshore wind development in southern

New England was booming—leases were sold, geophysical and geotechnical

surveys were underway, environmental analyses were conducted, and permits had

been granted;[18] *see also* Comm'r Add. at 9 (Add. XXIX). Although offshore wind

development was much farther behind in the Gulf of Maine, it was perceived as a

foregone conclusion and the lobster industry was concerned about additional lost

fishing opportunities (advocacy by lobstermen led to the entirety of Lobster

Management Area 1 being removed from the final wind energy area).[19]

Moreover, offshore wind development is not the only ocean user group

intensifying demands to expand into federal waters. For example, in 2021 when the

Addendum was initiated, the Biden Administration had also issued an Executive

Order on Tackling the Climate Crisis at Home and Abroad. Included in this

Executive Order was a goal of protecting 30-percent of U.S. waters by 2030. *See*

Comm'r Add. at 8–9 (Add. XXIX). The Commission recognized from past

---

[18] *See* BOEM, *Offshore Renewable Activities,* https://www.boem.gov/renewable-energy/offshore-renewable-activities (last visited Apr. 14, 2025).

[19] *See* BOEM, *Gulf of Maine Offshore Wind Lease Sale*, https://www.boem.gov/renewable-energy/state-activities/maine/gulf-maine (last visited Apr. 14, 2025).

experiences with the 2016 New England Fishery Management Council's Omnibus Deep-Sea Coral Amendment, as well as the Obama Administration's establishment of the Northeast Canyons and Seamounts National Marine Monument, that it needs accurate data on the magnitude of lobster and Jonah crab catch in very specific locations to understand the potential economic impacts. *See Id.* at 8 (Add. XXIX).

Increasingly, federal waters have also been identified as suitable for offshore aquaculture activities, marine protected areas, and subsea cable installations. *See Id.* at 6, 9 (Add. XXIX); and, under the current Trump Administration, new activities are proposed such as oil and gas development and deep-sea mining. Data on exactly when and where fishing occurred is imperative to understand the "footprint" of the fishery and how many fishermen will be impacted, both for future planning and for ongoing discussions on compensation.

4. Vessel Trackers are Necessary to Improve Enforcement.

Efficient and effective enforcement in the lobster fishery is difficult given the vast expanse of federal waters in the Atlantic Ocean (90 percent of the lobster management areas).[20] *See* Comm'r Add. at 6, 9 (Add. XXIX). With appropriate permissions, vessel tracking data makes identification of illegal fishing far easier and more cost effective. For example, the one-minute ping rate makes it possible to

---

[20] *See* ASMFC, *Lobster Management Stock Area Map*, https://asmfc.org/wp-content/uploads/2025/02/LobsterManagement_StockArea_Map_Nov2016.jpeg (last visited May 2, 2015).

accurately distinguish between transiting from one fishing location to another (steaming) and stopping the vessel to haul traps onboard, unload, and rebait them. "Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear." *See* Comm'r Add. at 8 (Add. XXIX). It also makes it possible to determine the number of traps on a trawl and the length of that trawl. *See* Comm'r Add. at 40–41 (Ping Rate Analysis); *see* Comm'r Add. at 7, 11 (Add. XXIX). When going offshore to conduct compliance checks (e.g., gear markings, presence of trap tags, weak inserts, etc.), precise location data makes it easier and quicker to find such fishing gear. *See* Comm'r Add. at 9 (Add. XXIX). Certain enforcement activities, such as documenting fishing in a restricted area, can be done from shore. Electronic vessel tracker data levels the playing field for all, as it is the law-abiding lobstermen that lose when illegal fishing is not deterred or enforced.

## **CONCLUSION**

The higher resolution spatial and temporal data obtained by Maine's vessel tracking requirement is necessary to ensure the health of the lobster fishery for the benefit of lobstermen, the State of Maine, and the nation. For the foregoing reasons, the Court should uphold the district court's order.

23

Respectfully submitted this 2nd day of May, 2025,

> */s/ Erica A. Fuller*
> Erica A. Fuller
> Conservation Law Foundation
> 62 Summer St.
> Boston, MA 02110
> (617) 850-1754
> efuller@clf.org
>
> *Counsel for Amici Curiae Conservation Law*
> *Foundation and Ocean Conservancy*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(f), I hereby certify this

brief complies with:

1. the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this brief contains 4,773 (of 6,500) words; and

2. the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: May 2, 2025                    */s/ Erica A. Fuller*
                                       Erica A. Fuller

                                       *Counsel for Amici Curiae Conservation Law*
                                       *Foundation and Ocean Conservancy*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2025, I filed the foregoing document with the First Circuit Court of Appeals via the CM/ECF system, thereby causing the parties or their counsel of record registered as ECF filers to be served by the CM/ECF system.

Dated: May 2, 2025

*/s/ Erica A. Fuller*
Erica A. Fuller

*Counsel for Amici Curiae Conservation Law Foundation and Ocean Conservancy*