No. 25-1007

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

FRANK THOMPSON,

Plaintiff – Appellant,

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH; JACK CUNNINGHAM,

Plaintiffs,

v.

CARL WILSON, in their official capacity as
Commissioner, Maine Department of Marine Resources,

Defendant – Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE (CASE NO. 1:24-CV-00001-JAW)

## BRIEF OF DEFENDANT-APPELLEE

|  |  |
|---|---|
|  | AARON M. FREY<br>Attorney General |
| THOMAS A. KNOWLTON<br>Deputy Attorney General | VALERIE A. WRIGHT<br>JACK DAFOE<br>Assistant Attorneys General<br>Six State House Station<br>Augusta, Maine 04333-0006<br>(207) 626-8800 |
| Of Counsel |  |
|  | Attorneys for Defendant-Appellee |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................iii

STATEMENT OF THE ISSUE................................................................1

STATEMENT OF THE CASE.................................................................1

SUMMARY OF ARGUMENT................................................................14

STANDARD OF REVIEW ...................................................................15

ARGUMENT .....................................................................................16

    I.    The district court correctly held that the DMR Rule does not violate the Fourth Amendment because it authorizes lawful administrative searches of fishing vessels operating in a closely regulated industry. ...................................................................16

        A. If an administrative search of a closely regulated industry meets the test set out in *New York v. Burger*, then it is reasonable under the Fourth Amendment. ....................................................16

        B. The district court correctly held that the DMR Rule satisfies the *Burger* test for lawful administrative searches of a closely regulated industry. ...........................................................22

            i.  The Supreme Court's decision in *City of Los Angeles v. Patel* did not change *Burger's* second element.........................23

            ii.  The district court correctly held that the DMR Rule satisfies the second element of the *Burger* test for lawful administrative searches of a closely regulated industry because it is necessary to further the regulatory framework. ..............................................................24

iii. The district court correctly held that the DMR Rule satisfies the third element of the *Burger* test because it performs the basic functions of a warrant. ..................................................... 30

II.    Thompson conceded below that the DMR Rule involves a closely regulated industry and cannot now argue the opposite on appeal. .......... 36

CONCLUSION ........................................................................................ 42

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co.,*
382 F.3d 36 (1st Cir. 2004) .................................................................. 39

*Baker v. Smith & Wesson, Inc.,*
40 F.4th 43 (1st Cir. 2022) ............................................................. 37, 38

*Brigham City v. Stuart,*
547 U.S. 398 (2006) ........................................................................... 16

*Carpenter v. United States,*
585 U.S. 296 (2018) ........................................................................... 20

*Carrozza v. CVS Pharmacy, Inc.,*
992 F.3d 44 (1st Cir. 2021) ................................................................ 18

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ....................................................................... Passim

*Clorox Co. P.R. v. Proctor & Gamble Com. Co.,*
228 F.3d 24 (1st Cir. 2000) .................................................................. 6

*Club Madonna Inc. v. City of Miami Beach,*
42 F.4th 1231 (11th Cir. 2022) ..................................................... 40, 41

*Correa v. Hosp. San Francisco,*
69 F.3d 1184 (1st Cir. 1995) .............................................................. 39

*Daigle v. Me. Med. Ctr., Inc.,*
14 F.3d 684 (1st Cir. 1994) ................................................................ 39

*Doe v. Stonehill Coll., Inc.,*
55 F.4th 302(1st Cir. 2022) ............................................................... 16

*Erdman v. Nationwide Ins. Co.,*
582 F.3d 500 (3d Cir. 2009) .............................................................. 38

*Fudge v. Penthouse Int'l, Ltd.*,
  840 F.2d 1012 (1st Cir. 1988) ................................................................. 6

*García-Catalán v. United States*,
  734 F.3d 100 (1st Cir. 2013) ................................................................. 16

*Giragosian v. Bettencourt*,
  614 F.3d 25 (1st Cir. 2010) ................................................................. 18

*Giragosian v. Ryan*,
  547 F.3d 59 (1st Cir. 2008)…..…………………………………………...2

*In re Hunter Envtl. Servs., Inc. Sec. Litig.*,
  921 F. Supp. 914 (D. Conn. 1996) ........................................................ 6

*Killgore v. City of S. El Monte*,
  3 F.4th 1186 (9th Cir. 2021) ........................................................ 31, 41

*Lang v. Wal-Mart Stores E., L.P.*,
  813 F.3d 447 (1st Cir. 2016) ................................................................. 37

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ................................................................. 20

*Legal Sea Foods, LLC v. Strathmore Ins. Co.*,
  36 F.4th 29 (1st Cir. 2022) ................................................................. 15

*Lowe v. Mills*,
  68 F.4th 706 (1st Cir. 2023) ................................................................. 2

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978) ........................................................................ 17, 40

*McPhail v. Mun. of Culebra*,
  598 F.2d 603 (1st Cir. 1979) ................................................................. 37

*Medeiros v. Vincent*,
  431 F.3d 25 (1st Cir. 2005) ......................................................... 2, 3, 4

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ........................................................... 27, 40

*N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*,
  163 F.3d 449 (7th Cir. 1998) ................................................................ 6

*New York v. Burger*,
  482 U.S. 691 (1987) ................................................................... Passim

*Oliver v. United States*,
  466 U.S. 170 (1984) ......................................................................... 21

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*,
  840 F.3d 879 (7th Cir. 2016) .............................................................. 41

*R.I. Fishermen's All., Inc. v. R.I. Dep't of Envtl. Mgmt.*,
  585 F.3d 42 (1st Cir. 2009) ............................................................. 3, 4

*Reyes-Colón v. United States*,
  974 F.3d 56 (1st Cir. 2020) ............................................................... 38

*Riley v. California*,
  573 U.S. 373 (2014) ......................................................................... 20

*Rivera v. Kress Stores of P.R., Inc.*,
  30 F.4th 98 (1st Cir. 2022) .................................................................. 2

*Rivera-Corraliza v. Morales*,
  794 F.3d 208 (1st Cir. 2015) ........................................... 17, 20, 33, 41

*Romani v. Shearson Lehman Hutton*,
  929 F.2d 875 (1st Cir. 1991) ................................................................ 6

*State v. Giles*,
  669 A.2d 192 (Me. 1996) .................................................................. 34

*Tarabochia v. Adkins*,
  766 F.3d 1115 (9th Cir. 2014) ........................................................... 22

*Tart v. Massachusetts*,
  949 F.2d 490 (1st Cir. 1991)........................................................ 30, 32, 33

*Taylor v. City of Saginaw*,
  922 F.3d 328 (6th Cir. 2019) ................................................................ 16

*3137, LLC v. Town of Harwich*,
  126 F.4th 1 (1st Cir. 2025) ................................................................... 18

*United States v. Almonte-Báez*,
  857 F.3d 27 (1st Cir. 2017)................................................................... 16

*United States v. Facteau*,
  89 F.4th 1 (1st Cir. 2023) .............................................................. 19, 23

*United States v. Gonsalves*,
  435 F.3d 64 (1st Cir. 2006)............................................................. 17, 31

*United States v. Green*,
  671 F.2d 46 (1st Cir. 1982)................................................................... 34

*United States v. Jeffers*,
  342 U.S. 48 (1951) ............................................................................... 16

*United States v. Jones*,
  565 U.S. 400 (2012) ............................................................................. 21

*United States v. Krynicki*,
  689 F.2d 289 (1st Cir. 1982)................................................................. 39

*United States v. La Guardia*,
  902 F.2d 1010 (1st Cir. 1990)................................................... 38, 39, 41

*United States v. Maldonado*,
  356 F.3d 130 (1st Cir. 2004)................................................................. 18

*United States v. Mangano*,
  128 F.4th 422 (2d Cir. 2025) ............................................................... 38

*United States v. Miranda-Carmona,*
    999 F.3d 762 (1st Cir. 2021)................................................................. 37

*United States v. Ponce-Aldona,*
    579 F.3d 1218 (11th Cir. 2009) ............................................... 31, 33, 34

*United States v. Sledge,*
    108 F.4th 659 (8th Cir. 2024) .............................................................. 38

*United States v. Villamonte-Marquez,*
    462 U.S. 579 (1983) ........................................................................ 22, 34

*United States v. Zannino,*
    895 F.2d 1 (1st Cir. 1990)..................................................................... 19

*United States Dep't of Just. v. Ricco Jonas,*
    24 F.4th 718 (1st Cir. 2022) ........................................................... 40, 41

## Constitutional Provisions

U.S. Const. art. I, § 10, cl. 3 ...................................................................... 2

U.S. Const. amend. IV ............................................................................... 16

## Statutes

12 M.R.S. §§ 4651-4656 (2024) ................................................................. 2

12 M.R.S. § 4652 (2024) ............................................................................ 3

12 M.R.S. § 6001(6) (2024) ........................................................................ 3

12 M.R.S. § 6002(3) (2024) ........................................................................ 3

12 M.R.S. § 6021 (2024) ........................................................................... 22

12 M.R.S. § 6133(1) (2024)................................................................. 22, 34

12 M.R.S. § 6173 (2024) ..................................................................... 13

12 M.R.S. § 6421(6) (2024)................................................................. 21

12 M.R.S. § 6432(2)-(4) (2024)........................................................... 21

12 M.R.S. § 6440 (2024) ..................................................................... 34

16 U.S.C. § 1852(a)(1)(A) .................................................................... 4

16 U.S.C. § 1856(a) .............................................................................. 3

16 U.S.C. §§ 5101-5108 ....................................................................... 4

16 U.S.C. § 5104 .................................................................................. 5

43 U.S.C. §§ 1301-1315 ....................................................................... 3

## Rules

Federal Rule of Civil Procedure 12(b)(6)....................................... 13, 15

## Regulations

13-188 C.M.R. ch. 5 (2021).................................................................. 13

13-188 C.M.R. ch. 25, § 25.98 (2023)................................................. 10

13-188 C.M.R. ch. 25, § 25.98(A)(1) ...................................................11

13-188 C.M.R. ch. 25, § 25.98(A)(2) ...................................................11

13-188 C.M.R. ch. 25, § 25.98(B)(1) ...................................................11

13-188 C.M.R. ch. 25, § 25.98(C) ...................................................11, 12

13-188 C.M.R. ch. 25, § 25.98(C)(4) ................................................... 35

50 C.F.R. § 648.10(c)(1)(ii) ........................................................................ 28

50 C.F.R. § 697.3(c) .................................................................................... 3

50 C.F.R. § 697.4 ........................................................................................ 4

50 C.F.R. § 697.4(q)(1)(iv) ........................................................................ 29

50 C.F.R. § 697.8(a)(2) .............................................................................. 21

7 Del. Admin. Code 3755-4.0 ....................................................................11

Md. Code Regs. 08.02.08.10(G) .................................................................11

322 Code Mass. Regs. § 7.11 .................................................................... 10

N.H. Code Admin. R. Fis 612.01 ...............................................................11

N.J. Admin. Code § 7:25-14.16(a)(12) ......................................................11

250-R.I. Code Regs. 90-00-5.5.8 ...............................................................11

**Other Authorities**

Pub. L. No. 77-539, 56 Stat. 267 (1942) ..................................................... 2

Pub. L. No. 81-721, 64 Stat. 467 (1950) ..................................................... 2

Pub. L. No. 103-206, 107 Stat. 2419 (1993) ............................................... 4

Maine Lobster Community Alliance, *A Lobsterman is a Lobsterman, Regardless of Gender* (July 7, 2023)*, available at* https://www.mlcalliance.org/post/a-lobsterman-is-a-lobsterman-regardless-of-gender ................................................. 1

New England Fishery Management Council, *Management Plans, available at* http://www.nefmc.org/management-plans .......................................... 4

New England Fishery Management Council, *Glossary of Fisheries Management and Science Terms*, *available at* https://www.nefmc.org/files/Glossary.pdf ........ 7

NOAA Fisheries, *Greater Atlantic Region Statistical Areas*, *available at*
    https://www.fisheries.noaa.gov/resource/map/greater-atlantic-region-statistical-
    areas ................................................................................................................... 7

NOAA Fisheries, *About Us*, *available at*
    https://www.fisheries.noaa.gov/about-us ............................................................. 4

NOAA Fisheries, *Atlantic Sea Scallop*, *available at*
    https://www.fisheries.noaa.gov/species/atlantic-sea-scallop .............................. 28

Office of Governor Janet T. Mills, *Carl Wilson, Department of Marine Resources*,
    *available at* https://www.maine.gov/governor/mills/about/cabinet/wilson ........... 3

## STATEMENT OF THE ISSUE

Whether the district court correctly held that the rule adopted by the Maine Department of Marine Resources requiring lobstermen to operate electronic tracking devices on federally permitted commercial lobster fishing vessels does not violate the Fourth Amendment to the United States Constitution.

## STATEMENT OF THE CASE

Based on their combined scientific and regulatory expertise, Maine and the other states that collaboratively manage the American lobster[1] fishery have determined that precise, reliable data about the location of lobster fishing activity is necessary to effectively manage the fishery for the future. To that end, in 2022, the Atlantic States Marine Fisheries Commission adopted a measure requiring lobstermen[2] to operate electronic tracking devices on federally permitted commercial lobstering vessels to collect precise location data. To comply with its obligations as a member state in the Commission, the Maine Department of Marine

---

[1] "American lobster" (*Homarus americanus*) is a species of lobster found on the Atlantic coast of North America.

[2] As noted by the district court, "lobstermen" is used as a gender-neutral term in the Maine lobster industry. *See* Maine Lobster Community Alliance, *A Lobsterman is a Lobsterman, Regardless of Gender* (July 7, 2023), https://www.mlcalliance.org/post/a-lobsterman-is-a-lobsterman-regardless-of-gender (last visited Apr. 15, 2025). The Commissioner likewise uses it as a gender-neutral term in this brief.

1

Resources ("DMR") adopted a Rule implementing the electronic tracking device requirement in Maine. Maine's Rule is the subject of this appeal.

### *The Atlantic States Marine Fisheries Commission and the Management of the American Lobster Fishery*[3]

Since 1942, Maine has been a party to the Atlantic States Marine Fisheries Compact, an agreement between the Atlantic coastal states (including the District of Columbia) to "exercise joint regulatory oversight of their fisheries."[4] *Medeiros v. Vincent*, 431 F.3d 25, 27 (1st Cir. 2005). Maine is thus a member of the Atlantic States Marine Fisheries Commission ("Commission"), the interstate organization that implements the Compact. *See* 12 M.R.S. §§ 4651-4656 (2024). Each member state appoints three representatives to the Commission: its director of marine

---

[3] The recited facts either were alleged in the Complaint; are matters of public record not susceptible to reasonable dispute; or are drawn from the exhibits attached to the Complaint and materials incorporated by reference or relied upon in the Complaint. *See Lowe v. Mills*, 68 F.4th 706, 713-14 (1st Cir. 2023); *Rivera v. Kress Stores of P.R., Inc.*, 30 F.4th 98, 102 (1st Cir. 2022); *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008). Thompson erroneously states that the facts in this case are undisputed. Thompson Brief ("Thompson Br.") at 7. Well-pleaded facts contained in a complaint are taken as true for purposes of considering an appeal of a dismissal for failure to state a claim, but that does not mean they are undisputed.

[4] Congress approved the Compact pursuant to art. I, § 10, cl. 3 of the United States Constitution. *See* Pub. L. No. 77-539, 56 Stat. 267 (1942), as amended by Pub. L. No. 81-721, 64 Stat. 467 (1950).

fisheries (for Maine, DMR Commissioner Wilson)[5]; a state legislator; and a public member with fisheries experience who is appointed by its governor.  *See* 12 M.R.S. § 4652; Plaintiff-Appellant's Appendix ("App.") at 17, ¶ 18.

The Commission establishes interstate fishery management plans setting forth minimum conservation standards that states must conform to (or exceed) by appropriate modifications to their state laws or regulations.[6]  *See R.I. Fishermen's All., Inc. v. R.I. Dep't of Envtl. Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009) ("*RIFA*"); *Medeiros*, 431 F.3d at 27-28.  Through its American Lobster Management Board ("Board"), the Commission coordinates the management of lobster fishing in its member states' jurisdictional waters pursuant to Amendment 3 to the Commission's Interstate Fishery Management Plan for American Lobster (the "Lobster Plan") and

---

[5]  Commissioner Wilson was confirmed and sworn in as Commissioner of DMR on April 8, 2025.  *See* https://www.maine.gov/governor/mills/about/cabinet/wilson (last visited Apr. 26, 2025).

[6]  A complex web of fisheries laws means that state and federal authorities often have overlapping jurisdiction.  States generally have primary responsibility for the conservation and management of fisheries within the territorial sea (in Maine's case, coastal waters within three nautical miles of shore).  *See* 43 U.S.C. §§ 1301-1315; 12 M.R.S. § 6001(6) (2024).  Management within the Exclusive Economic Zone— from three to 200 nautical miles from shore—is generally the primary responsibility of the federal government.  *See, e.g.*, 16 U.S.C. § 1856(a).  DMR has authority to enforce Maine's marine resources laws and regulations in federal and State waters. *See* 12 M.R.S. § 6002(3) (2024).  In the lobster fishery, if a state's regulations and the federal regulations differ, a federally permitted lobsterman "must comply with the more restrictive requirement or measure."  50 C.F.R. § 697.3(c).

subsequent Addenda.[7]  *See Medeiros*, 431 F.3d at 27-28.

Since Congress's 1993 enactment of the Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA"), Pub. L. No. 103-206, 107 Stat. 2419 (1993) (codified at 16 U.S.C. §§ 5101-5108), the Commission's fishery management plans have been backed by federal law.  Pursuant to the ACFCMA, the Commission must, among other things, "prepare and adopt coastal fishery management plans to provide for the conservation of coastal fishery resources," review states'

---

[7] Some fisheries overseen by the Commission are also managed by regional fishery management councils established under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), one of which is the New England Fishery Management Council ("NEFMC").  *See* 16 U.S.C. § 1852(a)(1)(A).  These councils develop federal fishery management plans for certain fisheries in their regions that must meet the objectives of the MSA's National Standards.  *See id.* § 1852(h).  But there is no such fishery management plan through the NEFMC for American lobster.  *See* https://www.nefmc.org/management-plans (listing NEFMC fishery management plans) (last visited Apr. 21, 2025).  Instead, pursuant to the Atlantic Coastal Fisheries Cooperative Management Act, the American lobster fishery is cooperatively managed by the states and the federal government under the framework of the Commission.  The individual member states regulate the fishery within their state coastal waters via state statutes and regulations that must comply with, and may exceed, the minimum standards in the Lobster Plan.  *See RIFA*, 585 F.3d at 46.  For consistency of management across state and federal waters, the United States Department of Commerce, through NOAA Fisheries (also known as the National Marine Fisheries Service), adopts regulations setting out lobster management measures that are complementary to the Lobster Plan and implements them via the federal permitting process for fishermen harvesting lobster in federal waters.  *See* 16 U.S.C. §§ 5101-5108; 50 C.F.R. § 697.4; https://www.fisheries.noaa.gov/about-us (last visited Apr. 27, 2025).  Therefore, neither the Commission nor its member states are constrained by the MSA or its National Standards in modifying the Lobster Plan or promulgating state regulations for the lobster fishery.

4

implementation and enforcement of its plans, and "report the results of the reviews" to the United States Secretary of Commerce. 16 U.S.C. § 5104. Should a member state fail to implement an essential element of a Commission plan, the Commission must notify the Secretary. *Id.* § 5105(b). If the Secretary independently determines that a state has failed to implement measures necessary for conservation, "the Secretary shall declare a moratorium on fishing in the fishery in question within the waters of the noncomplying State." *Id.* § 5106(c)(1).

### *Development and Adoption of Addendum XXIX*

After many years of regulatory oversight, the ten member states on the American Lobster Management Board "recognized the critical need for high-resolution spatial and temporal data to characterize effort"—that is, the location of fishing vessels and the location and density of fishing gear—in the federal lobster fishery. Commissioner's Addendum ("Comm'r Add.") at 5, § 1.0.[8] The Board noted

---

[8] As the lobstermen plaintiffs did below, Thompson provided to this Court an incomplete version of Addendum XXIX that omits the text of its Appendix A, the "Lobster Vessel Tracking Ping Rate Analysis." *See* Thompson Addendum ("Thompson Add.") at 132. The Commissioner includes as an addendum to his brief, and cites to, the complete Addendum XXIX document including Appendix A, as he did below in his Motion to Dismiss. Comm'r Add. at 3-42; ECF Nos. 23 at 4, 23-1. The district court considered the incomplete version of Addendum XXIX attached to the Complaint. *See* Thompson Add. at 70. Even if this Court likewise considers only the incomplete version of Addendum XXIX that omits Appendix A, the district court's decision should be affirmed for the reasons discussed in this brief. But DMR urges this Court to consider the complete version of Addendum XXIX including Appendix A, which provides evidence on which the Commission relied to

5

that the existing available lobster fishery data is "constrained to NOAA [National Oceanic and Atmospheric Administration] statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transit routes and fishing grounds." Comm'r Add. at 5, § 2.1. The Board therefore initiated Addendum XXIX "to consider implementing electronic vessel tracking requirements for federally[] permitted vessels in the lobster . . . fisher[y]" as a means of addressing the "critical need for electronic tracking data in the offshore fishery."[9] *Id.* at 5, § 1.0, 6, § 2.1.

---

determine that a one-minute ping rate is necessary to advance the goals of Addendum XXIX. Comm'r Add. at 19-41. Generally, "[i]f a plaintiff has selectively introduced material in the complaint but has omitted critical portions of the documents, the defendant is allowed to introduce the full text of the material for the court's consideration." *In re Hunter Envtl. Servs., Inc. Sec. Litig.*, 921 F. Supp. 914, 917-18 (D. Conn. 1996) (citing *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n.3 (1st Cir. 1991) (*superseded by statute on other grounds as stated in Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)) and *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988)). The lobstermen did not challenge the authenticity of the complete Addendum XXIX below, and Thompson has no basis to challenge it now. Further, the Court should consider the allegations in the Complaint concerning Addendum XXIX in light of the full text of the Addendum, and if there is any discrepancy between the allegations and the document text, "the exhibit trumps the allegations." *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)).

[9] Addendum XXIX was accompanied by Addendum IV to the Jonah Crab Fishery Management Plan. Although federal lobstering permits and Maine lobstering licenses are also crab fishing permits and licenses, for simplicity this brief refers exclusively to lobstering permits, lobstering licenses, and the lobster fishery.

6

Specifically, the Board initiated Addendum XXIX in the context of four "challenges the fishery is currently facing [that] pose a critical need for electronic tracking data." Comm'r Add. at 6, § 2.1. The Board observed that "[e]ach of these issues pose an acute need for high-resolution data on where and when fishery effort in the federal fleet occurs. Electronic tracking requirements in the federal fishery would fill this information gap and support fishery managers in addressing the aforementioned challenges." *Id.*

First, the Board explained that currently available data, including data collected from Vessel Trip Reports ("VTRs") already required of lobster vessels, is insufficiently detailed for management and scientific purposes, such as conducting stock assessments. *See* Comm'r Add. at 6, § 2.1. This data is insufficiently detailed because "not all lobster permit holders report at a finer scale than the NOAA statistical area; for each trip some provide a single latitude and longitude point meant to represent where the majority of fishing occurred, some provide 10 minute square(s) fished, and some provide only the statistical area fished."[10] *Id.* at 7, § 2.2.2. The Board further noted that "[i]mproved spatial resolution of total harvest data from

---

[10]  A "10 minute square" is an area defined by 10 minutes of latitude and 10 minutes of longitude; off the northeastern Atlantic coast, it is an area of approximately 70-80 square nautical miles. *See* https://www.nefmc.org/files/Glossary.pdf (last visited Apr. 21, 2025). A map of NOAA Fisheries Statistical Areas, which are much larger than 10 minute squares, is available at https://www.fisheries.noaa.gov/resource/map/greater-atlantic-region-statistical-areas (last visited Apr. 21, 2025).

vessel tracking will improve size composition data used in the stock assessment models to improve the accuracy of exploitation and reference abundance estimates." *Id.* at 7-8, § 2.2.2.

Second, the Board noted that interactions between protected marine species and lobster fishing will likely result in further risk reduction efforts being imposed on the fishery under the Atlantic Large Whale Take Reduction Plan ("ALWTRP"). Comm'r Add. at 6, § 2.1. Such risk reduction efforts may include "requirements for gear modifications [that] are expected to have a substantial economic impact on the fishing industry." *Id.* at 8, § 2.2.3. The Board explained that NOAA Fisheries develops the ALWTRP using a "co-occurrence model, which pairs information regarding the distribution of whales and commercial fishing gear to predict areas where whales may be prone to entanglement." *Id.* The currently available "coarse resolution" data makes it difficult to contribute valuable information about the location and density of fishing gear, particularly vertical buoy lines, to NOAA Fisheries. *Id.* at 6, § 2.1. Thus, the Board observed, "it is critical to gather and provide updated and enhanced spatial effort data to improve the associated risk reduction models" and better inform any forthcoming regulations issued by NOAA Fisheries, thereby attempting to limit impacts on the lobster industry. *Id.* at 8, § 2.2.3.

Third, the Board explained that the increase in competing uses of the ocean,

such as aquaculture, creation of new marine protected areas, offshore wind energy development, and offshore oil and gas exploration are putting pressure on the lobster fishery. *See* Comm'r Add. at 6, § 2.1, 9, § 2.2.4. The Board emphasized that "[i]t is critically important to record the footprint of the [U.S.] lobster fishery as spatial allocation discussions occur" around these competing uses. *Id.* at 8, § 2.2.4. The Board noted examples of where the lack of sufficiently detailed fishery data had prevented the Commission from providing adequate information necessary to understand the potential economic impacts of proposed competing uses. *See id.* at 8-9, § 2.2.4. The Board deemed better documentation of lobster fishing activity to be "essential" to inform future decisions regarding spatial allocation of the ocean among competing interests. *See id.*

Fourth, the Board explained that the "large geographic footprint and low density of lobster gear in the offshore federal management area" makes enforcement challenging. Comm'r Add. at 6, § 2.1. Having long recognized that "enforcement efforts in the offshore federal lobster fishery need to be improved," the Board commented that "[e]nforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming [in transit] versus hauling [setting or collecting traps] is critical to efforts to inspect gear and identify when fishermen are using illegal gear." *Id.* at 9, § 2.2.5. The Board valued the ability to more precisely locate fishing activity as a means of improving offshore enforcement efforts, thereby

protecting the lobster resource from fishing violations and ensuring the ongoing viability of the fishery. *See id.*

In developing Addendum XXIX, the Board undertook to assess precisely what "ping rate" is needed to capture the type of detailed data the Board identified as necessary to advance the Addendum's goals. The "ping rate" is how often an electronic tracking device captures and transmits a vessel's position. Comm'r Add. at 11, § 3.1.1. The Board considered evidence that a rate of one ping per minute was required to capture necessary information about the location and density of fishing gear that less frequent ping rates would miss. *See id.* at 19-41, Appendix A; *see also supra* note 8. Accordingly, in Addendum XXIX the Board required that any vessel tracking device "must collect location data at a minimum rate of one ping per minute" because that rate "is necessary to distinguish lobster fishing activity from transiting activity and can allow estimation of the number of traps per trawl (See Appendix A)." *See id.* at 11, § 3.1.1.

After the Commission's approval of Addendum XXIX in March 2022, and to comply with Maine's obligations under the Compact, DMR promulgated Chapter 25.98 ("the DMR Rule"), with an effective date of November 5, 2023. *See* 13-188 C.M.R. ch. 25, § 25.98 (2023). Maine was the second member state to adopt a regulation pursuant to Addendum XXIX. Massachusetts adopted a regulation effective May 1, 2023. *See* 322 Code Mass. Regs. § 7.11. Since Maine adopted the

DMR Rule, regulations pursuant to Addendum XXIX have been adopted by the member states of New Hampshire, N.H. Code Admin. R. Fis 612.01 (eff. Feb. 21, 2024); New Jersey, N.J. Admin. Code § 7:25-14.16(a)(12) (eff. Mar. 8, 2024); Delaware, 7 Del. Admin. Code 3755-4.0 (eff. Mar. 11, 2024); Rhode Island, 250-R.I. Code Regs. 90-00-5.5.8 (eff. Apr. 28, 2024);[11] and Maryland, Md. Code Regs. 08.02.08.10(G) (eff. Aug. 5, 2024).

### *The DMR Rule*

The DMR Rule applies only to lobstermen who hold both a Maine commercial lobster license and a federal lobster permit—meaning that they can legally fish for lobster in both state and federal waters. *See* 13-188 C.M.R. ch. 25, § 25.98(A)(2). The Rule requires these lobstermen to install an approved electronic tracking device on the federally permitted vessel listed on their Maine license and maintain the device in operational order while the vessel is in use. *Id.* § 25.98(B)(1), (C). DMR has provided license holders with approved Particle TrackerOne devices, *see* Thompson Addendum ("Thompson Add.") at 134, but a license holder can choose a different device so long as it meets the specifications of, and has been approved by, the Commission pursuant to Addendum XXIX, *see* 13-188 C.M.R. ch. 25,

---

[11] DMR understands that a Rhode Island state judge ordered the state agency not to enforce the Rhode Island rule pending the outcome of litigation. The judge's preliminary order in that case was not based on a Fourth Amendment argument and, therefore, is not relevant to this appeal.

§ 25.98(A)(1). The Particle TrackerOne device collects the position of the vessel once per minute when the vessel is moving and once every six hours when the vessel is moored or docked. Thompson Add. at 134.

Pursuant to the DMR Rule, it is unlawful for covered license holders to fish for lobster without having approved tracking devices installed and operating on their vessels, and they may not power down the device or tamper with the device or its signal. *See* 13-188 C.M.R. ch. 25, § 25.98(C). However, several exceptions apply: (1) the license holder is not required to keep the tracker externally powered (plugged in) when the vessel is moored or docked; (2) the device may be inoperative when the vessel is removed from coastal waters for an extended period of time; (3) the device may be inoperative for the purpose of being repaired or replaced; and (4) if the device fails and becomes inoperable, the license holder may continue fishing with approval from DMR while the situation is addressed. *See id.*

Vessel location data from the electronic tracking devices is transmitted to the Atlantic Coastal Cooperative Statistics Program ("ACCSP"), which maintains the Standard Atlantic Fisheries Information System ("SAFIS") database. App. at 29, ¶ 62. ACCSP protects the vessel location data using the same electronic transmittal systems and the SAFIS database that it already uses for self-reported VTR data, as described in Addendum XXIX. *See* Comm'r Add. at 2, § 2.1; 12, § 3.1.1; 16-17, § 3.2.3. Further, the vessel location data is "designated as confidential through

12

Maine law and regulation." Thompson Add. at 135. Specifically, Maine law requires that fisheries data be kept confidential and not be disclosed in a manner that permits identification of any person or vessel. 12 M.R.S. § 6173 (2024). DMR regulations also require that publicly released data not identify individual vessels or license holders. *See* 13-188 C.M.R. ch. 5 (2021).

On January 2, 2024, five Maine lobstermen filed a Complaint in the district court alleging that the DMR Rule violates the Fourth Amendment, incorporated against the states through the Fourteenth Amendment, among other claims. App. at 12-41. On January 12, 2024, the lobstermen filed a Motion for Preliminary Injunction (ECF No. 7). On March 1, 2024, the Commissioner opposed the Motion (ECF No. 16) and, on April 8, 2024, filed a Motion to Dismiss the Complaint (ECF No. 23) for, in relevant part, failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Also on April 8, 2024, the Commission filed an amicus curiae brief in support of the Commissioner's Motion to Dismiss (ECF No. 22).

The district court heard argument on the pending motions on November 19, 2024, with the Commission participating in oral argument as amicus. (ECF No. 32.) On November 21, 2024, in a thorough decision, the district court granted the Commissioner's Motion to Dismiss, dismissing all of the lobstermen's claims, and dismissed the lobstermen's Motion for Preliminary Injunction as moot. Thompson Add. at 3-100. In dismissing the lobstermen's Fourth Amendment claim, the district

13

court held that the lobstermen had failed to state a plausible claim for relief because the DMR Rule authorizes searches that comply with the elements of a lawful administrative search of a closely regulated industry.[12] *Id.* at 70-92.

On November 21, 2024, the district court entered a judgment of dismissal. Thompson Add. at 139. On December 19, 2024, only one of the lobstermen plaintiffs, Frank Thompson, appealed. Represented by new counsel, Thompson has appealed solely the district court's dismissal of the Fourth Amendment claim.

## SUMMARY OF THE ARGUMENT

The district court correctly held that the lobstermen failed to plead a plausible claim for relief on their Fourth Amendment claim because the DMR Rule does not violate the Fourth Amendment. If administrative searches of a closely regulated industry meet the three-part test set out by the Supreme Court of the United States in *New York v. Burger*, then they are reasonable under the Fourth Amendment. The district court correctly applied *Burger* and this Court's precedents to determine that the DMR Rule authorizes lawful administrative searches of a closely regulated industry and meets the *Burger* test.

---

[12] More precisely, the district court determined that the lobstermen had failed to plead a plausible claim for relief on their Fourth Amendment claim because, on the record properly before the court, DMR demonstrated that the DMR Rule complies with the Fourth Amendment. *See* Thompson Add. at 69, 73, 80-82, 85. DMR bears the burden of demonstrating that an exception to the warrant requirement for government searches applies. *See infra* at 16.

Specifically, the district court correctly held that the DMR Rule is necessary to advance DMR's substantial government interest in preserving the long-term health and stability of Maine's commercial lobster fishery.  The district court properly relied on facts in the record establishing the inadequacy of current data about where lobster fishing is occurring and the critical need for DMR to have better data to conduct lobster stock assessments, provide empirical evidence to federal regulators about potential impacts on the commercial lobster industry of federal regulations and allocations of ocean space for other uses, and engage in more efficient and effective enforcement efforts.  The district court also correctly determined that the DMR Rule performs the basic functions of a warrant.

The lobstermen conceded below that the DMR Rule involves a closely regulated industry and that the *Burger* test applies to their Fourth Amendment claim. Thompson, the sole appellant, may not now argue the opposite on appeal.

For these reasons, the Court should affirm the district court's decision.

## STANDARD OF REVIEW

This Court reviews the district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim de novo.  *See Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 34 (1st Cir. 2022).  A motion to dismiss is properly granted if the complaint fails to "allege facts sufficient to state a plausible claim for relief," with "plausible mean[ing] something more than

merely possible." *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 316 (1st Cir. 2022) (internal quotation marks omitted). In reviewing the district court's grant of a motion to dismiss for failure to state a claim, this Court accepts well-pleaded facts in the complaint but not conclusory legal allegations. *See García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013).

## ARGUMENT

I.     **The district court correctly held that the DMR Rule does not violate the Fourth Amendment because it authorizes lawful administrative searches of fishing vessels operating in a closely regulated industry.**

A.     **If an administrative search of a closely regulated industry meets the test set out in *New York v. Burger*, then it is reasonable under the Fourth Amendment.**

The Fourth Amendment prohibits "unreasonable searches and seizures," U.S. Const. amend. IV, and "warrantless searches of private premises are presumptively unreasonable," *United States v. Almonte-Báez*, 857 F.3d 27, 31 (1st Cir. 2017) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)). However, courts have recognized several exceptions to this presumption of unreasonableness, with the proviso that, even on a motion to dismiss, "[t]he government bears the burden of demonstrating an exception to the warrant requirement." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)). Of relevance here, an "administrative search" is a warrantless search that "serve[s] a 'special need' other than conducting criminal investigations." *City of Los Angeles v.*

16

*Patel*, 576 U.S. 409, 420 (2015). Generally, these warrantless searches do not violate the Fourth Amendment if the subject of the search is afforded an opportunity for pre-compliance review before a neutral decisionmaker. *Id.*

Where the search involves commercial premises in a "closely regulated industry," however, a "more relaxed standard" applies. *Patel*, 576 U.S. at 424. Such a search does not infringe the Fourth Amendment if (1) there is a substantial government interest behind the regulatory framework pursuant to which the search is made; (2) the search is "necessary to further [the] regulatory scheme"; and (3) the regulatory framework "perform[s] the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *New York v. Burger*, 482 U.S. 691, 702-03 (1987) (internal quotation marks omitted); *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216-217 (1st Cir. 2015) (describing the "*Burger* test"); *United States v. Gonsalves*, 435 F.3d 64, 67 (1st Cir. 2006) (same). The more relaxed standard for administrative searches of closely regulated industries applies because "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home [and] is particularly attenuated in commercial property employed in 'closely regulated' industries." *Burger*, 482 U.S. at 700; *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) ("[W]hen an entrepreneur embarks upon []

17

a business [in a closely regulated industry], he has voluntarily chosen to subject himself to a full arsenal of governmental regulation . . . ."); *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010) ("[T]he owner of commercial property in a closely regulated industry has a reduced expectation of privacy in those premises.").[13]  In short, a lawful administrative search of a closely regulated industry is "reasonable" and does not violate the Fourth Amendment.

Thompson argues that administrative searches that meet the *Burger* standard must also be "reasonable" under a separate standard.  *See, e.g.*, Thompson Brief ("Thompson Br.") at 11 ("[T]he Rule is unconstitutional unless it is *both* reasonable *and* fits entirely within the 'narrow exception' for administrative searches within a 'closely regulated industry.'" (emphasis in original)).  This argument was not raised below and is thus unpreserved.[14]  But even assuming that this argument is preserved

---

[13]  This lower expectation of privacy in commercial premises also applies when the "premises" is a vehicle.  *See United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) (noting, in analyzing administrative searches of commercial trucks, that "[f]or purposes of the *Burger* doctrine, we see no meaningful distinction between commercial premises and commercial vehicles").

[14]  Although Thompson is represented by new counsel on appeal, he is not entitled to present a new case.  Beyond attempting to reverse the lobstermen's closely regulated industry concession below (*see infra* Part II), Thompson also presents a slew of new arguments regarding application of *Burger*.  But it is axiomatic that, barring extraordinary circumstances, "[a]ppellants cannot raise an argument on appeal that was not squarely and timely raised in the trial court."  *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021) (internal quotation marks omitted); *see also 3137, LLC v. Town of Harwich*, 126 F.4th 1, 10 (1st Cir. 2025).  More

18

and adequately developed on appeal, Thompson is just plain wrong.  The Supreme Court has made clear that searches that meet the *Burger* test for administrative searches of closely regulated industries *are* "reasonable" within the meaning of the Fourth Amendment.  *See Burger*, 482 U.S. at 702 ("[W]arrantless inspection . . . even in the context of a pervasively regulated business, *will be deemed to be reasonable* only so long as three criteria are met." (emphasis added)); *Patel*, 576 U.S. at 426 ("Even if we were to find that hotels are pervasively regulated, [the challenged regulation] would need to satisfy three additional criteria *to be reasonable under the Fourth Amendment*." (emphasis added)).  Requiring an additional, free-floating "reasonableness" inquiry on top of the *Burger* test is simply not supported by the law.

Regardless, Thompson's "reasonableness" argument also fails on its own terms.  A good portion of Thompson's brief is devoted to arguing that the DMR Rule is not reasonable within the meaning of the Fourth Amendment because the electronic tracking is akin to Colonial-era "writs of assistance" or "general

---

precisely, "a party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court."  *United States v. Facteau*, 89 F.4th 1, 27 (1st Cir. 2023) (internal quotation marks omitted).  Further, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  At several points in this brief, the Commissioner will note where Thompson's arguments on appeal run afoul of these principles and should be deemed waived.

warrants." *See, e.g.*, Thompson Br. at 16-20.  This argument, as well as the related suggestion that the DMR Rule must have a direct historical analogue, *see* Thompson Br. at 17, was not made below and is therefore unpreserved.  But even if preserved, Thompson's contention that the collection of location data of commercial lobstering vessels is exactly like, or even worse than, British officers physically entering and "rummag[ing] through homes in an unrestrained search" is meritless.  *See* Thompson Br. at 18 (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)).  Not only is Thompson's analogy far-fetched on its face, it also does not account for the key factor underpinning administrative search doctrine, that a person has a reduced expectation of privacy in commercial operations.  *See Burger*, 482 U.S. at 702; *Patel*, 576 U.S. at 426; *Rivera-Corraliza*, 794 F.3d at 216.

Thompson fruitlessly points to *Carpenter* and *Leaders of a Beautiful Struggle*, cases that did not involve commercial premises and raised different privacy considerations.  *See* Thompson Br. at 20-21.  In *Carpenter v. United States*, 585 U.S. 296 (2018), the Supreme Court considered the privacy interests of a person "in the record of his physical movements" as captured through detailed cell-site location information gathered as part of a criminal investigation.  *Id.* at 310-11.  In *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021), the

Fourth Circuit considered the privacy implications of citywide aerial surveillance of individuals and vehicles.[15]  *Id.* at 333-34.

In contrast to individuals going about their daily lives or driving private motor vehicles, the operators of commercial lobstering vessels have a reduced expectation of privacy in their vessels' movements.  Commercial lobstering vessels must display their registration numbers "so as to be clearly visible from enforcement vessels and aircraft."  50 C.F.R. § 697.8(a)(2).  The lobster traps they leave in the ocean must also be marked by surface buoys that are distinct and registered to a licensed lobsterman, and the buoy color design must be displayed on the vessel.  *See* 12 M.R.S. §§ 6421(6), 6432(2)-(4) (2024).  Therefore, both the lobster vessels and the traps they distribute are subject to visual identification by anyone in the vicinity, thereby greatly reducing any expectation of privacy in their locations.  *See Oliver v. United States*, 466 U.S. 170, 179 (1984) (noting that so-called "open fields" "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance").  In addition, as discussed further in Part I.B.iii of this brief, operators of vessels at sea generally have a greatly reduced

---

[15]  Thompson also cites *United States v. Jones*, 565 U.S. 400 (2012), in which the Supreme Court held that the surreptitious placement by the police of a GPS tracker on a private vehicle constituted a search under the Fourth Amendment.  *Id.* at 404-05. Other than the superficial parallel between a GPS tracker and the electronic vessel tracker, that case did not involve considerations germane to searches of commercial premises under a regulatory framework.

expectation of privacy and are subject to boarding by law enforcement without reasonable suspicion. *See United States v. Villamonte-Marquez*, 462 U.S. 579, 592 (1983); 12 M.R.S. § 6133(1) (2024).

For these reasons, Thompson's arguments about reasonableness generally under the Fourth Amendment are unavailing. As the lobstermen conceded below, the *Burger* test is the proper frame to analyze the reasonableness of the DMR Rule.

**B.    The district court correctly held that the DMR Rule satisfies the *Burger* test for lawful administrative searches of a closely regulated industry.**

The DMR Rule complies with all three elements of the *Burger* test.[16]  As to the first element, DMR has a substantial interest in ensuring the long-term viability of commercial lobstering as an economic and cultural pillar of Maine society and addressing threats to the industry by accurately characterizing the lobster fishery. *See* 12 M.R.S. § 6021 (2024) (establishing DMR in part to "conserve and develop marine . . . resources"); *see also Tarabochia v. Adkins*, 766 F.3d 1115, 1123 (9th Cir. 2014) (stating, "[t]o be sure, protecting the fishery is an important governmental interest"). The lobstermen did not dispute this substantial interest below, *see*

---

[16]  The Commissioner agreed below, and continues to maintain for purposes of this suit, that the DMR Rule authorizes searches within the meaning of the Fourth Amendment. As further discussed in Part II *infra*, the lobstermen conceded in the district court that the DMR Rule involves a closely regulated industry. *See* Thompson Br. at 40; Pls.' Mot. for Preliminary Injunction (ECF No. 7 at 21); Thompson Add. at 72 n.19.

Thompson Add. at 53, and on appeal, Thompson likewise acknowledges this substantial government interest, *see* Thompson Br. at 22.  Rather, Thompson argues that the DMR Rule fails to comply with the second and third elements of the *Burger* test.

### i. The Supreme Court's decision in *City of Los Angeles v. Patel* did not change *Burger's* second element.

Thompson contends that the *Patel* decision substantively changed the meaning of "necessary" under the *Burger* test, and that, post-*Patel*, the question of whether administrative searches of businesses in a closely regulated industry are "necessary to further [the] regulatory scheme," *Burger*, 482 U.S. at 702, requires determining whether the regulation's absence would "fatally undermine" the government's interest, or alternatively, "whether the government's interest would be *completely defeated* by the lack of the challenged regulation," Thompson Br. at 29, 30 (emphasis in original).[17]  This Court should decline Thompson's invitation to rewrite the second element of the *Burger* test, for several reasons.

First, the *Patel* Court did not actually apply the *Burger* test because the Court determined that hotels are not a closely regulated industry and, therefore, that the *Burger* test did not apply.  *Patel*, 576 U.S. at 424-26, 428.  The *Patel* Court's comments on the hypothetical application of *Burger* to hotels were merely dicta in

---

[17]  Thompson having never made this argument below, this Court should deem it waived.  *See Facteau*, 89 F.4th at 27.

23

response to the dissent's argument that the Court should have applied the *Burger* test. *See id.* at 426-27. Second, Thompson's proposed "fatally undermine" standard is derived from the *Patel* Court's characterization of the defendant's argument that "affording hotel operators any opportunity for pre-compliance review would fatally undermine the scheme's efficacy," not from any announcement of what a government defendant must show to meet the second element of the *Burger* test. *See Patel*, 576 U.S. at 427. Third, Thompson argues that his proposed revision of *Burger*'s second element is supported by the dissenting Justice Scalia's "view" in *Patel* that the *Patel* majority introduced a least-restrictive-means test into the *Burger* framework. Thompson Br. at 28 (citing *Patel*, 576 U.S. at 438 (*Scalia, J.* dissenting)). But Thompson does not point to any cases decided in the ten years since *Patel* that interpret *Patel* to have introduced a least-restrictive-means test.

In sum, the *Patel* majority's dicta and the *Patel* dissent's characterization of that dicta do not support Thompson's invitation to rewrite *Burger*'s second element: that a challenged regulation authorizing administrative searches must be "necessary to further [the] regulatory scheme." *Burger*, 482 U.S. at 702.

> **ii.    The district court correctly held that the DMR Rule satisfies the second element of the *Burger* test for lawful administrative searches of a closely regulated industry because it is necessary to further the regulatory framework.**

Notwithstanding his attempt to rewrite *Burger*, Thompson also contends that the DMR Rule is not "necessary" within the meaning of *Burger* because the

Commissioner "*wants*" but "doesn't *need*" more accurate lobster fishery data "to do his job of conservation and sustainability." Thompson Br. at 30 (emphasis in original). Thompson suggests that the DMR Rule is only about "data collection" or "regulating the lobster fishery," not about ensuring the fishery's long-term viability. *See* Thompson Br. at 29-32. This contention, however, does not engage with, or even acknowledge, the record before this Court.

In analyzing whether the DMR Rule meets the *Burger* test, the district court properly considered the language of Addendum XXIX "[b]ecause the [DMR] Rule is legally required to be consistent with the Addendum." Thompson Add. at 74; *see also* App. at 13-14, ¶ 6. The district court quoted Addendum XXIX's explanation of the challenges facing the fishery that "pose an acute need for high-resolution data on where and when fishery effort in the federal fleet occurs." Thompson Add. at 75 (quoting Comm'r Add. at 6, § 2.1). The district court quoted extensively from Addendum XXIX's discussion of the importance of using high resolution data for stock assessments, the "critical" need to provide enhanced spatial effort data to federal large whale regulators, the "critically important [need] to record the footprint of the [U.S.] lobster fishery as spatial allocation discussions occur" around emerging uses of the ocean, and the need to improve the efficiency and effectiveness of regulatory fishing enforcement. *Id.* at 74-79 (quoted material at 77, quoting Comm'r Add. at 8, §§ 2.2.3, 2.2.4). Applying *Burger* and its progeny to these and more

25

statements contained in Addendum XXIX, the district court correctly concluded that "the electronic tracker requirement articulated in the [DMR] Rule and the Addendum on which it is based are 'necessary' to advance the long-term health and stability of the Maine lobster fishery." *Id.* at 80.

Rather than engage with Addendum XXIX's conclusions about the necessity of electronic tracking of lobster vessels, Thompson presents a variety of misstatements and non-sequiturs.[18]  For example, he states that the "biggest giveaway" that the DMR Rule is unnecessary "is that *no one else* seems to be doing this in such an invasive way."  Thompson Br. at 32 (emphasis in original).  But this statement ignores the fact that the Commission, made up of Atlantic coastal states, adopted Addendum XXIX, and that several of the member states with lobster fisheries have also instituted electronic tracking requirements for commercial lobster vessels pursuant to Addendum XXIX.  *See supra* at 10-11.  Maine does not "stand[] alone," Thompson Br. at 39, in implementing electronic tracking of commercial lobster vessels; it stands with the other member states in the Commission that

---

[18] Although Thompson avoids engaging with Addendum XXIX, he does cherry-pick a quote from it and misidentify it as "the Commissioner's *own words*."  *See* Thompson Br. at 30 (emphasis in original).  That statement, that electronic vessel tracking "could significantly improve the information available to fishery managers and stock assessment scientists," Comm'r Add. at 6, § 2.1, does not negate the Commission and DMR's overall conclusion that electronic vessel tracking is critically necessary to ensure the long-term viability of the lobster fishery.

adopted Addendum XXIX. Indeed, the adoption of such tracking by multiple states fits comfortably within the existing regime of regulations governing almost every aspect of commercial lobster fishing.[19] *See* Def.'s Mot. to Dismiss at 13-15 (ECF No. 23.)

Thompson also suggests that the one-minute ping rate required by Addendum XXIX is unnecessarily frequent and intrusive. Thompson Br. at 32. But Addendum XXIX explained that a one-ping-per-minute rate is necessary to accurately characterize activity in the fishery, including the locations and density of commercial fishing gear, which is critical to addressing current and future threats to the fishery and ensuring successful management through improved stock assessment. *See* Comm'r Add. at 11, § 3.1.1 (relying on Appendix A, *id.* at 19-41). In suggesting that the DMR Rule could use the same ping rate allegedly used by tracking devices in the scallop industry, *see* Thompson Br. at 32, Thompson not only ignores Addendum XXIX Appendix A's "Ping Rate Analysis" of why the one-ping-per minute rate is

---

[19]  Contrary to Thompson's suggestion, the Fifth Circuit's *Mexican Gulf Fishing* decision is readily distinguishable. In that case, the Fifth Circuit considered whether charter boat owners "have a legitimate expectation of privacy to the whole of their movements while at sea" only after the court had determined that the "charter boat fishing industry" is not closely regulated and therefore that the framework for analyzing administrative searches of closely regulated industries did not apply. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 970 (5th Cir. 2023).

necessary to properly characterize activity in the lobster fishery,[20] but he makes no attempt to demonstrate that the scallop fishery presents the same data collection needs and challenges as the lobster fishery, or that scallops are fished in a similar manner using similar gear.[21]  Nor is Thompson's quotation of the district court's observation that the Magnuson-Stevens Act "does not require lobster boats to have a vessel tracker," Thompson Br. at 32 (quoting Thompson Add. at 9), relevant considering that the lobster fishery is primarily regulated under the framework of the Commission rather than the MSA, *see supra* note 7.

To the extent that Thompson questions the need for the tracking device to be operational when a vessel is being used for something other than fishing or when it is fishing in state waters, it is true that DMR has no interest in a lobster vessel's

---

[20]  *See supra* note 8.

[21]  Effective April 22, 2024, NOAA amended its scallop fishing regulations to lower the required ping rate in federal waters from once every thirty minutes to once every five minutes for vessels required to install a Vessel Monitoring System unit.  *See* 50 C.F.R. § 648.10(c)(1)(ii).  In general, a necessary ping rate is determined in part by the type of fishing gear and method of fishing used for a particular species.  Comm'r Add. at 28 (noting the ping rate analysis shows the "consistent rhythm of hauling familiar to anyone who has worked in fixed gear fisheries" such as the lobster fishery).  In contrast with lobstering, scallop fishing is primarily done using dredges dragged along the bottom instead of fixed gear, so a different necessary ping rate would be expected in the scallop fishery.  *See* https://www.fisheries.noaa.gov/species/atlantic-sea-scallop (last visited Apr. 28, 2025).

28

movements when it is not engaged in fishing. But common sense dictates that an alternative system by which lobstermen could turn the tracking system off and on based on when they self-report lobster fishing, or when they cross the line into federal waters, would be functionally equivalent to the current self-reporting system that lacks the necessary accuracy, reliability, and precision. *See* Comm'r Add. at 6, § 2.1. As the district court correctly observed, the possibility that a lobsterman could neglect to turn on the tracking device at the appropriate time would "skew the results" and "it is essential that the data be accurate." Thompson Add. at 89. Addendum XXIX points to an additional reason why the tracking device needs to start pinging every minute as soon as it leaves port, not merely when it crosses into federal waters. The tracking device's feature of slowing the ping rate while the vessel is in port and accelerating the ping rate when the vessel leaves port "allow[s] for validation of track data against self-reported VTR trip start and end times." Comm'r Add. at 12, § 3.1.1; *see also* 50 C.F.R. § 697.4(q)(1)(iv) (requiring lobstermen to report the date and time the vessel "left port on fishing trip").

Simply put, the Commission and DMR reasonably concluded, based on scientific evidence and their fishery management expertise, that the electronic tracking requirement as constructed in Addendum XXIX and the DMR Rule is necessary to protect and manage the fishery. The district court properly reached the same conclusion based on the record before it on the motion to dismiss.

### iii. The district court correctly held that the DMR Rule satisfies the third element of the *Burger* test because it performs the basic functions of a warrant.

The DMR Rule "perform[s] the two basic functions of a warrant" by "[1] advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and . . . [2] limit[ing] the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. The Rule puts covered lobstermen on notice that data regarding the location of their fishing vessels is being collected per the Rule's terms.[22] *See Tart v. Massachusetts*, 949 F.2d 490, 498 (1st Cir. 1991) (finding adequate notice where the regulation informed commercial fishermen "that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports"). And the Rule properly limits government discretion by only authorizing the collection of location data of licensed commercial fishing vessels. In this way, the Rule is comparable to other administrative search regimes that have been approved as properly limited under the *Burger* test.

---

[22] The district court correctly observed that not only does the DMR Rule itself put lobstermen on notice, but the material that DMR sent to every lobsterman with the Particle TrackerOne explained the Rule's requirements, why the Rule applied to them, the kind of data the tracker would collect, why the Commission established the tracking requirement, and other information. Thompson Add. at 85-86. This material was attached to the Complaint and has been included by Thompson with his brief on appeal. Thompson Add. at 134-38.

For example, in *Burger*, the Supreme Court concluded there were "appropriate restraints upon the discretion of inspecting officers" where "[t]he inspections can be made only of vehicle-dismantling and related industries" and "the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements" of the relevant statute. *Burger*, 482 U.S. at 711-12 (internal quotation marks omitted). Following *Burger*, courts have approved administrative searches with comparably specific limits on government discretion. *See Gonsalves*, 435 F.3d at 68 (approving administrative searches of drug-storage facilities "to determine whether any of the provisions [of the relevant pharmaceutical control law] are being violated, and to secure samples or specimens" (internal quotation marks omitted)); *United States v. Ponce-Aldona*, 579 F.3d 1218, 1226 (11th Cir. 2009) (approving administrative searches of commercial vehicles on public highways for certain cargo and documents presenting potential regulatory violations); *Killgore v. City of S. El Monte*, 3 F.4th 1186, 1192 (9th Cir. 2021) (approving "reasonable inspections of any massage establishment during regular business hours to ensure compliance with" regulations (internal quotation marks omitted)).

It is true that vessel location data collection under the DMR Rule occurs around-the-clock whenever a vessel is in operation. The *Burger* court, however, made clear that temporal limitations on administrative searches are only relevant to

31

the extent they demonstrate that the administrative search regime "place[s] appropriate restraints upon the discretion of the inspecting officers." *Burger*, 482 U.S. at 711. That is, timing restrictions for timing restrictions' sake are not necessary, and courts have approved administrative searches with no time limitations. For example, in *Tart*, this Court considered the constitutionality of administrative searches pursuant to a Massachusetts statute providing that state fishing permits "shall be produced for examination upon demand of any authorized person" with no restriction on when such requests could be made. *Tart*, 949 F.2d at 497-98 (quoting Mass. Gen. L. 130, § 2). Considering the third prong of the *Burger* test, the Court concluded that the statute, "although a tersely phrased authorization to conduct documentation checks," appropriately limited "the exercise of the fisheries officer's discretion in the field." *Id.* at 498. The Court explained that a statute authorizing an administrative search "need not in all circumstances prescribe exhaustive restrictions limiting the target, time and place of the inspection." *Id.* As the Court concluded, "[c]onsidered in the context of the entire regulatory scheme applicable to the commercial fishing industry . . . [t]he minimally intrusive nature of a proper verbal request to produce required documentation, and the importance of the governmental interests served by the Commonwealth's permitting requirement, satisfy us that the documentation inspection in this case did not offend the fourth amendment." *Id.* at 499.

32

Similarly, in *Ponce-Aldona*, the Eleventh Circuit concluded that a regime of unannounced, warrantless stops and searches of commercial vehicles on public highways did not violate the Fourth Amendment despite the complete lack of "time and place restrictions" on the searches. *Ponce-Aldona*, 579 F.3d at 1226. The court reasoned that "the absence of such restrictions is insignificant in the context of regulation of the commercial trucking industry" because "neither time nor place restrictions would be feasible"—commercial trucks operate 24 hours a day and could avoid fixed highway checkpoints. *Id.* More recently, this Court explained that "a regime may pass the *Burger* test even if there are no time limits—context is key" and cited *Ponce-Aldona* for the proposition that administrative search "schemes with no timing limits [are constitutional] if such limits would make inspections unworkable." *Rivera-Corraliza*, 794 F.3d at 221.

The DMR Rule presents the circumstances identified in *Tart* and *Ponce-Aldona*. As in *Tart*, the collection of location data at issue here is minimally intrusive in the context of the "entire regulatory scheme applicable to the commercial fishing industry." *Tart*, 949 F.2d at 499. Specifically, the nature of the searches authorized by the DMR Rule—the collection of vessel location data by a tracking device—is less intrusive than the suspicionless boarding and search of a vessel, which is already authorized under state and federal law. A vessel at sea, unlike a personal vehicle on a highway or a pedestrian on a public street, can be stopped by federal and state

33

officials for document checks and safety inspections at any time even without reasonable suspicion. *See Villamonte-Marquez*, 462 U.S. at 592 (noting that "the First Congress clearly authorized the suspicionless boarding of vessels, reflecting its view that such boardings are not contrary to the Fourth Amendment"); *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982); *State v. Giles*, 669 A.2d 192, 193 (Me. 1996). Maine law specifically provides that "[m]arine patrol officers may stop and board any watercraft at any time to inspect its documents, licenses and permits of the occupants of the watercraft and to conduct a safety inspection." 12 M.R.S. § 6133(1). There is a manifest distinction in the degree of intrusiveness between a tracker collecting vessel location data and an officer boarding and visually inspecting a vessel and its occupants. In addition, as the district court observed, the DMR Rule restricts the use of the data that is collected because it complies with existing legal requirements for data collection that are designed to protect individual information. Thompson Add. at 86.

As in *Ponce-Aldona*, additional timing restrictions on the electronic data collection would not be feasible because, like commercial trucking, commercial lobstering does not follow regular business hours. *See Ponce-Aldona*, 579 F.3d at 1226. Apart from seasonal nighttime and weekend restrictions, lobster fishing may take place at any time. *See* 12 M.R.S. § 6440 (2024). And as noted above, allowing vessel owners to turn the tracker on and off at their discretion would raise the

accuracy, reliability, and precision issues that have been identified with current self-reporting regimes and that the DMR Rule is designed to avoid.[23]

Thompson's argument regarding the third element of the *Burger* test is underdeveloped and ultimately unavailing. Thompson offers a serious of *ipse dixit* characterizations: the DMR Rule is "like a *general* warrant [because] it gives the Commissioner unlimited, plenary authority to constantly search the private property of Mr. Thompson"; a "*constant, unlimited* search"; or like "an elf-on-the-shelf in the kitchen of a restaurant that recorded—and reported—everything done on the commercial premises." Thompson Br. at 33-34 (emphasis in original). Not only do these characterizations fail to engage with the jurisprudence regarding the third element of the *Burger* test discussed above, but they are also unmoored from the reality of the DMR Rule. As previously noted, the DMR Rule puts licensed commercial lobstermen on notice that specific, limited information—location data for their commercial fishing vessels—is being collected.[24] *See supra* at 12, 30. The

---

[23] As noted above, the DMR Rule does feasibly limit data collection by requiring a much less frequent "ping" rate when a vessel is in port and by allowing vessel owners to apply for authorization to turn a tracker off when "the permitted vessel is removed from the coastal waters for an extended period of time or for purposes of repairing or replacing an approved tracking device." 13-188 C.M.R. ch. 25, § 25.98(C)(4).

[24] The lobstermen alleged in their Complaint, and Thompson repeats on appeal, that the tracking devices are Bluetooth-compatible and thus could be used to collect audio information. *See* App. at 34, ¶ 77; Thompson Br. at 8. The district court properly rejected this allegation as a well-pleaded fact, noting that the Federal Permit

electronic vessel tracking at issue in this case bears no relation to a hypothetical, unlimited search that records everything done on premises.

For the foregoing reasons, the district court correctly held that the lobstermen failed to plead a plausible claim for relief on their Fourth Amendment claim because the DMR Rule authorizes lawful administrative searches in a closely regulated industry and therefore does not violate the Fourth Amendment.

## II.    Thompson conceded below that the DMR Rule involves a closely regulated industry and cannot now argue the opposite on appeal.

At the end of his brief, Thompson attempts to avoid the application of *Burger* entirely by asserting that "modern lobstering" is not a "closely regulated industry," and therefore, the *Burger* test is inapplicable.  *See* Thompson Br. at 35-39.  As Thompson acknowledges, however, the lobstermen conceded in the district court that "commercial fishing" is a closely regulated industry for purposes of *Burger*. Thompson Br. at 40.  The lobstermen also never distinguished between commercial lobstering and the larger universe of commercial fishing for purposes of the "closely regulated industry" analysis.  *See* Thompson Add. at 72 n.19.  The result of the lobstermen's concession below was that the parties argued—and the district court

---

Holder Vessel Tracking Requirements attached to the Complaint make clear that the tracking devices only collect data on "the time and position" of fishing vessels, "not 'audio information' … as Plaintiffs feared."  Thompson Add. at 86 (quoting Thompson Add. at 134); *see also* Comm'r Add. at 12, § 3.1.1 (tracker captures and submits only "device identifier, datetime, latitude, and longitude, . . . [and] vessel identifier (Coast Guard number or state registration number)").

considered—the question of whether the searches authorized by the DMR Rule meet the *Burger* test for administrative searches of a closely regulated industry, not whether a closely regulated industry is involved in the first place. *See id.* Thompson now seeks to reverse his concession and asks this Court to consider for the first time on appeal whether commercial lobstering is a closely regulated industry for purposes of applying the *Burger* analysis.

This Court, however, has made clear that "[a] party cannot concede an issue in the district court and later, on appeal, attempt to repudiate that concession and resurrect the issue." *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 45 n.1 (1st Cir. 2022) (quoting *United States v. Miranda-Carmona*, 999 F.3d 762, 767 (1st Cir. 2021)). As this Court has explained, "[t]o hold otherwise would be to allow a litigant to lead a trial court down a primrose path and later, on appeal, profit from the invited error." *Id.* Further, considering the effect of such an about-face on the opposing party, "[a] party may not 'sandbag' his case by presenting one theory to the trial court and then arguing for another on appeal." *McPhail v. Mun. of Culebra*, 598 F.2d 603, 607 (1st Cir. 1979); *see also Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 455 (1st Cir. 2016) ("The bottom line, then, is that team Lang cannot forsake its earlier concessions, switching 'horses midstream' to offer an entirely new take on the essential-functions issue—a take that is completely inconsistent with her earlier position."). Indeed, multiple federal courts of appeal have held that a point conceded

in the district court generally cannot be raised on appeal. *See, e.g.*, *United States v. Mangano*, 128 F.4th 442, 466 (2d Cir. 2025); *United States v. Sledge*, 108 F.4th 659, 672 (8th Cir. 2024); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 507 n.2 (3d Cir. 2009).

Thompson's invocation of an exception to this well-established principle is misguided. This Court certainly "has the authority, in its discretion, to consider theories not articulated below" in certain narrow circumstances, bypassing the so-called "raise-or-waive" rule. *Reyes-Colón v. United States*, 974 F.3d 56, 62 (1st Cir. 2020) (internal quotation marks omitted). But the cases that Thompson relies on concern the Court's exercise of its discretion to consider issues that were merely *not raised* in the lower court. *See Reyes-Colón*, 974 F.3d at 62-63 (declining to consider an issue not raised in the district court); *United States v. La Guardia*, 902 F.2d 1010, 1013 (1st Cir. 1990) (considering an issue not raised in the district court). Thompson has not cited a single case where this Court considered, or said that it could consider, an issue that a party *conceded* below, leading the district court down the "primrose path" of invited error and setting up the opponent for sandbagging. *See Baker*, 40 F.4th at 45 n.1.

However, even if this Court were to treat Thompson's concession as no more than a failure to raise the "closely regulated industry" issue before the district court—and the Court should not so treat it—his failure would not fit within any exception

to the raise-or-waive rule. This Court has explained that exceptions to the rule, which "applies with full force to constitutional challenges," should be "narrowly configured and sparingly dispensed." *Daigle v. Me. Med. Ctr., Inc.*, 14 F.3d 684, 688 (1st Cir. 1994); *accord B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 41 (1st Cir. 2004). Although this Court has identified various factors that could support consideration of an argument first raised on appeal, a fundamental factor is the presence of plain error, such that proper resolution of the issue is not in doubt on the existing record and failing to address the issue would result in a miscarriage of justice. *See Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1196 (1st Cir. 1995) (noting that exceptions to the "raise-or-waive rule" are "few and far between, and appellate discretion should not be affirmatively exercised unless error is plain and the equities heavily preponderate in favor of correcting it"); *accord Daigle*, 14 F.3d at 688; *United States v. Krynicki*, 689 F.2d 289, 292 (1st Cir. 1982); *see also La Guardia*, 902 F.2d at 1013 (noting the Court's refusal in a prior case to consider a new argument on appeal "where correct resolution [was] doubtful").

Far from demonstrating plain error, Thompson's new contention that commercial lobstering is not a closely regulated industry asks this Court to undertake a series of legal and factual determinations to reach a resolution that is, at the very best for Thompson, doubtful. As a legal matter, addressing Thompson's new contention would require this Court to, among other things, 1) determine whether

39

the Supreme Court's *Patel* decision substantively changed the standard for identifying a closely regulated industry; 2) identify the elements of a closely regulated industry; and 3) determine whether the closely regulated industry inquiry in this matter should be applied to commercial fishing, commercial lobstering, "modern lobstering," *see* Thompson Br. at 35, or some other subset of the commercial fishing industry suggested by Thompson.[25]

As a factual matter, Thompson would require this Court to characterize the regulatory regime applicable to commercial lobstermen and analogize that regime to the myriad industries that have been identified—and continue to be identified post-*Patel*—as closely regulated.[26]  Therefore, even treating Thompson's concession as a

---

[25] The sine qua non of a closely regulated industry is "a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1248 (11th Cir. 2022) (quoting *Marshall*, 436 U.S. at 313); *see also United States Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 734 (1st Cir. 2022) (an industry is closely regulated when it is subject to pervasive regulation and inspection).  Beyond this fact-intensive inquiry, there is less agreement in the courts of appeal on the precise factors for determining whether a given commercial venture is part of a closely regulated industry for purposes of the *Burger* test.  However, even the Fifth Circuit, the appeals court that has arguably been most skeptical of administrative searches of closely regulated industries, rejected the argument that, after *Patel*, only industries that involve threats to the public welfare may be deemed closely regulated.  *Mexican Gulf Fishing Co.*, 60 F.4th at 968; *see* Thompson Br. at 35-37 (making the argument rejected by the Fifth Circuit in *Mexican Gulf Fishing*).

[26] In *Patel*, the Supreme Court questioned the scope of the closely regulated industry doctrine and noted that the Court itself has only recognized four industries (liquor

40

mere failure to raise the issue, this case does not present the type of extraordinary circumstance where this Court would consider exercising its authority to correct an error that is manifest on the face of the record. *Cf. La Guardia*, 902 F.2d at 1013 (considering a sentencing guidelines issue that was not raised in the lower court because, among other factors, "the point can be resolved with certitude on the existing record"). This Court should decline to allow Thompson to walk away from

---

sales, firearms dealing, mining, and automobile junkyards) as "closely regulated." *Patel*, 576 U.S. at 424. However, as shown above, the Court's actual holding in *Patel* was only that "hotels" in general do not constitute a closely regulated industry. *Id.* at 425-26. And post-*Patel*, courts have continued to recognize diverse industries as closely regulated. *See Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 895 (7th Cir. 2016) (recognizing "commercial trucking" as a closely regulated industry); *Killgore*, 3 F.4th at 1189 & n.4 (recognizing the continuing viability of pre-*Patel* characterizations of "salmon fishing, commercial fishing, family day care homes, transportation of hazardous materials, veterinary drugs, foreign trade zones, and commercial trucking" as closely regulated industries); *id.* at 1190-92 (determining that the "California massage industry" is closely regulated and noting the post-*Patel* characterization by other courts of "dump trucks," "precious metals," "commercial trucking" and "pain management clinics" as closely regulated); *Club Madonna Inc.*, 42 F.4th at 1249 (identifying "the nude dancing and adult entertainment industry" as closely regulated). Since *Patel*, this Court has suggested that "adult entertainment machines" used for gambling are "closely regulated," *Rivera-Corraliza*, 794 F.3d at 219, and cited pre-*Patel* caselaw to support the conclusion that the pharmaceutical industry is closely regulated, *Ricco Jonas*, 24 F.4th at 734-35.

his concession in the district court that the *Burger* test applies because the DMR

Rule involves a closely regulated industry. [27]

## CONCLUSION

For the reasons set forth above, the Commissioner requests that the Court

affirm the district court's dismissal of the Complaint.

Dated: April 30, 2025                      Respectfully submitted,

                                            AARON M. FREY
                                            Attorney General

                                            /s/ Valerie A. Wright
THOMAS A. KNOWLTON                          VALERIE A. WRIGHT
Deputy Attorney General                     JACK DAFOE
Of Counsel                                  Assistant Attorneys General
thomas.a.knowlton@maine.gov                 valerie.a.wright@maine.gov
                                            jack.dafoe@maine.gov

                                            Office of the Attorney General
                                            Six State House Station
                                            Augusta ME 04333-0006
                                            Tel. (207) 626-8800
                                            Fax (207) 287-3145

                                            Attorneys for Defendant-Appellee

---

[27] In his Motion to Dismiss, the Commissioner explained why commercial fishing, of which commercial lobstering is a part, is a closely regulated industry for purposes of the *Burger* test. *See* Def.'s Mot. to Dismiss at 13-15 (ECF No. 23). The Commissioner also explained why the Supreme Court's decision in *Patel* does not change this conclusion. *See id.* at 13 n.18. However, these explanations were appropriately succinct given that the lobstermen had already conceded in their Motion for Preliminary Injunction that commercial fishing is a closely regulated industry. *See id.* at 15 n.20 (citing Pls.' Mot. for Preliminary Injunction at 12 (ECF No. 7)).

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6). I further certify that all text in this opposition brief is in proportionally spaced Times New Roman Font and is 14 points in size. I further certify that, according to the word count function of the word-processing software used to prepare this opposition brief (Microsoft Word 365), this brief contains 10,948 words.

/s/ Jack Dafoe
JACK DAFOE
Assistant Attorney General
(207) 626-8868
jack.dafoe@maine.gov

Office of the Attorney General
Six State House Station
Augusta, Maine 04333-0006

Attorney for Defendant-Appellee

43

**CERTIFICATE OF SERVICE**

I, Jack Dafoe, hereby certify that on April 30, 2025, I electronically filed the

Brief of Defendant-Appellee with the Clerk of Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.

/s/ Jack Dafoe
JACK DAFOE
Assistant Attorney General
(207) 626-8868
jack.dafoe@maine.gov

Office of the Attorney General
Six State House Station
Augusta, Maine 04333-0006

Attorney for Defendant-Appellee

No. 25-1007

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

FRANK THOMPSON,

Plaintiff – Appellant,

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH; JACK CUNNINGHAM,

Plaintiffs,

v.

CARL WILSON, in their official capacity as
Commissioner, Maine Department of Marine Resources,

Defendant – Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE (CASE NO. 1:24-CV-00001-JAW)

## ADDENDUM OF DEFENDANT-APPELLEE

AARON M. FREY
Attorney General

THOMAS A. KNOWLTON
Deputy Attorney General

Of Counsel

VALERIE A. WRIGHT
JACK DAFOE
Assistant Attorneys General
Six State House Station
Augusta, Maine 04333-0006
(207) 626-8800

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

Atlantic States Marine Fisheries Commission, Addendum XXIX To
Amendment 3 To The American Lobster Fishery Management Plan;
Addendum IV To The Jonah Crab Fishery Management Plan:
Electronic Vessel Tracking for Federal Permit Holders,
March 2022 (ECF No.23-1) ................................................................. 3

Appendix A: Ping Rate Analysis ....................................................... 19

Appendix B: Standard Affidavit Language for Tracking Device
Certification ...................................................................................... 42

# *Atlantic States Marine Fisheries Commission*

## ADDENDUM XXIX TO AMENDMENT 3 TO THE AMERICAN LOBSTER FISHERY MANAGEMENT PLAN; ADDENDUM IV TO THE JONAH CRAB FISHERY MANAGEMENT PLAN

### *Electronic Vessel Tracking for Federal Permit Holders*



**March 2022**



*Sustainable and Cooperative Management of Atlantic Coastal Fisheries*

## Table of Contents

1.0 INTRODUCTION ........................................................................................................ 1

2.0 OVERVIEW ............................................................................................................... 1

2.1 Statement of the Problem ....................................................................................... 1

2.2 Background ............................................................................................................. 2

    2.2.1 Electronic Tracking Pilot Program ................................................................... 2

    2.2.2 Stock Assessment ............................................................................................ 3

    2.2.3 Fishery Interactions with Right Whales and Protected Resources .................... 4

    2.2.4 Marine Spatial Planning .................................................................................. 4

    2.2.5 Offshore Enforcement ..................................................................................... 5

3.0 MANAGEMENT PROGRAM ..................................................................................... 5

3.1 Tracker Specifications and Approval ....................................................................... 7

    3.1.1 Required Components and Minimum Technological Standards ......................... 7

    3.1.2 Device Approval Process .................................................................................. 9

3.2 Administrative Processes ....................................................................................... 10

    3.2.1 State-Level Administrative Processes ............................................................. 10

    3.2.2 Federal-Level Administrative Processes ......................................................... 11

    3.2.3 Data Reporting, Validation and Management Processes ................................. 12

4.0 COMPLIANCE ........................................................................................................ 14

5.0 RECOMMENDATIONS FOR ACTIONS IN FEDERAL WATERS ............................ 14

6.0 REFERENCES ........................................................................................................ 14

Appendix A. Ping Rate Analysis .................................................................................. 15

Appendix B. Standard Affidavit Language for Tracking Device Certification ............... 38

## 1.0 INTRODUCTION

The Atlantic States Marine Fisheries Commission (Commission) has coordinated the interstate management of American lobster (*Homarus americanus)* and Jonah crab (*Cancer borealis*) from 0-3 miles offshore since 1996 and 2015, respectively. American lobster is currently managed under Amendment 3 and Addenda I-XXVI to the Fishery Management Plan (FMP). Jonah crab is managed under the Interstate Fishery Management Plan and Addenda I-III. Management authority in the Exclusive Economic Zone (EEZ) from 3-200 miles from shore lies with NOAA Fisheries. The management unit for both species includes all coastal migratory stocks between Maine and Virginia. The management unit encompasses seven Lobster Conservation Management Areas (LCMAs) and two lobster stocks: the Gulf of Maine/Georges Bank (GOM/GBK) stock and the Southern New England (SNE) stock (Figure 1).

The American Lobster Management Board (Board) initiated Addendum XXIX to the American lobster FMP and Addendum IV to the Jonah crab FMP (here forth, the Addenda) to consider implementing electronic vessel tracking requirements for federally-permitted vessels in the lobster and Jonah crab fisheries to collect location and spatial effort data. For several years, the Board has recognized the critical need for high-resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries. In February 2018, the Board approved Addendum XXVI to improve the spatial resolution of lobster and Jonah crab harvester data to address ongoing marine spatial planning activities and assessment challenges. At the same time, the Board approved a one-year pilot program to test electronic tracking devices in the lobster and Jonah crab fishery. The intent of this pilot program was to identify appropriate tracking devices for use in the fishery and inform a Board decision on whether electronic tracking should be pursued in part, or all, of the lobster and Jonah crab fishery. Simultaneously, the Board supported additional work focusing on data integration and hardware testing. These projects lay the groundwork for implementing electronic tracking in the fishing fleet.

Based on recommendations from a work group comprising representatives from NOAA Fisheries, state and federal law enforcement, and members of the Board, the Addenda were initiated to consider requirements for electronic vessel tracking for federally-permitted vessels in the lobster and Jonah crab fishery under the authority of the Atlantic Coastal Fishery Cooperative Management Act (ACFCMA). The goal of the addendum is to collect high-resolution spatial and temporal data to characterize effort in the federal American lobster and Jonah crab fisheries for management and enforcement needs. These data will improve stock assessment, inform discussions and management decisions related to protected species and marine spatial planning, and enhance offshore enforcement.

## 2.0 OVERVIEW

### 2.1 Statement of the Problem

To date, the majority of spatial analyses of lobster and Jonah crab fishery data have been constrained to NOAA statistical areas and state management areas, hindering the ability to quantify effort in specific regions or identify important transit routes and fishing grounds. The

1

application of electronic vessel tracking to this fishery could significantly improve the information available to fishery managers and stock assessment scientists. In particular, a number of challenges the fishery is currently facing pose a critical need for electronic tracking data in the offshore fishery:

1) The stock assessment is currently limited by the coarse spatial scale of available harvest data for American lobster. NOAA Fisheries statistical areas and latitude/longitude coordinates are collected on the NOAA Fisheries Greater Atlantic Regional Fisheries Office (GARFO) Vessel Trip Report (VTR), however the collected spatial data represent the location of where the majority of the fishing effort occurred. The nature of the coarse spatial data is insufficient for management and scientific purposes. Though harvester reporting at the 10-minute square level was adopted for federally-permitted lobster vessels reporting to the states and the federal VTR continued to collect latitude and longitude for each trip, the precision of spatial information is not consistent across federal permit holders. This finer scale data does not provide the precision to accurately apportion effort within the stock units.

2) Due to interactions between protected marine resources and the lobster and Jonah crab fisheries, the fisheries will be required to implement significant risk reduction efforts under the Atlantic Large Whale Take Reduction Plan. These risk reduction efforts are based on models that estimate the location of vertical buoy lines using effort data of a similarly coarse resolution.

3) Recent executive orders have prioritized the development of offshore renewable energy and the conservation of US waters. The development of emerging ocean uses such as wind energy, aquaculture, and marine protected areas may all create marine spatial planning challenges for the lobster and Jonah crab fisheries.

4) The large geographic footprint and low density of lobster gear in the offshore federal management area makes it difficult to locate gear for compliance checks, reducing the efficiency and efficacy of offshore enforcement efforts.

Each of these issues pose an acute need for high-resolution data on where and when fishery effort in the federal fleet occurs. Electronic tracking requirements in the federal fishery would fill this information gap and support fishery managers in addressing the aforementioned challenges.

## 2.2 Background

### 2.2.1 Electronic Tracking Pilot Program
When Addendum XXVI/III to the Lobster and Jonah Crab FMPs, respectively, were approved in February 2018, a one year pilot program was established to test electronic tracking devices on lobster and/or Jonah crab fishing vessels. Given the variety of vessels and the spatial distribution of the fishery (both in distance from shore and breadth along the coast), the pilot

program tested multiple tracking devices in various conditions to identify technologies for use the lobster and Jonah crab fisheries.

The project assessed tracking devices from several different vendors by placing them on volunteer vessels from Maine and Massachusetts with lobster permits from June 2019 to May 2020. The project evaluated the technologies by looking at ease of compliance (or non-compliance), ability to determine trap hauls from steaming activity, industry feedback, cost-per fisherman, and law enforcement feedback. The results of the pilot showed that though the devices differed somewhat in features and performance, they all were able to deliver vessel positions and detect individual trap hauls. It also found that cellular based systems were both lower in cost and permitted faster ping rates than satellite systems. For example, the costs associated with cellular tracking devices tested during the pilot program range from $150 to $650 for the initial purchase of the tracking unit, and annual data service plans that would meet the proposed tracking requirements range from $191 to $420 per year. These costs are provided as examples only and may change dependent on which devices are approved for use in the fishery.

In addition to the pilot program testing tracking devices, the Board supported work on data integration and additional hardware testing. Specifically, this project focused on linking spatial data collected on vessel tracking devices to harvester reports submitted on eTrips Mobile. Recognizing the critical need for data to characterize spatial and temporal effort of the lobster fishery and the potential of available technology to address this need at low costs, the Board initiated Addendum XXIX in August 2021 to consider the adoption of electronic tracking devices in the federal fleet of the lobster and Jonah crab fisheries.

### 2.2.2 Stock Assessment

A complicating factor in the management of lobster is that the boundaries of the LCMAs do not align with the biological boundaries of the stocks (GOM/GBK vs. SNE). This is particularly problematic in LCMAs 2 and 3 which span both stocks. The intricacy of the stock boundaries is further complicated by the fact that many vessels fishing out of Rhode Island and Massachusetts that harvest lobsters on Georges Bank, must travel through the SNE stock area to reach their port of landing. In addition, these vessels may be permitted to fish in multiple management areas, including areas that span both lobster stocks.

To date, the stock assessment has only been able to analyze stock composition data at the spatial resolution of the NOAA statistical area. This is because not all lobster permit holders report at a finer scale than the NOAA statistical area; for each trip some provide a single latitude and longitude point meant to represent where the majority of fishing occurred, some provide 10 minute square(s) fished, and some provide only the statistical area fished. This creates challenges for the assessment because some parameters in the stock assessment model vary at a finer spatial scale than statistical area. For example, size composition data for lobster catch are currently generated by matching statistical area-specific total harvest data and biosampling data, but preliminary work has indicated size composition varies at a finer spatial scale. Improved spatial resolution of total harvest data from vessel tracking will improve size

3

composition data used in the stock assessment models to improve the accuracy of exploitation and reference abundance estimates.

### 2.2.3 Fishery Interactions with Right Whales and Protected Resources

To meet the goals of the Marine Mammal Protection Act and the Endangered Species Act, NOAA Fisheries recently published a final rule to amend the regulations implementing the Atlantic Large Whale Take Reduction Plan (ALWTRP) to reduce the incidental mortality and serious injury to North Atlantic right whales (*Eubalaena glacialis*), fin whales (*Balaenoptera physalus*), and humpback whales (*Megaptera novaeangliae*) in commercial lobster and Jonah crab trap/pot fisheries in the Northeast Atlantic (86 FR 51970). This action is being taken to reduce the risks to endangered North Atlantic right whales and other large whales associated with the presence of fishing gear in waters where these animals occur. The ALWTRP includes a significant reduction in the number of vertical buoy lines in the fishery in order to reduce right whale encounters with buoy lines. Weak rope requirements are included to reduce mortalities and serious injuries when entanglements do occur by increasing the chance of right whales freeing themselves from gear. The ALWTRP also includes changes to seasonal restricted areas closed to pot/trap gear that uses stationary vertical buoy lines. Current and future requirements for gear modifications are expected to have a substantial economic impact on the fishing industry.

The required risk reductions included in the ALWTRP are informed by the co-occurrence model, which pairs information regarding the distribution of whales and commercial fishing gear to predict areas where whales may be prone to entanglement. Electronic vessel tracking data would significantly improve the models used to assess the location of vertical lines in the fishery and their associated risk to right whales in the ALWTRP. The Biological Opinion[1] released in May 2021 outlines a Conservation Framework that intends to reduce mortality and serious injury to North Atlantic Right Whales by 95% over ten years. Within this Framework, additional risk reductions could be required in the US lobster fishery starting in 2025. Therefore, it is critical to gather and provide updated and enhanced spatial effort data to improve the associated risk reduction models ahead of this timeline.

### 2.2.4 Marine Spatial Planning

It is critically important to record the footprint of the US lobster fishery as spatial allocation discussions occur as a result of emerging ocean uses such as aquaculture, marine protected areas, and offshore energy development. For example, in 2016, the New England Fishery Management Council (NEFMC) took action on an Omnibus Deep-Sea Coral Amendment, which looked to provide protection to corals in the northwest Atlantic Ocean through the creation of discrete regions and/or broad depth zones. Given the harvest of lobster and Jonah crab occurs offshore, the Commission was asked to provide information on the magnitude of lobster and Jonah crab catch in specific regions in order to understand potential economic impacts. At the

---

[1] The Biological Opinion issued on May 27, 2021 can be found here:
https://www.greateratlantic.fisheries.noaa.gov/public/nema/PRD/Final%20Fisheries%20BiOp_05_28_21.pdf?fbclid=IwAR3ombXyORsm5o0aFYuoU84W-oUUIEMQUIK5_bqv2FnmVRuEBV3p_pFOenA

time, the lobster and Jonah crab fishery management plans required harvesters to report landings via NOAA statistical areas, regions much larger than those being considered for coral protection. As a result, the spatial resolution of catch and effort data for the lobster and Jonah crab fishery proved too coarse; without fine scale spatial information, impacts to the lobster and Jonah crab fishery had to be estimated by piecing together information from harvester reports, industry surveys, and fishermen interviews. Similar challenges occurred when the Northeast Canyons and Seamounts Marine National Monument was established in 2016, and it is expected that these challenges will continue given increased activity surrounding offshore wind, aquaculture, and oil and gas exploration. Additionally, in January 2021 President Biden issued an Executive Order on Tackling the Climate Crisis at Home and Abroad. Included in this Executive Order is a goal of protecting 30% of US waters by 2030. Given this goal, documentation of the US lobster fishery footprint is essential for consideration in future discussions and decisions regarding marine protected areas.

### 2.2.5 Offshore Enforcement

A potential benefit of collecting electronic vessel tracking data is the ability to improve enforcement in the offshore area. It has long been recognized that enforcement efforts in the offshore federal lobster fishery need to be improved, a particular concern given the rapid increase in landings and value during the last decade. As a result, there are ongoing efforts to enhance enforcement capabilities, including discussions around an offshore enforcement vessel capable of hauling and re-setting long trawls.

Enforcement personnel have consistently noted that having the ability to differentiate when a boat is steaming versus hauling is critical to efforts to inspect gear and identify when fishermen are using illegal gear. Even if location data are not reported in real-time, once a fishing location can be identified from vessel tracking data, enforcement personnel would be able to go to that location to inspect gear for appropriate markings, buoys, escape vents, and ghost panels. Given finite enforcement resources, information on distinct fishing locations would improve the efficiency and capability of offshore enforcement efforts.

### 3.0 MANAGEMENT PROGRAM

*This section adds to Section 3.1 of Addendum XXVI to American Lobster Amendment 3 and Section 3.4.1 of the FMP for Jonah Crab under the adaptive management procedures established in section 3.6 of the FMP for American Lobster and 4.4 of the FMP for Jonah Crab. The intent of the selected management program is to enhance harvester effort data collection.*

Addendum XXIX (American lobster) and IV (Jonah crab) implement electronic tracking requirements for federally-permitted lobster and Jonah crab vessels with commercial trap gear area permits.

Federal lobster and Jonah crab vessels issued commercial trap gear area permits are required to install an approved electronic tracking device to collect and transmit spatial data in order to participate in the trap gear fishery. This means any federally-permitted vessel without an approved electronic tracking device is prohibited from landing lobster or Jonah crab taken with

5

trap gear. Federal permit holders are required to install and activate an approved device prior to beginning a lobster or Jonah crab fishing trip with trap gear. The device must remain on board the vessel and powered at all times when the vessel is in the water, unless the device is authorized to power down by the principal port state. Possible reasons for authorization to power down include but are not limited to vessel haul out/repairs and device failure reported to the principal port state. Tampering with an approved tracking device or signal is prohibited; tampering includes any activity that may affect the unit's ability to operate or signal properly, or to accurately compute or report the vessel's position. These requirements apply to all federal permit categories included in Table 1.

**Table 1. Applicable Federal Permit Categories***

| Federal Permit Category Name | Federal Permit Category Abbr. | Description |
|---|---|---|
| Commercial Trap Gear Area 1 | A1 | May harvest lobster in Federal Lobster Management Area 1 using trap gear |
| Commercial Trap Gear Area 2 | A2 | May harvest lobster in Federal Lobster Management Area 2 using trap gear |
| Commercial Trap Gear Area 3 | A3 | May harvest lobster in Federal Lobster Management Area 3 using trap gear |
| Commercial Trap Gear Area 4 | A4 | May harvest lobster in Federal Lobster Management Area 4 using trap gear |
| Commercial Trap Gear Area 5 | A5 | May harvest lobster in Federal Lobster Management Area 5 using trap gear |
| Commercial Trap Gear Outer Cape Area | AOC | May harvest lobster in Federal Lobster Management Outer Cape Area using trap gear |

Commercial Trap Gear Area 6 is excluded, as the area occurs in state waters and requires a valid CT or NY state lobster license to fish in this area. If a vessel is permitted for Commercial Trap Gear Area 6 only, these requirements do not apply. Additionally, these requirements do not apply to vessels that hold an Area 5 Waiver Permit[2] and no other lobster trap gear area permits.

For additional clarity on situations for which the electronic tracking requirements do <u>not</u> apply, several examples are provided below:
- A person with a state-only lobster permit and no federal commercial trap gear area permit
- A permit holder with federal commercial trap gear permit that has been placed in confirmation of permit history (CPH), a permit status for when a vessel with limited

---

[2] The Area 5 Waiver is a permit category that may be selected by federal lobster permit holders with an Area 5 trap allocation who also hold a federal black sea bass permit. By opting into the Area 5 Waiver, permit holders are exempted from the more restrictive lobster trap gear specifications and trap tagging requirements to target black sea bass with unbaited traps. While in the Area 5 Waiver category, the vessel may retain the non-trap possession limit of 100 lobsters per day or up to 500 lobsters for a trip of 5 or more days.

access permits has sunk, been destroyed, or has been sold to another person without its permit history

- A vessel with a federal lobster commercial trap gear permit listed in Table 1 that <u>does not fish trap gear at any point in the fishing year</u> (i.e., <u>only</u> fishes other gear under a federal lobster commercial/non-trap permit, charter/party non-trap permit, and/or does not fish any trap gear at any point in the fishing year)

Specifications required of tracking devices to be approved for use in the fishery are described in Section 3.1. Administrative processes for the tracking program are described in Section 3.2. A separate document will be developed that will include additional details and standard operating procedures to guide the management agencies in implementing the vessel tracking requirements.

## 3.1 Tracker Specifications and Approval

### 3.1.1 Required Components and Minimum Technological Standards

The minimum criteria that must be met by tracking devices and product vendors for approval for use in the fishery are summarized in Table 2. Additional details on these requirements is included in the subsequent sections.

**Table 2. Required criteria for approval of vessel tracking devices and vendors**

| Requirements of Tracking Devices and Vendors |
| --- |
| <ul><li>Collection of location data at a minimum rate of one ping per minute for at least 90% of the fishing trip</li><li>Data events must contain device's current datetime, latitude, longitude, device and vessel identifier</li><li>Minimum accuracy of 100 m (328.1 ft) accuracy and position fix precision to the decimal minute hundredths</li><li>Ruggedness specifications allowing function in the marine environment</li><li>Ability to PUSH location data to the ACCSP trip locations API</li><li>Vendor customer service requirements</li><li>Vendor must maintain the confidentiality of personally identifying information and other protected data in accordance with federal law</li></ul> |

*Data Collection Rates*

A tracking device must collect location data at a minimum rate of one ping per minute for at least 90% of the fishing trip. A "ping" refers to a data event created by a tracking device containing the device's current datetime, latitude, longitude, device/vessel identifier and other optional data fields. The above rate is necessary to distinguish lobster fishing activity from transiting activity and can allow estimation of the number of traps per trawl (See Appendix A). Data transmission from the tracking device to the vendor should be initiated as soon as possible but no more than 60 minutes from the time the fishing trip is completed.

7

If the tracking device can determine when the vessel is in its berth, the device may automatically decrease the tracker ping rate. If the device is unable to automatically detect a berth location, the device must remain connected and pinging at one ping per minute at all times. This recommendation is designed to permit vendors' efforts to minimize cellular data and power consumption while the vessel is in port. For example, if pinging at a slower rate in the port, the tracking device could run on an internal battery and sleep between pings to save power versus being hard-wired to the vessel's power system. Additionally, this feature would improve data quality and allow for validation of track data against self-reported VTR trip start and end times.

*Precision and Accuracy Requirements*

A tracking device must meet minimum precision and accuracy requirements, specifically a minimum of 100 m (328.1 ft) accuracy and position fix precision to the decimal minute hundredths. It is expected that most modern tracking devices will be capable of significantly higher accuracies than 100 m.

*Tracking Hardware Considerations*

A tracking device must have ruggedness specifications that allow it to function in the marine environment, which may depend on where the device is installed on the vessel.

No specific requirement is specified for how a device shall be powered, provided that the tracking device can satisfy the technical requirements set forth in this section. Devices will likely be powered by some combination of vessel power, internal battery, and/or solar. The Commission level work group will be responsible for determining whether a device satisfies hardware requirements.

*Data Submission Requirements*

Tracking vendors must be able to PUSH location data to the Atlantic Coastal Cooperative Statistics Program (ACCSP) trip locations API and meet all specifications of this interface (https://accsp-software.github.io/spec-unified-api-prod/#tag/eTrips/paths/~1trip_locations/post). In addition to the device identifier, datetime, latitude, and longitude, vendors must also include a vessel identifier (Coast Guard number or state registration number) in the API submission. This data element is necessary to identify the vessel the device is tracking at the time of the ping. Data transmission from the vendor to the ACCSP trip locations API should occur in near real time upon receipt.

Tracking vendors must send test data to the ACCSP trip locations API as proof of the ability to satisfy the data submission requirements. The vendor is expected to have a mechanism for setting the vessel identifier in the administrative web interface to their tracking system.

*Customer Service Requirements*

Device vendors serve as the primary contact for the vessel tracking devices distributed by their company. This includes technical support related to hardware and any device-specific software. Vendors should provide diagnostic and troubleshooting support to permit holders, state agencies, and ACCSP, which is available seven days per week and year-round. Response times for customer service shall not exceed 24 hours. Detailed installation instructions must be provided to permit holders or their designated agents by vendors. Procedures must be established that assist permit holders to properly maintain their device. In the event of tracker malfunction, vendors must be available to troubleshoot, repair, or replace the device. Vendors must have the capability to diagnose and resolve communication anomalies with permit holders or state agencies. Upon request of ACCSP, state partners, or NOAA Fisheries, vendors must be available to assist with vessel tracking system operation, resolving technical issues, and related data analyses.

### 3.1.2 Device Approval Process

The approval of vendors and devices is undertaken by a Commission-level work group process. The work group is comprised of state, federal, and Commission staff. Changes to the requirements of tracking devices can be made by this working group with approval of the Lobster Board. The work group reviews device specifications to determine if a device meets the required components and minimum technological standards. Vendors are required to provide the ASMFC work group with the information in Table 3.

**Table 3. Information that must be submitted by vendors to device approval work group**

| *Information to be provided by vendors for work group review and device approval* |
|---|
| • Company information (name, contact, etc.) |
| • Customer service policy/capabilities (what assistance can be provided for troubleshooting) |
| • Complete cost information for devices and data |
| • Devices capable of a one ping per minute rate |
| • Whether devices can detect when the vessel is berthed/in port |
| • Precision (fixed) of 5 decimal places and accuracy capability (100 m max) <br>   o Does device evaluate quality of positional fix prior to pinging or does it just ping every minute? <br>   o Is the device capable of reporting horizontal accuracy and/or any other ping metadata? |
| • Which cellular providers and bands the device utilizes |
| • Whether vendor can PUSH the vessel ID (Coast Guard number or state registration number) as part of the location data to the ACCSP trip locations API, as well as meet all additional provisions of this interface: (https://accsp-software.github.io/spec-unified-api-prod/#tag/eTrips/paths/~1trip_locations/post) |
| • Power supply specifications |
| • Installation instructions/requirements |
| • Ruggedness specifications |
| • Ability to maintain the confidentiality of personally identifying information and other protected data in accordance with federal law |

9

**3.2 Administrative Processes**

This section describes the required administrative processes that must be implemented at the state and federal level to facilitate the collection and management of data under the electronic vessel tracking requirements for federal permit-holders in the lobster and Jonah crab pot/trap fisheries. Additionally, it describes the recommended roles and responsibilities of the states, federal agencies, and ACCSP in the processes involved in data reporting, validation, and management.

### 3.2.1 State-Level Administrative Processes

*Certification of Device Installation*

States must certify the installation and activation of approved vessel tracking devices for permit holders whose principal port listed on the federal fishery permit is within their state. Principal port is contained in the GARFO permit data which will be made accessible to states. An affidavit with uniform language is distributed by the states to permit holders (see Appendix B for affidavit language). This affidavit certifies an approved tracking device is installed on each vessel and is activated for transmitting spatial data. These requirements apply to all fishing trips regardless of the landing state, trip type, location fished, or target species. Each affidavit must be signed and returned to states prior to departing on the first fishing trip after the program implementation date. For initial implementation of this project, states will collaborate to define a deadline by which permit holders will need to have a certified tracker installed. A state may require additional information to certify installation such as photographs, notarized affidavits, or inspections, but this is not required.

GARFO provides states with American lobster-trap gear area permit ownership information, enabling states to contact permit holders and complete the process of certification of installation. In the event a vessel tracker is transferred between permit holders, states will instruct harvesters to contact tracking device vendors to complete the transfer of a vessel tracker.

*Permit Holder Support*

State agencies will communicate with permit holders to assist them in properly complying with the vessel tracking requirements. States are expected to respond to general inquiries from permit holders that land in their state, troubleshoot where feasible, and transfer inquires to the appropriate body for answers as needed (e.g., device issues to the vendors, electronic reporting app issues to the appropriate electronic vessel trip report provider help desk, etc.). Staff should be available to confirm with harvesters that vessel tracks are being received by ACCSP. States are not required to aid with the installation or troubleshooting of vessel trackers. If there is an issue with hardware or software related to tracker, states may assist the permit holder in contacting device vendors. It is the permit holder's responsibility to work with the vendor when they discover or are notified by the state of an issue.

COMM'R ADD-14

Data validation and compliance monitoring is the responsibility of the states. States contact permit holders to resolve data issues for trips landing in their state. Specifically, state agencies are tasked with resolving mismatches between vessel trip reports and associated vessel tracking information, or when tracking data are missing or incomplete. Additionally, states must validate that the data collected from a tracker meets the specifications defined by ASMFC. The administrative processes for permit holder support will be further developed and refined prior to implementation of the management program. A final data validation system and protocol will be developed by ACCSP and state and federal partners. This will include developing and testing data QA/QC for each jurisdiction prior to implementation of the program.

### 3.2.2 Federal-Level Administrative Processes

The following processes are the responsibility of GARFO to facilitate the implementation of the tracking program:

*Federal Permit Data*

To successfully administer a vessel tracking program, states will need access to up-to-date Federal American lobster permit data. GARFO will provide states with American lobster-trap gear area permit ownership information. The following information will be available:

- Vessel permit number
- Vessel name
- Hull ID (state registration or US Coast Guard Documentation Number)
- Permit endorsement
- Permit issuance date
- Permit expiration date
- Permit-holder name
- Permit-holder contact information
- Principal port and state

*Electronic Vessel Trip Report Data Processing*

Upon completion of rulemaking to implement federal harvester electronic vessel trip report (eVTR) requirements for federal lobster permits, GARFO will incorporate federal lobster eVTR data into its quality assurance program. Electronic reporting applications ensure the submission of complete and valid vessel trip reports, but do not ensure quality. Upon submission, eVTRs will be further validated to ensure a high level of data quality. Errors identified through the quality assurance program will be resolved through GARFO outreach efforts resulting in corrections and resubmissions of eVTR. Federal eVTR data will be available to ACCSP in near real-time, which can be used by ACCSP and state partners in identifying fishing activity in the vessel tracking data.

### 3.2.3 Data Reporting, Validation and Management Processes

This section outlines the expected processes for data reporting, validation and management for electronic vessel tracking. It also identifies the recommended roles and responsibilities of state and federal agencies and partner organizations in administrating these data processes.

*Data Dissemination and Confidentiality*

ACCSP maintains the confidentiality of trip and location data that have been submitted to ACCSP via API in addition to the trip data already maintained under its authority. Data is accessible to the appropriate state or federal entities with confidential data access. A map interface will be available in the SAFIS Management System (SMS) for authorized federal and state administrators to query and visualize trip locations.

*Data Flow*

ACCSP supports data flows for integrated and non-integrated trip report and location data from American lobster and Jonah crab federal permit holders required to collect location data via an approved tracking device. Figure 1 shows the flow of trip data and location data (vessel tracks) from the vessel to the ACCSP SAFIS database. Each step is broken down and described below.



**Figure 1. Vessel Tracking Data Flow**

COMM'R ADD-16

*Trip Data*

EVTR data must be submitted using a NOAA Fisheries GARFO approved eVTR application. All eVTR submissions are available in SAFIS at or near real-time.

*Location Data (Vessel Tracks)*

Tracking vendors must submit location data to the SAFIS database via the ACCSP trip locations API. Vendors will need to obtain the necessary API key, and devices must be capable of providing data in accordance with the API specifications.

*SAFIS API*

All parties, including ACCSP partners and vendors, submitting trip data and/or location data to the SAFIS Unified API (https://accsp-software.github.io/spec-unified-api-prod/) will need to obtain the necessary API keys and must be able to provide data in accordance with the API specifications.

*Data Management*

ACCSP maintains the database structures and processing required to store trip and location data. ACCSP will develop a process to match non-integrated trip and location data after they have been submitted to ACCSP. The trip ID will be assigned to the appropriate trip location data. The system will require the following by each partner:

- NOAA Fisheries is responsible for providing vessel registration (hull ID) and vessel permit number data contained in eVTR data to ACCSP. All eVTR data submitted to GARFO will be sent to ACCSP via API at or near real-time.
- State management agencies are responsible for working with tracking vendors to ensure data are being sent to ACCSP in accordance with the requirements outlined for certification. Two levels of coordination will be in place.
  - In Level 1, the device approval work group will coordinate with the vendor to address overall device issues that have arisen post certification.
  - In Level 2, individual state management agencies will work with the permit holder(s) to resolve issues specific to a single or small number of isolated devices.
  - Details on the roles and responsibilities for specific issues are outlined in the standard operating procedures document.
- Vendors will submit accurate vessel registration information and other required data elements to the ACCSP Trip Location API.

ACCSP is responsible for running trip matching programs at specified intervals. Criteria for matching reported trip data with location data will be developed with federal and state input. Data auditing reports, as specified in the standard operating procedures document, will be made available to the appropriate state and/or federal entities with confidential data access.

COMM'R ADD-17

*Data Quality*

GARFO and the state management agencies are responsible for data reporting compliance; GARFO is responsible for validation of eVTR data, and state management agencies are responsible for validation of trip location data. The matching of trip and location data by ACCSP is subject to the accuracy of the trip report data.

**4.0 COMPLIANCE**

This Addendum is effective on December 15, 2023.

**5.0 RECOMMENDATIONS FOR ACTIONS IN FEDERAL WATERS**

The management of American lobster in the EEZ is the responsibility of the Secretary of Commerce through the National Marine Fisheries Service. The Atlantic States Marine Fisheries Commission recommends that the federal government promulgate all necessary regulations in Section 3.0 to implement complementary measures to those approved in this addendum. The Commission requests that NOAA Fisheries publish the final rule on vessel tracking by May 1, 2023, with implementation no later than December 15, 2023.

**6.0 REFERENCES**

Atlantic States Marine Fisheries Commission (ASMFC). 1997. Amendment 3 to the Interstate Fishery Management Plan for American Lobster.

ASMFC. 2015. American Lobster Benchmark Stock Assessment and Peer Review Report.

ASMFC. 2020. American Lobster Benchmark Stock Assessment and Peer Review Report.

COMM'R ADD-18

Appendix A. Ping Rate Analysis

Introduction

Goals of High-Resolution Tracking Data

Extracting Effort from Tracking Data

Ping Rate Analysis

Case Studies from Other Trips

Data Size Considerations

Conclusions

References

# Lobster Vessel Tracking Ping Rate Analysis

Bill DeVoe, Maine Department of Marine Resources, William.DeVoe@maine.gov (mailto:William.DeVoe@maine.gov)

9/23/2021

## Introduction

Conversations regarding requirements for cellular-based vessel tracking in the federal lobster fishery have repeatedly recommended a one-minute ping interval as being necessary to distinguish fishing from non-fishing activity. This analysis utilizes data collected from tracking devices deployed on federal lobster vessels off the coast of Maine to illustrate the ability to discern and quantify effort at varying ping rates.

## Goals of High-Resolution Tracking Data

The primary goal considered in this analysis is to utilize high-resolution tracking data to extract the locations and size of trawls. These locations can be used to quantify vertical line concentrations spatiotemporally. Although a harvester report may be available with additional information on gear configuration, such as the number of sets or total number of traps, tracking data of sufficient resolution should be capable of predicting gear configuration and gear quantities. Collecting this information from tracking data would likely provided higher accuracy and could ease reporting burdens on harvesters.

Five trap trawls are currently the smallest permissible trawl that can be fished in federal waters of the Gulf of Maine. While there may be future utility in detecting smaller gear events, this analysis will consider the necessary minimum detectable gear size to be a five trap trawl.

## Extracting Effort from Tracking Data

The following overview of current methods for automated extraction of trawl locations from lobster fishing tracking data is provided before analyzing the impact of ping rate on the ability to discern effort.

COMM'R ADD-19

Machine learning models generally fall into the categories of supervised and unsupervised. Supervised models are built using groundtruthed training data containing classified events to train a model to predict the probability of those events in unclassifed data. For example, lobster tracking data where each ping was labeled as hauling/non-hauling based on a hauler sensor or observer data could be used to build a supervised model. Unfortunately, at present there are few instances of high-resolution classified lobster fishing tracking data. As such, the following details current efforts to produce an unsupervised effort detection model based on several prevalent unsupervised machine learning techniques.

Estimation of fishing effort based on velocity alone has been shown to overestimate fishing effort in some fisheries (Arasteh et al. 2020). Different vessels transit at varying speeds, and even for a single vessel within a single trip, transiting speeds may vary based on sea conditions. However, within the lobster fishery the density distribution of velocity as calculated between sequential points in a trip typically exhibits a bimodal or multimodal pattern corresponding with vessel activity (steaming, hauling, and setting.) Gaussian Mixture Modeling (GMM) has been utilized successfully to classify vessel activity in Scottish small-scale fisheries, including those fishing 10-50 trap trawls for European lobster. Establishing velocity thresholds using a GMM calculated on a per trip basis was shown to be effective at correctly labeling vessel activity, and also had rapid processing times compared with other models (Mendo, Smout, Photopoulou, et al. 2019). This study also found that multivariate models incorporating turning angle between pings resulted in minimal increases in activity detection accuracy, likely because hauling of trawls often presented as straight trajectories similar to transiting. Since tracking data for lobster vessels demonstrates similar patterns, velocity is therefore used as the primary variable to classify vessel activity within this analysis.

The following example uses tracking data obtained from a Succorfish SC2 pinging at a one-minute interval. The vessel was fishing ten trap trawls and was carrying a DMR observer who recorded a GPS point at the beginning of each trawl.

All processing in this analysis was completed in R 4.0.1 on a 64-bit Windows machine (R Core Team 2020), relying heavily on the tidyverse (Wickham 2019), sf (Pebesma 2018) and Rcpp (Eddelbuettel 2013) packages.

## Preprocessing

Raw tracking data was pre-processed to split the data into daily tracks and calculate metadata for each ping. This metadata most notably included the spatial and temporal difference between successive pings. Once tracking data had been divided into tracks, polyline features for each track were also created in pre-processing. Pre-processing was handled by a R/C++ package created by the author, and details of this processing are beyond the scope of this analysis.

## Removal of Pings-in-Port

The removal of pings in port is necessary prior to analysis of vessel tracking data. This was accomplished programmatically by taking the first and last point in the trip and calculating the distance between them. If the distance was below a reasonable threshold for indicating the vessel returned to port, points within a given radius of the centroid of the first and last point in the track were removed. Spatial filtering of pings within known port areas can also be utilized to remove pings in port from tracking data (Mendo, Smout, Photopoulou, et al. 2019).

After removal of pings in port, the minimum and maximum datetimes of the remaining points were used to calculate the trip start and end times, as well as the total trip temporal and spatial length.

Longer Vessel Tracking Ping Rate Analysis

The following plot shows the velocity for each point in the example trip, along with the timestamps of known trawl locations from the onboard observer.



Orange vertical lines are haul begin times collected by an onboard observer.

## Gaussian Mixture Model

The vector of velocities between sequential points in the trip was used to fit a Gaussian Mixture Model using the mixtools (Young et al. 2020) R package as per the method described in Mendo, Smout, Photopoulou, et al. (2019). An expectation-maximization (EM) algorithm was utilized to fit the model to three components corresponding to steaming, hauling, and setting activity. The upper threshold for hauling velocity was defined as 2 SD from the mean of the first distribution (Ibid). Since setting of gear can be difficult to detect and may overlap speeds used when hauling and steaming, a more conservative estimate from the upper hauling limit to the mean of the second distribution was utilized to classify gear setting. Steaming was classified using velocities above the second mean.

The velocity density distribution (dashed) and the normal distributions resulting from the EM fitted GMM for the example trip are shown below. Velocities corresponding to hauling (red), setting (green) and steaming (blue) are also highlighted.

17



## Initial Activity Classification

Points in the trip track were than classified using the velocity thresholds established by the GMM.

COMM'R ADD-22

Longer Vessel Tracking Ping Rate Analysis



Orange vertical lines are haul begin times collected by an onboard observer.

## Delineation of Hauls and Sets

Since above plot shows only individual pings classified as activities, clustering of classified points was necessary to identify discreet hauling and setting events. This also allowed for the removal of misclassified pings based on filtering criteria, for example a single ping classified as setting between two clusters of hauling pings.

Trip data was filtered into pings representing hauling and setting, and a matrix of the time difference in minutes between all pings in each data set was calculated. Hierarchical clustering was performed on the resulting matrices, using the single linkage method. The single linkage method clusters points based on the minimum distance between clusters; in this case, "distance" was the minimum time difference in minutes between distinct hauls and sets.

For this analysis, a common sense value of 2.1 minutes between hauls was utilized, such that at minimum one ping would occur between successive haul events. The same value was utilized for clustering sets. Deriving the value to cut the hauling clustering tree using the above GMM method applied to the sequential distance between hauling pings could be another approach, but was not explored in this analysis.

The dendrogram of hierarchal clustering of pings classified as hauling in the example trip is shown below, produced using the R package ggdendro (de Vries and Ripley 2020).

COMM'R ADD-23



Dendrogram of Hierarchal Clustering of Hauling Pings

Blue line is 2.1 minute threshold. Since log(1) = 0, 1 minute between pings is y=0

Constrictions on the minimum haul temporal length and maximum set temporal length were also applied to all trips, such that hauls less than 2 minutes and sets greater than 6 minutes were excluded. In production, these values could be adjusted based on the spatial area fished or on gear configuration details from a harvester report.

In the following plot, the duration of the parsed hauling and setting events from the example trip are highlighted. Observer-derived points were within the extracted haul spans, with the exception of one point that appeared to have been taken after the haul was complete. Detection of setting was much more difficult.

COMM'R ADD-24



## Ping Rate Analysis

In the following scenarios, tracking data from trips fishing a variety of gear configurations were subsampled to lower ping rates. The above method of detecting effort was utilized, with notable differences in the ability to detect vessel activity occurring as ping rate decreased.

The first example used the same trip fishing ten trap trawls as above. GMM results were similar at different ping rates, with the exception of three minutes.

COMM'R ADD-25



Dashed lines are velocity density distribution. Colored lines GMM normal distributions.
Velocities classified as hauling, setting, and steaming are colored red, green, and blue respectively.

Trawls were detected at the one, two and three minute ping rates.

COMM'R ADD-26





COMM'R ADD-27

## Trawl Location vs Trawl Size

In the plot above, clusters of pings around known trawl locations remain visible at ping rates slower than one minute. The one-minute and two-minute time series demonstrate flat-bottomed valleys corresponding to trawls. As the ping rate decreases, fewer pings occur during the haul and the pattern becomes more saw-toothed; there is still an indication of fishing activity, but the temporal resolution of the haul length decreases as the amount of time each ping represents increases. If the ten trap trawls fished in this example trip took 15 minutes to haul, at a one minute ping rate the temporal length of the haul could be estimated within 12% of the actual haul length (15 minutes +/- 1 minute). At a 5 minute ping rate, if the detected haul consisted of only one ping, this could represent anywhere from 5-15 minutes of fishing effort. Faster ping rates are therefore essential to estimating trawl size; measured temporal/spatial lengths of trawls combined with the minimum and maximum trawl sizes permitted in the area fished could provide probabilities of trawl size.

## The Rhythm of Work

The plot above also shows a consistent rhythm of hauling familiar to anyone who has worked in fixed gear fisheries. In many cases hauling is so consistent that a frequency corresponding to the haul time can be detected in tracking data. This may also be another possible future method for detecting trawl configurations. In the plot below, the Fast Fourier Transform has been taken of the velocity time series at different frequencies. The resulting spectral densities demonstrate the occurrence of repeating frequencies within the time series (likely the length of the trawl including setting). Note how the 1 minute and 2 minute time series have sharply defined peaks at 15 minutes, while the peaks widen to either side of 15 minutes as the ping rate decreases.

COMM'R ADD-28



Spectral Densities of Velocity Time Series For Trip Fishing Ten Trap Trawls

Another spectral analysis from a vessel fishing 15+ trap trawls is shown below, indicating a haul/set period of about 20 minutes. Other frequencies become more prevalent than the 20 minute signal at slower ping rates. It is likely that cleaner spectral densities would be acquired by applying the Fast Fourier Transform to vectors of pings classified as hauling/non-hauling versus raw velocity. However, the utility of this method in analyzing vessel tracking data has yet to be determined, and is presented more as a curiosity and comment on the consistency of hauling in the lobster fishery.

COMM'R ADD-29

Longer Vessel Tracking Ping Rate Analysis



## Case Studies from Other Trips

### Mix of 5-10 Trap Trawls

The following trip consisted of a mix of trawl sizes between 5 and 10 traps per trawls. Larger trawls were fished at the beginning and end of the trip, with shorter trawls in the middle. Several gear events that appeared in the spatial data to be sets (no hauling) were correctly classified. Detection of all trawls decreased at slower ping rates; most notably, the smaller trawls became harder to detect even at a 2 minute rate, with some trawls only being represented by a single ping.

COMM'R ADD-30





COMM'R ADD-31

Spectral analysis of this trip showed no strong signals corresponding to haul periods for the different gear configurations; it is possible that applying the Fast Fourier Transform using windowed approach (iterating over the trip subsetting 1-hour window for example) may allow for detecting of haul period signals for mixed gear configurations.

## Mix of 10 and 15 Trap Trawls (Average 11)

This trip had 25 reported hauls, which were detectable at the one and two minute ping rates. A cluster of points toward the end of the trip that was likely setting activity was misclassified as steaming. A notable issue occurred removing pings in port where the vessel moved to a new location at the end of the day.

COMM'R ADD-32





COMM'R ADD-33

## 15+ Trap Trawls

Trawls within this example trip were mostly detected; however, a notable issue is visible where several of the hauls were split into two hauls even though adjacent pings were correctly classified as hauling. This was likely due to dropped pings; the device lost GNSS reception causing the time difference between adjacent pings to be 2 or 3 minutes. When the resulting hauling classified data was clustered, the clustering threshold fell below this time difference causing two separate hauls to emerge. It will likely be necessary to interpolate dropped pings to avoid this issue. This example also highlights the necessity of a consistent ping rate during fishing.

COMM'R ADD-34

Page: Vessel Tracking Ping Rate Analysis



COMM'R ADD-35

## Unknown Trawls - Vessel 1

Unknown size trawls (likely < 10 traps) from a vessel not used in previous examples. Some pings in port were not removed, indicating the need for larger buffer size from the beginning of the track.





COMM'R ADD-37

## Unknown Trawls - Vessel 2

Unknown size trawls from a vessel not used in previous examples.



Activity Detection for Trip Fishing Unknown Size Trawls

Light red bars are filtered haul durations. Light green bars are filtered set durations.

COMM'R ADD-39

# Data Size Considerations

## Ping Data Structure

The following is the minimal datatype sizes necessary to represent a ping attributes in a relational database. Actual implementations would likely utilize structure requiring more space; these numbers are intended to represent the absolute minimum space to store ping data in an uncompressed state.

| Attribute | Optimal Data Type | Attribute Size Bytes | Comments |
|---|---|---|---|
| Device ID | 16-bit unsigned integer | 2 | Able to represent 65,536 unique devices/vessels. Actual device ID per manufacturer likely much longer than this, but can use lookup table in DB. |
| Time | 64-bit unsigned integer | 8 | Most devices transmit ping time as the UNIX epoch or an ISO datetime string, store as UNIX epoch. |
| Latitude | single-precision float | 4 | Precise to 7 decimal places. |
| Longitude | single-precision float | 4 | Precise to 7 decimal places. |
| Horizontal Accuracy | 16-bit unsigned integer | 2 | Store accuracy to one decimal * 10 - ie, accuracy of 2.45 meters stored as 25 |

## Database Size

A single vessel pinging at a one minute rate 24 hours a day would produce 525,960 pings annually. Thus, the full federal lobster fleet of ~1600 vessels would produce 841,536,000 pings. Given the above minimum size of 20 bytes per ping, this would result in 16.83GB of data annually. Minimizing pinging while in port and/or removing pings in port prior to long-term storage would further reduce this figure by likely more than 50%.

Ping rates slower than one minute would decrease data storage sizes accordingly. However, given the relatively small amount of data that would be produced by the entire fleet at even a one minute rate, reductions in ping rate would likely realize minimal cost savings if any relative to the loss of data resolution.

# Conclusions

- For trawls <10 traps in length, a one minute ping rate is necessary to distinguish the location of individual trawls. The size of the trawl relative to other small trawl sizes may not be discernible even at a one minute rate due to differences in hauling speed between vessels, locations and conditions. These results are consistent with findings in the Scottish European lobster creel fishery that a one minute ping rate was necessary to delimit hauling of 10-50 trap creels (Mendo, Smout, Russo, et al. 2019).

COMM'R ADD-40

- A one minute ping rate can allow for the detection of setting of gear when no hauling occurred.
- The location of trawls of 10 traps and greater can be distinguished at up to a 3 minute ping rate. However, as with smaller trawls, the precision with with the size of the trawl can be estimated will decrease at slower ping rates.
- The lack of groundtruthed classified ping data makes calculating metrics on the performance of effort detection algorithms difficult. With validated training data, such as haul times from an onboard observer or a hauler sensor connected to the tracker, it may be possible to build better models and calculate metrics of their accuracies.

# References

Arasteh, Saeed, Mohammad A. Tayebi, Zahra Zohrevand, Uwe Glässer, Amir Yaghoubi Shahir, Parvaneh Saeedi, and Hans Wehn. 2020. "Fishing Vessels Activity Detection from Longitudinal AIS Data." In *Proceedings of the 28th International Conference on Advances in Geographic Information Systems*. ACM. https://doi.org/10.1145/3397536.3422267 (https://doi.org/10.1145/3397536.3422267).

de Vries, Andrie, and Brian D. Ripley. 2020. *Ggdendro: Create Dendrograms and Tree Diagrams Using Ggplot2*. https://github.com/andrie/ggdendro (https://github.com/andrie/ggdendro).

Eddelbuettel, Dirk. 2013. *Seamless R and C++ Integration with Rcpp*. New York: Springer. https://doi.org/10.1007/978-1-4614-6868-4 (https://doi.org/10.1007/978-1-4614-6868-4).

Mendo, Tania, Sophie Smout, Theoni Photopoulou, and Mark James. 2019. "Identifying Fishing Grounds from Vessel Tracks: Model-Based Inference for Small Scale Fisheries." *Royal Society Open Science* 6 (10): 191161. https://doi.org/10.1098/rsos.191161 (https://doi.org/10.1098/rsos.191161).

Mendo, Tania, Sophie Smout, Tommaso Russo, Lorenzo D'Andrea, and Mark James. 2019. "Effect of Temporal and Spatial Resolution on Identification of Fishing Activities in Small-Scale Fisheries Using Pots and Traps." Edited by Christos Maravelias. *ICES Journal of Marine Science* 76 (6): 1601–9. https://doi.org/10.1093/icesjms/fsz073 (https://doi.org/10.1093/icesjms/fsz073).

Pebesma, Edzer. 2018. "Simple Features for R: Standardized Support for Spatial Vector Data." *The R Journal* 10 (1): 439–46. https://doi.org/10.32614/RJ-2018-009 (https://doi.org/10.32614/RJ-2018-009).

R Core Team. 2020. *R: A Language and Environment for Statistical Computing*. Vienna, Austria: R Foundation for Statistical Computing. https://www.R-project.org/ (https://www.R-project.org/).

Wickham, Hadley. 2019. *Tidyverse: Easily Install and Load the Tidyverse*. https://CRAN.R-project.org/package=tidyverse (https://CRAN.R-project.org/package=tidyverse).

Young, Derek, Tatiana Benaglia, Didier Chauveau, and David Hunter. 2020. *Mixtools: Tools for Analyzing Finite Mixture Models*. https://CRAN.R-project.org/package=mixtools (https://CRAN.R-project.org/package=mixtools).

COMM'R ADD-41

**Appendix B. Standard Affidavit Language for Tracking Device Certification**

**NOTICE TO FEDERAL AMERICAN LOBSTER COMMERCIAL TRAP GEAR AREA PERMIT HOLDERS**

Under the authority of the Atlantic Coastal Fisheries Cooperative Management Act, Addendum XXIX to Amendment 3 to the Interstate Fishery Management Plan for American Lobster and Addendum IV to the Fishery Management Plan for Jonah crab requires all vessels with a federal American Lobster Trap Gear Area permit to have an approved vessel tracker installed as of *Month DD, YYYY*. Tracking devices must be installed prior to the permit holder's first fishing trip. This vessel tracker must remain powered and transmitting when the vessel is in the water regardless of landing state, trip type, location fished, or target species. All devices must follow the specifications outlined in Section 3.1 of Addendum XXIX. A list of approved devices along with vendor contact information is attached to this document.

The principal port on your Federal Fishery Permit lies within the [*Principal Port State*], thus the [*Principal Port State Agency*] will be tasked with certifying the installation of your vessel tracking device. In the event you believe your tracker is not functioning correctly and must be serviced, please contact [*Principal Port State Agency*], and inform them of your situation.

Please complete, sign and return this form once an approved device has been installed on your vessel.

**Federal Fishery Permit Number:**

**Documentation or Vessel Registration Number:**

**Vessel Name:**

**Vessel Tracking Device Vendor:**

**Vessel Tracking Device Identifier:**

I certify that the above vessel tracking device is installed and properly functioning to the best of my knowledge.

Permit Holder Signature:

Permit Holder Printed Name:

Date:

COMM'R ADD-42