# In the United States Court of Appeals for the First Circuit

---

FRANK THOMPSON,

*Plaintiff-Appellant,*

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH; JACK CUNNINGHAM,

*Plaintiffs,*

v.

CARL WILSON, in their official capacity as Commissioner,
Maine Department of Marine Resources,

*Defendant-Appellee,*

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT

---

On Appeal from the United States District Court
for the District of Maine (No. 1:24-cv-00001-JAW)

---

Edward M. Wenger
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................... iii

INTRODUCTION & SUMMARY OF THE ARGUMENT ...................................1

ARGUMENT ...........................................................................................3

I. THE BLACK BOX TRACKING REQUIREMENT IS NOT REASONABLE UNDER ANY CONCEIVABLE DEFINITION OF THE WORD. ........................................................3

II. THE BLACK BOX TRACKING REQUIREMENT FLUNKS THE *BURGER* TEST. ..........9

    A. *Patel* makes clear: "necessary" in fact means "necessary." ...............10

    B. The Black Box Tracking Requirement is not necessary to achieve the Commissioner's conservation goals. ...................................................13

    C. The Black Box Tracking Requirement provides no "constitutionally adequate" substitution for a warrant. .................................................21

III. THE LOBSTER INDUSTRY IS NOT "CLOSELY REGULATED" UNDER *PATEL*..........24

    A. The Court should consider this critical issue. ......................................24

    B. The lobster injury is not "closely regulated" under *Patel*..................26

    C. Because the Black Box Tracking Requirement affords no opportunity for precompliance review, it is unconstitutional................................28

CONCLUSION ......................................................................................28

CERTIFICATE OF COMPLIANCE ...................................................................30

CERTIFICATE OF SERVICE...........................................................................31

# TABLE OF AUTHORITIES

## Cases

*Brigham City v. Stuart,*
547 U.S. 398 (2006) ........................................................................2, 4

*Carpenter v. United States,*
585 U.S. 296 (2018) ...........................................1, 5, 6, 7, 8, 9, 22, 23

*City of L.A. v. Patel,*
576 U.S. 409 (2015) ...................................2, 9, 10, 11, 12, 13, 14, 18, 22, 26, 28

*Hunstein v. Preferred Collection & Mgmt. Servs.,*
48 F.4th 1236 (11th Cir. 2022) .......................................................13

*Johnson v. Smith,*
104 F.4th 153 (10th Cir. 2024) .......................................................27

*Kyllo v. United States,*
533 U.S. 27 (2001) .......................................................................1, 5

*Mathis v. United States,*
579 U.S. 500 (2016) ........................................................................12

*McCoy v. Mass. Inst. of Tech.,*
950 F.2d 13 (1st Cir. 1991) .............................................................13

*Mexican Gulf Fishing Co. v. U.S. DOC,*
60 F.4th 956 (5th Cir. 2023) ...................3, 14, 15, 16, 19, 20, 22, 27

*New York v. Burger,*
482 U.S. 691 (1987) ..................................................................21, 22

*Riley v. California,*
573 U.S. 373 (2014) ...................................................................1, 7, 23

*Rivera-Corraliza v. Puig-Morales,*
794 F.3d 208 (1st Cir. 2015) ...................................4, 5, 11, 27

*Tart v. Massachusetts,*
949 F.2d 490 (1st Cir. 1991) ............................................................22

*United States v. La Guardia,*
902 F.2d 1010 (1st Cir. 1990) .........................................................25

*United States v. Jones,*
565 U.S. 400 (2021) ...................................................................7, 23

iii

*United States v. Santana*,
 6 F.3d 1 (1st Cir. 1993) ........................................................................13

*Woods v. Interstate Realty Co.*,
 337 U.S. 535 (1949) .......................................................................12, 13

**Constitutional Provisions**

U.S. CONST. amend. IV ........................................................................3, 4

**Other**

50 C.F.R. § 697.8 ....................................................................................7

Federal Rule of Appellate Procedure 32 ..............................................30

**INTRODUCTION & SUMMARY OF THE ARGUMENT**

"[T]he Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). "[A] central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance,'" and the Court has "kept this . . . in mind when applying the Fourth Amendment to innovations in surveillance tools." *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). "As technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," the Supreme Court has relentlessly "sought to 'assure[ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)) (alteration in original).

At bottom, the every-minute, twenty-four/seven, warrantless, suspicion-less, GPS-tracking regime imposed by the Black Box Tracking Requirement cannot be squared with any of the Fourth Amendment rudiments enshrined in our Constitution by the Founding Generation. On its face, it is unreasonable in scope (*all* lobster boats must be tracked *anytime* they are on the water *irrespective* of why they are on the water) and duration (essentially, *forever*). Because the Supreme Court has

1

consistently reiterated that "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), the profound *unreasonableness* of the Black Box Tracking Requirement, standing alone, renders it unconstitutional.

Notwithstanding this flaw, the Commissioner's Brief cements the notion that the Black Box Tracking Requirement cannot be salvaged by application of the closely regulated industry, administrative-search exception to the Fourth Amendment's warrant requirement. To satisfy this inquiry, the Commissioner must show that every-minute, twenty-four/seven, warrantless, suspicion-less, GPS tracking is *necessary* to achieve its goal of lobster-industry conservation and sustainability. *See City of L.A. v. Patel*, 576 U.S. 409, 426 (2015) (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)). But given the wide variety of other options it has (including, among other things, *not* requiring GPS tracking when lobster boats are not lobstering), it cannot be said that the Black Box Tracking Requirement is "necessary" in any sense of the word.

The Commissioner must also show that the Requirement provides a "constitutionally adequate substitution for a warrant." *Id.* (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)). And this it cannot do, given the persistence and omnipresence of the GPS-tracking requirement. Indeed, the Commissioner has cited *no* case (except for the district court order below) that upheld warrantless and

suspicion-less twenty-four/seven tracking of a vehicle (especially while the vehicle is being used for non-commercial purposes) against a Fourth Amendment challenge. The undersigned is similarly aware of none.

And, finally, under governing Supreme Court precedent, the lobster industry is *not* closely regulated. For this reason, the lack of any precompliance-review process renders the Black Box Tracking Requirement unconstitutional without more. And given the primacy of this crucial issue, the Court should take it up, notwithstanding the concession before the district court.

## ARGUMENT

### I. THE BLACK BOX TRACKING REQUIREMENT IS NOT REASONABLE UNDER ANY CONCEIVABLE DEFINITION OF THE WORD.

According to the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated." U.S. CONST. amend. IV (emphasis added). Put more bluntly, a search must be reasonable. If it is not, it violates the Constitution.

Irrespective of the *Burger* standard, it remains true that using modern GPS technology to monitor a boat's at-sea location twenty-four hours a day, seven days a week, *every* minute—regardless of whether it is being used for commercial purposes, personal endeavors, or *as a home*—"imposes a massive privacy cost." *Mexican Gulf Fishing Co. v. U.S. DOC*, 60 F.4th 956, 965 (5th Cir. 2023). This "degree of state intrusion" is indeed, in the district court's parlance, "inimical to the

restraint on government guaranteed by the Fourth Amendment." ADD-87. And like night follows day, it necessary follows that if a requirement is "inimical" to the Fourth Amendment' guarantee against "unreasonable searches and seizures," ADD-87, the requirement is "unreasonable," notwithstanding any other consideration, U.S. CONST. amend. IV.

If a search is so far outside the Fourth Amendment pale, simply gesturing to an exception from the Fourth Amendment's warrant requirement can't save it. This commonsense notion does not amount to "an additional, free-floating 'reasonableness' inquiry." *See* Red Br. at 19. It is merely a straightforward application of the Fourth Amendment, which guarantees the right of all people "against *unreasonable* searches and seizures." U.S. Const. amend. IV (emphasis added). Per that text, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City*, 547 U.S. at 403. And lest there be any residual doubt, this Court, in its most recent administrative-search case, has admonished "[j]udges" to "never forget that while the Constitution okays warrantless searches in some situations, it never okays unreasonable ones." *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 217 (1st Cir. 2015).

Other than asking the Court to stick its head in the sand and ignore the profoundly invasive (i.e., unreasonable) nature of around-the-clock GPS tracking (again, irrespective of whether a vessel is being used for lobster fishing or as a

houseboat), the Commissioner *twice* urges the Court to find the Mr. Thompson waived this argument. *See* Red Br. at 18, 20. Put another way, his position is that, after bringing a Fourth Amendment *unreasonable-search* claim against the Commissioner, Mr. Thompson has "waived" the ability to . . . challenge the search as unreasonable. To state the Commissioner's argument is to demonstrate that it is both asinine and revelatory of his struggle to defend as reasonable the deeply invasive, privacy-decimating, all-seeing-eye, Black Box Tracking Requirement. To be clear: "[r]easonableness is the amendment's central command, . . . with reasonableness determined by weighing the government's need for the search against the degree of intrusion into a citizen's privacy interests." *Rivera-Corraliza*, 794 F.3d at 215–16 (citing *Camara v. Mun. Court of City & Cnty. of S.F.*, 387 U.S. 523, 536–37 (1967); *Ruskai v. Pistole*, 775 F.3d 61, 68 (1st Cir. 2014)).

There is a reason why the Supreme Court has repeatedly (since, at least, its 2001 decision in *Kyllo*, 533 U.S. 27) viewed with extreme and ever-increasing skepticism *any* governmental exploitation of advanced technology to transgress "a person's expectation of privacy," particularly "in his physical location and movements." *Carpenter*, 585 U.S. at 306 (discussing *United States v. Knotts*, 460 U.S. 276 (1983)). And that reason is self-evident. "As technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," the Court "has sought to 'assure[ ] preservation of that degree of privacy

5

against government that existed when the Fourth Amendment was adopted.'" *Id*. at 305 (quoting *Kyllo*, 533 U.S. at 34) (alteration in original). Indeed, for close to one-hundred years, Justices of the Supreme Court have recognized that judges are "obligated—as '[s]ubtler and more far-reaching means of invading privacy have become available to the Government'—to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Id*. at 320 (quoting *Olmstead v. United States*, 277 U.S. 438, 473–74 (1928) (Brandeis, J., dissenting)).

"[A] central aim of the Framers," naturally, "was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* at 305 (quoting *Di Re*, 332 U.S. at 595). And "[a]lthough no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" *Id*. at 304–05 (quoting *Carroll v. United States*, 267 U.S. 132, 149 (1925)). Given the uncanny similarity to the reviled general warrants and writs of assistance that prompted the adoption of the Fourth Amendment by the Founding Generation, the Black Box Tracking Requirement cannot stand.

The Commissioner's only response? "In contrast to individuals going about their daily lives or driving private motor vehicles, the operators of commercial

lobstering vessels have a reduced expectation of privacy in their vessels'
movements." Red Br. at 21. The problem for the Commissioner? Two-fold.

First, the Commissioner is wrong on the law. A "reduced" expectation of
privacy does not mean (as the Commissioner would seem to have it) an "obliterated"
expectation of privacy. A "reduced" expectation means, for instance, that
"[c]ommercial lobstering vessels" can, consistent with the Fourth Amendment, be
required to "display their registration numbers 'so as to be clearly visible from
enforcement vessels and aircraft.'" Red Br. at 21 (quoting 50 C.F.R. § 697.8(a)(2)).
No one here finds that any more objectionable than the requirement that cars need
license plates.

An eradicated expectation of privacy, however, is necessary to justify
warrantless "GPS monitoring of a vehicle" that "tracks every movement a person
makes in that vehicle." *Carpenter*, 585 U.S. at 307 (citations and internal quotation
marks omitted). And because "individuals have a reasonable expectation of privacy
in the whole of their physical movements," *Id*. at 310 (citing *United States v. Jones*,
565 U.S. 400, 430 (2012) (Alito, J., concurring in judgment); *id*. at 415 (Sotomayor,
J., concurring)), the Commissioner's position is far out of step with decades of
Supreme Court precedent. *Cf. Riley*, 573 U.S. at 392 ("[W]hen 'privacy-related
concerns are weighty enough' a 'search may require a warrant, notwithstanding the

diminished expectations of privacy . . . .'") (quoting *Maryland v. King*, 569 U.S. 435, 463 (2013))).

Second—and most crucially—he is wrong on the facts. Although he admits it later in his brief, *see* Red Br. at 28–29, his defense of the Black Box Tracking Requirement's "reasonableness" declines to engage with perhaps the most glaringly problematic part of it: it tracks *far more* than commercial activity. A once-a-minute GPS location report that must (whenever a boat is in the water) be honored twenty-four hours a day, seven days a week, means that the Black Box Tracking Requirement provides a tremendous amount of "detailed, encyclopedic, and effortlessly compiled" data regarding *personal*, *non-commercial* activity. *See Carpenter*, 585 U.S. at 309. In the words of the district court: "Lobstermen are not always fishing on their boats. They have their own lives. Even though they use their boats to fish for lobsters, they also use these vessels to perform personal errands, to visit family and friends, and even in some cases to live on." ADD-86–87.

To the best of counsel's knowledge, *no court* has *ever* held that warrantless, suspicious-less, twenty-four/seven GPS tracking may be used to chart a vehicle's *every* move, whether commercial or personal, forever. The reason: doing so is profoundly and irredeemably *unreasonable*, given the Fourth Amendment. "Here," as in *Carpenter*, "the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities," but "[a]t the same time, this tool

risks Government encroachment of the sort the Framers, 'after consulting the lessons of history,' drafted the Fourth Amendment to prevent." *Carpenter*, 585 U.S. at 320 (quoting *Di Re*, 332 U.S. at 595).

Satisfying the terms of a Fourth Amendment warrant-requirement exception is manifestly *necessary* for the Commissioner. But when a requirement like the one at issue here is so wildly out of step with the principles at the very root of the Fourth Amendment itself, simply ticking off a list is *insufficient*, standing alone, for the constitutional inquiry. Because reasonableness remains the Fourth Amendment's core guarantee, the Black Box Tracking Requirement is unconstitutional even if the Commissioner could satisfy the administrative-search exception (and, as discussed below, he cannot).

## II. THE BLACK BOX TRACKING REQUIREMENT FLUNKS THE *BURGER* TEST.

Should the Court decide to apply the test for closely regulated industry administrative searches (and for the reasons discussed both above and below, it should not), the Black Box Tracking Requirement still violates the Fourth Amendment. And although we all agree that conservation of the lobster industry is a substantial government interest, the Black Box Tracking Requirement is eons away from being "necessary" to preserve it. *See Patel*, 576 U.S. at 426. What is more, nothing about the Black Box Tracking Requirement comes close to a constitutionally adequate substitution for the Fourth Amendment's warrant requirement. *See id.* Even

construing the inquiry toward the Commissioner's best-case scenario, the Black Box Tracking Requirement cannot stand.

## A. *Patel* makes clear: "necessary" in fact means "necessary."

Before diving into the analysis, another point warrants a brief divergence. In what has become the Commissioner's (largely incorrect) mantra, he argues that Mr. Thompson waived certain of his *Burger* Test arguments; in particular, whether *Patel* clarified the way in which the *Burger* Test must be applied. *See* Red Br. at 23 n.17. Nonsense.

Mr. Thompson pressed (in particular) the argument that the Commissioner could not satisfy *Burger* Step Two or Three throughout this litigation. The parties fully briefed the *Burger* Test before the district court. And the district court relied on *Patel* in setting out the standard for the test under the Fourth Amendment's closely held industry exception. *See* ADD-72. In no uncertain terms, *Patel*, and its effect on the *Burger* Test, was consistently at issue and fiercely debated before the district court.

What the Commissioner is really concerned about is Mr. Thompson's arguments about *Patel*'s effect on this Court's jurisprudence. The Commissioner is right to fear *Patel*. But Mr. Thompson did not waive the ability to argue about *Burger* Step Two merely because his arguments on appeal are not a verbatim recitation of his arguments before the district court (which, of course, had *no* discretion to veer

from this either Court's or the Supreme Court's jurisprudence). The district court rightly teed up the *Patel* issue for this Court, which needs to speak regarding *Patel*'s effect on *Burger*, a fact this Court in *Rivera-Corraliza* have recognized. *See* 794 F.3d at 223. Specifically, it bears reminding the Court of its ten-year-old admonition that "although *Patel*" did not apply in *Rivera-Corraliza*, "the law governing administrative searches continues to develop and that the bench and bar must be on the lookout for situations where *Patel* does hold sway." *Id*.

*Patel*'s effect on the *Burger* Test is simple. Because "necessary" is not synonymous with "rationally related," *Burger* Step Two, which asks whether "warrantless inspections" are "'necessary' to further [the] regulatory scheme," is not akin to the rational-basis test. *See Patel*, 576 U.S. at 426. Instead, when applying *Burger* Step Two in *Patel*, the Court looked to whether "precompliance review would *fatally undermine* the scheme's efficacy." *Id*. at 427. And the "fatally undermine" phrase was *not*, as the Commissioner would have it, language offered by the parties in *Patel*; an examination of the briefing in that case demonstrates that "fatally undermine" was the Supreme Court's framing, which Justice Scalia, in dissent, construed as "importing a least-restrictive-means test into" *Burger* Step Two. *Patel*, 576 U.S. at 438 (Scalia, J., dissenting).

In the Commissioner's view, Mr. Thompson's ask that the Court conduct a straightforward application of Supreme Court precedent amounts to an "invitation

to rewrite the second element of the *Burger* test." Red Br. at 23. But Mr. Thompson's insistence that interpreting the phrase "the warrantless inspections must be 'necessary' to further [the] regulatory scheme" to mean "the warrantless inspections must be '*necessary*' to further [the] regulatory scheme" is about as far from a rewrite as one can get. *Patel*, 576 U.S. at 426. Words have meanings, *Patel* made that point manifest in this context, and the only thing that Mr. Thompson has requested is that "necessary" be interpreted to mean "necessary." *See id.* Because "a good rule of thumb for reading" the Supreme Court's "decisions is that what they say and what they mean are one and the same," *see Mathis v. United States*, 579 U.S. 500, 514 (2016), the Commissioner's contrary argument is meritless.

Next, the Commissioner argues that the relevant portion of *Patel* was dicta. In so doing, he errs twice. First, the Commissioner's undeveloped argument is flatly incorrect. As the majority in *Patel* explained, its holding on the closely regulated industry section was an alternate holding by a majority of the Court that would have likewise disposed of the case. And since roughly the World War II era, it has been well-understood that alternate holding sections are *not* dicta—i.e., "where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949). Thus, when the Supreme Court "conclude[d] that" the law at issue in *Patel* "fails the second and third prongs of" the *Burger* Test, *Patel*, 576 U.S. at 426, it in no uncertain terms

issued a holding, *see Woods*, 337 U.S. at 537. Indeed, any time the Supreme Court "express[ly] reject[s]" a "theory," any "alternative holdings are not dicta, but instead are as binding as solitary holdings." *See Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1252 (11th Cir. 2022).

But even if the Commissioner was correct, and the Court were to construe *Patel*'s holding as dicta, it would not matter. This Court has long held that "[c]arefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when, as in this instance, badges of reliability abound." *United States v. Santana*, 6 F.3d 1, 9 (1st Cir. 1993). Indeed, "federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement." *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991). In other words, *Patel* applies, no matter how much the Commissioner may wish it was otherwise.

### B. The Black Box Tracking Requirement is not necessary to achieve the Commissioner's conservation goals.

Applying the correctly heightened inquiry that *Burger* Step Two requires demonstrates that the Black Box Tracking Requirement does not survive Fourth Amendment scrutiny. Simply put, it is far from "necessary" to track via GPS a lobster boat *every minute* that it is engaged in lobstering, and downright

counterproductive to do so every minute that it is on the water, whether or not it is lobstering. This failure dooms the Black Box Tracking Requirement.

At the risk of redundancy, rational-basis review is not the standard. Because it is not, the Court need not take the Commissioners' assertion about necessity at face value. And because "necessary" does in fact mean "necessary," *Patel*, 576 U.S. at 426, if the Commissioner can get the information he needs in ways that are *less* odious to the Fourth Amendment, the Black Box Tracking Requirement is unnecessary. *See generally Patel*, 576 U.S. at 438 (Scalia, J., dissenting) (construing *Patel* as "importing a least-restrictive-means test into" *Burger* Step Two).

In *Mexican Gulf Fishing Co.*, the Fifth Circuit examined whether a materially identical twenty-four-hour GPS-tracking requirement (in that case, on charter boats) was "necessary to enforce" statutory "data-collection provisions." 60 F.4th at 964.[1] There, as here, the government argued that "GPS data will help validate [fishing] effort and aid with enforcement of the reporting requirements," and "that the data improves the accuracy and reliability of fishery data by providing trip validation—

---

[1] Even though the *Mexican Gulf Fishing Co.* Court resolved the case on Administrative Procedure Act grounds, it nonetheless had to decide whether the twenty-four-hour GPS tracking requirement was "necessary" to achieve the government's data-collection goals. Since "necessary" means "necessary" irrespective of the legal context, the reasoning underlying *Mexican Gulf Fishing Co.* is directly on point.

in other words, corroborating whether a vessel has left the dock." *Id.* (internal citations and quotation marks omitted).

The Fifth Circuit was not persuaded. "Cutting against" the necessity "argument [was] the fact that charter-boat owners are already required to report all of the information that the Government says the GP[S]-tracking requirement is designed to collect." *Id.* There, like here, "before going on a trip, charter-boat owners must tell the Government the type of trip (fishing or otherwise), and if it is a fishing trip, they must also tell the Government where they are going, how long they expect the trip will take, and when and where they expect to return." *Id.* There, like here, they must also "report all fish harvested and discarded, as well as other commercial information." *Id.* (internal citations and quotation marks omitted). And there, like here, "the record lacks any evidence that charter-boat owners fail to accurately report their trips." *Id.*

Moreover, "[t]he data the Government demand[ed]" in *Mexican Gulf Fishing Co.* did "not communicate the location or duration of fishing." *Id.* at 965. Nor did "it communicate the number and type of fish caught, or the equipment used to catch those fish." *Id.* According to the Fifth Circuit, twenty-four/seven GPS monitoring, while wildly invasive, was of little utility because "[i]t only communicates a particular charter boat's exact location." *Id.*

*Id.* In his brief, the Commissioner gives the following reasons for the Black

Box Tracking Requirement, which largely track the reasons given by the government

in *Mexican Gulf Fishing Co.*:

- "[C]urrently available data, including data collected from Vessel Trip Reports ("VTRs") already required of lobster vessels, is insufficiently detailed for management and scientific purposes, such as conducting stock assessments.

- "[I]nteractions between protected marine species and lobster fishing will likely result in further risk reduction efforts being imposed on the fishery under the Atlantic Large Whale Take Reduction Plan."

- "[T]he increase in competing uses of the ocean, such as aquaculture, creation of new marine protected areas, offshore wind energy development, and offshore oil and gas exploration are putting pressure on the lobster fishery."

- "[T]he 'large geographic footprint and low density of lobster gear in the offshore federal management area' makes enforcement challenging."

Red Br. at 7–10. Like *Mexican Gulf Fishing Co.*, however, "boat owners are already

required to report all of the information that the Government says the GP[S]-tracking

requirement is designed to collect." *Mexican Gulf Fishing Co.*, 60 F.4th at 964. Like

*Mexican Gulf Fishing Co.*, the Commissioner considers his current data

"insufficiently detailed because not all lobster permit holders report at a finer scale

than the NOAA statistical area." Red Br. at 7 (internal citation and quotation marks

omitted); *compare Mexican Gulf Fishing Co.*, 60 F.4th at 964 (arguing that "GPS

data 'will help validate [fishing] effort and aid with enforcement of the reporting

16

requirements,'" and "that the data 'improves the accuracy and reliability of fishery data'" (internal quotation marks omitted)). And like *Mexican Gulf Fishing Co.*, these reasons should not persuade the Court that the Black Box Tracking Requirement is "necessary" to the Commissioners' goal of preserving the lobster industry.

Tellingly, the Commissioner has not argued that it needs information that it does not already require from lobster boats, which is already extensive; federally licensed lobstermen must already self-report:

1.      A unique trip identification number.

2.      A vessel identification number.

3.      The trip start date.

4.      The location (by NMFS Statistical Area) of the trip.

5.      The lobster management area.

6.      A ten-minute square level.

7.      The number of traps hauled on the trip.

8.      The number of traps set on the trip.

9.      The species harvested.

10.     The quantity (in pounds) of the harvest (unlike other aquatic industries, lobstering is not quota-based).

11.     The length of the trip.

12.     The number of traps employed per trawl.

13.     The number of buoy lines employed. And

14. The soak time of the traps.

ADD-12–13. Instead, it believes that the data it gets "is insufficiently detailed," and it lays the fault at the feet of some "lobster permit holders" that decline to "report at a finer scale than the NOAA statistical area." Red Br. at 7. Some permit holders "provide a single latitude and longitude point meant to represent where the majority of fishing occurred," others "provide 10 minute square(s) fished," and others "provide only the statistical area fished." Red Br. at 7.

Rather than rendering twenty-four/seven dragnet GPS tracking a "necessity," however, these concerns do no more than counsel of favor in harmonizing the way in which VTRs report their data, requiring that the VTRs report at a "sufficiently detailed" level, and enforcing those requirements. Given that the burden lies with the Commissioner to demonstrate that closely held industry exception applies, his failure to show that these lesser intrusive options would not work means that he has failed to show that the Black Box Tracking Requirement is "necessary." *See Patel*, 576 U.S. at 426. The Requirement is, indeed, a "want," but far from a "need." *See* Blue Br. at 30.

Above and beyond that the Commissioner (1) already gets lobster-boat location data from VTRs and (2) has never explained why those VTRs cannot mandate data at the necessary level of detail, his regulatory interest is in conservation and sustainability. *See* ADD-53. The Black Box Tracking Requirement, however,

"only communicates a particular [lobster] boat's exact location." *See generally Mexican Gulf Fishing Co.*, 60 F.4th at 965. Standing alone, it does not measure lobster stock, locate right whales, or collect any of the other data one would expect to be necessary to figure out how to preserve the lobster industry and conserve the waters of the Atlantic. Simply put, the paltry and (at best) indirect utility of the Black Box Tracking Requirement cannot, per the Fourth Amendment, justify "the massive privacy cost" that twenty-four/seven GPS monitoring inflicts. *See generally id*.

At an absolute constitutional minimum, though, the Commissioner has not demonstrated, and cannot conceivably demonstrate, a need to track lobster boats *every minute* when they are at sea but *not* engaged in lobstering. The Commissioner concedes that he "has no interest in a lobster vessel's movements when it is not engaged in fishing," but insists that "common sense dictates that an alternative system by which lobstermen could turn the tracking system off and on based on when they self-report lobster fishing, or when they cross the line into federal waters, would be functionally equivalent to the current self-reporting system that lacks the necessary accuracy, reliability, and precision." Red Br. at 28–29. Respectfully, the Commissioner's position makes almost no sense.

First, "common sense" isn't enough. *Record evidence* matters, and like in *Mexican Gulf Fishing Co.*, "the record" here "lacks any evidence that" lobster-boat

"owners fail to accurately report their trips." *Mexican Gulf Fishing Co.*, 60 F.4th at 964. Indeed, the Commissioner has never suggested otherwise.

Second (and relatedly), the Commissioners' complaint is not that lobster-boat owners are failing to submit their VTRs; instead, he argues that the VTRs do not contain data at the level of detail he prefers. Turning on the tracking device when lobstering begins or when boats enter federal water would (because of the way that the GPS trackers operate) provide the desired "accuracy, reliability, and precision." Red Br. at 29. His conjecture—and it is conjecture—that "a lobsterman could neglect to turn on the tracking device at the appropriate time" and thus "'skew the results,'" Red Br. at 29 (quoting ADD-89), can be solved by simply checking a boat's VTR and making sure that the tracker was on during the time at which the VTR reported that lobstering was occurring.

Finally, if it "'is essential that the data be accurate,'" Red Br. at 29 (quoting ADD-89), tracking lobster boats when they are not lobstering is profoundly counterproductive. GPS tracking communicates where a lobster boat is located— and nothing else. For that reason, the data will not only inform the Commissioner when and where a boat is lobstering (which might conceivably help with stock assessment). It will also report when and where a boat is being used to "to perform personal errands, to visit family and friends," ADD-87, to engage in rescue missions,

to harvest other aquatic life, or just to cruise through the ocean (which cannot conceivably help with stock assessment).

The problem: there is no way for the Commissioner to know through GPS data alone whether a boat is in a particular area where lobsters are located (which might be relevant) or far from where they are located (which could not be more irrelevant). When relevant data is combined with irrelevant data, the data necessarily becomes skewed. And because the Black Box Tracking Requirement mandates that lobster boats report *both* relevant and nonrelevant data, the risk of data contamination is far more acute than if a lobsterman here or there forgets to turn on the tracker while he is lobstering.

For all these reasons, the Black Box Tracking Requirement flunks Step Two of the *Burger* Test.

### C. The Black Box Tracking Requirement provides no "constitutionally adequate" substitution for a warrant.

Finally, the Black Box Tracking Requirement fails the requirement that it "perform[s] the two basic functions of a warrant"; i.e., "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 702–03. Indeed, it does no such thing. For that reason, it is unconstitutional.

To reiterate: the Black Box Tracking Requirement "demand[s] that" all federally licensed lobster "boat owners transmit their exact location to the Government, every hour of every day forever, regardless of why they are using the vessel." *See Mexican Gulf Fishing Co.*, 60 F.4th at 965. This *general* requirement is far afield from the Supreme Court's admonition that "'some quantum of individualized suspicion'" must exist "before a search or seizure may take place." *Carpenter*, 585 U.S. at 317 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61 (1976)). In other words, it is *not* sufficiently tailored in scope and time to function akin to an actual, specific warrant, as contemplated by the Fourth Amendment. *See Patel*, 576 U.S. at 426.

Even more problematic is the *perpetual* and *omnipresent* nature of the Black Box Tracking Requirement, which eliminates any suggestion that Requirement "has a properly defined scope." *Burger*, 482 U.S. at 703. True, some cases have put owners of commercial establishments and vehicles on notice that "routine documentation checks might occur at any time." *See, e.g.*, *Tart v. Massachusetts*, 949 F.2d 490, 498 (1st Cir. 1991). But even the district court has noted that a "search of a particular lobster boat must be limited to one boat at a single time," the Black Box Tracking Requirement "contemplates a constant search of each licensed lobster boat in the entire lobstering fleet," and this "means that "[t]he data collection" at issue here is vastly different in kind and intensity to past . . . practice." ADD-87.

It bears repeating: "'different constitutional principles'" apply now that "'twenty-four hour surveillance'" has become "'possible.'" *Carpenter*, 585 U.S. at 307 (quoting *Knotts*, 460 U.S. at 283–84). "[L]onger term GPS monitoring" incontrovertibly "impinges on expectations of privacy," *id*., and all the Supreme Court's recent precedent reinforces this notion. Given that, it cannot be said that the forever-watching Black Box Tracking Requirement has any conceivable comparability "to other administrative search regimes that have been approved as properly limited." Red Br. at 30. Outside of the order under review, counsel is aware of no case that has allowed a similar perpetual, technology-driven, and omnipresent search to survive Fourth Amendment scrutiny. For his part, the Commissioner fails to cite any.

Finally, the Commissioner's cynical description of the GPS data that the Requirement collects as "limited" is farcical. Around-the-clock location data, especially for boats that some call their home, "hold for many Americans the 'privacies of life.'" *Riley*, 573 U.S. at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The data that the Black Box Trackers collect are as "detailed, encyclopedic, and effortlessly compiled" as the cell-service information at issue in *Carpenter*, 585 U.S. at 309, and the GPS information at issue in *Jones,* 565 U.S. 400. No amount of "notice" can purge the unconstitutional taint that the Black Box

Tracking Requirement inflicts, *see* Red Br. at 30 & n.22, which means that it does not survive Fourth Amendment scrutiny.

## III.  THE LOBSTER INDUSTRY IS NOT "CLOSELY REGULATED" UNDER *PATEL*.

In what may amount (ironically) to the biggest concession of all in this case, the Commissioner makes no attempt—none—to demonstrate that the lobster industry is closely regulated under governing precedent. As discussed below, it is not, so the Black Box Tracking Requirement's lack of any precompliance review process renders it unconstitutional without more. Instead, the Commissioner pleads mightily for the Court to avoid the question. Here though, the Court should exercise its discretion and reach the issue.

### A.    The Court should consider this critical issue.

To be certain, Mr. Thompson does not dispute that the closely regulated industry point was conceded below. Rather than contesting waiver, he is straightforwardly asking this Court to exercise its discretion to excuse it, even though the district court did not first consider the question. In so requesting, he maintains that reaching this issue would be in line with this Court's well-settled framework for doing so when a question is not first raised to the district court. As noted in the opening brief, whether Maine commercial lobstering is a closely regulated industry (1) is a pure question of law, (2) can be resolved with certitude on the existing record, (3) is an important and novel Fourth Amendment question

affecting future litigants, and (4) is almost certain to recur in future challenges to the Commissioner's Black Box Tracking Requirement. *See* Blue Br. at 40–43.

The Commissioner contests *none* of the above. Instead, he gets gummed up in his concocted distinction between an affirmative concession and a failure to make an argument (incidentally, he cites no case establishing a meaningful distinction between the two). But in so doing, he misses entirely this Court's reason for establishing the waiver exception in the first place. It is not to let slide an allegedly less blameworthy reason why the district court did not address an issue.[2] It is because some issues are both susceptible to appellate-court attention in the first instance and monumentus enough to excuse a waiver. This question fits the bill; it is an essential, constitutional, purely legal issue that "is almost certain to be presented in identical terms in other cases." *United States v. La Guardia*, 902 F.2d 1010, 1013 (1st Cir. 1990).

---

[2] It bears noting, however, that the district court did recognize the argument that *Patel* may have altered the closely held industry inquiry:

> Commissioner Keliher acknowledges in a footnote that the U.S. Supreme Court in *Patel* . . . questioned the scope of the closely regulated industry doctrine and noted that it had only recognized four industries (liquor sales, firearms dealing, mining, and automobile junkyards) as "closely regulated." . . . However, Commissioner Keliher says, the Court's actual holding in *Patel* was only that hotels' . . . do not constitute a closely regulated industry, . . . and, post-*Patel*, courts have continued to recognize various industries as closely regulated.

ADD-36 (citations and internal quotation marks omitted).

In any event, Mr. Thompson has always maintained that the Black Box Tracking Requirement is an illegal administrative search under the Fourth Amendment. It is no huge leap to conclude that a Fourth Amendment claim about administrative searches preserves *sub*-arguments therein, even if (under the pressure of oral argument), he accepted the Commissioner's (mistaken) construction of the issue.

**B.      The lobster injury is not "closely regulated" under *Patel*.**

In no uncertain terms, the Supreme Court has emphasized that the closely regulated industry . . . is the exception," one that must remain "narrow," lest it "swallow the rule." *Patel*, 576 U.S. at 424 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)). In more than fifty years, the Supreme Court has recognized "only four industries that 'have such a history of government oversight that *no reasonable expectation of privacy* . . . could exist for a proprietor over the stock of such an enterprise.'" *Id*. (quoting *Barlow's, Inc.*, 436 U.S. at 313 (emphasis added)). And per the Court in *Patel*, the thread connecting the four industries that it has recognized as closely regulated is that there is something "inherent in the[ir] operation" that "poses a clear and significant risk to the public welfare." *Id*.

This Court has recognized that *Patel* ratcheted tighter the universe of industries that can be considered "closely regulated" for purposes of the Fourth Amendment. First, it noted that "the law governing administrative searches

continues to develop." *Rivera-Corraliza*, 794 F.3d at 223. Then, it advised "the bench and bar must be on the lookout for situations where *Patel* does hold sway." *Id*. And, finally, it quoted *Patel* for the proposition that "practically all commercial premises or services . . . can be put to use for nefarious ends," while those that the Court has found to be closely regulated are all "intrinsically dangerous." *Id*. at 219 n. 16.

The post-*Patel* test over which the Circuits appear to be coalescing has been neatly set out by the Fifth Circuit. According to that court, the inquiry looks to "[t]he history of warrantless searches in the industry, how extensive the regulatory scheme is, whether other states have similar schemes, and whether the industry would pose a threat to the public welfare if left unregulated." *Mexican Gulf Fishing Co.*, 60 F.4th at 969 (quoting *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019)); *see also Johnson v. Smith*, 104 F.4th 153, 166 (10th Cir. 2024). And here, (1) neither the Commissioner nor his Amici have demonstrated a long history of warrantless searches of the lobster industry in particular (rather than the maritime industry in general); (2) the regulatory scheme pales in comparison to that of, e.g., the coal-mining industry; (3) virtually no states other than those comprising the ASMFC have imposed a comparable requirement (and the one comparable federal requirement was stricken by the Fifth Circuit in *Mexican Gulf Fishing Co*.); and (4) the Commissioner has failed to establish that the industry would pose a threat to the

public welfare if left unregulated. For those reasons, the lobster industry is not closely regulated for purposes of the Fourth Amendment's administrative-search exception.

### C. Because the Black Box Tracking Requirement affords no opportunity for precompliance review, it is unconstitutional.

Under *Patel*, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." 576 U.S. at 419. The Black Box Tracking Requirement provides no such review. Thus, if the Court concludes that the lobster industry is not closely regulated, the Black Box Tracking Requirement must be stricken for defying the Fourth Amendment.

## CONCLUSION

For these reasons, the Court should reverse.

Dated: May 29, 2025

Respectfully submitted,

*/s/ Edward M. Wenger*
Edward M. Wenger
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
*emwenger@holtzmanvogel.com*

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 32(a)(7), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,474 words.

2.     This document complies with the typeface and type-style requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 29th day of May 2025, a true copy of the Initial Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER